David S. Stone
Robert A. Magnanini
STONE & MAGNANINI LLP
150 JFK Parkway, 4th Floor
Short Hills, New Jersey 07078
(973) 218-1111
*Attorneys for Plaintiffs*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ANIMAL SCIENCE PRODUCTS, INC.,**<br>2864 FM 1275<br>Nacogdoches, TX 75961<br><br>**RESCO PRODUCTS, INC.,**<br>2 Penn Center West<br>Pittsburgh, PA 15276<br><br>     Plaintiffs,<br><br>    – v. –<br><br>**CHINA MINMETALS CORPORATION,**<br>5 Sanlihe Road, Haidian,<br>Beijing, China 100101<br><br>**CHINA NATIONAL MINERALS CO,<br>LTD.,**<br>Bldg 15 Block 4 Anhui Li, Chaoyang,<br>Beijing, China 100101<br><br>**XIYANG GROUP,**<br>Xiyang Mansion, Yingluo Town, Liaoning,<br>Haicheng, China 114200<br><br>**XIYANG (PACIFIC) IMPORT & EXPORT<br>LTD. COMPANY,**<br>Bin Guan, Xiyang Steel & Iron Headquarters<br>Haicheng, Liaoning, China 114200 | Case No. 05-4376 (GEB)<br><br>FIRST AMENDED CLASS ACTION<br>COMPLAINT<br><br>JURY TRIAL DEMAND |

**XIYANG REFRACTORY MATERIALS
LTD. COMPANY,**
10F Sinochem Tower, Office A-2,
Fuxingmenwai Street, Beijing 114213

**XIYANG FIREPROOF MATERIAL CO.
LTD.,**
Yinglou Town, Liaoning,
Haicheng, China 114213

**SINOSTEEL CORPORATION,**
17B Xichang'an Street, West District
Beijing, China 100031

**SINOSTEEL TRADING COMPANY,**
17B Xichang'an Street, West District
Beijing, China 100031

**LIAONING JIAYI METALS & MINERALS
CO., LTD.,**
1 Gangwan Plaza, Zhongshan
18/F NO.15 Renmin Road
Dalian, China 116001

**LIAONING FOREIGN TRADE GENERAL
CORPORATION,**
2 Hongyan Street, Xigang District
Dalian, China 116001

**LIAONING JINDING MAGNESITE
GROUP,**
Nanlou Economic Development District,
Liaoning, Dashiqiao, China 11503

**DALIAN GOLDEN SUN IMPORT &
EXPORT CORP.,**
11F Fortune Mansion, 18 Shiji Street, Liaoning,
Dalian, China 116001

**HAICHENG HOUYING CORP. LTD.,**
Wanke Dongyuan Building No. 2015
Liaoning, Anshan, China 114002

**HAICHENG HUAYU GROUP IMPORT &
EXPORT CO. LTD. (HUAZIYU),**
Hua Zi Yu Village, Bali Town, Liaoning
Haicheng, China

**HAICHENG PAILOU MAGNESITE ORE
CO. LTD.,**
Pailou Town, Haicheng,
Anshan, China 114207

**YINGKOU HUACHEN (GROUP) CO. LTD.,**
Fenshui, Dashiqiao,
Liaoning, China 115100

Defendants.

Plaintiffs, by and through their undersigned attorneys, bring this action on their own behalf and on behalf of all others similarly situated for treble damages and injunctive relief under the antitrust laws of the United States against the above-named Defendants, demanding a trial by jury. Plaintiffs file this First Amended Complaint pursuant to this Court's Order of December 30, 2008.

## I.   NATURE OF THE ACTION

1.      This case arises out of a conspiracy among all Defendants and their co-conspirators that has the purpose and effect of fixing prices of magnesite and magnesite products exported to and purchased in the United States. Defendants have also committed other unlawful practices designed to inflate the prices of magnesite and magnesite products sold to Plaintiffs and other purchasers in the United States and elsewhere.  This action seeks no damages or relief with respect to non-import foreign commerce or products sold outside of U.S. commerce.

2.      Defendants have directly sold and delivered magnesite and magnesite products to customers in the United States at prices inflated, fixed, and maintained by the conspirators pursuant to horizontal agreements to restrain trade.  The allegations of this Complaint of a conspiracy are not inferred from evidence of parallel pricing; instead, Defendants have expressly agreed and conspired to fix prices and limit competition.  Defendants also engaged in communications and meetings.  This is confirmed by documentary evidence from a nongovernmental association of which Defendants are members. These acts constitute *per se* violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

3.      The conspiracy has existed from at least April 2000 to date, and increased its effectiveness through new agreements to fix prices and limit supply entered in 2003.  Defendants' illegal cartel has deliberately targeted and severely burdened consumers in the United States. The cartel has affected hundreds of millions of dollars of commerce in products that are used in American manufacturing facilities and households.

4.     China's economy has gone through a transition where decisions on pricing by companies such as Defendants are the result of their own decision-making and not the result of a government mandate.  China has repeatedly represented to the World Trade Organization that this transition has occurred.  With respect to the decisions about pricing of magnesite in particular, Defendants' association, the China Chamber of Commerce of Metals, Minerals & Chemicals Importers & Exporters ("CCCMC"), has represented to the U.S. Department of Commerce that

> It is well known China has established a market economy system over the past 20 years. The government, at both national and local levels, has faded out from direct involvement in the management of enterprises and become a macro regulator. It has no right to fix the prices for these enterprises, whether they are state-owned or privately owned, nor does it have the ability to influence prices by interfering in the purchase of raw materials, the channels of distribution, or company business practices. Additionally, a basic legal system for the market economy has been established in China. This system protects the independence and autonomy of enterprises, and ensures that the nature and quantity of the goods to be produced are decided by the producer at his own will, according to the demand in the market. Even state-owned enterprises are operated under the rules of market economics. Therefore, domestic prices of Chinese products as a whole are not interfered with, and they are reliable. All Chinese enterprises operate in a competitive and fully open market that relies on supply and demand to for price determination.[1]

5.     The U.S. Supreme Court has observed that cartels such as are at issue in this case are the "supreme evil of antitrust." *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004).  For decades, the Antitrust Division of the U.S. Department of Justice and civil Plaintiffs have asserted subject matter jurisdiction in criminal and civil actions relating to the sales of products in U.S. commerce by members of international cartels such as at issue here.  As a result, the United States has a long track record of pursuing civil and criminal prosecution of cartels that affect U.S. commerce.  So long as the products and services were sold in the U.S., including products and services imported from foreign nationals, U.S. antitrust enforcement

---

[1]  Comments of the China Chamber of Metals, Minerals, Chemical, Importers & Exporters on Market Oriented Enterprise *available at* ia.ita.doc.gov/download/nme-moe/comments-20071210/cccmc-nme-moe-cmt-20071210.pdf (hereinafter "CCCMC Comments") (attached hereto as Exhibit 1).

against cartels reaches defendants all over the world.  For example, recent antitrust prosecutions of foreign companies include:

- Vitamin and citric acid producers from France, Switzerland, Germany, Japan, Canada and the Netherlands;
- Dynamic random access memory (DRAM) manufacturers from Taiwan, Korea, Germany and Japan;
- Sorbate manufacturers from Japan and Germany;
- Marine transportation companies from Norway, Belgium and the Netherlands;
- Lysine producers from Korea and Japan; and
- Sodium gluconate producers from France, Japan and the Netherlands.[2]

This action is thus brought as a traditional action to enforce the antitrust laws of the United States against companies selling products in U.S. commerce,, actions from which companies based in China (or any other nation) are not exempt.

## II.   JURISDICTION AND VENUE

6.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 4 and 16, to obtain injunctive relief and to recover treble damages and the costs of suit, including reasonable attorneys' fees, for the injuries sustained by Plaintiffs by reason of Defendants' violations of the Sherman Act.

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1337 and 15 U.S.C. §§ 1, 15, 22, and 26.  This Court has jurisdiction over this action against Defendants China Minmetals Corporation and any other directly-owned state enterprises pursuant to 28 U.S.C. § 1605.

8.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), (c) and (d) and 15 U.S.C. §§ 15, 22, and 26.

---

[2] U.S. Dep't of Justice, Antitrust Division, "Selected Criminal Cases April 1, 1996 through September 30, 1999," *available at* http://www.usdoj.gov/atr/public/4523d.htm; "Sherman Act Violations Yielding a Corporate Fine of $10 Million or More," *available at* http://www.usdoj.gov/atr/public/criminal/212091.htm.

9.     Jurisdiction over all Defendants comports with the United States Constitution 15
U.S.C. §§ 15, 22, and 26, and the New Jersey long-arm statute.  Jurisdiction over any state-owned
Defendant is based on 28 U.S.C. § 1608.

**III.    PARTIES**

10.     Plaintiff Animal Science Products, Inc. ("Animal Science") is a Texas corporation
with its principal place of business in Nacogdoches, Texas.

11.     Plaintiff Resco Products, Inc. ("Resco") is a Pennsylvania corporation with its
principal place of business in Pittsburgh, Pennsylvania.  Resco purchased magnesite directly from
co-conspirators Rongyuan Magnesite Corporation and Yingkou Sanhua Refractory Material Co.,
Ltd.  Possehl, Inc. has assigned to Resco its rights, title, and interest in and to all causes of action it
may have relating to magnesite or magnesite products brokered by Possehl, Inc. and subsequently
delivered to Resco during the relevant period.  Possehl, Inc. purchased magnesite and magnesite
products directly from defendants during the class period and shipped those products to Resco.

12.     Defendant China Minmetals Corporation ("China Minmetals"), formerly known as
China National Metals & Minerals Import & Export Corporation, is a Chinese state-owned trading
company based in Beijing.  China Minmetals is a conglomerate that includes the trading of metals
and minerals.  It conducts business with and through its wholly owned subsidiary and North
American Headquarters, China Minmetals U.S.A., Inc., which maintains its principal place of
business in Leonia, Bergen County, New Jersey.   China Minmetals directly sold magnesite products
to U.S. companies and shipped magnesite products to the United States during the period described
in this Complaint.

13.     Defendant China National Minerals Co., Ltd. ("China National Minerals") is a
Chinese trading company based in Beijing.  China National Minerals is a subsidiary and affiliate of

4

China Minmetals.  China National Minerals directly sold magnesite products to U.S. companies and shipped magnesite products to the United States during the period described in this Complaint.

14.     Defendant Xiyang Group, also known as Haicheng Xiyang Group, is a Chinese corporation based in China and Hong Kong.  Xiyang Group is not state-owned.  Xiyang Group is a conglomerate that engages in metals and minerals trading among other things, including exports of magnesite to the United States.

15.     Defendant Xiyang (Pacific) Import & Export Ltd. Company ("Xiyang Pacific") is a Chinese trading company based in the Liaoning province of China with offices in Hong Kong. Xiyang Pacific is a subsidiary and affiliate of Xiyang Group.  Xiyang Pacific has directly sold magnesite products to U.S. companies and shipped magnesite products to the United States during the period described in this Complaint.

16.     Defendant Xiyang Refractory Materials Ltd. Company ("Xiyang Refractory") is a Chinese company based in the Liaoning province of China.  Xiyang Refractory is a subsidiary and affiliate of Xiyang Group.  Xiyang Refractory is a producer and exporter of magnesite.

17.     Defendant Xiyang Fireproof Material Co. Ltd. ("Xiyang Fireproof") is a Chinese corporation based in the Liaoning province of China.  Xiyang Fireproof is a subsidiary and affiliate of Xiyang Group.  Xiyang Fireproof is a producer and exporter of magnesite.

18.     Defendant Sinosteel Corporation ("Sinosteel"), formerly China Iron & Steel Industry & Trade Group Corporation, is a Chinese corporation based in China.  Sinosteel is a direct or indirectly state-owned multinational conglomerate that includes metals and minerals production and trading.

19.     Defendant Sinosteel Trading Company ("Sinosteel Trading"), formerly known as China Metallurgical Import & Export Corporation, is a wholly-owned subsidiary of Sinosteel and is

based in Beijing China.  Sinosteel Trading has directly sold magnesite products to U.S. companies and shipped magnesite products to the United States during the period described in this Complaint.

20.     Defendant Liaoning Jiayi Metals & Minerals Co. Ltd. ("Liaoning Jiayi"), formerly known as Liaoning Metals & Minerals Import & Export Corporation and also known as Liaoning Jiayi Industrial Development Co., is a Chinese corporation based in the Dalian province of China. Liaoning Jiayi is not state-owned.  Liaoning Jiayi has directly sold magnesite products to U.S. companies and shipped magnesite products to the United States during the period described in this Complaint.

21.     Defendant Liaoning Foreign Trade General Corporation ("Liaoning Foreign Trade") is a privately owned Chinese corporation based in the Liaoning province of China.  Liaoning Foreign Trade is not state-owned.  Liaoning Foreign Trade is a producer and exporter of magnesite and other export products.

22.     Defendant Liaoning Jinding Magnesite Group ("Liaoning Jinding Magnesite") is a Chinese corporation based in the Liaoning province of China.  Liaoning Jinding Magnesite operates two magnesite mines and is a producer and exporter of magnesite.  Liaoning Jinding Magnesite is not state-owned.  Liaoning Jinding Magnesite has directly sold magnesite products to U.S. companies and shipped magnesite products to the United States during the period described in this Complaint.

23.     Defendant Dalian Golden Sun Import and Export Corp. ("Dalian Golden Sun") is a Chinese joint-stock limited corporation based in the Dalian province of China.  Dalian Golden Sun has directly sold magnesite products to U.S. companies and shipped magnesite products to the United States during the period described in this Complaint.

24.     Defendant Haicheng Houying Corp. Ltd. ("Haicheng Houying") is a Chinese corporation based in the Liaoning province of China.  Hiacheng Houying is not state-owned.

6

Haicheng Houying also maintains an office in the state of New Jersey, which acts as its foreign trade office in the United States. Haicheng Houying is a producer and exporter of magnesite. Haicheng Houying has directly sold magnesite products to U.S. companies and shipped magnesite products to the United States during the period described in this Complaint.

25. Defendant Haicheng Huayu Group Import & Export Co. Ltd. (Huaziyu) ("Haicheng Huayu") is a Chinese corporation based in the Liaoning province of China. Haicheng Huayu is a producer and exporter of magnesite. Hiacheng Huayu is not state-owned. Haicheng Huayu has directly sold magnesite products to U.S. companies and shipped magnesite products to the United States during the period described in this Complaint.

26. Defendant Haicheng Pailou Magnesite Ore Co. Ltd. ("Haicheng Pailou") is a Chinese corporation based in the Liaoning province of China. Haicheng Pailou is a producer and exporter of magnesite.

27. Defendant Yingkou Huachen (Group) Co., Ltd. ("Yingkou Huachen") is a Chinese corporation based in the Liaoning province of China. Yingkou Huachen is not state-owned. Yingkou Huachen is a producer and exporter of magnesite products. Yingkou Huachen has directly sold magnesite products to U.S. companies and shipped magnesite products to the United States during the period described in this Complaint. Defendant Yingkou Huachen is currently operating under the name Jiachen Group Co., Ltd. ("Jiachen Group").

28. Defendants' co-conspirators include Rongyuan Magnesite Corporation of China, subsequently renamed Shangawa Rongyuan Refractories Co., Ltd, Yingkou Sanhua Refractory Material Co., Ltd., subsequently renamed Yingkou Wonjin Refractory Material Co., Ltd., Shenyang Metals and Minerals, and CITIC Trading.

29. Each of these Defendants and its co-conspirators has colluded with each other to restrain competition by, among other things, setting artificial prices pursuant to illegal horizontal

7

agreements among these competitors.  These horizontal practices were designed to, and in fact did, have a substantial and adverse impact in the United States.

30.    The acts charged in this Complaint as having been performed by Defendants and their co-conspirators, including trading companies in China, were authorized, ordered, or done by their respective officers, agents, employees, or representatives, while actively engaged in the management of each Defendants' business or affairs. The acts charged in the Complaint continue to the present day.

## IV.    CLASS ACTION ALLEGATIONS

31.    Plaintiff Animal Science brings this action on its own behalf, and under Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, as representative of a class defined as:  all persons or entities who have purchased magnesite or magnesite products manufactured by any Defendant for delivery in the United States requiring injunctive relief against Defendants to end Defendants' antitrust violations (the "injunctive relief" class).

32.    Plaintiff Resco Products brings this action on its own behalf, and under Rule 23(b)(3) of the Federal Rules of Civil Procedure, as representative of a class defined as:  all persons or entities who have directly purchased magnesite or magnesite products for delivery in the United States from any of Defendants or their co-conspirators from September 2001 to the date that the cartel is ended by an injunction or otherwise (the "damages" class).

33.    Excluded from both classes are all governmental entities, Defendants, their co-conspirators, Chinese trading companies, and their respective subsidiaries and affiliates.

34.    Members of the classes are numerous and joinder is impracticable.

35.    Plaintiffs' claims are typical of the members of the classes.  Plaintiffs and all members of the plaintiff classes were damaged by the same wrongful conduct by Defendants.

36.     Plaintiffs will fairly and adequately protect and represent the interests of the plaintiff classes.  The interests of Plaintiffs are coincident with, and not antagonistic to, those of the classes.

37.     Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action and antitrust litigation.

38.     Questions of law and fact common to the members of the classes predominate over questions, if any, that may affect only individual members because Defendants have acted on grounds generally applicable to the classes.  Such generally applicable conduct is inherent in Defendants' collusion.

39.     Questions of law and fact common to the classes include:

  (a)     whether Defendants combined, agreed, and conspired among themselves to restrain competition for – and specifically to fix, maintain, or stabilize export prices of – magnesite and magnesite products in the United States;

  (b)     the existence and duration of the horizontal agreements to restrain competition alleged in this Complaint;

  (c)     whether each Defendant was a member of, or participant in, any combination and/or conspiracy alleged in this Complaint;

  (d)     whether and to what extent Defendants' conduct caused injury to business or property of Plaintiffs and the damages class, and, if so, the appropriate measure of damages;

  (e)     whether the agents, officers or employees of Defendants and their co-conspirators participated in telephone calls and meetings in furtherance of the conspiracy alleged herein; and

  (f)     whether Plaintiffs and members of the plaintiff classes are entitled to declaratory and/or injunctive relief.

9

40.     Class action treatment is the superior (if not the only) method for the fair and efficient adjudication of this controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that it might not be practicable to pursue individually, substantially outweigh the difficulties, if any, that may arise in management of this class action.

## V.     TRADE AND COMMERCE

41.     Magnesium is the eighth most abundant element on earth and constitutes about two percent of the earth's crust.  Magnesite is the naturally occurring carbonate form of magnesium and represents the largest use of magnesium in the world.

42.     Magnesite is mined from magnesium deposits and delivered from the mine to a crushing plant where it is crushed in three stages.  Depending on the grade of the crushed material, the crushed magnesite is used in different production facilities to produce different forms of magnesite.

43.     There are three principal forms of magnesite sold in U.S. commerce.  Dead-burned magnesite ("DBM") is produced by high temperature conversion of magnesite.  DBM is used for the lining of metallurgical or refractory furnaces used for the melting of steel, nonferrous metal and glass and the making of cement.  Approximately 70 percent of the world's production of magnesite is attributable to DBM.

44.     Caustic-calcined magnesite ("CCM") is produced by low temperature conversion.  CCM is used in many market segments, including environmental applications.  For example, CCM is used to remove silica and heavy metals from industrial wastewater, to remove sulphur dioxide

from industrial gases.  Approximately 36 percent of U.S. magnesite consumption from 2000 to 2006 was in the form of CCM.[3]

45.     A third type of magnesite – electro-fused magnesite ("EFM") or fused magnesite – is produced by fusing CCM at high temperatures in an electric arc furnace.  EFM is divided into two segments: refractory and electrical.  Refractory EFM is used in similar fashion to DBM and is sometimes used in combination with DBM.  Electrical EFM is used in insulating material in heating elements for electrical goods.  China accounts for 80 percent of worldwide EFM production.  Approximately 8 percent of the world's production of magnesite is in the form of EFM.

46.     China is a leading producer of magnesite.  According to statistics published by the United States Geological Survey ("USGS"), China's share of annual world production has increased from 32 percent in 2001 to 45 percent in 2007.[4]

47.     During the period described in this Complaint, the international market for magnesite and magnesite products was dominated by Defendants and their co-conspirators, including producers of magnesite and magnesite products and trading companies in China exporting magnesite and magnesite products.  China is the most significant foreign supplier of magnesite to the United States with an 83 percent share of fused and dead-burned magnesite imports and an 87 percent share of caustic calcined magnesia imports in 2007.[5]

---

[3] Schlag, Glauser & Fujita, "Magnesium Oxide and Other Magnesium Chemicals," CHEMICAL ECONOMICS HANDBOOK, p. 22, SRI Consulting, 2007 (hereinafter "CEH") (excerpts attached hereto as Exhibit 2).

[4] USGS, Magnesium Compounds, 2002 MINERALS YEARBOOK,  p. 48.10 *available at* http://minerals.usgs.gov/minerals/pubs/commodity/magnesium/magnmyb02.pdf (attached hereto as Exhibit 3; USGS, Magnesium Compounds, 2007 MINERALS YEARBOOK (hereinafter "2007 Yearbook") p. 46.8 *available at*
http://minerals.usgs.gov/minerals/pubs/commodity/magnesium/magnmyb07.pdf (attached hereto as Exhibit 4).

[5] 2007 Yearbook Table 6.

48.     During the period relevant to this Complaint, the conduct of Defendants and their co-conspirators has taken place in and affected the interstate commerce of the United States. Hundreds of thousands of metric tons of magnesite are imported into the United States each year from China. Data from the U.S. International Trade Commission confirms that imports from China into the U.S. of magnesite exceeded 500,000 metric tons in each year from 2000 to 2006:

**United States Magnesite (Magnesia) Imports**
Source: U.S. International Trade Commission
(Units in Metric Tons)

| Year | Fused and Dead-Burned Magnesia | | Caustic Calcined Magnesia | | Natural and Other Magnesite | | Total | |
|------|---------|--------------|---------|---------------|---------|---------------|---------|---------------|
| | China | All Countries | China | All Countries | China | All Countries | China | All Countries |
| 2000 | 345,016 | 500,673 | 88,488 | 136,241 | 6,282 | 33,476 | 439,786 | 670,390 |
| 2001 | 244,957 | 363,060 | 77,380 | 129,859 | 5,098 | 28,631 | 327,435 | 521,550 |
| 2002 | 286,348 | 394,222 | 88,737 | 147,610 | 8,915 | 29,180 | 384,000 | 571,012 |
| 2003 | 310,051 | 379,370 | 92,670 | 150,026 | 17,257 | 35,382 | 419,978 | 564,778 |
| 2004 | 340,933 | 418,013 | 96,432 | 157,398 | 9,259 | 31,568 | 446,625 | 606,979 |
| 2005 | 389,828 | 477,638 | 96,342 | 152,193 | 7,998 | 33,282 | 494,168 | 663,113 |
| 2006 | 359,777 | 433,131 | 127,340 | 162,785 | 9,813 | 34,193 | 496,930 | 630,109 |
| Total | 2,276,909 | 2,966,107 | 667,389 | 1,036,112 | 64,622 | 225,712 | 3,008,921 | 4,227,931 |

49.     The value of U.S. imports of magnesite and magnesite products from China exceeded $50 million in 2000 and exceeded $160 million in 2008.[6]

50.     The United States consumes about 25 percent of China's magnesite exports.[7] The steel industry in the United States is the primary consumer of magnesite products, with 390 thousand metric tons consumed by steel refractories in the United States during 2006. Cement refractories are the second leading consumer of magnesia in the United States.[8]

---

[6] *See* United States International Trade Commission Interactive Tariff and Trade Dataweb *available at* http://dataweb.usitc.gov/ (hereinafter "USITC Dataweb"); USGS, Magnesium Compounds, 2000 MINERALS YEARBOOK, Table 7 *available at* http://minerals.usgs.gov/minerals/pubs/commodity/magnesium/magnmyb00.pdf (hereinafter "2000 Yearbook") (attached hereto as Exhibit 5).
[7] CEH, p. 92.
[8] CEH, pp. 27-28.

51.     The conduct of Defendants and their co-conspirators has directly, substantially and foreseeably restrained trade and commerce in the United States.  Members of the conspiracy, including Defendants Sinosteel Trading, Liaoning Jiayi, Haicheng Houying, Haicheng Huayu, Yongkou Huachen, China Minerals, and Minmetals directly have sold and continue to sell magnesite and magnesite products to U.S. companies and in U.S. commerce at prices artificially increased by the Cartels.

## VI.   FACTUAL ALLEGATIONS

### A.     Violations of Antitrust Laws

52.     On April 9, 2000, following the 1999 decline of magnesite prices, 13 producers and exporters of magnesite in China, including mining companies and trading companies, established the Jiayuan Magnesite Export Group ("Jiyuan Magnesite Group") for the export of magnesite.  The members of the Jiyuan Magnesite Group agreed to fixed, uniform export prices in order to avoid competitive price cutting.   Defendants Xiyang Refractory Material, Yingkou Huachen, Dalian Golden Sun and Liaoning Foreign Trade were among the original 13 members of the Jiyuan Magnesite Group.  Each of them signed an agreement with each of the others to ship their products at the price fixed by the Jiyuan Magnesite Group.[9]

53.     During that same period, a second group was formed, calling itself the "Huaxia Magnesia Products Export Group" ("Huaxia Magnesite Group").  Members of the Huaxia Magnesite

---

[9] USGS 2000 Minerals Yearbook p. 49.3; "China Jiayuan Magnesite Export Group," ENGINEERING AND MINING JOURNAL, Aug. 1, 2000 (attached hereto as Exhibit 6); "Magnesite Export Group Set Up in China's Dalian," ASIA PULSE, Apr. 11, 2000 (attached hereto as Exhibit 7); "Magnesium carbonate producers form export syndicates," Royal Society of Chemistry, CHEMICAL BUSINESS NEWSBASE, Aug. 18, 2000 (attached hereto as Exhibit 8).

Group included Defendants Liaoning Jiayi and Haicheng Huayu, and co-conspirators Shenyang

Metals & Minerals and CITIC Trading.[10]

54.    The members of the two Jiyuan and Huaxia Magnesite Groups collectively

represented more than 70 percent of the export volume of magnesite in China.

55.    As a result of these agreements, despite slumping demand, the price of magnesite

products imported from China to the United States increased during 2000. According to statistics

available from the United States International Trade Commission, the customs value of DBM

imported from China into the United States rose from $104 per metric ton in the fourth quarter of

1999 to $158 per metric ton by the fourth quarter of 2000.[11]

56.    According to the website of CCCMC, the President of the Jiayuan Magnesite Cartel,

Shun Shuyuan, also the Chief Executive of Defendant Yingkou Huachen, reported that by mid-2001

the cartel's efforts had been successful and "would give [Chinese companies] 50 million USD of

export sales."[12]

57.    On February 19, 2001, the Jiyuan and Huaxia Magnesite formally established a

single, unified group under the name "Chinese Magnesite Export Association" (the "Cartel"). The

unification effort was spearheaded by Defendant Liaoning Jiayi. The Cartel comprised 23 exporting

companies, including Defendants Haicheng Pailou, Yingkou Huachen, Xiyang Group, Haicheng

Houying and Haicheng Huayu. The Cartel aimed to provide strict management control of all sales,

production schedules of individual producers and export prices for Chinese magnesite, including

exports to the United States. It set new standard prices that varied based on the purity of the product:

---

[10] "Second Chinese magnesium carbonate export group formed," Royal Society of Chemistry, CHEMICAL BUSINESS NEWSBASE, Aug. 22, 2000 (attached hereto as Exhibit 9).

[11] *See* USITC Dataweb.

[12] CCCMC Website, June 2001, *"The Nation's Magnesite Self-Regulation Initiatives is [sic] Showing Results"* (attached hereto as Exhibit 10).

$140 per ton for magnesite with 95% magnesium oxide, $114 per ton for 90% magnesium oxide, and $160 per ton for 97% magnesium oxide.[13]

58.    In 2003, the Cartel announced "floor prices" of magnesite exports, including exports to the United States, that were $10 to $15 per ton higher than the prevailing prices at the end of 2002.[14]

59.    Due to internal concerns about the effectiveness of its members' individual and collective efforts, the Cartel conducted several further meetings of Defendants and other exporters. On March 22, 2003, at least 19 exporting companies, including Defendants Liaoning Jiayi, Haicheng Houyin, Yingkou Huacheng, Dailan Golden Sun, China Minmetals, China Minerals, Sinosteel Trading, Xiyang Pacific, and Haicheng Huayu met in Shenyang, China to discuss and forecast the price trend for the year 2003. The members of the Cartel agreed to strengthen self-regulation and cooperation to reduce competition in exports of magnesite. The members also agreed to have the Cartel establish itself under the name the "China Magnesite Forum" and established goals of restraining competition and establishing limits on export supply in order to maintain and increase prices.

60.    Operating under the name China Magnesite Forum, the members of the Cartel further agreed that cartel-related disputes would be arbitrated among themselves by their association, the CCCMC. CCCMC is not a governmental organization.[15]

---

[13] "And Then There Was One: China's latest Magnesite Export Group," INDUSTRIAL MINERALS, Aug. 2, 2001 (attached hereto as Exhibit 11); "Chinese Export Association Holds DBM Prices Steady," METAL – PAGES, Aug. 15, 2001 (attached hereto as Exhibit 12); "Magnesite," MINING ANNUAL REVIEW, Oct. 2001 (attached hereto as Exhibit 13).

[14] "New Chinese Export Group Formed Prices Rise," INDUSTRIAL MINERALS, Apr. 1, 2003 (attached hereto as Exhibit 14).

[15] CCCMC Comments; United States International Trade Commission, Investigation No. 731-TA-1022, September 23, 2003 Hearing Transcript (excerpt attached hereto as Exhibit 15).

61. CCCMC reported on agreements that Defendants had reached at the March 22

meeting:

> On March 22[nd], 19 major enterprises from the Magnesite export industry held a meeting in Shenyang to thoroughly review and analyze the Magnesite export industry . . . . The group agreed that the most important topics of discussion for now and the near future were: to strengthen self-regulation and cooperation in the industry, act against improper competition and uphold normal and orderly export procedures within the established framework of quota tender policy.

> After much discussion and exchange of ideas, the group agreed to the immediate setting up of the Magnesite Export Industry Self-Regulating Group in the form of the "China Magnesite Forum." The Forum will accept arbitration and guidance from the China Chamber of Commerce of Metal, Minerals & Chemicals Importers & Exporters.[16]

62. On February 1, 2004, members of the Cartel, including Defendants Sinosteel Trading, Xiyang Group, Haicheng Houying, Haicheng Huayu and Jiachen Group met under yet another name, calling themselves the "China Magnesite Self-Disciplined Association." The goal of this group was to maintain DBM prices in a range between $152 per metric ton for 90.0% magnesium oxide and $210 per metric ton for 97.3% magnesium oxide.[17]

63. Over the weekend of December 9-10, 2006, members of the Cartel, including Defendants Xiyang Group, Haicheng Huaya, Haicheng Houying and Jiachen Group met and agreed to increase prices by $10 per ton for exports of DBM, including exports to the United States. This agreement followed an earlier agreement by members of the Cartel, reached in November 2006, to increase the price of exported DBM, including exports to the United States, by $30 per ton.[18]

---

[16] CCCMC Webpage, "Magnesite Export Industry Self-Regulatory Group – The China Magnesite Forum." (attached hereto as Exhibit 16).

[17] USGS, Magnesium Compounds, 2004 MINERALS YEARBOOK p. 47.2 *available at* http://minerals.usgs.gov/minerals/pubs/commodity/magnesium/magnmyb04.pdf (attached hereto as Exhibit 17); Trends & Developments in Refractory Raw Materials Supply, Industrial Minerals Presentation at Tehran International Conference on Refractories – 3-6 May 2004 *available at* http://www.mineralnet.co.uk/pdfs/697/51_ticr.pdf (attached hereto as Exhibit 18).

[18] USGS, Magnesium Compounds, 2006 MINERALS YEARBOOK p. 46.2, *available at* http://minerals.usgs.gov/minerals/pubs/commodity/magnesium/magnmyb06.pdf (attached hereto as Exhibit 19).

64.    In February 2007, members of the Cartel met to discuss a possible agreement to increase the export price of dead-burned magnesite, including exports to the United States.[19]

65.    Due to the efforts to increase prices at the end of 2003, the Cartel achieved significant price increases in the U.S., stabilized U.S. prices, and avoided major price cutting despite low levels of demand.  An overcharge analysis from a regression model by Plaintiffs' expert economist Dr. Russell Lamb of Econ One shows that, between 2000 and 2003, the Cartel overcharged U.S. buyers of magnesite by an average of 4 percent, while between 2004 and 2008, as a direct result of the Cartel's activities, U.S. magnesite purchasers were overcharged more than 21 percent.[20]

66.    During the period of the charged combination and conspiracy, Defendants and their co-conspirators have participated in meetings and conversations, in addition to the meetings described above, in which the export prices, production, and markets for magnesite and magnesite products were discussed and agreed upon.

67.    At their meetings, Defendants and others agreed to and did eliminate, suppress, and limit competition, by, among other things:

    (a)    discussing the production schedules and export prices of magnesite and magnesite products including for the U.S.;

    (b)    agreeing to control the supply of magnesite and magnesite products for export to the U.S. and elsewhere;

    (c)    agreeing to increase and maintain export prices of magnesite and magnesite products to the U.S. and elsewhere,

---

[19] Mike O'Driscoll, The Turning of the Dragon *available at* http://www.mineralnet.co.uk/pdfs/697/109_sme2007.pdf  at p. 14 (attached hereto as Exhibit 20).

[20] Expert Report of Dr. Russell Lamb, dated September 27, 2007, filed in Support of Plaintiffs' Motion for a Default Judgment.

68.     Defendants' decision to enter into the *per se* unlawful agreements with each other as competitors, as described above, was and is wholly voluntary, not the result of government action. Neither the CCCMC nor the government of China interferes with the pricing decisions of the associations' members, including those members that are state-owned enterprises; the CCCMC has unequivocally made such representations to the United States Department of Commerce and to the United States International Trade Commission.[21]

69.     Defendants have been able to increase prices successfully without maintaining 100 percent control of the market.  The Defendant producers have the competitive advantage of lower costs than their competitors.[22]  Defendants also have enjoyed a competitive advantage relative to manufacturers in other nations because China has employed a fixed currency exchange rate which undervalues the Yuan, making Chinese exports of magnesite and magnesite products to the United States relatively less expensive compared to exports of magnesite and magnesite products from other nations.

70.     Further, as the Cartel has taken steps to restrain production and increase prices, competitors have shown that they would follow price increases rather than undercut the new Cartel price levels.

71.     The Cartel established by Defendants and their co-conspirators continues its illegal conduct today.

**B.      The Impermissible Effect on Relevant Markets**

72.     During the conspiracy, prices of magnesite and magnesite products exported to the United States from China have not followed the laws of supply and demand that exist in a

_____

[21] *See* notes 1, 16 *supra.*
[22] CEH, p.91.

18

competitive market.  Instead, prices have been set and maintained at artificially high levels by Defendants and their co-conspirators.

73.    The following chart illustrates the effect on U.S. prices of magnesite products of the illegal conduct described herein:



**Chinese Dead-Burned Magnesite Prices**
(94-95% MgO)

Source: Industrial Minerals

### C.    Benefit to Defendants

74.    As described herein, each Defendant has substantially benefited from its participation in this illegal price-fixing conspiracy.

## VII.    INJURY TO PLAINTIFFS

75.    Defendants' combination and conspiracy have had the following effects, among others:

19

(a)   The price of magnesite and magnesite products purchased by Plaintiffs (and the plaintiff classes) has been fixed, raised, maintained and stabilized at artificial and non-competitive levels;

(b)   Competition in the sale of magnesite and magnesite products has been restrained.

## VIII.   THE NEED FOR INJUNCTIVE RELIEF

76.   During the period covered by this Complaint, Plaintiffs have purchased magnesite and magnesite products from Defendants and their coconspirators and/or are purchasers of magnesite and magnesite products requiring injunctive relief. By reason of the alleged violations of the antitrust laws, Plaintiffs paid more for magnesite and magnesite products and substitute products than they would have paid in the absence of the illegal combination and conspiracy, and as a result they have been irreparably injured and have suffered damages in an amount presently undetermined.

77.   It is in the public interest to enjoin Defendants from continuing to operate a conspiracy and combining to fix the prices of magnesite and magnesite products, and the public interest will not be disserved by a permanent injunction.

78.   Plaintiffs and the classes will continue to be injured by Defendants' ongoing conduct in violation of the antitrust laws of the United States in the absence of injunctive relief.

## IX.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray:

A.   That the Court determine that this action may be maintained as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to all members of the plaintiff classes;

20

B.      That the unlawful combination and conspiracy alleged herein be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.      That Plaintiffs and each class member of the damages class recover three-fold their damages, as provided by law, determined to have been sustained by each of them (using such damage methodologies as may be appropriate at trial), and that joint and several judgments in favor of Plaintiffs and the plaintiff classes be entered against Defendants and each of them;

D.      That Defendants be enjoined from continuing the currently ongoing unlawful combination and conspiracy alleged herein and other appropriate injunctive relief;

E.      That Plaintiffs and the plaintiff classes recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

F.      That Plaintiffs and the plaintiff classes be granted such other, further and different relief as the nature of the case may require or as may be deemed just and proper by this Court.

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues triable of right by a jury.

Dated:  March 30, 2009

_____s/ Robert A. Magnanini_____
David S. Stone
Robert A. Magnanini
STONE & MAGNANINI LLP
150 JFK Parkway, 4th Floor
Short Hills, New Jersey 07078
(973) 218-1111

Richard E. Donovan

William A. Isaacson
Tanya S. Chutkan
Jennifer Milici
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, NW, Suite 800
Washington, DC  20015
Tel.:  202-237-2727

21

KELLEY DRYE & WARREN LLP
200 Kimball Drive
Parsippany, New Jersey 07054
Tel: 973-503-5900

Fax:  202-237-6131

Edmund W. Searby
McDONALD HOPKINS, LLC
600 Superior Avenue, East
Suite 2100
Cleveland, Ohio  44114
Tel:  (216) 348-5400