Donald A. Robinson
Leda Dunn Wettre
**Robinson, Wettre & Miller LLC**
One Newark Center, 19th Floor
Newark, New Jersey 07102
(973) 690-5400

Nicholas L. Coch
Jonathan S. Caplan
Timothy J. Helwick
Mark A. Baghdassarian
**Kramer Levin Naftalis & Frankel LLP**
1177 Avenue of the Americas
New York, New York  10036
(212) 715-9100

*Attorneys for Defendants*
*Sinosteel Corporation, Sinosteel Trading Company and*
*Liaoning Jiayi Metals & Minerals Co., Ltd*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANIMAL SCIENCE PRODUCTS, INC., et al., | Civil Action No. 05-4376 (GEB/ES) |
| Plaintiffs, | |
| v. | |
| CHINA NATIONAL METALS & MINERALS IMPORT & EXPORT CORPORATION, et al., | Return Date: September 8, 2009 |
| | (Document filed electronically) |
| Defendants. | |

**MEMORANDUM OF DEFENDANTS SINOSTEEL CORPORATION,
SINOSTEEL TRADING COMPANY AND LIAONING JIAYI METALS &
MINERALS CO., LTD. IN SUPPORT OF THEIR MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT FOR LACK OF SUBJECT MATTER
JURISDICTION AND/OR ON GROUNDS OF ABSTENTION**

Table of Contents

Page

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ...................................................................................................4

    A.    Procedural History .....................................................................4

    B.    The Revised Allegations in the Amended Complaint..............................4

        1.    The Alleged "Cartels" Are Admittedly  Short-Lived
            and Ineffective Magnesite Associations .....................................4

        2.    Plaintiffs' Conclusory Damage Allegations Lack
            "Factual Heft" ......................................................................6

        3.    Vague and Unsubstantiated  Allegations of
            Purchases and an Assignment...................................................7

        4.    Plaintiffs' Additional Allegations of Immaterial
            Industry-Related Data ............................................................8

ARGUMENT ......................................................................................................10

I.    The Amended Complaint Fails To Provide A Basis For Subject
    Matter Jurisdiction ......................................................................................10

    A.    The FTAIA Bars Application of U.S. Antitrust Laws to
        Wholly Foreign Conduct Having No Direct, Substantial or
        Foreseeable Effect on United States Commerce.....................................10

        1.    Plaintiffs' Conclusory Allegations of Import Trade
            and Import Commerce Are Insufficient to Avoid the
            FTAIA.................................................................................11

        2.    The Amended Complaint Concedes that
            Defendants'  Conduct Involves Trade and
            Commerce With Foreign Nations .............................................14

        3.    Plaintiffs Fail to Show a Link Between  Defendants'
            Activities and the United States................................................14

             a.    Plaintiffs' Conclusive Allegations and
                Minor Revisions to Its Prior Allegations Are
                Insufficient to Show Any Direct Effect ........................15

KL3 2725861.1

Table of Contents
(continued)

Page

b.   Plaintiffs' New Allegations Also  Fail To
Establish the Requisite Link ........................................................18

c.   Plaintiffs' Additional Industry-Related Data
Also Fail to Provide A Link to the United
States ........................................................................................22

4.   There Is No Alleged Effect That Gives Rise To A
Claim Under The Sherman Act........................................25

B.   The Complaint Fails To Satisfy The Jurisdictional
Requirements Of The Sherman Act........................................26

C.   The Complaint Fails To Satisfy The Jurisdictional
Requirements Of The Foreign Sovereign Immunities Act ...................28

II.   The Court Should Abstain From Asserting Subject Matter
Jurisdiction On The Basis Of Act Of State, Sovereign Compulsion
And International Comity ........................................................29

A.   The Act of State, Sovereign Compulsion and International
Comity Doctrines Apply ........................................................29

1.   Act of State and Sovereign Compulsion........................30

2.   International Comity ........................................................31

B.   Defendants' Alleged Conduct is Mandated  By Chinese
State Regulation of Export Commodities ............................32

C.   International Comity and the Restatement Factors Require
Abstention ........................................................................35

CONCLUSION........................................................................37

KL3 2725861.1

Table Of Authorities

## FEDERAL CASES

Page(s)

*In re Agent Orange Prod. Liab. Litig.*,
   373 F. Supp. 2d 7 (E.D.N.Y 2005) .................................................................36

*Animal Science Prods., Inc. v. China National Metals & Minerals Import &
   Export Corp.*,
   596 F. Supp. 2d 842 (D.N.J. 2008) ...... 2, 4, 5, 8-12, 14-17, 18, 21 n.12, 23, 24, 25

*Ashcroft v. Iqbal*,
   129 S.Ct. 1937 (2009) ...........................................................................20, 21

*Banco Nat'l de Cuba v. Sabbatino*,
   376 U.S. 398 (1964) ............................................................................30

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................15

*Boyd v. AWB Ltd.*,
   544 F. Supp. 2d 236 (S.D.N.Y. 2008) ...............................................10, 15, 18, 27

*Carpet Group Int'l v. Oriental Rug Importers Ass'n*,
   227 F.3d 62 (3rd Cir. 2000) .......................................................................10, 26

*Dee-K Enterprizes, Inc. v. Heveafil Sdn. Bhd*,
   299 F.3d 281 (4th Cir. 2002) .......................................................................26, 28

*Emerson Elec. Co. v. Le Carbone Lorraine, S.A.*,
   500 F. Supp. 2d 437 (D.N.J. 2007) ...................................................................14

*Envtl. Tectonics Corp. v. W.S. Kirkpatrick, Inc.*,
   847 F.2d 1052 (3d Cir. 1988) .......................................................................30

*Fed. Ins. Co. v. Richard I. Rubin & Co., Inc.*,
   12 F.3d 1270 (3d Cir. 1993)...........................................................................28

*Gross v. German Found. Indus. Initiative*,
   456 F.3d 363 (3d Cir. 2006)...........................................................................30

*Hartford Fire Insurance. Co. v. California*,
   509 U.S. 764 (1993)...............................................................................32, 35

*In re Hypodermic Prods. Antitrust Litig.*, No. 05-CV-1602, 2007 WL
   1959225 (D.N.J. June 29, 2007) ...................................................................25

KL3 2725861.1

Table Of Authorities
(continued)

Page(s)

*Illinois Brick Co. v. Illinois,*
  431 U.S. 720 (1977) ........................................................................25

*Int'l Ass'n of Machinists and Aerospace Workers v. OPEC,*
  649 F.2d 1354 ...............................................................................34

*In re Intel Corp. Microprocessor Antitrust Litig.,*
  452 F. Supp. 2d 555 (D.Del. 2006) ..............................................20, 27

*Interamerican Refining Corp. v. Texaco Maracaibo, Inc.,*
  307 F. Supp. 1291 (D.Del. 1970) ...................................................31, 34

*Kansas v. UtiliCorp United, Inc.,*
  497 U.S. 199 (1990) .........................................................................25

*Mannington Mills, Inc. v. Congleum Corp.,*
  595 F.2d 1287 (3d Cir. 1979) ....................................................31, 32, 35

*Millicom Int'l Cellular, S.A. v. Republic of Costa Rica,*
  995 F. Supp. 14 (D. Colom. 1998) ....................................................28

*Montreal Trading Ltd. v. Amax, Inc.,*
  661 F.2d 864 (10th Cir. 1981) ...........................................................27

*Mortensen v. First Fed. Sav. & Loan Ass'n,*
  549 F.2d 884 (3d Cir. 1977).........................................................10, 12

*Parker v. Brown,*
  317 U.S. 341 (1943) .........................................................................31

*Timberlane Lumber v. Bank of America N.T. & S.A.,*
  549 F.2d 597 (9th Cir. 1976) .............................................................32

*Turicentro S.A. v. Am. Airlines Inc,*
  303 F.3d 293 (3d Cir. 2000)..............................................................13

*United States v. Brodie,*
  174 F. Supp. 2d 294 (E.D. Pa. 2001) ..................................................31

*Vanity Fair Mills, Inc. v. T. Easton Co.,*
  234 F.2d 633 (2d Cir. 1956)..............................................................36

iv

Table Of Authorities
(continued)

Page(s)

*W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp.*,
  493 U.S. 400 (1990) ................................................................................................30

## FEDERAL STATUTES

28 U.S.C. § 1603 ......................................................................................................28

28 U.S.C. § 1605 (a)(2) ............................................................................................28

Fed. R. Civ. P. 12(b)(1) .......................................................................................1, 12

15 U.S.C. § 6a ....................................................................................................11, 21

## OTHER

H.R. Rep. No. 97-686 ...............................................................................................32

Restatment (Third) of Foreign Relations Law § 403 ..........................................35, 36

KL3 2725861.1

Pursuant to Fed. R. Civ. P. 12(b)(1), defendants Sinosteel Corporation ("Sinosteel"), Sinosteel Trading Company ("Sinosteel Trading"), and Liaoning Jiayi Metals & Minerals Co., Ltd. ("Jiayi") (collectively, the "Sinosteel/Jiayi Defendants"), respectfully submit this memorandum in support of their motion to dismiss the First Amended Complaint of plaintiffs Resco Products, Inc. ("Resco") and Animal Science Products, Inc. ("Animal Science") for lack of subject matter jurisdiction.  Alternatively, the Court should abstain from asserting jurisdiction over this matter for reasons of sovereign compulsion, act of state and international comity.

## PRELIMINARY STATEMENT

More than three years after filing their original Complaint, and despite being given ninety days in which to replead their dismissed claims, Plaintiffs fail to come forth with even a shred of evidence on which to justify the application of United States antitrust laws to defendants' wholly-foreign activities that are not directed to, and have no direct effect on, United States commerce.  Like its predecessor, the Amended Complaint is entirely devoid of any basis for asserting subject matter jurisdiction.  It is based on purely unsubstantiated conjecture that prices of magnesite imported from China – the lowest-cost source in the world for this material – would have been even cheaper but for an alleged conspiracy that Plaintiffs concoct from disparate and inconsistent sources on the internet.  For multiple reasons more fully explained below, Plaintiffs' Amended Complaint should be dismissed.

In dismissing the original Complaint, the Court made clear that "in the event Plaintiffs file an Amended Complaint, Plaintiffs *must* incorporate in their submission evidentiary proof allowing the Court to conduct a *factual determination* . . . and to conclusively satisfy itself as to presence or lack of subject matter jurisdiction over this

1

action."  *Animal Science Prods., Inc. v. China Nat'l Metals & Minerals Import & Export Corp.*, 596 F. Supp. 2d 842, 881 (D.N.J. 2008) (the "Opinion").  Yet, Plaintiffs ignore the Court's directive by failing to proffer *any* proof that defendants actually imported magnesite into the United States, or that defendants' alleged China-based activities had "a direct, substantial, and reasonably foreseeable" effect on U.S. trade or commerce.  As a result, Plaintiffs cannot avoid the bar under the Foreign Trade Antitrust Improvements Act (the "FTAIA") to the extraterritorial application of the Sherman Act.

In the Amended Complaint, Plaintiffs pay transparent lip service to the FTAIA by cryptically alleging, without any substantiating evidence, that "[unspecified] [d]efendants have directly sold and delivered magnesite and magnesite products to customers in the United States at prices inflated, fixed, and maintained by the conspirators pursuant to horizontal agreements to restrain trade."  (A.C. ¶ 2).  Plaintiffs' inability to provide any supporting evidence is not surprising because the Sinosteel/Jiayi Defendants are not importers of magnesite or magnesite products ("Processed Magnesite").  Rather, each purchases Processed Magnesite from various Chinese producers and sells those products to buyers, who are typically brokers, located in China.  These brokers, in turn, arrange for delivery to importers or end-users around the world.  Thus, the Sinosteel/Jiayi Defendants are engaged in precisely the type of foreign trade and commerce to which the FTAIA bars application of the Sherman Act.  In fact, Plaintiffs do not allege even to have purchased magnesite from any named defendant, but only from two alleged "co-conspirators."  These purported co-conspirators, moreover, apparently sold to Plaintiffs without an export license, making them, unlike the Sinosteel/Jiayi defendants, smugglers of Processed Magnesite.

In lieu of evidentiary support, Plaintiffs simply recast their prior allegations to omit references to defendants' undeniable "worldwide" and "foreign trade" activities and sprinkle the boilerplate phrase "including exports to the United States" throughout their amended pleading.  This is nothing more than an apparent attempt to make defendants' business activities appear less global and more directed to the United States.  Indeed, to show the supposed "effect on U.S. prices of magnesite products," the Amended Complaint re-cycles a graph from Plaintiffs' prior motion papers of magnesite prices from 1998 through 2007.  Not only is such data dramatically at odds with any claim that the alleged cartel had any impact on magnesite prices, this Court already deemed such data insufficient.

In short, no amount of word-smithing and artful pleading can change the fact that (1) defendants are <u>not</u> "importers" of magnesite, (2) their production and trading activities take place entirely in China, and (3) any coordinated export volume and sales efforts (to the extent they exist) are global in scope and not directed to the United States.  As a result, the Amended Complaint is barred by the FTAIA for lack of subject matter jurisdiction.  Further, absent a "direct effect" on United States commerce, the Amended Complaint also fails to provide a basis for subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), which applies to all defendants directly owned by the Chinese government, including Sinosteel here.

Even if Plaintiffs could overcome these jurisdictional hurdles (which they cannot), the Court should abstain from asserting jurisdiction for reasons of sovereign compulsion, act of state and international comity.  In order to protect its local minerals industry, to counter charges of "dumping" and to prevent smuggling, the Chinese central government adopted a regulatory export licensing and quota system that requires traders of

3

magnesite (including the Sinosteel/Jiayi Defendants) to adhere to certain minimum prices and volumes for Processed Magnesite available for export.  The Amended Complaint impermissibly seeks to "export" the United States antitrust laws to penalize defendants for simply complying with these Chinese-mandated regulations.

## BACKGROUND

### A.     Procedural History

Plaintiffs filed the original Complaint on September 7, 2005 and the Court dismissed the Complaint without prejudice on December 30, 2008, both for failure to state a claim and for lack of subject matter jurisdiction.  Opinion, 596 F. Supp. 2d at 877-80.  In granting Plaintiffs leave to replead within ninety days, the Court also stated that any challenge to subject matter jurisdiction or abstention should be filed at defendants' "*first opportunity* to respond to the Amended Complaint."  *Id*. at 881.  After Plaintiffs filed the Amended Complaint, the Court granted the parties' briefing schedule.  (D.I. 83).

### B.     The Revised Allegations in the Amended Complaint

#### 1.     The Alleged "Cartels" Are Admittedly Short-Lived and Ineffective Magnesite Associations

Like its predecessor, the Amended Complaint is based almost entirely on the contents of various websites and alleges that various price-fixing cartels have operated in China since 2000 and have purportedly inflated prices of Processed Magnesite. Paradoxically, Plaintiffs primarily support their newly-minted allegations with data from the same "Government Surveys" (including for the years 2006 and 2007) that the Court already

4

found undermined the merits of their claim.  *See* Opinion, 596 F. Supp. 2d at 855-57, 869;

(D.I. 77-2 at 10-39, 69-82 (Pl. Exhs. 3-5, 17); (D.I. 77-4 at 1-10) (Pl. Exh. 19)).[1]

        The Amended Complaint claims that at least five associations of magnesite

"producers and exporters" – which allegedly included some Defendants and unspecified co-

conspirators – have formed in China since April 2000 (*i.e.*, the  "Jiyuan Magnesite Export

Group," "Huaxia Magnesia Products Export Group," "Chinese Magnesite Export

Association," "China Magnesite Forum" and "China Magnesite Self-Disciplined

Association").  (A.C. ¶¶ 52 - 71).  While the Amended Complaint tries to portray these

groups as a single price-fixing "Cartel," Plaintiffs' sources indicate that these groups have

been short-lived, disparate associations whose aim allegedly has included such legitimate,

Chinese government-mandated goals as "to strengthen self-regulation and cooperation in the

industry, act against improper competition and uphold normal and orderly export procedures

within the established framework of quota tender policy."  (A.C. ¶ 61; D.I. 77-2 at 64 (Pl. Exh.

16); D.I. 77-4 at 14 (Pl. Exh. 20 at 4).  *See also* D.I. 77-2 at 52 (Pl. Exh. 11), at 53 (Pl. Exh. 12),

at 55 (Pl. Exh. 13 at 2)).  Indeed, the ineffectiveness of such groups was widely reported in the

industry press.  As one of Plaintiffs' primary sources states: "[c]oncerning magnesite exports,

there have been at least five successive versions of an exporters' syndicate since 2000, each

with laudable aims but lasting only a few months to a year before breaking up over

disagreements on prices and procedures or because of apathy."  (D.I. 77-4 at 14 (Pl. Exh. 20

at 4)).

---

[1] Copies of the original Complaint (D.I. 1) and the Amended Complaint (D.I. 77 or "A.C.")
showing additions and deletions thereto are attached as Exhibits A and B to the Declaration of
Timothy J. Helwick ("Helwick Decl.") submitted herewith.

Significantly, the Amended Complaint contains *no* specific allegations with respect to Sinosteel, which is not alleged to have been part of *any* of the magnesite syndicates.  To the extent that the Amended Complaint does mention Sinosteel Trading and Jiayi, such allegations are hopelessly vague, conclusory and misleadingly taken out of context.  (*See* discussion at Point I.A, *infra*.).

2. **Plaintiffs' Conclusory Damage Allegations Lack "Factual Heft"**

Nor do Plaintiffs proffer any facts to substantiate their claim for damages – *e.g.*, actual purchases at inflated prices – but rely instead solely on the opinion of their expert to allege that U.S. purchasers of magnesite were damaged as a result of the alleged Chinese conspiracies to fix the price of magnesite exports.  (A.C. ¶ 65, n. 20).  However, Plaintiffs' expert previously admitted to not having any data on the actual prices charged by defendants.  (D.I. 28-7 at ¶ 23).  Plaintiffs also conveniently fail to mention that there were widespread incidences of magnesite "smuggled" out of China:

> Industry sources reported that significant quantities of dead-burned magnesia have been smuggled out of China to the Republic of Korea without payment of export license fees and duties; the material then was exported to Europe and the United States.  This material reportedly was being offered at prices that were $25 to $40 per metric ton lower than comparable export prices from China.  In addition, China instituted a 5% export tax on magnesia on July 1, further exacerbating smuggling problems.

D.I. 77-2 at 23 (Pl. Exh. 4 at 46.2).  In this regard, Plaintiffs further fail to mention the regulations imposed by the People's Republic of China to protect China's natural resources as well as to counter incidences of smuggling and worldwide charges of "dumping."  As discussed below (Point II.B), the Chinese government regulates the exports of minerals, including Processed Magnesite, by, among other things, requiring producers and traders to

adhere to minimum export prices and quotas – the very behavior that Plaintiffs now erroneously seek to portray as anticompetitive.

### 3. Vague and Unsubstantiated Allegations of Purchases and an Assignment.

Notably, Plaintiffs do not allege to have purchased magnesite directly from any named defendant.  Rather, the Amended Complaint alleges that "Resco purchased magnesite directly from co-conspirators Rongyuan Magnesite Corporation and Yingkou Sanhua Refractory Material Co. Ltd.," neither of which is a named defendant.  (A.C. ¶ 11). Nor does the Amended Complaint provide any facts as to the terms of the purported direct sale(s), including the date, quantity, price or place of any sale and delivery.  (*Id.*). Moreover, the Amended Complaint does not even claim that either of these purported co-conspirators was licensed to bring Processed Magnesite into the United States (*Id.* at ¶ 28).[2]

Plaintiffs also do not substantiate their claims with evidence of any brokered sales under the alleged assignment.  The Amended Complaint simply alleges that: (i) "Possehl, Inc. has assigned to Resco its rights, title, and interest in and to all causes of action it may have relating to magnesite or magnesite products *brokered* by Possehl, Inc. and subsequently delivered to Resco during the relevant period" and (ii) "Possehl, Inc. purchased magnesite and magnesite products directly from defendants during the class

---

[2] In their default motion papers, Plaintiffs stated that Worldwide Refractories, Inc., a company Resco acquired *after* the original Complaint had been filed, made a direct purchase in 2004 from Rongyuan Magnesite Corp. of China ("Rongyuan"), and in the same year Resco allegedly made a direct purchase from Yingkou Sanhua Refractory of China ("Sanhua").  (D.I. 28-2 at 8). However, in their opposition Defendants submitted the declaration of Sijie Zhao, which showed that Rongyuan and Sanhua *could not have made* any such sales as neither company possessed a magnesite export license in 2004, which was required by the Chinese Government to make such sales.  (D.I. 35-16 (Second Supplemental Declaration of Sijie Zhao), at ¶¶ 5-11).

period and shipped those products to Resco." (A.C. ¶ 11) (emphasis added).[3]  There are no

factual allegations of purchases from Defendants for sale and delivery into the U.S.

Similarly, the Amended Complaint is entirely devoid of any information

about indirect purchases, if any, made by the other Plaintiff, Animal Science. (*Id*. at ¶ 10).

As discussed below at Point I.A.4, without such critical purchase and sale information, there

is no evidentiary support for Plaintiffs' alleged antitrust injury or damages in the U.S.

> **4.     Plaintiffs' Additional Allegations of
>          Immaterial Industry-Related Data**

The Court previously identified "a total of eleven allegations" in the original

Complaint "with statistical or statics-related data." Opinion, 596 F. Supp. 2d at 854. While

the Amended Complaint slightly revises and repeats some of these allegations, primarily to

correct errors previously noted by the Court, none of these revisions materially changes the

prior allegations that the Court deemed insufficient for purposes of conferring subject matter

jurisdiction or stating a claim.[4]

For example, the Amended Complaint alleges that: (i) "[h]undreds of

thousands of metric tons of magnesite are imported into the United States each year from

China" (A.C. ¶ 48); (ii) "[t]he value of U.S. imports of magnesite and magnesite products

---

[3] Defendants learned in connection with their prior motion to compel mandatory arbitration that
Resco apparently purchased an assignment from Possehl for $100. D.I. 53. When previously
asked to provide proof of any claims that it received from Possehl based on actual brokered
sales, Plaintiffs stated that they needed to subpoena certain third parties. (*See* D.I. 59-7
(Declaration of Leda Dunn Wettre dated May 22, 2008, Ex. 1)). Plaintiffs have not produced
any documents received in response to their subpoenas or otherwise substantiated their
assignment of a claim based on any actual sale brokered by Possehl.

[4] The Amended Complaint abandons certain other prior statistical related allegations: (i) "China
is estimated to have 80 percent of global magnesite reserves" (Compl. at ¶ 37); (ii) "non-cartel
members represent 30 to 40 percent of the U.S. market" (*id*. ¶ 53);  and  (iii) "prices of magnesite
in the animal feed industry [had] risen an overall 25 percent" (*id*. at ¶ 54).

from China exceeded $50 million in 2000 and exceeded $160 million in 2008" (*id*. at ¶ 49); (iii) "the price of magnesite products imported from China to the United States increased during 2000" (*id*. at ¶ 55); (iv) "[a]ccording to the website of CCCMC, the president of Jiayuan Magnesite [Group] . . . reported that by mid-2001 the cartel's efforts had been successful and 'would give [Chinese companies] 50 million USD of export sales." (*id*. at ¶ 56). These allegations do not materially differ from Plaintiffs' prior statistical allegations (*Compare* D.I. 1, Compl. ¶¶ 43, 46) that the Court found unavailing. *See* Opinion, 596 F. Supp. 2d at 854-57.[5] And none of these allegations establish illegal price-fixing directed to the United States. Importantly, just as in the original Complaint, no Sinosteel/Jiayi Defendants are even alleged to have been part of the Jiyuan Magnesite Group. (A.C. ¶ 52).

---

[5] Likewise, the Amended Complaint simply repeats two allegations that the Court previously found "do not bear on the subject of the Complaint since they related to global tendencies in magnesite production processes" – namely, "70% of the world's production of magnesite is attributable to DBM" (A.C. ¶ 43) and "8 percent of the world's production of magnesite is in the form of EFM" (*id*. ¶ 45). *See* Opinion, 596 F. Supp. 2d at 854. While Plaintiffs now allege that "36 percent of U.S. magnesite consumption from 2000 to 2006 was in the form of CCM" (A.C. ¶ 44), this also does not materially bear on the subject of their claims.

## ARGUMENT

I.    **The Amended Complaint Fails To Provide
      A Basis For Subject Matter Jurisdiction**

The Court expressly required that "Plaintiffs *must* incorporate in their

submission evidentiary proof allowing the Court to conduct a *factual determination* . . . and

to conclusively satisfy itself as to presence or lack of subject matter jurisdiction over this

action." Opinion, 596 F. Supp. 2d at 881. The Third Circuit has clearly outlined plaintiff's

heavy burden in resisting a factual attack on subject matter jurisdiction:

> When a defendant attacks subject matter jurisdiction "in fact,"
> as opposed to an attack on the allegations on the face of the
> complaint, the Court is free to weigh the evidence and satisfy
> itself whether it has power to hear the case.  In such a situation,
> "no presumptive truthfulness attaches to plaintiff's allegations, and
> the existence of disputed material facts will not preclude that trial
> court from evaluating for itself the merits of jurisdictional claims."
> In addition, the burden of proving the existence of subject matter
> jurisdiction lies with the plaintiff.

*Carpet Group Int'l v. Oriental Rug Importers Ass'n*, 227 F.3d 62, 69 (3rd Cir. 2000)

(quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).

Plaintiffs fail to meet this burden.

A.    **The FTAIA Bars Application of U.S. Antitrust Laws to
      Wholly Foreign Conduct Having No Direct, Substantial
      or Foreseeable Effect on United States Commerce**

"Under the FTAIA's statutory framework, all conduct involving non-import

foreign commerce is excluded from the scope of the Sherman Act unless (1) the alleged

conduct has a 'direct, substantial and reasonably foreseeable effect' on 'American domestic,

import, or (certain) export commerce;' and (2) the effect is 'of a kind that antitrust law

considers harmful, *i.e.*, the effect must give rise to a Sherman Act claim.'" *Boyd v. AWB

Ltd.*, 544 F. Supp. 2d 236, 242 (S.D.N.Y. 2008); *see also See Carpet Group*, 227 F.3d at

69.[6]  Thus, the FTAIA analysis involves several inquiries: whether defendants were

"involve[d in] import trade or import commerce"; whether defendants' alleged conduct

"involv[e]d trade or commerce with foreign nation"; whether defendants' activities caused

"direct, substantial and reasonably foreseeable effect" on the United States' market; and whether

the accused activities give rise to a Sherman Act claim.  Opinion, 596 F. Supp. 2d at 861-62.

Applying this analysis, Plaintiffs' amended pleading is barred by the FTAIA.

>    1.    **Plaintiffs' Conclusory Allegations of Import Trade
>          and Import Commerce Are Insufficient to Avoid the FTAIA**

The FTAIA applies to the Sinosteel/Jiayi Defendants because they are <u>not</u>

importers.  "Once it is determined that the defendants are not actual importers or that they

were importing goods all over the world, the FTAIA is triggered."  *Id*. at 861.

Previously, the Court found that "[t]he Complaint is void of any information

as to whether any of these seventeen Defendants was actually bringing Processed Magnesite

into the United States" and "allow[ed] for a presumption that none of Defendants actually

imported Processed Magnesite into the United States."  *Id*. at 868.[7]  Attempting to avoid the

FTAIA trigger, Plaintiffs have (i) concocted a boilerplate general allegation that unspecified

---

[6] The FTAIA, 15 U.S.C. § 6a, provides, in relevant part, that:

> [The Sherman Act] shall not apply to conduct involving trade or
> commerce (other than import trade or import commerce) with
> foreign nations unless-(1) such conduct has a direct, substantial
> and reasonably foreseeable effect-(A) [on domestic, i.e., interstate]
> trade or commerce, or on import trade or import commerce with
> foreign nations . . . (2) such effect gives rise to a claim under the
> provisions of Sections 1 to 7 of [the Sherman Act].

[7] The Amended Complaint names as defendants the same sixteen Chinese companies as in the
original Complaint, but drops Minmetals, the New Jersey subsidiary of China Minmetals Corp.,
as a named defendant.  (A.C. ¶¶ 12-27).

KL3 2725861.1

"Defendants have directly sold and delivered magnesite and magnesite products to customers in the United States" (A.C. ¶ 2) and (ii) deleted their prior allegations of Defendants' Chinese "production" activities and "world-wide" trade practices – including allegations previously noted by the Court that Defendants were engaged in selling magnesite "throughout the world."  Opinion, 596 F. Supp. 2d at 870 (*compare* Compl. ¶¶ 26, 50-51, 53 *with* A.C. ¶¶ 12 – 29, 51).  However, these conclusory allegations and strategic deletions are not sufficient to overcome a factual challenge to subject matter jurisdiction.  *See Mortensen*, 549 F.2d at 891 (on a factual Fed. R. Civ. P. 12(b)(1) motion addressed to subject matter jurisdiction "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims").

More particularly, the Amended Complaint repeatedly alleges, without any factual support, that nine of the sixteen named defendants, including Jiayi and Sinosteel Trading, have "directly sold magnesite products to U.S. companies and shipped magnesite products to the United States during the period described in this Complaint." (A.C. ¶¶12-13, 15, 19-20, 22-27).  In fact, the Sinosteel/Jiayi Defendants are not "importers."  Rather, they engage in trading Processed Magnesite *in China* with buyers – *i.e.*, primarily brokers – who accept delivery in China for export to foreign countries worldwide.  (Ba Decl. at ¶¶ 6-8, Zhao Decl. at ¶¶ 5-7).[8]  Such activity does not meet the requirements of import trade.  *See* Opinion, 596 F. Supp. 2d at 861 ("[I]f '[d]efendants *did not directly bring items or services into the United States*..., they cannot be labeled 'importers,' [nor it could be said that

---

[8] The Sinosteel/Jiayi Defendants also submit the declarations of Feng Ba ("Ba Decl.") and Sijie Zhao ("Zhao Decl.") in further support of the instant motion.

defendants] have they engaged in 'import trade or commerce.'").  This is consistent with the Third Circuit's decision in *Turicentro S.A. v. Am. Airlines Inc*, 303 F.3d 293, 303 (3d Cir. 2000) (the FTAIA "does not define the term 'import,' but the term generally denotes a product (or perhaps a service) has been brought into the United States from abroad" and that because "Defendants did not directly bring items or services into the United States . . . they cannot be labeled 'importers'").[9]

The magnesite sales contracts previously submitted to the Court provide evidentiary proof that the Sinosteel/Jiayi Defendants are not importers.  For example, Jiayi's contracts with Possehl for the sale of Processed Magnesite denote that the sale is "FOB Bayuquan" – that is, Possehl takes possession of the product in the Chinese port city Bayuquan.  (D.I. 35-7 at 5).  Thus, Possehl, not Jiayi, arranges for the magnesite to be delivered to the ports of destination, which are located worldwide, and may include the United States (*see id.; see also* Zhao Decl. at ¶ 7).  Similarly, sales contracts between the Sinosteel defendants and Possehl for Processed Magnesite all involve the transfer of the product at a port in China.  (D.I. 35-4 at 5; *see also* Ba Decl. at ¶ 8).

In short, notwithstanding Plaintiffs' bald assertions and boilerplate allegations, the Sinosteel/Jiayi Defendants are not importers of Processed Magnesite into the United States.  Thus, the Amended Complaint requires further scrutiny under the FTAIA.

---

[9] Where an importer may buy from a foreign seller, that seller is not an importer, as previously explained by the Court.  Opinion, 596 F. Supp. at 861 (explaining that "even if a certain importer purchased or otherwise obtained the defendants' product in a foreign market (be it the defendants' national market or any other market) and brought the defendants' product into the United States, the fact that the product eventually found its way into the United States does not transform the defendant into an 'importer' and, hence, an antitrust claim against the defendants must pass muster under the FTAIA before the Sherman Act claim can be entertained.").

### 2. The Amended Complaint Concedes that Defendants' Conduct Involves Trade and Commerce With Foreign Nations

The second inquiry under the FTAIA is "whether Plaintiffs' allegations indicate that Defendants' alleged conduct 'involv[ed] trade or commerce . . . with foreign nations.'"  Opinion, 596 F. Supp. 2d at 869 (quoting the FTAIA).  The Amended Complaint concedes that Defendants, including the Sinosteel/Jiayi Defendants, are engaged in foreign trade or commerce.

In particular, Plaintiffs allege that various Defendants met and agreed "to control the supply of" and "to increase and maintain export prices of magnesite and magnesite products to the U.S. *and elsewhere*."  (A.C. ¶ 67) (emphasis added).  Insofar as each Defendant allegedly is involved in the export of magnesite outside of China – *i.e.*, "elsewhere" – this shows that Defendants are involved in trade or commerce with foreign nations sufficient to warrant further scrutiny under the FTAIA.  *See Emerson Elec. Co. v. Le Carbone Lorraine, S.A.*, 500 F. Supp. 2d 437, 443 n.5 (D.N.J. 2007) (quoting FTAIA) ("The parties agree that the FTAIA applies because Plaintiffs allege harm from 'conduct involving trade or commerce ... with foreign nations,' that is, purchases of electrical carbon products outside the United States.").

### 3. Plaintiffs Fail to Show a Link Between Defendants' Activities and the United States

Since the Sinosteel/Jiayi Defendants are not importers and are alleged to be involved in trade and commerce with foreign nations, the FTAIA bars Plaintiffs' claims unless Plaintiffs can demonstrate a direct effect in the U.S. as a result of the accused activities.  "To avoid the FTAIA bar, the plaintiff must show a clear link between the aim of Defendants' alleged illegal activities and the United States market" and "[t]o establish 'direct effect,' the plaintiff must show a causal link between the *wrongful conduct* and the

*anticompetitive effect* suffered in the United States." 596 F. Supp. 2d at 870; *see id*. at 862.

Significantly, Defendants' alleged extraterritorial conduct must be more than a "but for"

cause of the alleged effect on the United States to constitute the "kind of 'direct' effect on

domestic commerce that could give rise to an antitrust claim within the jurisdictional reach

of the Sherman Act." *Boyd*, 544 F. Supp. 2d at 246. The Amended Complaint fails this test.

> **a.      Plaintiffs' Conclusive Allegations and**
> **Minor Revisions to Its Prior Allegations**
> **Are Insufficient to Show Any Direct Effect**

The Amended Complaint continues to make the same "conclusive

allegations" concerning direct effects that the Court previously found inadequate. In

particular, Plaintiffs' amended pleading simply deletes prior references to "foreign trade"

and replaces that language with "United States" in an attempt to avoid the FTAIA bar: (1)

"[Defendants'] horizontal practices were designed to, and in fact did, have a substantial and

adverse impact in the United States" (A.C. ¶ 29); (2) "the conduct of Defendants . . .

affected the interstate commerce of the United States" (*id*. at ¶ 48); and (3) "[t]he conduct of

Defendants has directly, substantially and foreseeably restrained trade and commerce in the

United States" (*id*. at ¶ 51). *Compare* D.I. 1, Compl. ¶¶ 27, 43, 44.

Like their predecessor allegations, these rejuvenated allegations lack the

requisite "[factual] heft" and amount to nothing more than an insufficient "formulaic

recitation of the elements of a cause of action." *See* Opinion, 596 F. Supp. 2d at 870 (citing

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007). In particular, Plaintiffs provide no

substantiating proof of any "adverse impact," "affect," or "restraint" on U.S. markets to

back up their conclusory allegations.

The Amended Complaint also makes minor revisions to the other potential

"linking" allegations that the Court previously found inadequate. *Id*. at 870 -71. For

example, Plaintiffs now allege that:  (1)"Defendant producers have the competitive advantage of lower costs than their competitors" (A.C. ¶ 69); (2) "Defendants also have enjoyed a competitive advantage . . . because China . . . undervalues the Yuan, making Chinese exports of magnesite and magnesite products relatively less expensive compared to exports . . . from other nations" (*id.*);  (3)"During the conspiracy, prices of [Processed Magnesite] exported to the United States from China have not followed the laws of supply and demand that exist in a competitive market.  Instead, prices have been set and maintained at artificially high levels by Defendants and their co-conspirators" (*id*. at ¶ 72); (4) "[A]s the cartel has taken steps to restrain production and increase prices, competitors have shown that they would follow price increases rather than undercut the new cartel price levels" (*id*. at ¶ 70).  (*Compare* D.I. 1, Compl. ¶¶ 42; 53-54; 56-57).  None of these slightly revised allegations remedies the defects previously found by the Court.  Opinion, 596 F. Supp. 2d at 870 - 75.[10]

As an example, the Court previously denounced the allegation in the original Complaint that prices of Chinese magnesite exports "have not followed the laws of supply and demand that exist in a competitive marketplace" because "[p]rices have remained stable or increased during the period of the conspiracy despite low demand."  (D.I. 1, Compl. ¶ 56).  The Court explained that "[t]he [supply/demand economic] model neither requires all producers to sell comparable goods at the same price nor implies that a decline in demand would force all producers to lower their prices: the leeway available to sellers depends on price elasticity of their

_____

[10] While Plaintiffs have tried to fix some of their prior defective allegations, the Amended Complaint simply abandons others, including: (i)  [d]ue to [D]efendants' price fixing and market allocation activity, the prices of [Processed Magnesite] have increased despite reduction in the cost of production" (D.I. 1, Compl. ¶ 57); (ii) "[i]n 2004, the collusive agreements of the cartel continued to maintain prices well above those of a competitive market" (*id*. at ¶ 54); and (iii) "[p]rices of magnesite in the animal feed industry . . . have steadily increased . . . and risen an overall 25 percent during [the Relevant Period]" (*id*. at ¶ 54).

goods."  Opinion, 596 F. Supp.2d at 875.  The Amended Complaint now substitutes for this prior

allegation the wholly conclusive allegation that "[i]nstead, prices have been set and maintained at

artificially high levels."  (A.C. ¶ 72).  Again, Plaintiffs cite to no evidentiary proof to back up

this allegation.  In stark contrast to Plaintiffs' conclusory allegations is the undeniable fact,

evidenced by sources attached to the Amended Complaint, that China is the *lowest* cost supplier

(*i.e.*, the cheapest source) of Processed Magnesite.  (Helwick Decl., Exh. C (Chart showing

prices of magnesite by country and year).  Opinion, 596 F. Supp. 2d at 874.  As a basic principle

of economics (i.e., price elasticity of demand) and plain logic, even in the face of declining world

demand, buyers of magnesite reasonably would be willing to pay higher prices for Chinese

magnesite than substantially higher prices for magnesite imported from other countries.  *See*

Helwick Decl., Exh. D at 458-64.

       Indeed, the Court's use of a coffee hypothetical in its prior Opinion was prescient:

as reported in the business press, McDonalds has launched a new, comparatively lower-priced

"McCafe" premium coffee product line (although pricier than McDonalds' regular coffee) to

compete with Starbucks' higher priced products, even in the face of declining demand for

expensive coffees in the current recessionary environment.  *Compare* Opinion, 596 F. Supp. 2d

at 871 ("coffee" hypothetical) *with* Helwick Decl., Exh. E ("McDonald's expansive line of

coffee beverages compete with Starbucks Corp. and other coffee shops.  McDonald's said last

month that the early coffee sales had exceeded expectations.").

       Likewise, the Amended Complaint (¶ 70) cites no support for the allegation

(repeated from the original Complaint) that "competitors have shown that they would follow

price increases rather than undercut the new cartel price levels."  Opinion, 596 F. Supp. 2d at

874-75.  As the Court previously ruled, this allegation "appears not only factually

unsubstantiated . . . but also facially insufficient to either suggest Defendants' illegal activities or

to link these activities to the United States market: the fact of parallel pricing does not satisfy the

pleading requirements even with respect to the far-less-demanding standard posed by the

Sherman Act." *Id*.  Contrary to Plaintiffs' renewed allegation, the Government Surveys cited by

the Court, and relied upon by Plaintiffs, show that magnesite prices from other countries at times

declined as Chinese prices increased (but remained the lowest in the world), which is consistent

with basic economic principles of supply and demand.  (*See* Helwick Decl. Exh. C (Chart)).

>    **b.    Plaintiffs' New Allegations Also**
>    **Fail To Establish the Requisite Link**

Five new allegations make apparent – but equally futile – attempts to show a link

between Defendants' alleged illegal activities and U.S. commerce.  (*See* A.C. ¶¶ 57, 58, 62-64).

As an initial matter, Plaintiffs misleadingly attempt to manufacture a link to the U.S. simply by

inserting the phrase, "including exports to the United States," in their new allegations. (A.C. ¶¶

57, 58, 63-64).  However, the sources cited for these allegations do not even mention the U.S.,

but instead refer to global pricing and export policies.  (*See* D.I. 77-2 at 52-59 (Pl. Exhs. 11-14)

at 69-82 (Pl. Exh. 17); D.I. 77-4 at 1-10 (Pl. Exh. 19), at 11-34 (Pl. Exh. 20)).  In effect,

Plaintiffs make the same "but for" circular and speculative argument as before, which the Court

has already rejected – *i.e.*, "but for" Defendants' alleged conspiracy to increase worldwide export

prices of Processed Magnesite, prices would have been lower in the U.S.  This argument is

legally insufficient to confer subject matter jurisdiction.  *See Boyd*, 544 F. Supp. 2d at 244 ("'but

for' causation is not the type of direct causation contemplated by the FTAIA").

Plaintiffs' new allegations also assert that various magnesite producers and traders

formed associations over the years with the aim of coordinating production and standardizing

global export prices.  (A.C. ¶¶ 57, 58, 62-64).  However, there is no allegation that any such

efforts at industry coordination were in fact successful or had a direct anticompetitive effect on

the United States.  To the contrary, Plaintiffs' own source states that each association had

"laudible aims but last[ed] only a few months to a year before breaking up over disagreements on

prices and procedures or because of apathy."  D.I. 77-4 at 14 (Pl. Exh. 20 at 4).  Tellingly,

Plaintiffs do not proffer any sales invoices for U.S. purchases to substantiate that such allegedly

"fixed prices" had any effect on U.S. buyers.

Plaintiffs' new allegations have additional problems – they are internally

inconsistent and do not even allegedly involve the Sinosteel/Jiayi Defendants.  For example,

according to Plantiffs, the CMEA "*fixed*" the price for 90% magnesium oxide (*i.e.*, 90% DBM)

at $114 per metric ton in February 2001.  (A.C. ¶ 57).  Plaintiffs then assert that members of the

alleged cartel (not including any of the Sinosteel/Jiayi Defendants) reached an agreement in

November 2006 to increase the price of DBM by $30 per ton, followed by an additional $10

increase per ton in December 2006.  (*See* A.C. ¶¶ 62 - 63).

However, Plaintiff's own source reveals that the price increased *from* $100 to

$130 per/ton in November 2006.  D.I. 77-4 at 24 (Pl. Exh. 20 at 14).  This means that the price of

90% DBM prior to <u>November</u> <u>2006</u> had been *below* the price of $114 that allegedly had been

"fixed" as of <u>February</u> <u>2001</u>.[11]  Moreover, Plaintiffs state that the alleged agreement to raise

prices in December 2006 "was supported by the Haicheng Municipal government," which is

---

[11] The price of higher quality magnesium oxide 97% allegedly did increase during the same time period, from $160 per ton in February 2001 to as high as $240 per ton as of August 2006. (*Id.*)  However, Plaintiffs' own source explains that "[t]he bottom line is that China is actively discouraging the export of minerals in an effort to redress its trade imbalance and protect its natural resources, while at the same time encouraging producers to supply higher standard mineral grades to domestic markets."  (D.I. 77-4 at 23 (Pl. Exh. 20 at 13)).

19

contrary to Plaintiffs allegations of "wholly voluntary [conduct], not the result of government action." (A.C. ¶ 68).

Plaintiffs also claim the alleged "Cartel" discussed the possibility of increasing prices in February 2007. Yet Plaintiffs' own source states that there was "speculation that [a] new 10% export tax will be implemented after [the] Chinese New Year, from March 2007." (D.I. 77-4 at 24 (Pl. Exh. 20 at 14). Plaintiffs simply ignore the critical point that this tax increase would readily explain the alleged "possibility" of a price increase. (A.C. ¶ 64; D.I. 77-4 at 24 (Pl. Exh. 20 at 14). This type of conjecture in a pleading fails as a matter of law. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) (complaint does not satisfy pleading requirements "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct").

Plaintiffs' exhibits further illustrate the significant flaws in the amended pleading. The Government Surveys previously relied upon by the Court (and now relied upon by Plaintiffs) confirm that price changes in magnesite are readily explainable by the Chinese government-imposed licensing and quota system, increases in the price of fuel and raw materials, the need to protect Chinese producers and China's national resources and the desire to reduce smuggling and to minimize charges of "dumping" while increasing quality. (D.I. 77-4 at 14-24 (Pl. Exh. 20 at 4-14); D.I. 77-2 at 23 (Pl. Exh. 4 at 46.2), at 32 (Pl. Exh. 5 at 49.3), at 70 (Pl. Exh. 17 at 47.2); D.I. 77-4 at 3 (Pl. Exh. 19 at 46.2)). *See also In re Intel Corp. Microprocessor Antitrust Litig.*, 452 F. Supp. 2d 555, 561 (D. Del. 2006) (alleged domestic effects of conduct were not "direct" because they were "premised on a multitude of speculative and changing factors affecting business and investment decisions, including market conditions, the cost of financing, supply and demand, ... and world-wide economic and political conditions").

Finally, two other new allegations are mere conclusions, without any evidentiary support:  (i) "Due to the efforts to increase prices at the end of 2003, the Cartel achieved significant price increases in the U.S., stabilized U.S. prices, and avoided major price cutting despite low levels of demand" (A.C. ¶ 65); and (ii) "Defendants have been able to increase prices successfully without maintaining 100 percent control of the market" (A.C. ¶ 69).  As the Supreme Court has ruled, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft*, 129 S. Ct. at 1949.

In short, the Amended Complaint suffers from the same defect as its predecessor: its underlying argument is entirely circular.[12]  Plaintiffs argue that because the prices of Processed Magnesite exported from China and the rest of the world were increasing during the relevant period, those price increases must have been the result of a conspiracy, which in turn must have had a direct effect on the United States, because prices were rising all over the world. With no substantive support, this circular argument fails again.[13]

---

[12] The Court previously ruled that the Complaint was based on "nothing but a circular argument":

> Stripped of all niceties, Plaintiffs' assertion is nothing but a circular argument first stating that Defendants' Processed Magnesite prices kept rising during the Relevant Period (along with the world's Processed Magnesite prices), then deducing from that fact that the price rise must be attributed to a conspiracy, and then following that conclusion with a deducement that the rising prices must have had a direct and substantial effect on the United States market *simply because the prices were rising all over the world*, United States included.  *See Generally*, Compl.  However, the "direct, substantial and reasonably foreseeable effect" element of the FTAIA cannot be pled by a mere expression of Plaintiffs' disappointment with the world's pricing tendencies.  In light of the foregoing, the Court will dismiss the Complaint for lack of subject matter jurisdiction, pursuant to 15 U.S.C. § 6a.

Opinion, 596 F. Supp. 2d at 877 (emphasis in original).

[13] Three other newly-pleaded allegations only serve to undermine further Plaintiffs' showing any anticompetitive impact in the United States or have no relevance to the jurisdictional inquiry:  (1)
(footnote continued)

21

c.   **Plaintiffs' Additional Industry-Related Data**
     <u>**Also Fail to Provide A Link to the United States**</u>

The Amended Complaint also contains five new statistical-related allegations

that include a number of errors and inconsistencies, and do not evidence anticompetitive

conduct by Defendants or impact on U.S. trade or commerce:

(i)   "According to statistics available from the United States
      International Trade Commission, the customs value of
      DBM imported from China to the United States rose from
      $104 per metric ton in the fourth quarter of 1999 to $158
      per metric ton by the fourth quarter of 2000."  (A.C. ¶ 55).

(ii)  "China is a leading producer of magnesite.  According to
      statistics published by the United States Geological Survey
      (USGS), China's share of annual world production has
      increased from 32 percent in 2001 to 45 percent in 2007."
      (*Id*. ¶ at 46).

(iii) "China is the most significant foreign supplier of magnesite
      to the United States with an 83 percent share of fused and
      dead-burned magnesite imports and an 87 percent share of
      caustic calcined magnesia imports in 2007."  (*Id*. at ¶ 47).

(iv)  "Data from the U.S. International Trade Commission
      confirms that imports from China to the U.S. of magnesite

---

"Due to internal concerns about the effectiveness of its members' individual and collective efforts, the Cartel conducted several further meetings of Defendants and other exporters....to discuss and forecast the price trend for the year 2003."  (A.C. ¶ 59);  (2) "[T]he Cartel further agreed that cartel-related disputes would be arbitrated among themselves by their association, the CCCMC .... [which] is not a governmental organization."  (*Id*. at ¶ 60);  and (3) "The [alleged Cartel] agreed [at a March 22, 2003 meeting] that the most important topics of discussion for now and the near future were: to strengthen self-regulation and cooperation in the industry, act against improper competition and uphold normal and orderly export procedures within the established framework of quota tender policy."  (*Id*. at ¶ 61; D.I. 77-2 at 64 (Pl. Exh. 16)).  None of these allegations even suggests that any Defendants were targeting the United States.  To the contrary, Plaintiffs' own source states that in March 2003 certain Chinese companies met "to discuss and forecast the *international* market demand and price trend for the year 2003."  (*See* D.I. 77-2 at 64 (Pl. Exh. 16)) (emphasis added).  Likewise, the Amended Complaint alleges Defendants agreed to control the supply and to increase and maintain the prices of magnesite and magnesite products exported "to the U.S. *and elsewhere*." (A.C. ¶ 67) (emphasis added).

exceeded 500,000 metric tons in each year from 2000 to 2006." (*Id.* at ¶ 48).

(v)     "The United States consumes about 25 percent of China's magnesite exports.  The steel industry in the United States is the primary consumer of magnesite products, with 390 thousand metric tons consumed by steel refractories in the United States during 2006.  Cement refractories are the second leading consumer of magnesia in the United States." (*Id.* at ¶ 50).

In particular, the mere allegation (A.C. ¶ 55) that DBM from China rose from

$104 to $158 per metric ton from the fourth quarter of 1999 to the fourth quarter of 2000 is not,

by itself, evidentiary proof of collusion.  *See* Opinion, 596 F. Supp. 2d at 872.  This allegation

also is inconsistent with:  (i) Plaintiffs' chart of DBM prices (A.C. ¶ 73), which indicates that the

price stayed in a range between $120 and $125 during the same period, and (ii) data from the

2000 Government Survey (also relied upon by Plaintiffs), which shows that DBM imported from

China to the U.S. only slightly increased in price from $127 to $129 per metric ton from year-

end 1999 to year-end 2000.[14]  (*See* D.I. 77-2 at 37 (Pl. Ex 5 at Table 7)).

The 2000 Government Survey further shows that DBM imported from China was

substantially cheaper than the prices of DBM per metric ton imported from other countries – *e.g.*,

$225 (Australia) and $459 (Austria), while only $129 (China) as of year-end 2000.  *Id.*  *See also*

Opinion, 596 F. Supp. 2d at 864 (observing that Chinese magnesite prices were "substantially

below" the prices of other countries).  Given this price difference, not surprisingly China's share

of world production and magnesite exports increased yearly as China was undeniably the low

---

[14] Price can be inferred from Table 7 of Plaintiffs' Exhibit 5 by dividing the value received by the quantity of metric tons imported   Thus, DBM imports from China at yearend 1999 were 275,000 metric tons for $34.9 million in value, or $127 per metric ton, as compared to 345,000 metric tons for $44.6 million in value, or $129 per metric ton, at yearend 2000.  A chart of magnesite prices based on the Government Surveys is set forth in Exhibit C to the Helwick Decl.

KL3 2725861.1

cost supplier, and demand for its cheaper goods increased even as worldwide demand allegedly declined during the same period.  (*Compare* D.I. 77-2 at 19 (Pl. Exh. 3 at Table 10) *with* D.I. 77-2 at 29 (Pl. Exh. 4 at Table 9)).

Plaintiffs also wrongly assert that "[t]he United States consumes about 25 percent of China's magnesite exports."  (A.C. ¶ 50).  Plaintiffs' own source actually shows that magnesite exported by China to the U.S. in 2006 was 15 percent (not 25 percent)  of China's total magnesite exports.  (D.I. 77-2 at 9 (Pl. Exh. 2 at 92).  The 15 percent figure is consistent with data previously identified by the Court and confirms that China's export and trading activities are global in nature and not directed to the U.S.[15]  Opinion, 596 F. Supp. 2d at 856.

Plaintiffs also misread their own chart (A.C. ¶ 48), which indicates that magnesite imports from China into the United States were *less than* 500,000 metric tons each year from 2000 to 2006 (*i.e.*, between 327,425 and 496, 930 metric tons), and thus did not "exceed[] 500,000 metric tons in each year from 2000 to 2006" as alleged.  Plaintiffs' chart further shows that magnesite imported from China represented less than half of the total magnesite imports into the United States in all these years, evidencing that there is no lack of an alternative supply of magnesite or exclusive dependence by United States companies on China for magnesite imports.  (*Id.*).  The undisputed fact is that magnesite is readily available from multiple sources around the world, aking Plaintiffs' theory of price fixing by Defendants unsound as a matter of law, economics and just plain logic.

---

[15] Plaintiff's Exhibit 2 (D.I. 77-2) at 92 states:  "About 2.0 million metric tons of magnesium oxide were exported from China in 2006, although the magnesium oxide exports were restricted to 1.0 million metric tons for 2006 under the China E/L (Export License) Act."  Of that 2 million metric tons, 300,000 metric tons, which is 15 percent (not 25 percent), were exported to the United States.  (*Id.*)

4.      **There Is No Alleged Effect That Gives
        <u>Rise To A Claim Under The Sherman Act</u>**

In order to overcome the FTAIA bar, the Amended Complaint also needs to show

that any alleged effect on the United States "gives rise to a claim under [the Sherman Act]."

Opinion, 596 F. Supp. 2d at 861 n.16.  Plaintiffs, who provide no evidence to substantiate their

direct or assigned purchases at allegedly inflated prices, cannot meet this burden.

Through an alleged assignment, Resco claims to stand in the shoes of Possehl,

yet no facts are alleged from which it plausibly can be inferred that Possehl, a broker, has

suffered the requisite "antitrust injury."  *In re Hypodermic Prods. Antitrust Litig.*, No. 05-

CV-1602, 2007 WL 1959225, at *8 (D.N.J. June 29, 2007) (Linares, J.) ("[A] plaintiff must

allege facts establishing an 'antitrust injury.'") (citations omitted); *see also Illinois Brick Co.*

*v. Illinois*, 431 U.S. 720, 736-47 (1977) (only direct purchasers have standing to sue on a

price-fixing theory, with few possible exceptions).[16]

Importantly, Plaintiffs previously disclosed that Worldwide Refractories, Inc.

("Worldwide"), a company Resco acquired *after* the complaint had been filed, made a direct

purchase in 2004 from Rongyuan, and in the same year Resco allegedly made a direct

purchase from Sanhua (D.I. 28-2, Pl. Default Mem., at 8).  However, these two sellers,

which are alleged to be "co-conspirators" in the Amended Complaint, could not have legally

made any such sales as neither company possessed a magnesite export license in 2004 as

required by Chinese Government regulations to make such sales.  (D.I. 35-22 (Second

Supplemental Declaration of Sijie Zhao, at ¶¶ 5-11)).  Consequently, insofar as Plaintiffs

---

[16] *See also Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 216-17 (1990) (holding that
exceptions should not be made to *Hanover Shoe* and *Illinois Brick* direct purchaser rule, even "in
rather meritorious circumstances").

purchased smuggled and/or grey market magnesite, at undisclosed prices, they do not allege an antitrust injury as a result of the alleged price-fixing by licensed suppliers.

### B. The Complaint Fails To Satisfy The Jurisdictional Requirements Of The Sherman Act

The FTAIA further bars Plaintiffs' claims because there is no anticompetitive effect from the allegations of the Amended Complaint that give rise to a Sherman Act claim. "[I]t is well established that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States. *Dee-K Enterprizes, Inc. v. Heveafil Sdn. Bhd*, 299 F.3d 281, 286 (4th Cir. 2002); *see Carpet Group*, 227 F.3d at 69. For the reasons already stated, the Amended Complaint fails to adequately allege and substantiate that Defendants' wholly-foreign conduct had a substantial effect in the United States.

The Fourth Circuit's opinion in *Dee-K* illustrates how Plaintiffs' allegations fail to establish the requisite anticompetitive effect needed for a Sherman Act claim. In *Dee-K*, plaintiffs alleged a price fixing conspiracy against producers of extruded rubber thread in Southeast Asia. In evaluating whether there existed a direct substantial effect in the U.S., the Court found that "the bulk of the conduct related to the global conspiracy alleged in the complaint" in which "the [alleged illegal price fixing] agreements were all formed entirely outside the United States in several other countries" and the "target of the conspiracy was a global market." *Dee-K*, 299 F.3d at 295. The only links to the U.S. were sales of rubber thread in the United States by subsidiaries of two of the defendants and a handful of faxes from producers of the rubber thread describing pricing in the United States. As the Court concluded, "these links to the United States are mere drops in the sea of conduct that occurred in Southeast Asia (and around the world)" and therefore found that

KL3 2725861.1

the alleged misconduct did not have the required substantial effect on U.S. commerce to justify extraterritorial application of the Sherman Act.  *Id.*; *see also Montreal Trading Ltd. v. Amax, Inc.,* 661 F.2d 864, 869 (10th Cir. 1981) ("When the contacts with the United States are few, the effects upon American commerce minimal, and the foreign elements overwhelming, . . . we do not accept jurisdiction.").  The same as in *Dee-K*, Plaintiffs here allege activity in China directed to the global market.

   *Boyd* is also instructive to illustrate a pleading barred under the FTAIA alleging global price-fixing of a commodity (wheat).  In that case, Judge Lynch focused on whether the allegations showed a "direct, substantial and reasonably foreseeable effect on American domestic, import or (certain) export commerce" to warrant the extraterritorial reach of U.S. antitrust laws.  *Boyd,* 544 F. Supp.2d at 243 (internal quotation marks omitted).  The court concluded that Plaintiffs' pleading failed to meet this threshold:

> Although the complaint's description of the "global nature of
> the wheat pricing mechanism" may paint a plausible scenario
> by which AWB's [defendants'] conduct in Iraq might well have
> been a factual, or "but for," cause of a drop in domestic wheat
> prices, such "'but for causation is not the type of *direct*
> causation contemplated by the FTAIA."

*Id.* at 244 (quoting *In re Intel Corp. Microprocessor Antitrust Litig.*, 452 F. Supp. 2d 555, 561 (D. Del. 2006)).  In particular, the court found that "a myriad of other factors-including foreign and domestic market conditions, crop yields, harvesting and transportation costs, and other factors affecting global supply and demand-also impacted projected Ending Stocks, and hence domestic wheat prices, during the proposed class period."  *Id.* at 245.  The same result as in *Boyd* is warranted here – Plaintiffs allege nothing more than a Chinese conspiracy to fix prices of magnesite exported globally, including products shipped to the

27

United States, which at most constitutes an indirect "but for" effect on prices in the United States.

### C.    The Complaint Fails To Satisfy The Jurisdictional Requirements Of The Foreign Sovereign Immunities Act

The allegations in the Amended Complaint also fail to establish jurisdiction under the Foreign Sovereign Immunities Act (the "FSIA") with respect to the Chinese state-owned Defendants. *See Fed. Ins. Co. v. Richard I. Rubin & Co., Inc.*, 12 F.3d 1270, 1286 (3d Cir. 1993); *Millicom Int'l Cellular, S.A. v. Republic of Costa Rica*, 995 F. Supp. 14, 18 (D. D.C. 1998).

For purposes of the FSIA, a "foreign state" includes an "agency or instrumentality of a foreign state" if a "majority of [its] shares or other ownership interest is owned by a foreign state or political subdivision thereof." 28 U.S.C. § 1603. As alleged, Sinosteel is a "state-owned multinational conglomerate." (A.C. ¶ 18). *See also* Ba Decl. at ¶ 2 ("Sinosteel is incorporated under the Chinese law in China and 100% of its shares are owned by the Chinese government . . . ."). As such, Sinosteel is immune from the jurisdiction of the Unites States courts except, *inter alia*, in a non-jury action based "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a *direct effect* in the United States." 28 U.S.C. § 1605 (a)(2) (emphasis added). As noted, there are no specific allegations with respect to Sinosteel. Therefore, there is no basis to assert jurisdiction over this Chinese state-owned entity.

II.     **The Court Should Abstain From Asserting Subject Matter Jurisdiction On The Basis Of Act Of State, Sovereign Compulsion And International Comity**

   A.     **The Act of State, Sovereign Compulsion and International Comity Doctrines Apply**

The doctrines of act of state, sovereign compulsion and international comity reflect the view that United States courts should refrain from intruding on and judging conduct that is both lawful and compelled by a foreign sovereign and refrain from questioning the motives of such foreign nations in establishing their laws and policies. Such matters should be left to the executive and legislative branches of government, which have been granted the power to establish and manage international relationships between the United States and foreign nations.[17]

Here, in light of the deficiencies in the Amended Complaint identified in the preceding sections, Plaintiffs' allegations reduce to an illegal horizontal price fixing scheme in which defendants purportedly formed various export associations – *i.e.*, "cartels" – "to provide strict management control of all sales, production schedules of individual producers and export prices for Chinese magnesite, including exports to the United States" and set "floor prices" for magnesite exports at prices higher than prevailing prices. (A.C. ¶¶ 52-67). As explained more particularly in Section B below, China's Central Government, through the Ministry of Commerce ("Ministry") and the Chamber of Commerce of Metals, Minerals & Chemical Importers and Exporters (the "Chamber") mandate this very conduct through export quotas and setting minimum export prices.

---

[17] As reported in *The Wall Street Journal* on June 24, 2009 and other media outlets, the United States recently filed a complaint with the World Trade Organization charging China with illegal trade practices with respect to, *inter alia*, magnesium. This action by the U.S. Government highlights the importance of this Court abstaining from matters more appropriately addressed through the executive branches of the U.S. and Chinese Governments. (Helwick Decl., Ex. F).

In short, because defendants were required by the laws of China to engage in the precise conduct alleged to be illegal in the Amended Complaint, this lawsuit cannot be resolved without interfering with Chinese policy for the operation of domestic firms within China, and without impermissible inquiry into the motives of China's Central Government, requiring dismissal under each of these doctrines.

### 1.  Act of State and Sovereign Compulsion

The act of state doctrine "preserve[s] the separation of powers between the federal judiciary and the political branches of our government."  *Envt'l Tectonics Corp. v. W.S. Kirkpatrick, Inc.*, 847 F.2d 1052, 1058 (3d Cir. 1988), *aff'd W.S. Kirkpatrick & Co., Inc. v. Envt'l. Tectonics Corp.*, 493 U.S. 400 (1990).  Dismissal under the act of state doctrine is mandatory where a defendant can show that: (1) the act of the sovereign was of a public nature, *i.e.*, involved government functions; and (2) the determination of the defendant's liability depends on the court's inquiry into the validity of the sovereign act. *See Banco Nat'l de Cuba v. Sabbatino*, 376 U.S. 398, 400-01, 437-39 (1964) (court precluded from "inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory"); *Gross v. German Found. Indus. Initiative*, 456 F.3d 363, 391-92 (3d Cir. 2006) (courts must dismiss pursuant to the Act of State doctrine "when resolution of a suit would require the court to declare invalid and ineffective . . . the official act of a foreign sovereign.") (citing *Kirkpatrick*, 493 U.S. at 405).

The foreign sovereign compulsion doctrine is "[s]imilar in effect but somewhat conceptually distinct" from the act of state doctrine because the policies underlying the sovereign compulsion defense include not only due deference to the official acts of foreign governments but also fairness to a defendant, who is caught in a conflict of laws and cannot simultaneously obey both. *Mannington Mills, Inc. v. Congleum Corp.*, 595

F.2d 1287, 1293 (3d Cir. 1979).  This defense "shields from antitrust liability the acts of

parties carried out in obedience to the mandate of a foreign government."  *Id.*; *see also*

*Interamerican Refining Corp. v. Texaco Maracaibo, Inc.*, 307 F. Supp. 1291, 1298 n.18

(D.Del. 1970).

   Where the refusal to comply with the sovereign's command would result in

the imposition of significant penalties or the denial of significant benefits, it is unfair to

impose liability on a private party for so complying.  *Interamerican*, 307 F. Supp. at 1298.

Accordingly, dismissal under the Foreign Sovereign Compulsion doctrine requires that:  (1)

the alleged behavior was compelled by the foreign government; and (2) the foreign order

was basic to the alleged course of conduct and not just peripheral to it.  *Mannington Mills*,

595 F.2d at 1293; *United States v. Brodie*, 174 F. Supp. 2d 294, 300 (E.D. Pa. 2001).

   It is well-settled that issuing laws and regulations are acts of a public nature

involving government functions.  *See Interamerican*, 307 F. Supp. at 1298 ("[S]overeignty

includes the right to regulate commerce within the nation.").  Moreover, "[w]hen a nation compels

a trade practice, firms there have no choice but to obey.  Acts of a business become effectively acts

of the sovereign." *Id.* at 1298 & n.18 (citing *Parker v. Brown*, 317 U.S. 341 (1943)).  In that

situation, the act of state and sovereign compulsion doctrines essentially merge.

## 2. <u>International Comity</u>

   Comity is based on a desire not to offend foreign governments and to preserve the

stature and credibility of the United States in the international community.  The Third Circuit has

emphasized that courts should show particular sensitivity to the principles of international comity

in the context of applying U.S. antitrust law where foreign contacts are involved.  *Mannington*

*Mills*, 595 F.2d at 1297.  The Third Circuit also has adopted factors for determining whether to

abstain from exercising jurisdiction on the ground of comity, including: (1) Degree of conflict with

31

foreign law or policy; (2) Nationality of the parties; (3) Relative importance of the alleged violation

of conduct here compared to that abroad; (4) Availability of a remedy abroad and the pendency of

litigation there; (5) Existence of intent to harm or affect American commerce and its foreseeability;

(6) Possible effect upon foreign relations if the court exercises jurisdiction and grants relief; and (7)

whether, if relief is granted, a party will be placed in a position of being forced to perform an

illegal act in either country or be under conflicting requirements of both countries.  *Id*. (adopting

factors from *Timberlane Lumber Co. v. Bank of America N.T. & S.A.*, 549 F.2d 597, 614-15 (9th

Cir. 1976)).[18]

   **B.    Defendants' Alleged Conduct is Mandated**
   **By Chinese State Regulation of Export Commodities**

   As part of its management of China's national resources and in response to

"dumping" charges, China's Central Government introduced controls on export prices and

volumes for certain minerals, including magnesite.  As Plaintiffs' sources explain, these

controls have had a lasting effect on Chinese mineral exports: "[t]he result was that Chinese

minerals supply to the world market increased in quality as well as quantity."  *See* D.I. 77-4

at 13 (M. O'Driscoll, *The Turning of the Dragon*), Pl. Exh. 20 at 3).

   On behalf of the Central Government, the Ministry regulates Processed

Magnesite exports.  (D.I. 35-48, Art. 1; D.I. 35-57 at Art. 3; D.I. 35-63 at Arts. 1-3).  The

Ministry established the Chamber to implement its regulations concerning the export of

Processed Magnesite.  (D.I. 35-40 at Arts. 3-6; D.I. 35-41 at ¶¶ 1-3; D.I. 35-42 at ¶¶ 1-4 &

---

[18] Even if not barred by the FTAIA, the Court may abstain from extraterritorially applying the
Sherman Act to wholly-foreign conduct for reasons of international comity.  *See Hartford Fire
Ins. Co. v. California*, 509 U.S. 764, 798 (1993) ("If a court determines that the requirements for
subject matter jurisdiction are met, [the FTAIA] would have no effect on the court['s] ability to
employ notions of comity ... or otherwise to take account of the international character of the
transaction")) (quoting H.R. Rep. No. 97-686, p. 13 (1982)).

A; D.I. 35-46 at I-III).  Importantly, the Ministry's regulations were intended to "protect the resources and to maintain stable development of magnesium product export, related issues for purposes of strengthening the administration of the export of magnesium products." (D.I. 35-41 at 2).

More particularly, the Ministry sets quotas on the amount of Processed Magnesite that can be exported each year and allocates export volumes to producers and licensed exporters through a bidding process.  (D.I. 35-42 at ¶¶ 1-4 & A; D.I. 35-43 at Section V; D.I. 35-45; D.I. 35-46 at II; D.I. 35-48 at Ch. 2-5; D.I. 35-52 at I-IV; D.I. 35-52; D.I. 35-58 at Art. 9; D.I. 35-59 at Arts. 1, 3, 7-10).  The Ministry requires that magnesite producers and exporters coordinate production volumes and set certain minimum prices at which magnesite will be sold for export.  (D.I. 35-52 at Art. 32(3); D.I. 35-53 at Sections II & IV; D.I. 35-57 at Art. 16; D.I. 35-61 at I(2)).  In turn, the minimum price is registered with the Ministry.  (*Id.*)  The Ministry further requires that enterprises obtain a license to export Processed Magnesite from China.  (*See* D.I. 35-42 at ¶¶ 1-4 & A; D.I. 35-48 at Art. 4; D.I. 35-51 at III; D.I. 35-57 at Arts. 3, 4, 8, 10, 13, 16; D.I. 35-63 at Arts. 4, 6 & Chapters II, III; D.I. 35-65 at Chapters II-III)).

In order to obtain a license, an enterprise must submit documentation, including the magnesite sales contracts, to the Office of the Special Commissioner of the Ministry (the "Special Commissioner"), which issues export licenses.  (D.I. 35-44 at V; D.I. 35-54 at Art. 5; D.I. 35-57 at Art. 13; D.I. 35-61 at ¶¶ 4, 6; D.I. 35-63 at Ch. II- III). The Special Commissioner then reviews the documentation and will only issue the license if the price for Processed Magnesite meets the minimum price.  (D.I. 35-44 at V(3); D.I. 35-48 at Arts. 16, 17; D.I. 35-52 at Art. 32(3); D.I. 35-54 at Art. 8(6); D.I. 35-57 at Art. 16; D.I. 35-

33

61 at I(2)).  Failure to comply with the quota and minimum price regulations results in penalties, including the loss of an export license.  (D.I. 35-50 at Art. 6; D.I. 35-52 at Art. 34(6); D.I. 35-56 at Art. 65; D.I. 35-57 at Art. 41; D.I. 35-58 at Art. 26; D.I. 35-63 at Art. 39).  The Central Government thus requires the very behavior by Defendants that Plaintiffs allege violates the Sherman Act – *i.e.*, the control of supply and setting of export prices.

The situation here is strikingly similar to the tight control over Venezuela's oil industry in *Interamerican*.  In *Interamerican*, the court held that the Act of State and Foreign Compulsion doctrines required dismissal because the industry operated under a highly-controlled regulatory regime and the defendants' conduct was compelled by that regime.  307 F. Supp. at 1296-97.  Here too, the Defendants operate within a highly-controlled industry, with the Chinese government deciding how much magnesite may be exported by each exporter and the minimum price that must be charged for all exported magnesite.  As in *Interamerican*, the Defendants' allegedly anticompetitive acts in this case are "effectively acts of the sovereign" and in any event were "compelled" by China's regulations and the acts of its officials.  Indeed, the alleged conduct of the Defendants here was in response to government instruction similar to the instruction given to the *Interamerican* defendants by the Venezuelan equivalent to the Chamber.

Accordingly, the Court should dismiss this case under either or both of the act of state and sovereign compulsion doctrines.  (*See* D.I. 35-16, Zhao Suppl. Decl.); *see also Int'l Ass'n of Machinists and Aerospace Workers v. OPEC*, 649 F.2d 1354, 1355, 1358, 1361-62 (9th Cir. 1981) (Plaintiffs sued oil producing States and oil producers alleging price-fixing based on the creation of OPEC; defendants did not appear in the proceedings

but court dismissed the action for lack of jurisdiction; dismissal affirmed on act of state doctrine).

### C.     International Comity and the Restatement Factors Require Abstention

Considerations of international comity also strongly weigh in favor of this Court refraining from exercising jurisdiction over this case.  Virtually all the factors set forth by the Third Circuit in *Mannington Mills* counsel against exercising jurisdiction here.  For example, the alleged claim of unlawful price-fixing is asserted against Chinese Defendants, the allegations conflict with Chinese government-mandated regulations of China's own natural resources, the accused activities are not in response to any direct or intentional effect on U.S. commerce, and any accused sales of magnesite is subject to the remedy of mandatory arbitration in China.  Also, if this Court granted any of the remedies sought by Plaintiffs, it likely would negatively impact existing US-China relations and the efforts of the political branches in this area.

Courts often look to the factors set forth in the Restatement (Third) of Foreign Relations Law § 403 as to whether to prescribe U.S. laws to foreign activities.  "Under the Restatement, a nation having some 'basis' for jurisdiction to prescribe law should nonetheless refrain from exercising that jurisdiction 'with respect to a person or activity having connections with another state when the exercise of such jurisdiction is unreasonable.'"  *Hartford Fire Ins*., 509 U.S. at 818 (Scalia dissent) (quoting Restatement (Third) of Foreign Relations Law, § 403(1)).  The "reasonableness" inquiry turns on, *inter alia*: (a) the extent to which the challenged activity takes place within the regulating territory, *id*. § 403(a), (b) the connections between the regulating state and those whom the regulation is designed to protect, *id*. § 403(2)(b), (c) the character of the activity to be regulated and the importance of regulation to the regulating state, *id*. § 403(2)(c), (d) the

35

extent to which another state may have an interest in regulating the activity, *id*. § 403(2)(g), and (e) the likelihood of conflict with regulation by another state, *id*. § 403(h).

There can be no dispute that Defendants' conduct here took place exclusively in China and that China has a strong, legitimate national interest in protecting its natural resources by regulating trade and export of mineral products. The Defendants are Chinese companies operating in the magnesite industry, whose interests the regulations are designed to protect. By comparison, the United States (and other countries) have no competing interest in regulating the production and export of Chinese Processed Magnesite, other than to prevent "dumping," which the Chinese regulations are designed to prevent. Not only is there no conflict with China's regulation of its own magnesite export industry and worldwide antidumping regulations, but these goals are aligned. Under these circumstances, it would be unreasonable to prescribe U.S. laws to China's regulated magnesite export industry.

Likewise, the extraterritorial injunction plaintiff Animal Science seeks, over conduct by Chinese defendants in China that these Defendants assert results from official Chinese government directives and policies, raises serious concerns as to its propriety, practicality and enforceability. These concerns are well summarized by Judge Weinstein in his opinion in *In re Agent Orange Prods. Liab. Litig.*, 373 F. Supp. 2d 7, 45 (E.D.N.Y. 2005):

> Requests for extraterritorial injunctions often raise serious concerns for sovereignty and enforceability which compel denial. *See generally Vanity Fair Mills, Inc. v. T. Easton Co.*, 234 F.2d 633, 647 (2d Cir. 1956). The power to enjoin activities on foreign soil "should be exercised with great reluctance when it [would] be difficult to secure compliance … or when the exercise of such power is fraught with possibilities of discord and conflict with the authorities of another country."

36

*Id.*

For these reasons, the Court should abstain from asserting jurisdiction to apply the Sherman Act to Defendants' wholly foreign activities.

## CONCLUSION

For the reasons set forth above, the Court should dismiss the Amended Complaint with prejudice for lack of subject matter jurisdiction or, alternatively, abstain from asserting jurisdiction for reasons of act of state, sovereign compulsion, and comity.

Respectfully submitted,

**Robinson, Wettre & Miller LLC**

By **    /s/ Donald A. Robinson    **
Donald A. Robinson
One Newark Center
Newark, New Jersey  07102
(973) 690-5400

and

**Kramer Levin Naftalis & Frankel LLP**

1177 Avenue of the Americas
New York, New York  10036
(212) 715-9000

*Attorneys for Defendants*
*Sinosteel Corporation, Sinosteel Trading*
*Company, Liaoning Jiayi Metals & Minerals Co.,*
*Ltd.*

KL3 2725861.1