represents the largest use of magnesium in the world. China is estimated to have 80 percent of global magnesite reserves.

38.   Magnesite is mined from magnesium deposits and delivered from the mine to a crushing plant where it is crushed in three stages. Depending on the grade of the crushed material, the crushed magnesite is used in different production facilities to produce different forms of magnesite.

39.   There are three principal forms of magnesite sold in U.S. commerce. Dead-burned magnesite ("DBM") is produced by high temperature conversion of magnesite. DBM is used for the lining of metallurgical or refractory furnaces used for the melting of steel, nonferrous metal and glass and the making of cement. Approximately 70 percent of the world's production of magnesite is attributable to DBM.

40.   Caustic-calcined magnesite ("CCM") is produced by low temperature conversion. CCM is used in many market segments, including environmental applications. CCM is used to remove silica and heavy metals from industrial wastewater, to remove sulphur dioxide from industrial gases, and for other uses. Approximately 22 percent of the world's production of magnesite is attributable to CCM.

41.   A third type of magnesite – electro-fused magnesite ("EFM") or fused magnesite – is produced by fusing CCM at high temperatures in an electric arc furnace. EFM is divided into two segments: refractory and electrical. Refractory EFM is used in similar fashion to DBM and is sometimes used in combination with DBM. Electrical EFM is used in insulating material in heating elements for electrical goods. Approximately 8 percent of the world's production of magnesite is attributable to EFM. China accounts for 80 percent of worldwide EFM production.

42.   During the period described in this Complaint, the international market for magnesite and magnesite products was dominated by defendants and their co-conspirators, including producers

8

of magnesite and magnesite products and trading companies in China exporting magnesite and magnesite products. Defendant producers have lower costs than their western competitors and as a result also dominate the group of manufacturers worldwide who can produce magnesite and magnesite products at costs below other producers. Exporters from China also enjoy a competitive advantage relative to manufacturers in other nations because China has employed a fixed currency exchange rate which undervalues the Yuan, making Chinese exports of magnesite and magnesite products to the United States relatively less expensive compared to exports of magnesite and magnesite products from other nations.

43. During the period of this Complaint, the conduct of defendants and their co-conspirators has taken place in and affected the interstate and foreign trade and commerce of the United States. Over 650,000 metric tons of magnesite are imported into the United States each year and over sixty percent of that is imported from China. U.S. imports of magnesite and magnesite products from China exceed $50 million per year.

44. The conduct of defendants and their co-conspirators has directly, substantially and foreseeably restrained such trade and commerce.

## VI.  FACTUAL BACKGROUND

### A.  Violations of Antitrust Laws

45. In approximately April 2000, following the 1999 decline of magnesite prices, thirteen producers and exporters of magnesite in China, including mining companies and trading companies, established a cartel called the "Jiayuan Magnesite Export Group" for the export of magnesite, and reached agreement on fixing unified export prices to avoid competitive price cutting. During that same period, a second cartel group formed called the "Huaxia Magnesia Products Export Group." The members of the two cartel groups collectively represented more than 70 percent of the export volume of magnesite in China.

46. As a result of these cartel agreements, despite slumping demand, the price of magnesite and magnesite products increased during 2000 by over 45 percent compared to 1999. The President of the Jiayuan Magnesite Export Group reported by mid-2001 that the cartel's efforts had been successful and would generate an additional 50 million U.S. dollars in export sales.

47. By February 2001, the two groups formally established a single cartel under the name of the "Chinese Magnesite Export Association." By this time, the cartel had grown to 23 exporting companies, including defendants.

48. Since April 2000, the magnesite cartel has conducted several further cartel meetings of defendants and other exporters. On March 22, 2003, at least 19 exporting companies, including defendants, met in Shenyang, China. The cartel members agreed to strengthen self-regulation and cooperation to reduce competition in exports of magnesite. The cartel agreed to establish itself under the name the "China Magnesite Forum" and established goals of restraining competition and establishing limits on export supply in order to maintain and increase prices. The members of the China Magnesite Forum agreed that cartel-related disputes would be arbitrated among themselves by their trade association, the China Chamber of Commerce of Metal, Minerals & Chemicals Importers & Exporters.

49. After achieving significant price increases, the cartel has successfully stabilized the prices of magnesite and magnesite products in the United States and avoided major price cutting despite low levels of demand.

50. Defendants began their ongoing combination and conspiracy to suppress competition by fixing the price and controlling export sale volumes of magnesite and magnesite products offered for sale to customers in the United States and elsewhere. The ongoing combination and conspiracy engaged in by the defendants and their co-conspirators is an illegal and unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

51. During the period of the charged combination and conspiracy, defendants and their co-conspirators have participated in meetings and conversations in China and elsewhere in which the prices, volume of sales, and markets for magnesite and magnesite products were discussed and agreed upon. These meetings have also been coordinated with trade association meetings for associations in which defendants are members.

52. At the above-described meetings and during the period of the conspiracy, defendants and others agreed to and did eliminate, suppress, and limit competition, by, among other things:

   (a) discussing the production volumes and prices of magnesite and magnesite products;

   (b) agreeing to control the supply of magnesite and magnesite products for export;

   (c) agreeing to increase and maintain prices of magnesite and magnesite products.

53. In addition to other practices, defendants' illegal concerted conduct was facilitated by their concentrated control over sales of magnesite and magnesite products. Together, defendants and their co-conspirators dominate the production and sale of magnesite in the world and the United States. Although non-cartel members represent approximately 30 to 40 percent of the U.S. market, the cartel has been successful because the other producers have higher costs for magnesite and magnesite products, including currency costs, than Chinese producers, which set a floor below which other producers cannot compete. Further, as the cartel has taken steps to restrain production and increase prices, competitors have shown that they would follow price increases rather than undercut the new cartel price levels.

54. In 2004, the collusive arrangements of the cartel continued to maintain prices well above those of a competitive market. Prices of magnesite in the animal feed industry, for example,

11

have steadily increased during the period of the cartel and risen an overall 25 percent during that period.

55. The cartel established by defendants and their co-conspirators continues its illegal conduct today.

### B. The Impermissible Effect on Relevant Markets

56. During the conspiracy, prices of magnesite and magnesite products have not followed the laws of supply and demand that exist in a competitive market. Prices have remained stable or increased during the period of the conspiracy despite low demand.

57. Due to defendants' price fixing and market allocation activity, the prices of magnesite and magnesite products have increased despite reductions in the cost of production.

### C. Benefit to Defendants

58. Each defendant has substantially benefited from its participation in this illegal price-fixing conspiracy.

### D. Fraudulent Concealment

59. Plaintiffs did not discover and could not discover, through the exercise of reasonable diligence, the existence of the claims sued upon in April 2000 because defendants and their co-conspirators actively, intentionally, and fraudulently concealed the existence of the combination and conspiracy from plaintiffs in the United States through at least the time four years prior to the filing of this Complaint by one or more of the following affirmative acts, including acts in furtherance of the conspiracy:

    (a) Meetings which were kept secret from U.S. customers in which the prices, sales volumes, and markets for magnesite and magnesite products were discussed and agreed;