FOR  PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| ANIMAL SCIENCE PRODUCTS, INC., et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Civ. No. 05-4376 (GEB) |
| v. | : | |
| | : | |
| CHINA NATIONAL METALS & MINERALS IMPORT & EXPORT CORPORATION, et al., | : | **OPINION** |
| | : | |
| Defendants. | : | |

**APPEARANCES:**

Robert A. Magnanini, Esq.
     Stone and Magnanini, LLP,
Richard E. Donovan, Esq.
     Kelley Drye & Warren LLP,
William A. Isaacson and Jennifer Milici, Esqs.
     Boies, Schiller & Flexner, LLP
*Attorneys for Plaintiffs Animal Science Products, Inc., Resco Products, Inc. and a class of
similarly situated.*[1]

Robert J. Del Tufo, Shepard Goldfein, Michael L. Weiner, Thomas Pak and Sean M. Tepe, Esqs.
     Skadden, Arps, Slate, Meagher & Flom, LLP
*Attorneys for Defendants China Minmetals Corp. and China National Minerals Co., Ltd.*

Donald A. Robinson and Leda Dunn Wettre, Esqs.
     Robinson, Wettre & Miller LLC,
Nicholas L. Coch, Jonathan S. Kaplan, Timothy J. Helwick and Mark A. Baghdassarian, Esqs.
     Kramer Levin Naftalis & Frankel LLP
*Attorneys for Defendants Sinosteel Corp., Sinosteel Trading Co. and Liaoning Jiayi Metals &
Minerals Co., Ltd.*

---

[1] The instant matter is a putative class action.

## TABLE OF CONTENTS

I.      Introduction

II.      Procedural Background

III.      Factual Background

IV.      Distinction Between the Relevant Tests and Burdens

     A.      Standard and Burden Associated with Jurisdictional Inquiry

     B.      Standard Associated with Pleading Underlying Claims

     C.      Burden Associated with Asserting Abstention

V.      Aspects Related to the FTAIA

     A.      Subject Matter Jurisdiction under the Export Exception to the FTAIA Bar

         1.      Interplay Between the Sherman Act, FTAIA and Hartford Fire

         2.      Plaintiffs Fail to Provide Factual Proof Meeting the FTAIA Exception

             a.      Paragraph One

             b.      Paragraph Three

             c.      Paragraph Twenty-Nine

             d.      Paragraph Forty-Seven

             e.      Paragraph Forty-Eight

             f.      Paragraph Forty-Nine

             g.      Paragraph Fifty

             h.      Paragraph Fifty-One

             i.      Paragraph Fifty-Five

             j.      Paragraph Sixty-Five

             k.      Paragraph Seventy-Two

             l.      Paragraph Seventy-Five

             m.      Amended Complaint Fails to Meet the FTAIA Exception

     B.      Subject Matter Jurisdiction Under the Introductory Clause of the FTAIA

         1.      Plaintiffs' Allegations

         2.      Claim That Defendants Effectively Acted as Importers

             a.      Plaintiffs' Legal Position

             b.      Coors Does Not Lend Support to Plaintiffs' Legal Position

             c.      Plaintiffs' Position Contradicts the Gist of the Third Circuit Law

             d.      Sales to an American Intermediary or American End-Consumer

         3.      Plaintiffs' Factual Proof as to Defendants' Importer Status

             a.      Plaintiffs' Own Exhibits

             b.      Discrepancies in Defendants' Statements

             c.      Defendants' Exhibits

VI.      Leave to Amend

     A.      General Rule

     B.      Implications of Twombly, Iqbal and Factual Review Under Turicentro

        C.     Limited Leave to Amend Is in the Interests of Justice
        D.     Prudential Considerations
  VII.  The FSIA and Abstention Aspects
        A.     Standard of Review
        B.     Applicable Legal Tests
             1.     The FSIA
             2.     The Act of State Doctrine
             3.     The Concept of Comity
             4.     Government Compulsion
        C.     Parties' Relevant Exhibits and Factual Assertions
             1.     Defendants' Moving Papers
             2.     Plaintiffs' Opposition
             3.     Defendants' Reply
        D.     Relevant Legal Proceedings and Evidence Submitted Therein
             1.     Judicial Notice and the Concept of Stare Decisis
             2.     Antidumping and Countervailing Proceedings
                  a.     European Union Proceedings
                  b.     Proceedings Before the International Trade Administration
             3.     Antitrust Proceedings
                  a.     Proceedings in the Western District of Pennsylvania
                  b.     Vitamin C Proceedings
        E.     The FSIA Appears Relevant as to Some Defendants
        F.     The Act of State Doctrine Does Not Warrant Abstention
        G.     Doctrine of Government Compulsion Appears Relevant
              1.     Preliminary Considerations
                  a.     Concept of Compulsion through the Prism of Common Law
                  b.     Concept of Compulsion through the Prism of Foreign Regimes
                  c.     Deference to Statements Made by an Arm of a Foreign Sovereign
              2.     The CCCMC Is a Government Entity for the Purposes of the Doctrine
              3.     Presence of Compulsory Processes
                  a.     Source of Compulsion
                  b.     Theoretical Severity
                  c.     Actual Existence of Prescripts
                  d.     Composite Effect
                  e.     Miscellaneous Considerations
              5.     Compulsion Established and Asserted
  VIII.  Conclusion

**BROWN**, Chief Judge:

## I.    INTRODUCTION

This matter comes before the Court upon Plaintiffs' filing of an amended complaint ("Amended Complaint" or "Am. Compl."), see Docket Entry No. 77, and upon submission of two motions to dismiss the Amended Complaint; these submissions were made by two groups of Defendants, i.e., by: (1) China Minmetals Corp. and China National Minerals Co., Ltd. (collectively, "Minmetals Defendants"); and (2) Sinosteel Corp., Sinosteel Trading Co. and Liaoning Jiayi Metals & Minerals Co., Ltd. (collectively, "Sinosteel Defendants"). See Docket Entry No. 98 ("Sinosteel's Motion" or "S/Mot.") and Docket Entry No. 99 ("Minmetals' Motion" or "M/Mot."). Plaintiffs duly filed their opposition to Sinosteel and Minmetals' Motions, see Docket Entry No. 105 ("Plaintiffs' Opposition" or "Opp."), to which the aforesaid two groups of Defendants duly replied. See Docket Entry No. 109 ("Minmetals' Reply" or "M/Reply") and Docket Entry No. 110 ("Sinosteel's Reply" or "S/Reply"). For the reasons stated below, Sinosteel and Minmetals' Motions will be granted, and the Amended Complaint will be dismissed as to the Minmetals and Sinosteel Defendants.[2] This dismissal, however, will be, in part, without prejudice, and Plaintiffs will be allowed to amend their pleadings and to provide the Court with factual proof establishing that Defendants were acting as 'importers" during the putative Class Period.

---

[2] The instant decision shall not be construed as having any direct, that is, immediately dispositive, effect on Plaintiffs' claims raised against all Defendants that did *not* file the Motions at bar ("Residual Defendants"). The Court, however, reserves any determination as to indirect applicability of the instant decision to Plaintiffs' claims against the Residual Defendants; for instance, the Court reserves its decision as to whether Plaintiffs' claims against the Residual Defendants – or certain aspects of such Plaintiffs' claims – might be barred from enforcement by the operation of the doctrine of collateral estoppel.

## II.   **PROCEDURAL BACKGROUND**

Being initiated almost half a decade ago, this matter has accrued a rather substantial

procedural history.  However, the bulk of these developments is largely irrelevant to the issues at

hand and, hence, it should suffice to merely note that, on September 7, 2005, Plaintiffs Animal

Science Products, Inc. ("Animal Science") and Resco Products, Inc. ( "Resco") filed a civil

complaint ("Original Complaint") on behalf of a putative class and named seventeen Chinese

business entities as Defendants.

The issues related to service of process dominated the next two years of litigation.  See,

e.g., Docket Entries Nos. 3-50; see also Docket Entry No. 73 ("December Opinion" or "Dec.

Op."), at 3-4 (detailing these procedural developments).  Eventually, Plaintiffs moved for a

default judgment, which triggered Defendants' motion for dismissal of the Original Complaint.

See Sep. Op. at 3-4.  These key revolutions were accompanied by: (a) an extensive litigation on

the issue of whether this matter should be resolved by arbitration instead of being litigated; and

(b) a panoply of peripheral claims and challenges based on a multitude of substantive and

procedural issues.  See id.; see also Docket Entries Nos. 3-63.

On September 15, 2008, this matter was reassigned to the undersigned and, on October 6,

2008, this Court held oral arguments as to the constellation of the then-pending motions. On

December 30, 2008, this Court issued its December Opinion and accompanying order.  See

Docket Entries Nos. 73 and 74.   The order dismissed the Original Complaint without prejudice,

and disposed of the then-pending Plaintiffs and Defendants' motions on various grounds.

The accompanying December Opinion ended with a guidance as to motion practice:

Thus far, the Court has been presented with a multitude of motions (in addition to those addressed in [the December] Opinion). Since these motions, as well as peripheral challenge[s] embedded in the [m]otions [to dismiss] resolved by this discussion, raise a panoply of issues, the Court finds it prudent to provide the parties with a roadmap to the future litigation in the event: (a) Plaintiffs' elect to take advantage of the leave to file an amended complaint; and (b) Defendants elect to renew some or all of the challenges extended in Defendants' motions and/or scattered in Defendants' oppositions to Plaintiffs' [m]otion [for default judgment]. Hence, in the event Plaintiffs file an amended complaint, Plaintiffs must incorporate in their submission evidentiary proof allowing the Court to conduct a factual determination (in contrast with the facial analysis conducted herein) and to conclusively satisfy itself as to presence of lack of subject matter jurisdiction over this action. In the event Defendants wish to extend challenges to the Court's subject matter jurisdiction and/or to assert that the Court shall abstain from resolving the instant matter on the grounds involving any provision, judicially-create[d] doctrine or public policy related to a foreign sovereign's action or to Chinese regulatory or legal regime, Defendants should do so at their first opportunity to respond to the amended complaint. If, and only if, the Court: (a) determines that it has proper subject matter jurisdiction over this action; and (b) finds that it shall not abstain from resolving it, Defendants may, if they so desire, renew their currently extended challenges in the following order:

(1)     Defendants shall first raise their challenges based on the alleged lack of personal jurisdiction, insufficient service of process and improper venue;

(2)     only in the event Defendants elect not to raise such challenges, of if the Court determines that in personam jurisdiction was duly obtained and, in addition, establishes that the instant matter is properly before the Court, Defendants may, if they wish, re-raise their argument that the Court shall compel arbitration of this action; and

(3)     if, and only if, Defendants elect not to raise such challenge or the Court denies Defendants' request to compel arbitration, Defendants may, if they so desire, renew their challenges asserting Plaintiffs' lack of standing and failure to state a claim upon which relief can be granted.

Dec. Op. at 59-60.

The parties duly complied with the aforesaid guidance. Plaintiffs filed their Amended

Complaint naming, in addition to the Minmetals and Sinosteel Defendants, the following entities

as Defendants in this matter: Xiyang Group; Xiyang (Pacific) Import & Export Ltd. Co.; Xiyang

Refractory Materials Ltd. Co.; Xiyang Fireproof Material Co. Ltd.; Liaoning Foreign Trade

General Co.; Dalian Golden Sun Import & Export Co.; Haicheng Houying Co. Ltd.; Haicheng

Huayu Group Import & Export Co. Ltd. (Huaziyu); Haicheng Pailou Magnesite Ore Co. Ltd. and

Yingkou Huachen Co. Ltd. See Docket Entry No. 77, at 1-3. In response, Defendants filed the

Motions at hand, challenging the Amended Complaint on the grounds of subject matter

jurisdiction and failure to meet the pleading requirements and, in addition, setting forth numerous

arguments advocating abstention.

### III.  FACTUAL BACKGROUND

Since the allegations raised in the Amended Complaint – and corresponding challenges

raised in the Minmetals and Sinosteel's Motions – fall into two broad categories, one addressing

a multitude of aspects related to abstention and/or Defendants' immunity from suit, and another

related to this Court's subject matter jurisdiction and Plaintiffs' compliance with the pleading

requirements  – a detailed recital of all allegations and challenges currently before the Court

might be unnecessarily overwhelming, while a short summary of the same could cause the parties

an undue concern that the Court's omission of certain aspects from such summary might be a

sign that these aspects have escaped the Court's attention.  Consequently, it appears useful to

detail the relevant assertions and challenges in connection with discussion of each individual

group of legal issues and, at the instant juncture, it should be sufficient to simply outline the key

background points.

Here, Plaintiffs are United States enterprises that consume, for the purpose of conducting

their respective businesses, magnesite-based products.  See Am. Compl. §§ 10, 11.  All

Defendants named in the Amended Complaint are Chinese business entities involved in the sale

of magnesite-based products. See id. §§ 12-27.  Plaintiffs assert that each of the named

Defendants either "directly sold magnesite products to the U.S. companies and shipped

magnesite products to the United States" or "engage[d] in metal and minerals trading among

other things, including export of magnesite to the United States." Id.  Plaintiffs further assert that

the overall prices charged for Chinese magnesite were artificially inflated because: (a) "[e]ach of

these Defendants and its co-conspirators has colluded with each other to restrain competition by,

among other things, setting artificial prices pursuant to illegal horizontal agreements among

[themselves]," id. § 29; and (b) "[t]hese horizontal practices were designed to, and in fact did,

have a substantial and adverse impact in the United States." Id. § 30.  In light of the foregoing,

Plaintiffs claim that Defendants' actions violated Section 1 of the Sherman Act, 15 U.S.C. § 1.[3]

Defendants challenge the Amended Complaint asserting that: (1) Plaintiffs' allegations

fail to meet the applicable pleading requirements; (2) Plaintiffs' allegations depict a picture

which – under the Foreign Trade Antitrust Improvements Act ("FTAIA") and the Foreign

Sovereign Immunities Act ("FSIA") – strips this Court of subject matter jurisdiction over this

matter; and/or (3) considerations of comity and the tenets of the "act of state" and "government

compulsion" doctrines warrant abstention. See generally, M/Mot, S/Mot, M/Reply and S/Reply.

---

[3] No allegations made in the Amended Complaint suggest that Plaintiffs made any effort to buy, specifically, magnesite of Chinese origin (or to avoid buying Chinese magnesite); rather, it appears that Plaintiffs were: (a) buying magnesite regardless of the product's origin: and (b) driven only by their interest in obtaining the particular magnesite-based products Plaintiffs needed at the cheapest price these products were available. See generally, Am. Compl.  The voluminous attachments to Plaintiffs' Amended Complaint indicate that Chinese magnesite-based products were indeed the cheapest in the world market, and Plaintiffs never asserted otherwise. See Docket Entry No. 77.  Rather, the financial point of Plaintiffs' legal claims could be reduced to the statement that the Chinese magnesite-base products were not as cheap as they could have been had Defendants not entered into the alleged collusive agreement(s). See id. § 29.

To the degree this panoply of issues allows, the Court will address these challenges <u>seriatim</u>.

IV.     **DISTINCTION BETWEEN THE RELEVANT TESTS AND BURDENS**

Since there appears to be confusion among the parties as to the applicable tests, the allocation of burdens and the procedural propriety of related inquiries, the Court finds it prudent to clarify these matters at the outset of this discussion.

For instance, Plaintiffs seem to assert that they need not address factual subject matter jurisdictional challenges since the Minmetals' Motion raises only facial jurisdictional challenges, and the Sinosteel's Motion "purports to raise factual challenges but the majority of its arguments concern purported deficiencies in Plaintiffs['] allegations." Opp., at 26. In addition, Plaintiffs maintain that the resolution of the subject matter jurisdictional aspect "should be postponed until summary judgment or a trial on the merits" because a decision as to subject matter jurisdiction would have a dispositive effect on the merits of Plaintiffs' Sherman Act claims. <u>See</u> <u>id.</u>

Defendants, on their part, make no distinction between the facial and factual standards and paraphrase their arguments with regard to the Court's subject matter jurisdiction in terms applicable to a facial review. <u>See</u>, <u>e.g.</u>, M/Mot., at 10-11 (discussing Rule 8 *facial* pleading requirements for the purposes of Defendants' *factual* analysis of the Court's subject matter jurisdiction). Moreover, Defendants seem to maintain that the Court must abstain from resolving this matter because *Plaintiffs* make insufficient assertions as to why this Court should not abstain from resolving it. <u>See</u>, <u>generally,</u> <u>id.</u> at 11-19, S/Reply at 19-23.

A.     **Standard and Burden Associated with Jurisdictional Inquiry**

Contrary to what appears to be Plaintiffs' impression, the subject matter jurisdiction inquiry initiated in this case was not a result of the challenges raised by the Minmetals

Page 9 of 222

Defendants or by the Sinosteel Defendants (or by any other Defendant); rather, the issue was raised by this Court sua sponte in light of the jurisdictional uncertainties presented by the case at bar. The Court's decision to look into the jurisdictional aspect ensued from the Court of Appeals' guidance that each "[c]ourt has a continuing obligation to sua sponte raise the issue of subject matter jurisdiction." Bracken v. Matgouranis, 296 F.3d 160, 162 (3d Cir. 2002); see also Morel v. INS, 144 F.3d 248, 251 n.3 (3d Cir. 1998) (quoting Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 (1982), as to the observation that "[a] federal court . . . will raise lack of subject-matter jurisdiction on its own motion").

Next, the burden to establish subject matter jurisdiction falls squarely on Plaintiffs since Plaintiffs invoked the Court's jurisdiction by bringing this action. See Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994) (clarifying that a federal court shall presume lack of jurisdiction, and the party seeking to invoke the court's jurisdiction bears the burden of proving that subject matter jurisdiction exists). Consequently, any potential shortcomings of – or any potential errors in – Defendants' subject matter jurisdictional challenges cannot have any effect on Plaintiffs' burden, except with regard to the issues discussed in "The FSIA" section of this Opinion, infra.

As this Court already pointed out in its December Opinion, deficiencies as to the "subject matter jurisdiction may be either 'facial' or 'factual.'" Turicentro, S.A. v. Am. Airlines, Inc., 303 F.3d 293, 300, n. 4 (3d Cir. 2002). The distinction between factual and facial assessments is rather dramatic. In a facial attack (that is, addressing a challenge based on the assertions made in the plaintiff's pleadings), the trial court must accept the complaint's allegations as true, i.e., the court merely requires the plaintiff to articulate the factual premise of his/her contentions, without

providing the court with any actual evidence underlying the plaintiff's factual assertions. "In

contrast, a trial court considering a factual attack accords plaintiff's allegations no presumption of

truth," and requires production of actual evidence upon which the plaintiff bases his/her factual

contentions. Turicentro, 303 F.3d at 299, n.4. Consequently, when assessing a factual – rather

than facial – deficiency, the court "can  look beyond the pleadings to decide factual matters

relating to jurisdiction." Cestonaro v. United States, 211 F.3d 749, 752 (3d Cir. 2000); see also

Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977) (a factual inquiry

into the district court's jurisdiction under Federal Rule of Civil Procedure 12(b)(1) is not

confined to the allegations in the complaint).

Furthermore, there is no procedural limitation as to the point in litigation in which a

factual inquiry as to the subject matter jurisdiction may be undertaken.  While it is true that, "in

the Sherman Act context, jurisdictional facts are often closely intertwined with the merits of the

claim," Carpet Group Int'l v. Oriental Rug Importers Ass'n, 227 F.3d 62, 73 (3d Cir. 2000), the

court in CNA v. United States, 535 F.3d 132, 145 (3d Cir. 2008), which is the case relied upon

by Plaintiffs, never held that the subject matter jurisdictional inquiry must be postponed until

summary judgment, or until trial.   Rather, the CNA court merely directed the district courts to

"ensure that defendants [were] not allowed to use Rule 12(b)(1) to resolve the *merits* [of

plaintiffs' claim] too early in litigation." Id. (emphasis supplied).

Here, the threshold subject matter jurisdictional inquiry is whether the FTAIA applies to

this matter, thereby removing this Court's jurisdiction to address the merits of Plaintiffs'

Sherman Act claims.  While the intricacies of the FTAIA are discussed infra (and the Sherman

Act test would be addressed only if subject matter jurisdiction over this matter is established), the

Court presumes the parties' familiarity with the basic proposition that, "[t]o establish a violation of Section 1, a plaintiff must prove: (1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action [was] illegal; and (4) that [the plaintiff was actually] injured as a proximate result of the concerted action."[4]  Gordon v. Lewistown Hosp., 423 F.3d 184, 207 (3d Cir. 2005) (citations omitted), cert. denied, 547 U.S. 1092 (2006).  In contrast, to avoid the FTAIA jurisdictional bar, the plaintiff must show either that: (a) the defendants are importers of goods/services in the United States, see 15 U.S.C. § 6a (stating the notoriously inelegant introduction that "[the Sherman Act] shall not apply to conduct involving trade or commerce [] other than import trade or import commerce []"); accord Carpet Group, 227 F.3d 62 at 72; Turicentro, 303 F.3d at 302; or, in alternative, (b) show that the defendants are exporters whose conduct "[had/]has a direct, substantial and reasonably foreseeable effect" on the United States domestic trade or commence.  See 15 U.S.C. § 6a(1); accord Turicentro, 303 F.3d at 302; Kruman v. Christie's Intern. PLC, 284 F.3d 384, 395 (2d Cir. 2002), overruled on other grounds, F. Hoffmann-LaRoche, Ltd. v. Empagran, SA, 542 U.S. 155 (2004).

Even a purely mechanical comparison of the elements comprising the Sherman Act standard with the elements of the FTAIA test reveals that these two tests, while perhaps peripherally related, have so little in common that a resolution of the threshold FTAIA aspect cannot be deemed substantively dispositive for purposes of the merits of the underlying Sherman

---

[4]  Notably, if a restraint is per se illegal, no examination of the practice's impact on the market is necessary for finding of anti-competitive effects within relevant product and geographic markets, see Pace Elecs., Inc. v. Canon Computer Sys., Inc., 213 F.3d 118, 123 (3d Cir. 2000), which means, in turn, that no aspect even vaguely resembling the "direct, substantial and reasonably foreseeable effect" of the FTAIA can possibly arise.

Act claims. Therefore, the caution articulated by the <u>CNA</u> court appears virtually inapplicable to a FTAIA-based scenario, since – without engaging in undue overreaching – a judicial decision disposing of a FTAIA challenge does not prematurely resolve the merits of the underlying Sherman Act claims.

**B.     Standard Associated with Pleading Underlying Claims**

Since Plaintiffs' Original Complaint asserted fraudulent conduct by Defendants, Plaintiffs' prior pleadings were examined under the requirements of Rule 9. However, the Amended Complaint no longer makes these assertions. Therefore, for the purposes of their Sherman Act claims, Plaintiffs' new set of allegations is subject to review under Rule 8.

It is long established that a court should "accept as true all of the [factual] allegations in the  complaint and reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." <u>Morse v. Lower Merion School Dist.</u>, 132 F.3d 902, 906 (3d Cir. 1997). Nonetheless, the Third Circuit has noted that courts are not required to credit bald assertions or legal conclusions improperly alleged in the complaint. <u>See</u> <u>Burlington Coat Fact. Sec. Litig.</u>, 114 F.3d 1410, 1429 (3d Cir. 1997). Therefore, legal conclusions draped in the guise of factual allegations may not benefit from the presumption of truthfulness. <u>See</u> <u>Nice Sys., Ltd. Sec. Litig.</u>, 135 F. Supp. 2d 551, 565 (D.N.J. 2001).

Addressing the clarifications as to the litigant's pleading requirement stated by the United States Supreme Court in <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544 (2007), the Court of Appeals for the Third Circuit provided the district courts with guidance as to what pleadings are sufficient to pass muster under Rule 8. <u>See</u> <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 230-34 (3d Cir. 2008). Specifically, the Court of Appeals observed as follows:

> "While a complaint . . . does not need detailed factual allegations, a plaintiff's obligation [is] to provide the 'grounds' of his 'entitle[ment] to relief' . . . ." Twombly, 127 S. Ct. at 1964-65 . . . ."[T]he threshold requirement of Rule 8(a)(2) [is] that the 'plain statement [must] possess enough heft to 'sho[w]' that the pleader is entitled to relief.'" Id. at 1966. [Hence] "factual allegations must be enough to raise a right to relief above the speculative level." Id. at 1965 & n.3.

Id. at 230-34 (original brackets removed).  This pleading standard was further refined by the

United States Supreme Court in its recent decision Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009),

where the Supreme Court clarified as follows:

> [In any civil action, t]he pleading standard . . . demands more than an unadorned ["]the-defendant-unlawfully-harmed-me["] accusation. [Twombly, 550 U.S.] at 555 . . . . A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." [Id.] at 555.  [Moreover,] the plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully. Id. [Indeed, even w]here a complaint pleads facts that are "merely consistent with" a defendant's liability, [the so-alleging complaint still] "stops short of [showing] plausibility of 'entitlement to relief.'" Id. at 557 (brackets omitted).  [A fortiori,] the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions [or to t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements [, i.e., by] legal conclusion[s] couched as a factual allegation [e.g.,] the plaintiffs' assertion of an unlawful agreement [or] that [defendants] adopted a policy "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." . . . . [W]e do not reject these bald allegations on the ground that they are unrealistic or nonsensical. . . .  It is the conclusory nature of [these] allegations . . . that disentitles them to the presumption of truth. . . . [Finally,] the question [of sufficiency of] pleadings does not turn [on] the discovery process.  Twombly, 550 U.S.] at 559 . . . . [The plaintiff] is not entitled to discovery [where the complaint asserts some wrongs] "generally," [i.e., as] a conclusory allegation [since] Rule 8 does not [allow] pleading the bare elements of [the] cause of action [and] affix[ing] the label "general allegation" [in hope of developing actual facts through discovery].

Iqbal, 129 S. Ct. at 1949-54.

The Third Circuit observed that Iqbal hammered the "final nail-in-the-coffin" for the "no

set of facts" standard set forth in Conley v. Gibson, 355 U.S. 41, 45-46 (1957),[5] which was

---

[5] The Conley court held that a district court was permitted to dismiss a complaint for failure to state a claim only if "it appear[ed] beyond doubt that the plaintiff can prove no set of

applied to federal complaints before <u>Twombly</u>.  See <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203

(3d Cir. 2009).  Since <u>Iqbal</u>, the Third Circuit has instructed district courts to conduct, with

regard to Rule 8 allegations, a two-part analysis when the district courts are presented with a

Rule 12(b)(6) motion to dismiss:

> First, the factual and legal elements of a claim should be separated.  The District Court
> must accept all of the complaint's well-pleaded facts as true, but may disregard any legal
> conclusions.  [See <u>Iqbal</u>, 129 S. Ct. at 1949-50].  Second, a District Court must then
> determine whether the facts alleged in the complaint are sufficient to show that the
> plaintiff has a "plausible claim for relief" [in light of the definition of "plausibility"
> provided in <u>Iqbal</u>.]  In other words, a complaint must do *more than allege the plaintiff's
> entitlement to relief.*  A complaint has to "show" such an entitlement with its facts.  <u>See</u>
> <u>Phillips</u>, 515 F.3d at 234-35.  As the Supreme Court instructed in <u>Iqbal</u>, "[w]here the
> well-pleaded facts do not permit the court to infer more than the *mere possibility of
> misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled
> to relief.'"  <u>Iqbal</u>, [129 S. Ct. at 1949-50 (emphasis supplied)].  This "plausibility"
> determination will be "a context-specific task that requires the reviewing court to draw on
> its judicial experience and common sense." <u>Id.</u>

<u>Fowler</u>, 578 F.3d at 210-11 (emphasis supplied).[6]

---

facts in support of his claim which would entitle him to relief." <u>Conley v. Gibson</u>, 355 U.S. at
45-46.  Under this "no set of facts" standard, a complaint could effectively survive a motion to
dismiss so long as it contained a bare recitation of the claim's legal elements.

   [6] This Court is not aware of any legal decision addressing the effect of <u>Iqbal</u> on the
standard applicable to the *factual* Rule 12 challenges, as they are defined in <u>Turicentro</u>.
However, it appears logical for the Supreme Court's guidance in <u>Iqbal</u> to have at least a ripple
effect on the standard applicable to factual challenges.  Since the Supreme Court in <u>Iqbal</u>
expressly guided that a plaintiff cannot obtain discovery with regard to his/her claims unless the
plaintiff actually spells out the facts underlying these claims, the same guidance – if applied to
factual rather than facial review – must yield the rule that a plaintiff cannot obtain discovery with
regard to evidence verifying jurisdiction.  Indeed, concluding otherwise invites a scenario where
the plaintiff, being charged with the duty to actually produce jurisdictional evidence, is
nonetheless permitted to flatly admit that (s)he has no such evidence and that all (s)he can do is
to speculate in his/her pleadings that such evidence might be discovered.  In other words,
allowing the plaintiff to conduct discovery for the purposes of factual challenge would result in
an anomalous rule granting the plaintiff a broader pleading latitude for the purposes of the test
under which the plaintiff's pleadings are not even granted presumption of truth.

C.      **Burden Associated with Asserting Abstention**

The Supreme Court has long rejected the rigid proposition that abstention is a technical

rule of equity procedure.  See Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 718 (1996).

Rather, the Court held that "the authority of a federal court to abstain from exercising its

jurisdiction extends to all cases in which the court has discretion to grant or deny relief." Id. at

718.  However, as the parties seeking abstention, Defendants bear the burden of showing that

abstention is the appropriate course. Cf. Colo. River Water Conservation Dist. v. United States,

424 U.S. 800, 814 (1976) ("The doctrine of abstention, under which a District Court may decline

to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception

to the duty of a District Court to adjudicate a controversy properly before it"); Sheerbonnet v.

American Express Bank, Ltd., 17 F.3d 46, 49 (2d Cir. 1994) (given "the virtually unflagging

obligation of the federal courts" to exercise jurisdiction where warranted, a defendant seeking

abstention faces a heavy burden).  Consequently, any potential shortcomings of – or any potential

errors in – Plaintiffs' position advocating against abstention cannot reduce or otherwise affect

Defendants' burden of establishing that this Court should refrain from resolving this matter.

V.      **THE FTAIA ASPECT**

A.      **Subject Matter Jurisdiction under the Export Exception to the FTAIA Bar**

1.      **Interplay Between the Sherman Act, FTAIA and *Hartford Fire***

As with the above-discussed issues of applicable standards and burdens, there appears to

be a certain confusion among the parties as to the relationship between the governing statutory

provision and relevant common law precedents addressing the issue of federal jurisdiction over

the claims alleging collusive agreements within the context of international trade.  See, e.g.,

S/Mot., at 7 (suggesting the presence of *two different* tests by stating: "Plaintiffs' . . . allegations are insufficient to establish that Defendants' alleged conspiracy involved United States "import commerce" or had a "direct, substantial, and reasonably foreseeable effect" on U.S. commerce, as required by the . . . FTAIA . . . *or* that [Defendants' conduct] involved 'import commerce' or trade that had 'substantial effect[s]' on U.S. domestic commerce, as required by <u>Hartford Fire Ins[.] Co. v. California</u>").

The Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. Federal courts have struggled for decades to determine their jurisdiction over allegations of foreign restraints of trade. <u>See, e.g.</u>, Areeda & Hovenkamp, Antitrust Law, ¶ 272 (2d ed. 2000); <u>see also</u> <u>Den Norske Stats Oljeselskap As v. Heere-Mac v.o.f.</u>, 241 F.3d 420, 423-24 (5th Cir. 2001) ("The history of this body of case law is confusing and unsettled").

Prior to the passage of the FTAIA, the courts applied various tests in order to determine when foreign conduct fell within the purview of the Sherman Act. The most widely used standard was the "effects test," which was developed by the Second Circuit in <u>United States v. Aluminum Co. of Am.</u> ("<u>Alcoa</u>"), 148 F.2d 416, 444 (2d Cir. 1945). The <u>Alcoa</u> court considered whether Congress intended the Sherman Act to impose liability for conduct outside the United States and under which circumstances the Constitution allowed Congress to do so. <u>See</u> <u>id.</u> Judge Hand rejected the idea that Congress meant "to punish all whom [United States] courts can catch." <u>Id.</u> at 443. Instead, the <u>Alcoa</u> court held that the Sherman Act was meant to reach foreign conduct only if that conduct was *intended to affect* (and did, in fact, affect) United States

commerce.  See id. Accordingly, in Hartford Fire Ins. Co. v. California, the Supreme Court

focused on the "intent-to-affect" language of Alcoa and summarized the effects test by stating

that "it is well established by now that the Sherman Act applies to foreign conduct that was

*meant to produce* and did in fact produce some substantial effect in the United States." 509 U.S.

764, 796 (1993) (citing Alcoa, emphasis supplied).

      Application of the Alcoa effects test, however, proved difficult, causing the precise

extraterritorial reach of the Sherman Act to remain less than crystal clear.  In response to that

difficulty, Congress enacted the FTAIA in 1982 -- because the "courts differ[ed] in their

expression of the proper test for determining whether United States antitrust jurisdiction over

international transactions exists," H.R. Rep. No. 97-686 (1982), reprinted in, U.S.C.C.A.N. 2487,

2487 (1982) -- the statute, hence, built on the common law principle established in Alcoa and

embraced in Hartford Fire.  In no ambiguous terms, the FTAIA "clarif[ied] the Sherman Act [by]

mak[ing it] explicit [that, in foreign trade cases, the Sherman Act had] application only to

conduct having a 'direct, substantial and reasonably foreseeable effect' on domestic commerce."

Id.  Specifically, the FTAIA provided that:

> [The Sherman Act] shall not apply to conduct involving trade or commerce (other than
> import trade or import commerce) with foreign nations unless --
> (1)    such conduct has a *direct, substantial, and reasonably foreseeable effect* --
>       (A)    . . . on [United States] import trade or import commerce with foreign
>             nations . . .
>     and
> (2)    such effect gives rise to a claim under the [Sherman Act].

15 U.S.C. § 6a (emphasis supplied).

      Although subsection (1) created an exception to the FTAIA's jurisdictional bar with

regard to those claims that were raised against foreign *exporters*, the language of this exception

did not clarify the meaning of the phrase "direct, substantial, and reasonably foreseeable effect,"

and federal courts' lack of interest in the FTAIA for the first decade after its enactment created an

interpretative void opening the door to a debate as to whether the FTAIA established a new

jurisdictional standard or merely codified the very same test that was articulated in Alcoa and

Hartford Fire.[7]  The gap was filled by the Ninth Circuit, which reasoned as follows:

> Our task when interpreting legislation is to give meaning to the words used by Congress;
> we strive to avoid constructions that render words meaningless. See United States v.
> Fiorillo, 186 F.3d 1136, 1153 (9th Cir. 1999).  The FTAIA states that the Sherman Act
> shall not apply to foreign conduct unless it has a "direct, substantial, and reasonably
> foreseeable effect" on domestic commerce. [See] 15 U.S.C. § 6a(1).  [In contrast,] the
> Supreme Court [explained that] the Alcoa test . . . confer[s] jurisdiction so long as the
> conduct creates "some substantial effect in the United States." Hartford Fire, 509 U.S. at
> 796.  Unlike the FTAIA, the Alcoa test does not require the effect to be "direct." [Hence,
> a]dopting the [reading of the FTAIA equivalent to that of] applying the Alcoa test would
> render meaningless the word "direct" in the FTAIA.  We are not willing to rewrite a
> statute under the pretense of interpreting it.  Moreover, applying Alcoa instead of the
> FTAIA would contravene the FTAIA's purpose. The FTAIA created its jurisdictional test
> because the "enactment of a single, objective test – the 'direct, substantial, and reasonably
> foreseeable effect' test – will serve as a simple and straightforward clarification of
> existing American law." [H.R.] at 2487-88. The [H.R.] goes on to state: "The specific
> purpose of the Sherman Act modification is: to more clearly establish when antitrust
> liability attaches to international business activities." Id. at 2492.  It would be a serious
> departure from the goal of achieving clarity for us to conclude that Congress meant only
> "some substantial effect," Hartford Fire, 509 U.S. at 796, when it said "direct, substantial,
> and reasonably foreseeable effect."  Clarity is not achieved by employing three modifiers
> ("direct," "substantial," and "reasonably foreseeable") as the standard for the required
> effect of the challenged conduct and then telling businesses that only one modifier ([e.g.,]

--------

[7]  Several courts noted this question without answering it, e.g., the Supreme Court did so
in Hartford Fire, noting that the effects test is well established, see, 509 U.S. at 796, and
observing – in a footnote – that the facts of Hartford Fire did not require the Court to address the
question of "whether the [FTAIA's] 'direct, substantial, and reasonably foreseeable effect'
standard amends existing law or merely codifies it." Id. at 796 n.23.  After so concluding, the
Court quickly turned to the issue of whether principles of international comity should have
prevented the exercise of jurisdiction, see id. at 797; the swiftness of the Court's transition
perhaps made the value of Hartford Fire less obvious for the purposes of the FTAIA.

"substantial") is relevant to Sherman Act liability.[8]

. . .

[W]e [now] must consider what Congress meant by "direct." A dictionary published contemporaneously with the enactment of the FTAIA defined "direct" as "proceeding from one point to another in time or space without deviation or interruption." Webster's Third New Int'l Dict. 640 (1982). Further, our efforts at understanding the meaning of "direct" are aided by the Supreme Court's interpretation of a nearly identical term in the . . . FSIA. The FSIA states that immunity does not extend to commercial conduct "outside the territory of the United States . . . that [] causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). After the lower federal courts struggled for years to define "direct effect," the Supreme Court unanimously declared that an effect is "direct" if it follows as an immediate consequence of the defendant's activity. [See] Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 618 (1992).

United States v. LSL Biotechnologies, 379 F.3d 672, 679 (9th Cir. 2004).[9]

This Court finds the reasoning in Biotechnologies well founded and persuasive. Thus,

Sherman Act claims (if they are based on defendants' *export* practices but fail to state facts

showing that these practices caused a direct, substantial, and reasonably foreseeable effect on

United States commerce) effectively plead the plaintiff out of court or -- to put it another way --

in order to survive dismissal under the FTAIA jurisdictional bar, the plaintiff must show that:

---

[8] The FTAIA test neither reversed nor even diluted the "intent-to-affect-and-effect-in-fact" common law principle established in Alcoa/Hartford Fire. Cf. United States v. Texas, 507 U.S. 529, 534 (1993) ("[S]tatutes which invade the common law [are] to be read with a presumption favoring the retention of long-established and familiar principles, except when the statutory purpose to the contrary is evident"). Rather, the FTAIA spelled out additional – perhaps already implied but not articulated in Alcoa – elements. See Biotechnologies, 379 F.3d at 680, n.6 ("the dissent does not argue that the effects need not be direct, but rather that the 'meant to affect' requirement has always been part of the 'effects test' [of Alcoa]. Thus, the panel agrees on the standard; we merely disagree about its source. We say it is the FTAIA, while the dissent says the common law. We all recognize that conduct related to international trade is exempt from the Sherman Act unless it has a 'direct, substantial, and reasonably foreseeable effect' on domestic commerce").

[9] The Biotechnologies court also observed that the process of "[a]pplying Alcoa [in lieu of the FTAIA] might also ignore the words 'reasonably foreseeable,' although we recognize that foreseeability might be a concept inherent in any scheme that seeks to impose liability." Biotechnologies, 379 F.3d at 679, n.4.

(i)      defendants' export practices were "direct" (in the sense that defendants' conduct actually

caused such immediate consequence) with regard to United States domestic commerce, see id.;

(ii)     defendants' conduct actually was "substantial" (in the sense that defendants' conduct was

actually "intended/consciously meant") to produce a consequence in the United States;[10] see

Hartford Fire, 509 U.S. at 796; Alcoa, 148 F.2d at 444;

(iii)    that consequence was a foreseeable result of defendants' action rather than a mere

incidental occurrence. See id.

     Being mindful of the *cumulative* effect created by all three qualifiers of the FTAIA

exception (i.e., by the "direct, substantial, and reasonably foreseeable" elements, as they are read

in light of guidance provided in Alcoa/Hartford Fire), the Court followed, in its December

Opinion, the case law which – while addressing various "throughout-the-world-with-the-United-

States-included" foreign trade scenarios – found allegations asserting indiscriminating world-

wide trade activities lacking focus on the United States commerce insufficient to invoke the

FTAIA exception. See Docket Entry No. 73, at 28-34.

     Specifically, this Court:

(i)      relied on the observation made in Dee-K Enters. v. Heveafil Sdn. Bhd., 299 F.3d 281,

294-96 (4th Cir. 2002), and Dee-K's utilization of Hartford Fire, which noted that

---

   [10] The Court is mindful that the "intended/meant-to-affect" aspect retained by the FTAIA
from Alcoa/Hartford Fire does not have immediate lingual correspondence to the word
"substantial," which is an element of the exception language provided in subsection (1)(A).
Indeed, it appears that the word "direct" might be of better use to convey the sense of intent to
affect.  However, the Court finds it improper to switch the meanings of the terms "direct" and
"substantial" as they were articulated by the Supreme Court in Alcoa/Hartford Fire and in
Republic of Argentina v. Weltover.  Therefore, the Court retains the Supreme Court's meaning of
these terms and, with an eye on clarity of its decisions, utilizes the words "substantiality" and
"directness" as references to the tests offered by the Supreme Court.

a court should consider whether the [defendants'] *acts, targets, and effects* . . . are *primarily* foreign or *primarily* domestic. This inquiry will best accommodate the cases with mixed fact patterns, defying ready categorization as "foreign" or "domestic" conduct, which our increasingly global economy will undoubtedly produce. We cannot begin to foresee the scope or complexity of future transactions. To adopt simplistic rules . . . might well yield unintended and unfortunate results. . . . We note that this approach echoes that of the Third Circuit in <u>Carpet Group</u> and finds support in several of the treatises[11];

and

(ii)    observed that the FTAIA plaintiff challenging foreign exportation practices must show that defendant-exporters' conduct was, in some way, "focused" on the United States domestic market (since no defendant can unknowingly intend or mean to affect the American market), and a mere showing that defendants' exportation practices indiscriminately targeted "a global market, [and the] links to the United States [were] mere drops in the sea of conduct that occurred . . . around the world" would fail to establish that the defendants' activities resulted in the "direct, substantial and reasonably foreseeable effect" on the United States trade needed to remove the FTAIA jurisdictional bar.  Docket Entry No. 73, at 33-34 (quoting <u>Dee-K Enters.</u>, 299 F.3d at 295, which cited <u>In re Uranium Antitrust Litig.</u>, 617 F.2d 1248, 1254 (7th Cir. 1980), the case relying, in turn, on <u>Alcoa</u>).

### 2.    Plaintiffs Fail to Provide Factual Proof Meeting the FTAIA Exception

Seemingly relying on § 6a (1)(A), Plaintiffs summarize their factual proof as follows:

Defendants' conspiracy ha[d] "the purpose and effect of fixing prices of magnesite . . . products exported to and purchased in the United States." [Am. Compl.] ¶ 1. Defendants' [trading activities] ha[d] "affected hundreds of millions of dollars of commerce in products that are used in American manufacturing facilities" and "severely burdened

---

[11] <u>See</u> <u>infra</u> note 57 for a detailed discussion of <u>Dee-K Enters.</u> and its particular relevance to certain aspects of the claims at bar.

consumers in the United States." Id. ¶ 3; see also [i]d. ¶ 29. . . . Defendants' . . . pricing ha[d] directly affected U.S. commerce by increasing the price of Chinese magnesite purchased . . . for use in the United States. [See Am. Compl.] ¶¶ 1, 51, 55, 65, 72 and 75. This effect has been substantial, leading to average overcharges of more than 21% on each sale of magnesite made . . . during the four year period from 2004 to 2008. [See Am. Compl.] ¶ 65. . . .  In 2007, Defendants and [entities associated with Defendants] had an 83% share of [a certain type of magnesite product that was exported from all over the world] to the United States and 87% share of [another type of magnesite product that was exported from all over the world] to the United States.  [See] id. ¶ 47.  The value of the . . . magnesite from China [that was brought to the United States] exceeded $160 million in 2008.  [See] id. ¶ 49.  Accordingly, Defendants' [trade] activities have affected . . . U.S. commerce . . . .

Opp. at 17-18.[12]  Each of the paragraphs cited in the Opposition, i.e., Paragraphs 1, 3, 29, 47-51,

55, 65, 72 and 75 of the Amended Complaint, warrants an individual discussion.[13]

---

[12]  Since Plaintiffs in this matter are not pro se litigants but rather are represented by counsel, the Court need not examine the Amended Complaint for statements vaguely indicating assertions of facts, compare Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998) (guiding that pro se pleadings "must be construed liberally and with a measure of tolerance"),  and presumes that Plaintiffs' Opposition correctly directed the Court's attention to the statements in the Amended Complaint which Plaintiffs deem support their position under subsection (1)(A).

[13]  Granted that Plaintiffs' Amended Complaint systemically utilizes the term "Cartel" and, moreover, keeps referring to such "Cartel" as a single and continuously existing entity, the Court finds it useful to trace the history of this "Cartel," as painted by Plaintiffs.  The following discussion, however, shall not be construed as expressing the Court's position that an actual -- or a single and continuing cartel (or even a numbers of cartels) -- existed; this issue is expressly reserved to be resolved in the event the Court has to address Plaintiffs' Sherman Act claims. First, relying on certain sources, Plaintiffs assert that, on April 9, 2000, Xiyang Refractory Materials, Yingkou Huachen, Dalian Golden Sun and Liaoning Foreign Trade, plus nine unspecified entities, established first "sub-Cartel" named "Jiyuan Magnesite Group," while Defendants Liaoning Liayi and Haicheng Huayu, plus non-defendant Shenyang Metals, established another "sub-Cartel" named "Huaxia Magnesite Group."  See Am. Compl. ¶¶ 52-53. Then, without stating their factual source, Plaintiffs assert that "[o]n February 19, 2001, the Jiyuan and Huaxia Magnesite Groups formally established a single, unified group under the name 'Chinese Magnesite Export Association' ('Cartel'). . . . The [resulting joint] Cartel comprised 23 exporting companies, including [eighteen unspecified entities and] Haicheng Pailou [not listed as a member of either "sub-Cartel"], Yingkou Huachen, Xiyang Group [not listed in either "sub-Cartel"], Haicheng Houying  [not listed in either "sub-Cartel"] and Haicheng Huayu." Id. ¶ 57. Then Plaintiffs allege, without specifying their source, that "[o]n March 22, 2003, at least 19 exporting companies [that is, the amount of companies less than the 23 companies comprising

a.   *Paragraph One*

Paragraph One alleges as follows:

> This case arises out of a conspiracy among all Defendants and their [unspecified]
> co-conspirators[14] that has the purpose and effect of fixing prices of magnesite and

---

the alleged unified Cartel], including Liaoning Jiayi [resurrected from the second 'sub-Cartel'],
Haycheng Houyin[g], Yingkou Huachen[], Dailan Golden Sun [resurrected from the first 'sub-
Cartel'], China Minmetals [not included in the previous versions of 'Cartel' or in any 'sub-
Cartel'], China Minerals [not included in the previous versions of 'Cartel' or in any 'sub-Cartel'],
Sinosteel Trading [not included in the previous versions of 'Cartel' or in any 'sub-Cartel'],
Xiyang Pacific [not included in the previous versions of 'Cartel' or in any 'sub-Cartel'] and
Haicheng Huayu met in Shenyang, China[,] to discuss and forecast price trend for the year 2003."
Id. ¶ 59.  Plaintiffs then allege that "[t]he members of the [presumably, this "discussion/
forecasting group"] agreed . . . to have [a new version of] the Cartel establish[ed] . . . under the
name the 'China Magnetic Forum.'" Id.  Next, citing certain sources, Plaintiffs maintain that,
"[o]n February 1, 2004, [unspecified] members of the [presumably, the latest version of] the
Cartel [that] includ[ed] Defendants Sinosteel Trading, Xiyang Group [resurrected from the
original version of the Cartel], Haicheng Huaya, Haicheng Houying [resurrected from the
original version of the Cartel] and Jiachen Group [not included in either version of the Cartel or
in any 'sub-Cartel'] met under yet another name calling themselves the 'China Magnesite Self-
Disciplined Association.' Id. ¶ 62.  After so stating, Plaintiffs claim that unspecified members of
an unspecified transformation of this ever-changing Cartel "reached [an agreement sometime] in
November 2006, to increase the price of exported [magnesite-based products]." Id. ¶ 63.
Finally, citing no sources, Plaintiffs state that, "[o]ver the weekend of December 9-10, 2006,
[unspecified number of the members of this ever-changing] Cartel, including Xiyang Group,
Haicheng Huaya, Haicheng Houying and Jiachen Group met and agreed to increase prices" on
magnesite-based products.  Id.  Citing an Internet article, Plaintiffs conclude the foregoing
discussion with the statement that, sometime "[i]n February 2007, [unspecified] members of [this
ever-changing] Cartel met to discuss a possible agreement to increase the export price." Id. ¶ 64.
Although Plaintiffs assert that the "Cartel" is still operative, see id., ¶ 3, they do not describe any
post-February-2007 memberships, meetings or activities of the "Cartel." See also note 146, infra.

[14]   While the Amended Complaint states that "Defendants' co-conspirators include[d]
Rongyuan Magnesite Corporation of China, subsequently renamed Shangawa Rongyuan
Refractories Co., Ltd, Yingkou Sanhua Refractory Material Co., Ltd., subsequently renamed
Yingkou Wonjin Refractory Material Co., Ltd., Shenyang Metals and Minerals, and CITIC
Trading," the Amended Complaint does not explain why these entities are not named as
Defendants, same as it does not clarify whether any other entity exporting Chinese magnesite
might be included in the list of such non-liable "co-conspirators."  See Am. Compl. ¶ 28. On the
contrary, the Amended Complaint makes passim reference to unspecified "co-conspirators"
(hence suggesting that such references are unrelated to the entities listed in Paragraph Twenty

> magnesite products exported to and purchased in the United States.  Defendants have also committed other unlawful practices designed to inflate the prices of magnesite and magnesite products sold to Plaintiffs and other purchasers in the United States and elsewhere.

Am. Compl. ¶ 1.

This Paragraph provides the Court with no factual proof of any kind, preventing the Court from utilizing this Paragraph for its factual analysis, as defined in <u>Turicentro</u>.  Moreover, being comprised of conclusory, self-serving sentences, this Paragraph fails to assert facts even in accordance with the lenient pleading requirements articulated in <u>Twombly</u> and <u>Iqbal</u>. Consequently, the content of this Paragraph will be disregarded for failure to support Plaintiffs' position that the Court has jurisdiction to hear their claims under 15 U.S.C. § 6a (1)(A).

### b.    *Paragraph Three*

Paragraph Three asserts:

> The conspiracy has existed from at least April 2000 to date, and increased its effectiveness through new agreements to fix prices and limit supply entered in 2003. Defendants' illegal cartel [at an unspecified stage of its existence and, hence, of unspecified composition] has deliberately targeted and severely burdened consumers in the United States. Th[is unspecified in its stage-of-existence and composition] cartel has affected hundreds of millions of dollars of commerce in products that are used in American manufacturing facilities and households.

<u>Id.</u> ¶ 3.

The three sentences comprising this Paragraph suffer of the deficiencies identical to those

─────────────────

Eight).   Plaintiffs' systemic reference to unspecified co-conspirators of Defendants, especially if assessed in light of the ever-changing composition of the alleged "Cartel," leaves the list of "co-conspirators" to the Court's imagination and necessarily invites a possibility that *all* Chinese exporters of magnesite products -- regardless of whether or not they were identified in the Amended Complaint -- could be such "co-conspirators"; this possibility, in turn, lends support to Defendants' assertion that *all* Chinese exporters of magnesite-based products were subject to compulsory price regulations governing export of Chinese magnesite-based products, as discussed <u>infra</u>, note 139 of this Opinion.

plaguing Paragraph One, i.e., the statements made in Paragraph Three are not cognizable even for

the purposes of facial review, as defined in Twombly and Iqbal.  A fortiori, these statements

cannot qualify as factual proof for the purposes of factual review, as defined in Turicentro.

Therefore, the content of Paragraph Three will similarly be disregarded by the Court without

reaching the issue of whether this Paragraph could even be relevant to the "direct, substantial,

and reasonably foreseeable" elements of the FTAIA exception stated in subsection (1)(A).

### c.    *Paragraph Twenty-Nine*

The following paragraph in Plaintiffs' list, i.e., Paragraph Twenty-Nine, states:

> Each of these Defendants and its [unspecified] co-conspirators has colluded with each
> other to restrain competition by, among other things, setting artificial prices pursuant to
> illegal horizontal agreements among these competitors.  These horizontal practices were
> designed to, and in fact did, have a substantial and adverse impact in the United States.

Id. ¶ 29.

The shortcomings of this Paragraph are similar to those plaguing Paragraphs One and

Three, discussed supra, i.e., Plaintiffs offer the Court not a single factual proof, but only a

"fusion" of: (a) legal conclusions applicable to any garden-variety Sherman Act scenario; and (b)

a FTAIA/Sherman Act element.  Therefore, the Court will analogously disregard the factless

content of this Paragraph without reaching the issue of whether it might even be relevant to the

"direct, substantial, and reasonably foreseeable" elements of the FTAIA exception.

### d.    *Paragraph Forty-Seven*

The next paragraph referred to by Plaintiffs, that is, Paragraph Forty-Seven, alleges:

> During the period described in this [Amended] Complaint, the international market for
> magnesite and magnesite products was dominated by Defendants and their [unspecified]
> co-conspirators, including producers of magnesite and magnesite products and trading
> companies in China exporting magnesite and magnesite products.  China is the most
> significant foreign supplier of magnesite to the United States with an 83 percent share of .

. . magnesite imports [in one type of magnesite product] and an 87 percent share of . . . magnesia imports [in another type of magnesite product] in 2007.

Id. ¶ 47. The Court gathers that this Paragraph aims to provide the Court with a showing that Defendants' export activities fell within the meaning of the exception in subsection (1)(A).

The Paragraph refers the Court, through footnote 5, to "2007 Yearbook Table 6," that is, to a table in the document attached to the Amended Complaint as Plaintiffs' Exhibit 4. The table, produced by the United States Census Bureau, shows that, in comparison with results of the year 2006, United States importation of Chinese magnesite-based products in the year 2007 slightly decreased in quantity and in value with regard to a certain magnesium oxide product but slightly increased in quantity and in value with regard to another magnesium oxide product. See Docket Entry No. 77-1, at 27; see also infra note 17 of this Opinion (explaining the distinction between crude magnesite and types of magnesium oxide). With regard to the first product, the table shows that United States import of this product was comprised of 85.4% (rather than 87% asserted by Plaintiffs) volume of goods of Chinese origin, and it's relevant value was 74.1% of United States overall 2007 importation of that product. See id. With regard to the second product, the table shows 83.3% volume and 67.3% value as to the relevant United States importation in 2007. See id. The table -- presenting, by definition, a snapshot of United States importation only in 2007 (and also verifying that Chinese magnesite products were the cheapest among all other goods of these types imported by the United States) -- is entirely silent as to Defendants' individual (or even collective) share, be it volume-wise and/or value-wise, thus leaving it to the Court's imagination whether Defendants' goods comprised the entire batch of Chinese magnesium oxide imported by the United States in 2007, or none of it, or any amount in between. See id.

Since, without resolving this ambiguity, the Court cannot assess the validity of Plaintiffs'
claims made against *Defendants* (rather than against the entire Chinese magnesite industry), the
Court examined the Amended Complaint for any statement that may shed light on the relation
between individual Defendants and the entire Chinese industry producing magnesite-based
goods.  The detected statements in the Amended Complaint (that appear relevant to the Court's
inquiry) do not assist Plaintiffs' position; on the contrary, they render Plaintiffs' claims
unwarranted.  For instance, Paragraph Fifty-Four of the Amended Complaint states: "[t]he
members of the two Jiyuan and Huaxia Magnesite Groups [i.e., the two initial 'sub-Cartels']
collectively represented more than 70 percent of the export volume of magnesite in China"
during unspecified year(s).  Am. Compl. ¶ 54.  (Notably, Paragraph Fifty-Four does not provide
the Court with any source of Plaintiffs' conclusion as to this percentile, hence rendering it of no
use for the purposes of factual analysis, as defined in Turicentro.  The Court, however, ignores
this shortcoming, for the purposes of this Opinion only, to address Plaintiffs' claim as a whole.)

If the Court were to entertain this 70% figure and, also, to take a leap of logic in
Plaintiffs' favor by presuming that the ever-changing "Cartel" and the sum of Jiyuan and Huaxia
Magnesite "sub-Cartels" were, somehow, the same thing, but see supra note 13 of this Opinion
(prompting a conclusion otherwise), Plaintiffs' allegations would merely suggest that  Defendants
(perhaps, jointly with their specified and unspecified co-conspirators) had a 70 percent share of
Chinese magnesite-based export.[15]  Further examining Plaintiffs' Amended Complaint, the Court

---

[15]  The Court is mindful of a possibility that this factlessly asserted 70 percent, if real,
might be a "high-tide" scenario, since Plaintiffs concede that Chinese world-wide export of
magnesite-based products differed rather significantly over the years relevant to Plaintiffs'
claims.  See Am. Compl. ¶ 46 (relying on United States surveys for assertion that "China's share
of annual world production has increased from 32 percent in 2001 to 45 percent in 2007," i.e.,

finds this 70% figure relevant to Plaintiffs' claim that "[t]he United States consumes about 25 percent of China's magnesite exports." Id. ¶ 50.  In support of that proposition, Plaintiffs rely on their Exhibit 2.  See id. at 12, n. 7.  However, Plaintiffs' Exhibit 2 states:

> About 2.0 million metric tons of magnesium oxide were exported from China in 2006 . . . . In 2006, 590 thousand metric tons, 500 thousand metric tons, 300 thousand metric tons, and 640 thousand metric tons of magnesium oxide were exported from China to Japan, Europe, the United States, and Other Asia, respectively.[16]

Docket Entry No. 77-1, at 9.[17]

Read jointly with Exhibit 2, Plaintiffs' Paragraph Forty-Seven stands for the propositions

---

grew 13%).  If the overall volume of Chinese magnesite-based export varied by more than 50%, the Court has no reason to presume that the exportation share of Defendants (and their specified and unspecified co-conspirators, if any) did not fluctuate in the same fashion or even more dramatically.

[16] Defendants correctly point out the mathematical error in Plaintiffs' calculation of what share of 2 million tons of Chinese overall exportation in 2006 was represented by 300 thousand tons imported during that year by the United States: while Plaintiffs assert that 300,000 is a quarter of 2 million, Defendants correctly observe that it is only 15%.

[17] The Court reads Plaintiffs' reliance on their Exhibit 2 as an assertion that Defendants were exporters not of crude magnesite but rather of magnesium oxide.  Magnesium oxide is a product qualitatively different from magnesite; this is so because "magnesite" is a layperson's term for magnesium carbonate, the composition having chemical symbol "$MgCO_3$," while the layperson's term "magnesia" designates what is technically known as "magnesium oxide," the composition having chemical formula "$MgO$."  Magnesium oxide can be obtained from magnesium carbonate by heating magnesite to 700°C to 1000°C, which causes decomposition of magnesite into magnesium oxide and carbon dioxide (alternatively, magnesium oxide can be obtained, upon introduction of calcined dolime and heat, through a chain of chemical reactions processing seawater and brine containing magnesium chloride.)  See, e.g., <<http://www. magnesia specialties. com/students.htm>>.  The report of Plaintiffs' expert, see Docket Entry No. 28-6, relied upon by Plaintiffs in Paragraph Sixty-Five, discussed infra, similarly suggests that Defendants were exporters of magnesium oxide rather than of crude magnesite, since the report takes pains to inform the Court that "[h]eating magnesite to a temperature between 700°C and 1000°C [produces] caustic calcined magnesia," while "[f]urther heating [to] temperatures between 1500°C and 2000°C produces . . . [so-]called dead-burned magnesia," and "electro-fused magnesia . . . is created by heating magnesite [to] about 2,800°C for several continuous hours."  Docket Entry No. 28-6, at 5.

that the alleged "Cartel" a/k/a the sum of "Jiyuan and Huaxia Magnesite Groups" was the source

of a mere 10.5% (i.e., 70% of these 15%) of the Chinese-origined magnesium oxide destined for

export, and that is only if the Court generously presumes a pro-rate spread of export destinations

among all Chinese exporters (since a non-pro-rata hypothesis would allow to presume that no

Defendants' goods whatsoever -- or mere droplets of Defendants' export -- ended in the United

States, and that these 15% of all Chinese magnesium oxide that ended in the United States came

from the 30% share of goods exported by Chinese entities that were not members of the alleged

"Cartel").  This 10.5% figure cannot possibly be read as factual proof showing that Defendants

intended/meant to affect *United States* commerce: if anything, it suggests that Defendants' focus

was domestic Chinese sale and exportation to countries other than the United States.

Consequently, the content of Paragraph Forty-Seven (asserting the percentile of United States

importation of Chinese-originated magnesite in 2007) fails to meet the requirements of factual

review, as defined in Turicentro, and -- even under the standard of facial review -- fails to

indicate that the Court has jurisdiction to hear Plaintiffs' Sherman Act claims.  If anything, this

Paragraph merely verifies the interest of United States importers in buying Chinese magnesite-

based products, perhaps because these products have consistently been the cheapest on the global

market.

### e.     *Paragraph Forty-Eight*

The following paragraph, i.e., Paragraph Forty-Eight, alleges as follows:

During the period relevant to this Complaint, the conduct of Defendants and their
[unspecified] co-conspirators has taken place in and affected the interstate commerce of
the United States.  Hundreds of thousands of metric tons of magnesite are imported into
the United States each year from China.  Data from the U.S. International Trade
Commission confirms that imports from China into the U.S. of magnesite exceeded
500,000 metric tons in each year from 2000 to 2006.

Am. Compl. ¶ 48.  The Paragraph also includes the following table:

| Year | United States Magnesite (Magnesia) Imports Source: U.S. International Trade Commission (Units in Metric Tons) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Fused and Dead-Burned Magnesia | | Caustic Calcined Magnesia | | Natural and Other Magnesite | | Total | |
| | China | All Countries | China | All Countries | China | All Countries | China | All Countries |
| 2000 | 345,016 | 500,873 | 88,488 | 136,241 | 8,282 | 33,476 | 439,796 | 670,590 |
| 2001 | 244,957 | 383,060 | 77,380 | 129,869 | 5,098 | 28,631 | 327,455 | 521,560 |
| 2002 | 286,348 | 394,222 | 83,737 | 147,610 | 8,915 | 29,180 | 384,000 | 571,012 |
| 2003 | 310,651 | 379,370 | 92,670 | 150,026 | 17,257 | 35,382 | 419,978 | 564,778 |
| 2004 | 340,933 | 418,013 | 98,432 | 157,308 | 9,260 | 31,656 | 448,625 | 606,979 |
| 2005 | 389,828 | 477,636 | 99,342 | 152,193 | 7,998 | 33,282 | 494,168 | 663,113 |
| 2006 | 360,777 | 433,131 | 127,540 | 192,786 | 9,513 | 34,193 | 496,830 | 650,109 |
| Total | 2,276,909 | 2,966,107 | 667,388 | 1,935,112 | 64,622 | 225,712 | 3,008,921 | 4,227,831 |

Although the Amended Complaint provides the Court with no citation allowing the Court

to verify the authenticity of the table, the Court presumes, for the purposes of this Opinion only,

that the table is true and correct.[18]  Since the above-replicated table indicates that China was the

origin of the lion's share of magnesite-based products imported by the United States during the

period from 2000 to 2006, the prices on Chinese-originated magnesite-based goods could have a

"direct" effect on the prices charged in the United States.

However, the table -- providing, again, data only as to magnesite-based goods of Chinese

origin imported by the United States -- is wholly silent as to the share of magnesium oxide

exported by *Defendants*, rather than by China as a country, same as the table sheds no light on

Defendants' domestic Chinese sales and export to countries other than the United States.  See id.

In other words, it appears that Plaintiffs invite the Court to equate *all* Chinese magnesite-based

---

[18]  Contrary to the claim asserted in Paragraph Forty-Eight, the table verifies that the share
of Chinese magnesite (even if assessed collectively with regard to all types of magnesite-based
products) in the magnesite-based goods imported by the United States during any given year
from 2000 to 2006 *never reached*, and certainly *never exceeded*, 500,000 metric tons.   It appears
that Plaintiffs failed to distinguish between the columns titled "All Countries" and "China."

Page 31 of  222

export with Defendants' magnesium oxide export. This the Court cannot do,[19] since Plaintiffs' facts just as comfortably allow for an inference that *Defendants*' share in Chinese exportation of magnesium oxide caused no effect whatsoever. Cf. Fowler, 578 F.3d at 210-11 ("[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief'") (quoting Iqbal, 129 S. Ct. at 1949-50). If Plaintiffs' allegations fail even facial review, these allegations cannot operate as a proof for the purposes of the Court's factual review, as it is defined in Turicentro. Consequently, the content of Paragraph Forty-Eight will be disregarded for failure to provide factual proof as to the Court's subject matter jurisdiction over Plaintiffs' claims.

### f. *Paragraph Forty-Nine*

The next paragraph relied upon by Plaintiffs, i.e., Paragraph Forty-Nine, states as follows:

> The value of U.S. imports of magnesite and magnesite products from China exceeded $50 million in 2000 and exceeded $160 million in 2008.

See id. ¶ 49 (referring the Court to footnote 6 which, in turn, directs the Court's attention to: (a) a table in Plaintiffs' Exhibit 5; and (b) a reference to a web page <<http://dataweb.usitc.gov/>>).

The table included in Plaintiffs' Exhibit 5 shows that, during the year 2000, various

---

[19] The Court notes the practical anomaly of the legal position advocated by Plaintiffs. The bulk of evidence submitted in this matter suggests, rather unambiguously, that magnesite-based products of Chinese origin have been consistently the cheapest on the global market. This fact, apparently, has been prompting United States importers to buy predominantly the goods of Chinese origin. That predominant purchasing election, in turn, caused the predominance of Chinese goods in United States overall importation of magnesite-based products, even though it occurred with what seems to be complete neutrality of Chinese exporters who, it appears, were willing to sell their magnesite-based product to any buyer, regardless of whether such buyer was domestic or foreign, or of a particular foreign origin. Yet, Plaintiffs invite this Court to find that the *purchasing elections made by United States importers* somehow show that *Chinese sellers meant to affect* United States commerce.

magnesite-based products of Chinese origin were imported by the United States in the amount of $553,116,000. <u>See</u> Docket Entry No. 77-1, at 37.  The web reference to <<http://dataweb.usitc. gov>> brings the Court to the homepage of the United States International Trade Commission, where no drop-down menu, no direct link, no search directory and no advance search of terms "China Chinese Magnesite 2008" allowed the Court to locate a particular statement with regard to United States importation of Chinese magnesite-based products in 2000 or 2008; in other words, this piece of Plaintiffs' "factual proof" was effectively nothing but Plaintiffs' directive to the Court to find evidence supporting Plaintiffs' claim.  <u>See</u> <<http://dataweb.usitc. gov>>. Such "proof," by definition, fails to support Plaintiffs' position: "[d]istrict judges have no obligation to act as counsel or paralegal [even] to <u>pro se</u> litigants," <u>Pliler v. Ford</u>, 542 U.S. 225, 231-32  (2004), and, <u>a fortiori</u>, have no obligation seek out evidence supporting the claims asserted by a represented litigant.

However, the crucial error with Plaintiffs' Paragraph Forty-Nine is not the dead-end result of Plaintiffs' citations.  Rather, the shortcomings of Plaintiffs' statement and Exhibit 5 are substantively identical to those plaguing the above-discussed Paragraph Forty-Eight, <u>i.e.</u>, Plaintiffs try to equate the *entire Chinese export* of magnesite-based products with *Defendants*' export of magnesium oxide.  As explained in the preceding subsection of this Opinion, the Court declines Plaintiffs' invitation to so equate since Plaintiffs' data, even if true, fails to establish proof that Defendants were meaning/intending to affect United States commerce.  Therefore, the Court will disregard the content of Paragraph Forty-Nine for failure to provide factual proof.

### g.    *Paragraph Fifty*

The following paragraph referred to by Plaintiffs, <u>i.e.</u>, Paragraph Fifty, asserts:

> The United States consumes about 25 percent of China's magnesite exports.  The steel industry in the United States is the primary consumer of magnesite products, with 390 thousand metric tons consumed by steel refractories in the United States during 2006. Cement refractories are the second leading consumer of magnesia in the United States.

Am. Compl. ¶ 50 (referring the Court to footnotes 7 and 8, which -- in turn -- refer the Court to Plaintiffs' Exhibit 2 already examined by the Court in the subsection "Paragraph Forty-Seven," supra).

The content of this Paragraph warrants little discussion, since the issue of which particular industry among United States industries is the leading -- or second leading -- consumer of magnesite-based products is wholly irrelevant to the subject matter jurisdictional inquiry at bar. That leaves the Court only with Plaintiffs' erroneously calculated claim that the United States consumes 25% of Chinese magnesite.  See supra note 16 of this Opinion (pointing out the error in Plaintiffs' mathematics as to 25%, which should actually be 15%).  As the Court already explained in its discussion of the shortcomings of Plaintiffs' Paragraph Forty-Seven, this 15% reference lends no support to Plaintiffs' claim that Defendants' activities fall within the language of subsection (1)(A): Defendants' export of, presumably, 10.5% of Defendants' goods to the United States cannot show that Defendants intended/meant to affect American domestic commerce. Therefore, the content of Paragraph Fifty will similarly be disregarded for the purposes of the Court's review, since it fails to provide factual proof of Plaintiffs' position.

### h.    *Paragraph Fifty-One*

Plaintiffs' next paragraph, that is, Paragraph Fifty-One, alleges:

> The conduct of Defendants and their [unspecified] co-conspirators has directly, substantially and foreseeably restrained trade and commerce in the United States. Members of the conspiracy, including Defendants Sinosteel Trading, Liaoning Jiayi, Haicheng Houying, Haicheng Huayu, Yongkou Huachen, China Minerals, and Minmetals directly have sold and continue to sell magnesite and magnesite products to U.S.

companies and in U.S. commerce at prices artificially increased by the Cartels [in unexplained plural].

Am. Compl. ¶ 51.

The deficiencies of this Paragraph are identical to those of Paragraphs One, Three and Twenty-Nine, i.e., the content of this Paragraph fails to present any evidential support for Plaintiffs' position for purposes of factual review, as it is defined in Turicentro. Moreover, this Paragraph expressly includes the error disqualifying its content even for the purposes of facial review, since it "asserts" a mere mechanical repetition of the elements of the FTAIA exception. See Iqbal, 129 S. Ct. at 1949-51 ("[A fortiori,] the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions [or to t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements [, i.e., by] legal conclusion[s] couched as a factual allegation [e.g.,] the plaintiffs' assertion of an unlawful agreement [or] that [defendants] adopted a policy "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group" (quoting Twombly, 550 U.S. at 555, and Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979)). Therefore, the Court will disregard Plaintiffs' self-serving assertions set forth in Paragraph Fifty-One.[20]

### i.  *Paragraph Fifty-Five*

The following paragraph, that is, Paragraph Fifty-Five, maintains:

---

[20] The Court also notes, in passing, that an alleged fact of sale of goods to an importer who might bring the goods into the United States in no way shows the seller's intent to affect the United States commerce unless there are facts showing that the seller actually sought to sell to (i.e., discriminated in favor of sales to) the buyers bringing the goods into the United States.  See Fowler, 578 F.3d at 210-11 ("[w]here the well-pleaded facts do not permit the court to infer more than the *mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief'*") (quoting Iqbal, 129 S. Ct. at 1949-50) (emphasis supplied).

As a result of these agreements, despite slumping demand, the price of magnesite products imported from China to the United States increased during 2000. According to statistics available from the United States International Trade Commission, the customs value of [dead-burned magnesium oxide] imported from China into the United States rose from $104 per metric ton in the fourth quarter of 1999 to $158 per metric ton by the fourth quarter of 2000.

Am. Compl. ¶ 55.

The Paragraph is referring the Court to footnote 11, which -- in turn -- refers the Court to the discussed <u>supra</u> homepage of the United States International Trade Commission, where, as stated <u>supra</u>, no drop-down menu, no direct link, no search directory and no advance search of terms allowed the Court to locate the statement referred to by Plaintiffs, <u>i.e.</u>, Plaintiffs' "factual proof," once again, is nothing but Plaintiffs' directive to the Court to find evidence supporting Plaintiffs' claim. <u>See</u> <<http://dataweb.usitc. gov>>.  Moreover,  Plaintiffs' first sentence, <u>i.e.</u>, "[a]s a result of [Defendants' collusive] agreements, despite slumping demand, the price of magnesite products imported from China to the United States increased during 2000" appears factually questionable[21] and, even if factually correct, merely paraphrases Plaintiffs' self-serving economic conclusion (that a drop in demand for certain goods must necessarily result in a drop or stagnation of price charged for these goods)[22] into a factless statement sounding like a fact. <u>See</u>

---

[21]  <u>See</u> December Opinion at 50 (quoting a United States government survey, <u>see</u> <<http://minerals.usgs.gov/minerals/pubs/commodity/ magnesium/mgcmyb2001.pdf>>, showing that the decline of 2001 followed *the spike in importation that took place in 2000*, and explaining the reasons for a significant *increase* in United States demand for imported magnesite-based goods in 2000).

[22]  The Court already addressed this issue in its December Opinion detailing to Plaintiffs the operation of economic functions as follows:

The "supply and demand" economic model describes the operations of market mechanism.  It is graphically represented through two curved functions which, if read jointly, reflect the understanding that, in a competitive market, price will function to

Iqbal, 129 S. Ct. at 1953 ("the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions . . . couched as a factual allegation").

The second sentence of Plaintiffs' Paragraph Fifty-Five similarly fails to support Plaintiffs' position. That sentence cites the homepage of the United States International Trade Commission in order to assert that "the customs value of [dead-burned magnesium oxide] imported from China into the United States rose from $104 per metric ton in the fourth quarter of 1999 to $158 per metric ton by the fourth quarter of 2000." Am. Compl. ¶ 55. This statement appears also

---

equalize supply and demand. The model neither requires all producers to sell comparable goods at the same price nor implies that a decline in demand would force all producers to lower their prices: the leeway available to sellers depends on price elasticity of their goods. Thus, if demand for certain goods begins to decline, the sellers offering their goods at the upper-bracket prices would be forced to lower them (or go out of business if competitive prices become so low to render their businesses unprofitable), while the sellers offering their goods at lower-bracket prices do not have to change their pricing policies -- and may even legitimately increase their prices -- until the demand drops to such a point that there is not enough market even for the goods they sell. To illustrate, if tomato growers who previously sold their crop for $ 1.00 to $ 2.00 per pound are faced with a market decline, the growers who were selling at $ 2.00 per pound would have to lower their prices in order to compete for the shrunk market (or to leave the business if they cannot afford reduction in price), while the growers who were selling at $ 1.00 per pound would still be in the position to keep increasing their prices until the decline in demand becomes such that even these growers cannot sell their entire crop (at which point, these growers would have to either compete with each other by lowering their sale prices or reduce their production). Hence, Plaintiffs' argument that the gradual increase in the prices of Processed Magnesite imported from China during the Relevant Period was in contradiction to the rules of supply and demand is based on an incorrect reading of economic theories.

Docket Entry No. 73, at 49-50. In addition to the foregoing, the hike in price might be unavoidable to a seller that finds itself suddenly burdened with rising cost of overhead, soaring fixed costs and variable costs unrelated to payroll (e.g., rise in utilities charges), higher taxes, etc. -- such developments might cause the seller to shift the increase in cost of operation to the buyer regardless of demand, since the seller's failure to so shift the burden might simply result in a speedy bankruptcy. Accord id. at 42-46 (detailing to Plaintiffs the interplay between relevant economics and accounting concepts, and providing data showing dramatic increase in the labor-related, fixed and variable costs in Chinese magnesite industry).

factually questionable, since a United States Government Survey indicates that the per-metric-ton price on Chinese dead-burned magnesium oxide was $126.90 in 1999, and $129.27 in 2000. See <<http://minerals.usgs.gov/minerals/pubs/commodity/magnesium/401400.pdf>>, at 8. If so, a simple mathematical calculation reveals that the per-ton price rose by $2.37, that is, by less than 2% (rather than by $54.00 per ton asserted by Plaintiffs in Paragraph Fifty-Five); such rise in price is so trivial in comparison with the base price of $126.90-per-ton that it would be unlikely to signify any non-nominal effect on United States commerce.[23]

---

[23] The Court notes that Plaintiffs attached to their Opposition an exhibit containing a copy of the document upon which Plaintiffs seemed to rely for the purposes of their $158 figure. The document contains a table showing that, basing their numbers on tariff and trade data from the United States Department of Commerce and the United States International Trade Commission, the unidentified-by-the-document entity compiling the table determined that prices of Chinese magnesium oxide were $0.1 per kilogram during the first quarter of 2000, $0.111 per kilogram during the second quarter, $0.136 during the third, and $0.158 during the fourth quarter. See Docket Entry No. 105-36, at 2. Since Plaintiffs assert that the price at the end of 1999 was $104 per ton, the Court gathers that Plaintiffs' position is that the price dropped from $0.104 to $0.1 during the first quarter of 2000 but then began climbing. Plaintiffs' Opposition addresses this climb as follows: "The Government Survey provided *yearly* total import volumes and *yearly average* prices[, while the United States International Trade Commission's] quarterly data demonstrates [a price increase] consistent with Plaintiffs' allegation that the initial two export cartels were formed in April of 2000 and succeeded in raising the price of magnesite exported to the United States." Docket Entry No. 105. Plaintiffs' figures, if averaged, appear to be similar to the Survey's figure of $129.27 per ton (since the average of Plaintiffs' numbers results in $126.25 per ton, and the $3.02 difference might be a result of a heavier export during the third and fourth quarters, although the Court cannot determine the same with any degree of certainty since Plaintiffs' exhibit does not provide quarterly import volume). However, the Court is not entirely clear as to Plaintiffs' point that the rise in the price of Chinese magnesium oxide in 2000 must be viewed as a proof of the "Cartel's" formation and initial activities. According to Plaintiffs' version of the "Cartel's" history, the initial "sub-Cartels" solidified into a unified "Cartel" in February of 2001, muscling the largest membership during the entire "Cartel's" history, see supra note 13, which – pursuant to Plaintiffs' logic -- should have resulted in further intensification of "Cartel's" activities and further increase in import prices of Chinese magnesium oxide, but the United States Government Survey indicates that the 2001 price for Chinese magnesium oxide was $148.75 per metric ton (if calculated on the grounds of the total tonnage and total value stated in the Survey). See <<http://minerals.usgs.gov/minerals/pubs/commodity/magnesium/mgcmyb2001.pdf>>. Thus – if the Court were to adopt Plaintiffs' position that this

However, the key shortcoming of Plaintiffs' position is not rooted in the uncertainty of Plaintiffs' figures. Rather, it ensues from the fact that these figures show only the price trend with regard to all Chinese dead-burned magnesium oxide imported into the United States during 2000. Even if the Court were to ignore the "snap-shot" quality of this figure (since it cannot be imported into Plaintiffs' allegations with regard to 2001, 2002, 2003, 2004, 2005, 2006, 2007 and thereafter, apparently), the overall rise in Chinese prices charged with regard to United States import cannot show an "intent-to-affect" even by the entire Chinese magnesite industry unless Plaintiffs provide facts showing that Chinese domestic purchases and all foreign non-American purchasers were charged lower prices. Plaintiffs, however, do not even assert these facts and certainly offer no proof of them. Since Plaintiffs' figures do not establish that the entire Chinese magnesite industry was intending to affect United States commerce, the Court has no reason to deduce from this stark absence of facts that *Defendants* undertook actions that were meant to affect United States commerce. In light of the foregoing, the Court will disregard the content of Paragraph Fifty-Five, since it fails to provides the Court with any relevant factual proof.

### j.    *Paragraph Sixty-Five*

Next paragraph, i.e., Paragraph Sixty-Five, provides the Court with the following statement:

> Due to the efforts to increase prices at the end of 2003, the Cartel achieved significant price increases in the U.S., stabilized U.S. prices, and avoided major price cutting despite low levels of demand. An overcharge analysis from a regression model by Plaintiffs'

---

$148.75 price is not the year-end price but merely a yearly average -- the increase of the alleged "Cartel" in size and in collusive activities should not have resulted in a progressive *drop* of prices during 2001 (since, if the price at the end of 2000's fourth quarter was $158 per ton, as Plaintiffs' exhibit alleges, than the price had to drop by the end of 2001 by 12.34%, i.e., down to *$139.50* per ton, in order to yield the yearly average of $148.75 reflected in the Survey).

expert economist Dr. Russell Lamb of Econ One shows that, between 2000 and 2003, the Cartel overcharged U.S. buyers of magnesite by an average of 4 percent, while between 2004 and 2008, as a direct result of the Cartel's activities, U.S. magnesite purchasers were overcharged more than 21 percent.

Am. Compl. ¶65.

This Paragraph refers the Court to footnote 20, reading, "Expert Report of Dr. Russell Lamb [("Lamb")], dated September 27, 2007, filed in Support of Plaintiffs' Motion for a Default Judgment" ("Report"). See id. at 20. Although this reference states no docket entry number, the Court, given the above-designated date of execution, the authorship and the purpose of submission of the report, presumes that Plaintiffs' footnote 20 was intended to make a reference to Docket Entry No. 28-6.

Plaintiffs' reliance on the conclusions drawn by Plaintiffs' expert -- rather than on facts and evidentiary proof of such facts -- is necessarily concerning for the purposes of factual review for two reasons. First, Federal Rule of Evidence 702, amended to codify the Supreme Court's decisions in Daubert v. Merrell Dow Pharms., 509 U.S. 579 (1993), GE v. Joiner, 522 U.S. 136 (1997), and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), is unambiguous in the sense that it provides that an expert should base the expert's opinion on the litigant-provided facts rather than providing the expert's opinion as a "fact" supporting litigant's claim. See Fed. R. Evid. 702; accord Daubert, 509 U.S. 579. Second, since the factual review at hand is a process qualitatively different in its premises and goals from a default judgment process, the Report -- even if it were, hypothetically, proper for the purposes of Plaintiffs' then-pending-and-since-dismissed motion for default judgment -- appears questionably relevant to the Rule 12 inquiry currently conducted.[24]

---

[24] "[T]he plaintiff may seek the Court's entry of default judgment under either [subpart of] Rule 55(b)." Doug Brady, Inc. v. N.J. Bldg. Laborers Statewide Funds, 2008 U.S. Dist.

However, in light of the Court of Appeals' guidance as to the breadth of proof the district court should consider while conducting its factual review under Rule 12, see Turicentro, 303 F.3d at 300, n. 4 (explaining that, in its assessment of a factual deficiency, the district court "must weigh [all available] evidence relating to jurisdiction, with discretion to allow affidavits, documents, and even limited evidentiary hearings," and citing Garcia v. Copenhaver, Bell & Assocs., 104 F.3d 1256, 1260-61 (11th Cir. 1997); Ohio Nat'l Life Ins. Co. v. United States, 922 F.2d 320, 325 (6th Cir. 1990); and Oaxaca v. Roscoe, 641 F.2d 386, 391 (5th Cir. 1981)), this Court concludes that it would be an error to disregard the content of the Report merely on the grounds that it is an expert opinion and, thus, will assess the content of the Report on its merits.

That content of the Report is as follows:

(i)     The Report opens with Lamb's statement detailing his employ and studies.  See Docket Entry No. 28-6, at 3.

(ii)    Then, in no ambiguous terms, Lamb states that he "assume[d] that the allegations contained in the [Original] Complaint [were] in fact true."[25]   Id. at 3-4.

---

LEXIS 28324, at *19 (D.N.J. April 7, 2008) (citing Nationwide Mutual Ins. Co. v. Starlight Ballroom Dance Club, Inc., 175 Fed. App'x 519, 521, n.1 (3d Cir. 2006).  However, default judgment necessarily ensues from a party's failure "to plead or otherwise defend" against the allegations of his/her opponent.  Id. at *18-19 (detailing the first step of default procedure under Fed. R. Civ. P. 55(a)).  Although the second step of default allows the court to exercise its discretion in order to "establish the truth of any allegation by evidence," see Fed. R. Civ. P. 55(b)(2)(C), an entry of default does not obligate the court to conduct a facial -- moreover factual -- review.  Hence, while for the purposes of a litigant's default application, the litigant's expert may be warranted in his/her submission of the expert's opinion based on facts as they are pled by the litigant seeking default, it is indeed questionable at best whether the same is warranted for the purposes of a factual review under Rule 12.

[25] This statement renders the applicability of the Report to the *Amended* Complaint questionable at best not only because Lamb fails to base his Report on *independent* facts but also because the Report unambiguously declares that it takes, as true, the facts stated in the *Original*

(iii)     Following this introduction, the Report proceeds to an observation that various forms of

magnesium oxide are obtained, inter alia from extensive heating of magnesite. See id. at 5

(relying on a document designated as Stefan Schlag, Jim Glauser and Kenji Fujita, Magnesium

Oxide and Other Magnesium Chemicals, Chemical Economics Handbook, SRI Consulting, 2007"

("CEH")).[26]  The Report then informs the Court that "[t]he steel industry is a primary source of

magnesia demand" and "[c]ement refractories are the second leading consumer of magnesia."

Docket Entry No. 28-6, at 6 (relying on CEH and referring, seemingly, to American industrial

landscape).

(iv)     Then, switching to Chinese production of magnesium oxide, the Report informs the Court

that "[a]bundant magnesite deposits and inexpensive processing have provided Chinese producers

with a competitive price advantage relative to other exporters of magnesite products."  Id. at 7

(relying exclusively on CEH for this sweeping economic conclusion).  This statement is followed

by a conclusion that "[d]emand for Chinese magnesia has been driven by China's domestic steel

---

Complaint, that is, in the set of pleadings which: (a) was dismissed by the Court for insufficiency
of these very pleadings; and, even more importantly, (b) differed, and rather dramatically, from
the Amended Complaint as to the factual assertions made therein.  However, the Court ignores
the anomaly of Plaintiffs' reliance on the Report based on different and dismissed facts in order
to focus on the even more troubling deficiencies of Plaintiffs' utilization of Lamb's Report.

[26]  CEH appears to be the key basis for Lamb's deducements.  See Docket Entry No. 28-6
(citing CEH in 18 out of Report's 34 footnotes).  However, no reproduction of CEH is attached to
the Report, and the Court's efforts to locate CEH in a printed version yielded no success.  The
Court, however, located a website stating that it is a "product review" titled "Magnesium Oxide
and Other Magnesium Chemicals"; it is, apparently, authored by "Stefan Schlag and Kenji Fujita
and James Glauser" of SRI Consulting.  See <<http://www.sriconsulting.com/CEH/Public/
Reports/747.2000/>>.  The Court, therefore, presumes that Lamb referred to this online source as
CEH.  The CEH located by the Court online has the table of contents which, while listing 237
sections and subsections, omits such features as "list of sources" and/or "bibliography," thus
leaving the Court to wonder whether CEH was based on data that could be deemed reliable for
the purposes of legal proceedings.

manufacturing industry." Id.

(v)      With that, the Report repeats, in a purely conclusory fashion, that "the injury to [P]laintiffs arises because they purchased Chinese magnesite at prices higher than they would have paid but for the [D]efendants' misconduct," and proceeds to "[t]he calculation of [Plaintiffs'] damages arising from [Defendants'] conspiracy to fix prices." Id. at 8.

(vi)     Lamb begins such calculation by stating that the base damages (that is, prior to trebling) are equal to "[t]he difference between the actual . . . prices [paid to unspecified Chinese sellers of magnesium oxide by unspecified buyers of the same] and the prices that would have prevailed [presumably, in the entire market of Chinese domestic and exported magnesium oxide] but for [Defendants'] misconduct"; he calls such difference "overcharge." Id.

(vii)    Then, the Report states that, "[t]o calculate the overcharge in this matter, [Lamb] use[d] the method known as a benchmark."[27] Id. at 9.  Specifically, Lamb asserted that he used data related to sale of Chinese magnesite (which, the Court trusts, was data reflecting Chinese sales of magnesium oxide rather than crude magnesite) during the period from 1995 to 2000 in order to compare that data to -- presumably corresponding -- data as to the sale of Chinese magnesium oxide during the period from 2000 to the date of execution of the Report (that is, September 27,

---

[27]   Although Lamb's reference to "a benchmark" does not provide the Court with any clarification as to the actual methodology intended to be employed by Lamb (i.e., the Report only asserts that "[t]he benchmark methodology is an accepted method for calculating damages in the field of antitrust economies" and cites a 1967 article by Robert B. Bergstrom titled "The Role of the Expert in Proving and Disproving Damages in Antitrust Claims"), the Court presumes that the Report intended to use econometric benchmark analysis, a tool common in business management which is effectively a comparison of two or more sets of corresponding data.  See, e.g., Robert C. Camp, Benchmarking: The Search for Industry Best Practices That Lead to Superior Performance (2006) (detailing the methodology and applications of the tool).

2007).[28]  See id. at 9, 18.

(viii)   Next, the Report acknowledges that "[p]rices on [magnesium oxide] depend on many factors [and,] if any of these market factors also vary between the [after-2000] and the [1995-to-2000] period[s], then movements of these other factors should be taken into account when determining the overcharge," id. at 10, i.e., that data must be adjusted.

(ix)   Lamb states that, in order to perform such adjustment, he "employed a statistical technique known as multiple regression analysis." [29] Id. at 10.  Since Lamb's conclusions are based on multiple regression analysis, his Report cannot be intelligibly discussed without at least a brief clarification as to the gist of the statistical tool he employed.[30]  The premise underlying regression

---

[28]  Lamb, apparently, used the year 2000 as a breakpoint because -- relying on the Original Complaint -- he took it as a fact that pre-2000 sales of Chinese magnesium oxide were necessarily unaffected by Defendants' collusive activities but these sales became necessarily affected by Defendants' alleged conspiracy in 2000.

[29]  Usually, benchmark analysis is used as an alternative to -- rather than in conjunction -- with regression analysis.  See, e.g., In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 313 (3d Cir. 2008) ("[Plaintiffs' expert] identified two 'potential approaches' to estimating damages, [either]: (1) benchmark analysis, which would compare actual prices during the alleged conspiracy with prices that existed before the [alleged conspiracy]; and [the second option is] (2) regression analysis, through which it 'may be possible . . . to estimate the relationship between price of [the product allegedly affected by collusive activities] and the various market forces that influence prices, including demand and supply variables.' [Either one of] these methods, according to [Plaintiffs' expert], could be used to estimate the prices plaintiffs would have faced but for the conspiracy").  However, since a benchmark analysis suggested by Lamb seemingly envisioned a comparison of the overall trends in Chinese sales of magnesium oxide during the pre-alleged-conspiracy and the during-alleged-conspiracy periods, and regression analysis was seemingly meant only to adjust the during-alleged-conspiracy trend by removing effects of all conspiracy-unrelated developments that were absent during the pre-alleged-conspiracy period, the Court finds the possibility of joint utilization of these two methods not unreasonable, although the Court is left to wonder how these *generic* Chinese trends show intent of *Defendants*.

[30]  The Court's overview of regression analysis is based on Larry Wasserman, All of Statistics: A Concise Course in Statistical Inference (Springer  2004) ("All Statistics"); Statistics, Super Review (Research and Educ. Assoc., M. Fogiel, Chief Editor 2004); Douglas Downing,

analysis is a recognition that there are many situations in life where one quantity (called the "independent variable") might have an effect on another quantity (called the "dependent variable"); to illustrate, there might be a relation between disposable personal income and consumption spending.[31]  If the relationship between these two variables is figured out, then the changes of the dependent variable can be predicted if the changes of the independent variable are known or can be predicted.  In order to start the analysis, pools of known observations of the quantities at issue have to be collected: in the aforesaid example, it would be the population's disposable income and its spending, e.g., for each year during the period 1989-2009.  Once these pools of data are collected, they are usually presented in a visually meaningful form on an $xy$ diagram (so presented, the data looks like a cloud of scattered points in $xy$ axes, called a "scatterplot"), where all dependant variable data (in this example, spending) is $y$ values, and all independent variable data (disposable income) is $x$ values: so each year is reflected on the diagram by a point having its own $x$ and $y$ values.  The overall "trend" of the scatterplot is the trend in the income/spending relationship during 1989-2009; this "trend" can be expressed by a straight line which best represents all the points in the graph.  This line, in turn, is called the "regression line," and this type of analysis is called regression analysis.  Since, geometrically, the regression line can be defined in terms of its slope "m" and its vertical intercept "b" (where the line crosses the $y$ axis), the mathematical equation of the line can be written as $y = mx + b$,[32]

---

Jeffrey Clark, Business Statistics (Barron's 4th ed. 2003) ("Business Statistics"); Douglas Downing, Jeffrey Clark,  Statistics The Easy Way (Barron's 3rd ed., 1997) ("Easy Statistics").

[31]  Such relationship between *two* variables give base to so-called "simple regression."

[32]  Not all simple relationships could be reduced to $y = mx + b$.  For instance, if the true relationship between $x$ and $y$ is defined by equation $y = cd^x$, where both $c$ and $d$ are two unknown

although both "m" and "b" typically carry caret symbol ("^") and, thus, are referred to as "m-hat" and "b-hat." The caret symbol stresses that both "m" and "b" are merely estimated, and that any regression model comes with an important warning that "the mere fact that there is a strong association between two variables does not indicate there is a cause and effect relationship between them." Easy Statistics at 270-72 (providing detailed examples, diagrams and calculations illustrating the same). These principles equally apply to simple regression (dealing with just two variables, as $y$ and $x$) and to multiple regression; indeed, "multiple regression" merely means that there is more than just one independent variable "$x$," for example, a multiple regression equation could be $y_i = b_1x_{i1} + b_2x_{i2} + b_3 + e_i$. If the constants are expressed in numbers, such model might look, for instance, as:

$$y = 1.8016x_1 + 6.0658x_2 + 7.5546$$
$$\quad\;\; (.2202) \quad\;\; (.1422) \quad\;\; (3.2556)$$

where 1.8016 is the coefficient for $x_1$, 6.0658 is the coefficient for $x_2$, 7.5546 is the coefficient for the constant term, and the parenthetical numbers underneath represent corresponding standard errors. A division of each coefficient value by its corresponding standard error results in a measure called "$t$-statistic," it is used to test hypotheses about the value of the coefficient.[33]

---

constants, the solution is obtained through the concept of logarithm. (An explanation of what is logarithm is best given by the question, "to what power should we raise 2 to get 128?" and its answer "7," because $2^7 = 128$, so the logarithm, i.e., $\log_2 128$, is "7"). Applying common logarithms to the equation $y = cd^x$, we can rewrite it as $\log y = \log d * x + \log c$, i.e., as a formula resembling the familiar $y = mx + b$. Thus, logarithms are frequently used in regression analysis.

[33] A calculation of multiple regression output also gives an $R^2$ value which is called the coefficient of multiple determination. The value of $R^2$ is always between 0 and 1, it measures the percent variation in the dependent variable $y$ that can be explained by the regression. The higher $R^2$, the more it means that the regression does a good job accounting for the variation in $y$ through variations in $x_1$ and $x_2$.

Having so reviewed the very basic points of regression analysis, the Court now returns to its discussion of Lamb's regression-related statements.

(x)     Lamb begins by explaining the meanings of the terms "dependant variable" and "independent variables"; he uses alternative terms for the latter (i.e., "explanatory variables" or "regressors"). See Docket Entry No. 28-6, at 10. Lamb also clarifies that, for the purposes of his analysis, "the price of Chinese magnesite is the dependent variable" (that is, $y$), but does not state whether his observations included prices charged only with regard to Chinese exportation or with regard to domestic Chinese prices, or United States importation (which leads to Court to conclude that these prices were the same, and all buyers were treated equally regardless of their origin). See id. Moreover, the Report does not provide the Court with *any* observations utilized by Lamb for his calculations: the Report simply invites the Court to trust Lamb that these pools of data were properly collected, by stating as follows:

> [In order to obtain a pool of observations as to the this "price," Lamb utilized] prices obtained from Industrial Minerals, a market research firm.[34] The data [Lamb] used include[d] monthly prices for three common grades of Chinese dead-burned magnesia from July 1994 through July 2007.[35] Lamb] used these three price series to measure the dependent variable [$y$] in [his] regression model[.36] Lamb] believe[d that] these price data provide[d] reliable measures of magnesite prices [because] Industrial Minerals is cited as a source of industry information by numerous[, although unspecified] experts on magnesite, [and in]

---

[34] The Court's own efforts to locate "Industrial Minerals, a market research firm" did not yield any success; the Court was merely able to locate a British-based online magazine titled "Industrial Minerals" at <<http://www.mineralnet.co.uk/>>.

[35] I.e., Lamb, seemingly, took observations corresponding to 156 periods, since the 13 years (from 1994 to 2007), multiplied by 12 months per year, yield 156 monthly intervals.

[36] See infra sub-paragraph (xiii) of this subsection for a discussion of the problems associated with the "three panels," the phrase which, it seems, might have been used by Lamb to refer to the very same data that Lamb alternatively designated as his "three price series."

citations in Deborah A. Kramer, "Magnesium Compounds" review in 2006
Minerals Yearbook, published by United States Geological Survey in June 2007.
In addition, [Lamb] compared the prices [he used as his pool of $y$ observations] to
other publicly available sources[37] and found them to be consistent [in an
unspecified fashion] with prices for Chinese magnesite products sold in the United
States (which Lamb, presumably, obtained from Industrial Minerals, "a market
research firm"].

Id. at 11 and n. 29 (footnoted text incorporated).

(xi)     With that, Lamb states that he selected the total of six independent variables, namely:

(a)     two variables that Lamb believed affected the demand factor as to magnesite-based

products (these variables are "growth of Chinese  steel production" and "growth in

Chinese cement production");

(b)     two variables that Lamb associated with Chinese export-related "price" advantage

(these variables are: (a) the exchange rate between United States Dollar and Chinese Yuan;

and (b) an assessment of the value of Yuan against the basket of international currencies

Lamb titled "World Foreign Exchange Rate");[38] and

---

[37] However, the sole "other publicly available" source named by Lamb is the very same
CEH, see Docket Entry No. 28-6, at 11, n. 30, the reliability of which the Court cannot
determine. See supra note 26 of this Opinion.

[38] The Court is not familiar with the concept of "World Foreign Exchange Rate," and the
Report does not enlighten the Court as to the nature of this tool.  However, in light of Lamb's
mentioning of the International Monetary Fund ("IMF") in connection with this tool, the Court
presumes that Lamb aimed to refer to the Special Drawing Rights ("SDRs").  An SDR (which is
a unit of account created by the IMF) is a weighted sum of contributions of four major
currencies, and it is adjusted every five years (for instance, for the period of 2006-2010, one SDR
is the sum of 0.632 US dollars, 0.41 euro, 18.4 Japanese yen and 0.0903 pound sterling, while for
the period 2001-2005 it was 0.577 US dollars, 0.426 euro, 21 Japanese yen and 0.0984 pound
sterling).  See <<http://www.imf.org/external/fin.htm>> (IMF-Finances website, left column,
SDR-rate section).  Since the Dollar is already included in the SDR, utilization of both Yuan-
Dollar and Yuan-SDR comparisons invited "double counting" into Lamb's assessment of his
model's reliability.  And, since the model subdivided data by 2000-2003 and 2003-2007 sub-
periods, see Docket Entry No. 28-6, at 15, the Court is unclear as to how the 2005 change in SDR

(c)      two variables that Lamb associated with the costs of production and supply.  These

variables included: (1) cost of crude oil (since -- for the reasons not entirely clear to this

Court -- Lamb presumed that the process of heating magnesite into magnesium oxide

necessarily requires oil rather than natural gas, coal or other sources of energy[39]); and (2)

Chinese domestic inflation (since Lamb believed that the overall increase in Chinese

consumer prices would drive up prices charged for exported natural resources).  See id. at

11-13, 15.[40]

(xii)    The Report does not share with the Court Lamb's regression equation.  Rather, short-

---

value and de-pegging of the Yuan from the Dollar were factored in the 2003-2007 sub-period.

[39] Compare <<http://www.springerlink.com/content/h13p454817437337/fulltext.pdf?
page=1>> (reproducing an article showing that the USSR magnesium oxide production switched
from oil to natural gas thirty years ago, i.e., in 1969, finding natural gas a more viable and
efficient source of energy for the purposes of magnesium oxide production).  In view of: (a)
apparent viability of non-oil heating of magnesite into magnesium oxide; (b) relative scarcity of
Chinese oil in comparison with its coal, see, e.g., <<http://www.eia.doe.gov/emeu/cabs/China/
Background.html>> and <<http://www.eia.doe.gov/emeu/cabs/China/Oil.html>> (showing that,
during the period at issue, China has become the third largest world importer of oil due to the lag
between her domestic production and domestic consumption, while -- at the same time, China
remained the world's largest producer and consumer of coal); and (c) substantial difference in
price increases experienced by oil, coal and natural gas during the first decade of the XXI
century, that is, the period at issue, see <<http://tonto.eia.doe.gov/cfapps/STEO_ Query/
steotables.cfm?tableNumber=8&periodType=Annual&startYear=2000&endYear=2009
&startMonthChanged=false&startQuarterChanged=false&endMonthChanged=false&endQuarter
Changed=false&noScroll=true&loadAction=Apply+Changes>> (showing that power generation
fuel costs, in dollars per million Btu, rose from 2000 to 2009 by $2.22 as to coal, by $4.57 as to
natural gas, and by at least $9.37 as to oil), Lamb's utilization of oil prices as a regressor is
unclear.  Compare Docket Entry No. 77-1, at 70, and Docket Entry No. 77-3, at 11 (Plaintiffs'
exhibits attached to the Amended Complaint; the exhibit suggests that coal was the source of
heating involved in all relevant technical processes, and the price of coal kept soaring).

[40] Although, presumably, Lamb should have collected pools of monthly observations for
each of these six variables, the Report neither provides the Court with actual pools of these
observations nor even states where the Court could locate them on its own.

cutting through all stages of his regression analysis, Lamb simply informs the Court that he

reached certain results and organized some of these results into a table ("Lamb's Regression

Result"), where: (1) estimates of variables were converted to their natural logarithms; (2) $R^2$

statistics show that Lamb's regression model "explains 87 percent of the variation in the

dependent variable" (hence, leaving 13% unexplained); and (3) $t$-statistics is provided as a

measure of what is "statistically significant."[41] Id. at 14-15.

Specifically, Lamb's Regression Result table is as follows:

### Chinese Magnesite Regression Model Results

| Observations | 429 | Wald Statistic | | 601.36 |
| Panels | 3 | Prob. > [Wald] | | 0.00 |
| Time Periods | 143 | OLS R-Squared | | 0.88 |

| Explanatory Variables[1] | Coefficient Estimate | Standard Error | t-Statistic | Statistical Significance[2] |
|---|---|---|---|---|
| (1) Growth in Chinese Steel Production | 0.166 | 0.050 | 3.360 | *** |
| (2) Growth in Chinese Cement Production | 0.062 | 0.024 | 2.150 | ** |
| (3) Chinese Consumer Price Inflation | 0.587 | 0.224 | 2.600 | *** |
| (4) Crude Oil Price | | | | |
|   Contemporaneous | 0.057 | 0.027 | 1.860 | ** |
|   1 Month Lag | 0.007 | 0.027 | 0.330 | |
|   Sum of Coefficients | 0.044 | 0.027 | 2.050 | ** |
| (5) Chinese Yuan / USD Foreign Exchange Rate | -1.076 | 0.449 | -2.400 | *** |
| (6) Chinese Yuan World Foreign Exchange Rate | | | | |
|   Contemporaneous | -0.192 | 0.163 | -1.180 | |
|   1 Month Lag | 0.256 | 0.175 | 1.460 | * |
|   2 Month Lag | -0.250 | 0.165 | -1.520 | * |
|   3 Month Lag | 0.095 | 0.156 | 0.360 | |
|   4 Month Lag | -0.155 | 0.158 | -0.970 | |
|   5 Month Lag | -0.043 | 0.157 | -0.270 | |
|   6 Month Lag | -0.515 | 0.144 | -3.570 | *** |
|   Sum of Coefficients | -0.844 | 0.206 | -4.110 | *** |
| (7) Collusion Overcharges[b] | | | | |
|   2000 - 2003 | 0.040 | 0.017 | 2.330 | *** |
|   2004 - 2007 | 0.198 | 0.025 | 7.940 | *** |

Notes:
1. Fixed effects and quarterly seasonal indicator variables are incorporated in the model but not reported.
2. Singled Tailed Statistical Significance Levels: *** < 1% significance level, ** < 5% significance level, * < 10% significance level
3. Collusion period is April 2000 to Present

Id. at 14-15.

---

[41] "Significance" is a statistical term informing the reader about how certain is the analyst that a relationship between the variable actually exists, i.e., that the result is unlikely to occur by chance. See Business Statistics at 287. However, "unfortunate stereotypes often arise from the use of the word *significant* in statistical studies. For example, studies often find statistically significant differences in certain abilities between men and women, but the variation in ability within each sex is much greater than the variation between the means of the two sexes. It would be wrong to use the result of such a study to prejudge the ability of any particular individual." Id. at 288.

(xiii)    Even a superficial review of the table reveals that Lamb's Regression Result and the body

of the Report are incongruent.  For instance, while Lamb stated that his observations involved 156

periods, see supra, note 35 of this Opinion, the table somehow states that there were only 143

periods.  And while there appears to be a correlation between these 143 periods, three "panels"

and 439 "observations" (since 143 x 3 = 429), the Court is left to guess which "panels" Lamb had

in mind, since he allegedly studied *six* independent variables and should have, at least

theoretically, obtained six price series.[42]  Similarly, the Court is left to guess a number of other

aspects of Lamb's model and calculations.[43]

(xiv)    The main problem with Lamb's Regression Result, however, seems to be not the string of

---

[42]  Since Lamb also referred to "three price series," see Docket Entry No. 28-6, at 11, the
Court cannot exclude the possibility that Lamb's "three panels" and "three time series" are the
same, that they have nothing to do with sets of data collected with regard to Lamb's six
independent variables, and that they were intended, for instance, to refer to three spans of time:
1995-2000, 2000-2003 and 2004-2007.  However: (a) lack of any statements with regard to 1995-
2000 span in Lamb's Regression Result renders this possibility unlikely; and (b) the 1995-2000
span would yield 48 monthly observations, hence raising the Court-calculated 156 monthly
periods, see supra note 35 of this Opinion, to 204 (i.e., the sum of 156 and 48), thus rendering the
statement included in Lamb's Regression Result that Lamb collected observations with regard to
143 periods even more incomprehensible.

[43]  E.g., the table does not explain how $R^2$ of 0.87 asserted in the Report became $R^2$ of
0.86 in the table, leaving another percent of price variation unexplained.  Analogously, no reason
is provided as to the relevance or even need for "Wald Statistic," which the Court presumes to be
"Wald test," a parametric test typically substituted by the likelihood-ratio test (since the Wald
test can give different answers to the same question, depending on how the question is phrased).
See All Statistics at 153-54.  In the same vein, the Court is left to guess why the Report stresses
that *t*-statistics is used to determine statistical significance, if Lamb's Regression Result provides
a totally different column, titled "Statistical Significance," which seemingly aims to provide the
same assessment but on the grounds of what seems to be the so-called one-tailed test (applicable
only if all studied relationships fell entirely within one tail of the distribution, which is unclear if
it were actually true in this matter).  Simply put, since Lamb did not provide the Court with his
regression equation and pools of data, the Court has no opportunity to determine the validity of
Lamb's calculative decisions, e.g., his resort to logarithms, or his results, or his end conclusions.

the aforesaid incongruences and ambiguities, but the inexplicable appearance of two new

regressors, called "Collusion Overcharges" ("CO"). Indeed, while the Report asserts -- although

without providing the Court with either actual data or citations to the sources of such data -- that

Lamb took observations of magnesite prices, steel production, cement production, oil prices,

inflation of the Yuan and fluctuations in its exchange rate, the Report at no point asserts that

Lamb took -- or even could have taken -- any actual observations of these Collusion Overcharges.

Rather, Lamb asserts that,

> [because] Plaintiffs allege that the operation of the cartel resulted in higher prices
> for magnesite products in the U.S. . . . [Lamb] include[d two] variables [that he
> deemed to be] "indicator variables" for the period April 2000 through 2003 and for
> the period from 2004 forward . . . to account for the possibility that the alleged
> ["C]artel["] may have become more effective over time.

Docket Entry No. 28-6, at 13-14.

(xv)    The statement that a certain variable is binary (also referred to as "dummy variable" or by

the term preferred by Lamb, i.e., "indicator variable") merely establishes that this dummy variable

is presumed to be "1" if a certain condition is true and "0" if that condition is false. See Business

Statistics at 394-95; accord Docket Entry No. 28-6, at 14 (seemingly trying to express the same by

stating that "[s]uch indicator variables take the value of one during the period in question and zero

elsewhere"). "Dummy variables," however, are *artificially created* variables utilized with a

realization that, sometimes, a certain set of factors that affects the dependent variable might not be

not quantitative (i.e., while being known as present during the events statistically analyzed, it

cannot be given by numbers); the coefficient of such dummy variable indicates how much effect

this particular set of unquantifiable factors that the variable expresses had on the constant terms in

the regression.  See Business Statistics at 394-95.[44]

(xvi)   Since -- unlike in the World War II example provided in note 44 of this Opinion -- there is

no information establishing either the fact or the span of any Chinese collusive agreements

(among Defendant or all Chinese magnesite exporters, or other entities), the Court construes

Lamb's resort to dummy variables as Lamb's presumption that a "certain" factor (or a certain

combination of certain factors) fluctuated with 0.04 coefficient to Chinese prices on magnesite-

based products during the years 2000-2003, and with 0.195 coefficient during the 2004-2007

period.  However, the Court has no reason to presume that this "certain" factor was  Chinese

collusive agreements rather than a collusion-unrelated economic factor other than the six

independent variables selected by Lamb (that is, other than growth in Chinese steel production,

growth in Chinese cement production, domestic inflation of the Yuan and fluctuation of the Yuan

versus the United States Dollar and SDR).[45]  Yet, in a purely conclusory fashion, the Report

---

[44] The concept could be illustrated as follows: "For example, suppose you are investigating [United States] consumption behavior with time series data for the period 1930 to 1950.  You would expect that consumption behavior would have been  significantly different during the years of World War II than it was before and after the war.  To take this effect into account, you can create an artificial variable that will take the value 1 during each of the war years and the value 0 during each of the other years."  Business Statistics at 394.  In such example, the usage of a dummy variable based on the WWII during the years affected by the WWII is warranted since the fact of the WWII occurrence has been unquestionably established, the same as the years during which the United States were engaged in the WWII.

[45] The developments that could have had an influence on the prices of Chinese magnesium oxide (and, thus, might be dummy variables, that is, if the Court is to presume that these developments were, somehow, not quantitative) include: increases in Chinese domestic and export taxation, increases in cost of capital ensuing from borrowing (or issuance of debt), needs for repairs and/or new constructions caused by depreciation of equipment/other fixed assets, rising cost of labor, etc.  Indeed, the increase in wages appears to be the most probable factor -- as this Court already pointed out in its December Opinion:

the cost of labor in Chinese mining and mining-related industries more than doubled from

deduces from Lamb's Regression Result the following statement:

> The [dummy] variables included in the model measure the extent by which prices
> were higher as a result of the *alleged conspiracy* in this matter. These variables are
> both statistically significant. This result means that class members were all harmed
> in that they paid a higher price for magnesite products *as a result of the alleged
> conspiracy*.

Docket Entry No. 28-6, at 16 (emphasis supplied).

(xvii)   Moreover, the Report not only declares, in conclusory fashion, that Lamb's artificially

created dummy variables must be collusive activities of Defendants, the Report also omits to

inform the Court of any results of the benchmark comparison of post-2000 data and 1995-2000

data that was promised by Lamb at the outset of his Report.  See id. at 10-11 (promising such

---

2000 to 2005. 29 See <<http://www.stats.gov.cn/tjsj/ndsj/2006/html/E0520E.HTM>>;
<<http://www.stats.gov.cn/english/statisticaldata/yearlydata/yb2004-e/html/E0526ae.htm
>>; <<http://www.stats.gov.cn/english/statisticaldata/yearlydata/YB2002e/html/e0526ae.
htm>>; <<http://www.stats.gov.cn/english/statisticaldata/yearlydata/YB2001e/html/
e0526ae.htm>> (information provided by the National Bureau of Statistics of China,
indicating that the wages of employees in state-owned facilities increased, between 1999
and 2005, from 8,283 yuan to 20,992 yuan per annum, that is 254%; while the wages in
collectively-owned units increased from 4,857 to 11,268 (231%), and in all other units
went from 9,842 to 21,207, that is, 215%).

Docket Entry No. 73, at 45-46.  It appears rather evident that the "Chinese Consumer Price
Inflation" variable factored in the Lamb's Regression Result could not have accounted for these
dramatic rise in labor costs, since: (a) the concept of "consumer price inflation" is qualitatively
different from that of "labor costs"; (b) the coefficient of 0.587 detected by Lamb as an assessor
of the effect the increases in inflation had on the increases in magnesium oxide prices fails to
correspond to the above-quoted over-200% increase in labor costs; and (c) rising cost of Chinese
labor was virtually certain to be higher than domestic inflation of the Yuan (causing consumer
price inflation) because an increase in wages *exceeding* the increase in inflation is a feature
necessary for an increase in the population's purchasing power (and its standard of living) which,
seems, was unquestionably achieved in China during the first decade of the XXI century.  See,
e.g., Yangtze China Inv. Interim Results, London Stock Exchange Aggregated Regulatory News
Service (Dec. 4, 2009);  Form 8-k: Cn Dragon Announces Determination to Change Direction of
Current Business Operations, US State News (Dec. 4, 2009); Low-carbon Urbanization Is Way
Forward for China, Chinadaily.com (Nov. 30. 2009).

comparison by stating that "[r]egression is an appropriate technique in this context because it controls for the impact of each explanatory variable upon the dependent variable, while allowing me to quantify the difference between prices during the alleged conspiracy and the benchmark period, e.g. the overcharge"). Instead, the Report merely states:

> Table 3 [("Table 3"), replicated below,] shows the estimated overcharges from the regression model. These results show the percentage by which prices for magnesite were higher as a result of the alleged conspiracy. In order to obtain the percentage overcharge from the estimated coefficient it is necessary to make a technical adjustment. The conspiracy had greater impact in the period after 2004, since the estimated overcharge on magnesite prices was higher during that time period.

**Table 3**

Estimated Overcharge Percentages

| Collusion Period[1] | Estimated Overcharge Percentage |
|---|---|
| 2000  2003 | 4.03% |
| 2004  2007 | 71.83% |

1. Collusion period is April 2000 to Present.

Id. at 16 and n. 35.

In other words, the Report seems to substitute the promised benchmark analysis by a percentile conversion of the coefficients of arbitrarily labeled dummy variable with the goal of restating the very same inexplicable conclusion, i.e., that Chinese magnesite prices during 2000-2007 had to be affected by certain "Chinese" collusive activities.

(xviii) Re-repeating the same once again, the Report concludes with Lamb's assertion that, "[b]ased on [his] analysis of the market for Chinese magnesite[, Lamb] ha[s] determined that all class members were injured as a result of the alleged conspiracy." Id. at 18. However, in light of the above-discussed chain of deficiencies (e.g., the unwarranted assumption that the facts borrowed from dismissed Original Complaint were true; the failure to provide the Court with

Page 55 of 222

Lamb's pools of data, the sources of this data, as well as with Lamb's regression equations; the

discrepancies between the figures and statements made in the Report and Lamb's Regression

Results; the discrepancies between the figures and statements made in the Report and the

statements made in the Amended Complaint; the inexplicable deducement that Lamb's dummy

variables were necessarily representative of collusive activities; failure to perform the benchmark

analysis originally presented as the key analytical step; etc.), the Court cannot accept the Report as

proof that "Chinese" collusive activities actually took place and/or that these activities were the

source of increase in magnesite prices.  A fortiori, the Court cannot apply Lamb's conclusions

specifically to Defendants.[46]

With that, the Court now returns to the second sentence composing Plaintiffs' Paragraph

Sixty-Five (asserting that "[a]n overcharge analysis from a regression model by . . . Lamb . . .

shows that, between 2000 and 2003, the Cartel overcharged U.S. buyers of magnesite by an

average of 4 percent, while between 2004 and 2008, as a direct result of the Cartel's activities,

---

[46] The Court, having a mere layperson's familiarity and no expert command of statistics, is certainly mindful of the possibility that the Court misconstrued either Lamb's deducements and/or his regression model, and/or the correlation Lamb envisioned between the benchmarking and regression analyses, etc. However, the possibility of the Court's misconstruction of the Report transforms the Report into a document even less suitable to operate as a factual proof: it is axiomatic that Rule 702 admits expert testimony "if it will assist the trier of fact to *understand* the evidence or a fact in issue," Moses v. Payne, 543 F.3d 1090, 1101 (9th Cir. 2008) (quoting State v. Farr-Lenzini, 970 P.2d 313, 318 (Wash. Ct. App. 1999)); see also Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997), and the Court has no obligation to decipher an expert's cryptic message. Moreover, since -- under Rule 702 -- expert testimony *cannot be misleading*, see Moses, 543 F.3d at 1101 (citing Farr-Lenzini, 970 P.2d at 319), an expert's report must be amenable to understanding by a layperson not only with respect to the words composing the end-conclusion but also with regard to the rationale and the steps of the processes employed. Indeed, construing Rule 702 otherwise would invite experts to "create" facts by simply ushering floods of technical terminology on the judiciary stripped of an actual opportunity to analyze the testimony.

U.S. magnesite purchasers were overcharged more than 21 percent"). Am. Compl. ¶ 65. This statement is incorrect even regardless of above-discussed shortcomings of the Report, since the Report neither speaks in terms of "Cartel's activities" (rather, it asserts "overall Chinese" activities) nor covers the year 2008 and any time thereafter (rather, it covers only the period from July 2000 to July 2007). Moreover, the Report merely suggests that the increases in Chinese prices might have been related to intensification of certain factor(s), some of which were assessed through, allegedly, actual pools of data. The Report, however, clearly states that the "collusion factor" was merely hypothesized by Lamb into a dummy variable as a result of Lamb's taking Plaintiffs' allegations in the Original Complaint as true facts. Simply put, Lamb's Report can be reduced to a sophistic statement, "if Plaintiffs' factual assertions are true, then Lamb's calculations of Plaintiffs' factual assertions shows that these assertions are true." Such statement establishes neither *Defendants*' intent nor even anyone's intent to affect United States commerce; moreover, it does not even establish the "directness" of these "someone's" actions (since, according to Lamb's results, the collusive activities, even during the "high-tide" period, caused only a price increase of $2.16 per metric ton).[47] Consequently, Plaintiffs' second sentence in Paragraph Sixty-Five appears to be nothing but Plaintiffs' unwarranted distortion of the already insufficient Report. In light of the foregoing, the Court will disregard the content of this Paragraph for failure to provide any relevant factual proof of Plaintiffs' position.

---

[47]  Since, according to Plaintiffs, the export price rose during 2000 from $104 per metric ton to $158 per metric ton (i.e., by $54 per ton per year), see Am. Compl. ¶ 55, then the deduced-by-Lamb 4.03% effect, see Table 3, of such $54 increase would amount to the yearly price rise of $2.16 per metric ton (4.03% of $54), i.e., it yields Lamb's conclusion that "Chinese" collusive agreements caused only a $2.16 rise in price of magnesium oxide, and the remaining $51.84 ($54 - $2.16) rise in price was attributed to factors unrelated to these "Chinese" collusive agreements.

k.     *Paragraph Seventy-Two*

Next paragraph, i.e., Paragraph Seventy-Two, alleges as follows:

> During the conspiracy, prices of magnesite and magnesite products exported to the United States from China have not followed the laws of supply and demand [which, in Plaintiffs' opinion, should] exist in a competitive market.  Instead, prices have been set and maintained at artificially high levels by Defendants and their [unspecified] co-conspirators.

Am. Compl. ¶ 72.

Both of these statements fail to provide the Court with any proof necessary for the factual review, as defined in Turicentro (moreover, these statements fail to meet even the pleading requirements, as construed by Twombly and Iqbal).  Indeed, the first sentence offers the Court only Plaintiffs' self-serving simplistic construction of economic models, virtually repeating the error of the above-discussed Paragraph Fifty-Five.  See supra, note 22 of this Opinion (explaining the fallacy of Plaintiffs' overly simplified position).   The second sentence does not even aim to state a fact: rather, it offers the Court a recital of a Sherman Act requirement, but attempts to disguise that recital as a fact.  However, such pleading is insufficient even for the purposes of facial review.  See Iqbal, 129 S. Ct. at 1949-54 ("the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions [or to t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements [, i.e., by] legal conclusion[s] couched as a factual allegation [e.g.,] the plaintiffs' assertion of an unlawful agreement [or] that [defendants] adopted a policy 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group") (citation omitted).  Needless to say, such recital of legal elements fails to provide any proof for the purposes of factual review.  Therefore, the Court will disregard the content of Paragraph Sixty-Three for the purposes of its jurisdictional assessment.

### l.      *Paragraph Seventy-Five*

Finally, Paragraph Seventy-Five asserts:

> Defendants' combination and conspiracy have had the following effects, among
> others: (a) [t]he price of magnesite and magnesite products purchased by Plaintiffs . . . has
> been fixed, raised, maintained and stabilized at artificial and non-competitive levels; (b)
> [c]ompetition in the sale of magnesite and magnesite products has been restrained.

Am. Compl. ¶ 75.

The shortcomings of this Paragraph are identical to those of Paragraph Seventy-Two, i.e.,

Plaintiffs state nothing but a set of legal conclusions depicting "a" Sherman Act scenario and

merely paste Defendants' name and the product's name into the picture in an effort to repackage

their self-serving legal conclusions into a statement sounding like an assertion of fact.  Since the

Supreme Court expressly cautioned against such pleading practices even for the purposes of facial

review, see Iqbal, 129 S. Ct. at 1949-54, the Court certainly cannot accept Plaintiffs' bare legal

conclusions as proof for the purposes of factual review, as defined in Turicentro.  Therefore, this

final set of allegations made by Plaintiffs in an attempt to establish that this Court has subject

matter jurisdiction over this case under the FTAIA exception will also be disregarded.

### m.      *Amended Complaint Fails to Meet the FTAIA Exception*

As the foregoing discussion illustrates, not a single Paragraph of the Amended Complaint

among those advertized in the Opposition as providing the Court with factual proof as to the

Court's subject matter jurisdiction under 15 U.S.C. § 6a(1)(A) lives up to its promise.  The bulk of

Plaintiffs' pleadings related to the FTAIA exception fail to assert any facts (offering, instead, a

kaleidoscope of self-serving conclusions and/or recitals of legal elements) and the remainder of

Plaintiffs' statements assert facts that either negate Plaintiffs' claims or are self-contradicting, or

inapposite to Plaintiffs' position, or unwarranted in light of Plaintiffs' own evidence, or based on deficient assumptions and inexplicable conclusions. Since Plaintiffs failed to offer the Court even a single factual proof meeting the Rule 12 review, as articulated in Turicentro, the Court is constrained to conclude that Plaintiffs' Amended Complaint asserts Sherman Act claims (based on Defendants' status as exporters of Chinese magnesium oxide) that fall outside the Court's subject matter jurisdiction, and these claims should be dismissed.

Such conclusion, however, does not dispose of another reading of the Amended Complaint, which seems to suggest that Plaintiffs might be suing Defendants not in Defendants' capacity as exporters of Chinese goods but as importers of goods into the United States. The Court, therefore, now turns to such reading of the Amended Complaint.

## B.      Subject Matter Jurisdiction Under the Introductory Clause of the FTAIA

As noted supra, the FTAIA, in its introductory clause provides that:

> [The Sherman Act] shall not apply to conduct involving trade or commerce (*other than import trade or import commerce*) with foreign nations.

15 U.S.C. § 6a (emphasis supplied). Hence, in perhaps ineloquent but nonetheless unambiguous terms, Section 6a provides that the FTAIA-based jurisdictional bar is wholly inapplicable to pleadings alleging that the wrongful conduct was undertaken by defendants as *im*porters (rather than as *ex*porters). The Court's December Opinion already reviewed the Court of Appeals' guidance as to the issue of whether the defendants are importers or exporters:

> [T]he FTAIA asks whether [the] defendants were "involve[d in] import trade or import commerce." See Carpet Group, 227 F.3d at 69, 72. If all that defendants were doing was actually bringing goods or services into the United States, then the FTAIA . . . is not even triggered, i.e., the claim [against the defendants] squarely falls within the scope of the Sherman Act. See Turicentro, 303 F.3d at 302 ("[While the FTAIA] does not define the term 'import,' . . . the term generally denotes a product (or perhaps a service) has been

Page 60 of 222

brought into the United States from abroad") (citing Webster's Third New Int'l Dictionary (1986); Black's Law Dictionary (6th ed. 1990)).  However, if "[d]efendants did not directly bring items or services into the United States . . . , they cannot be labeled 'importers,' [nor could it be said that defendants] have they engaged in 'import trade or commerce.'"  Id.  In other words, even if a certain importer purchased or otherwise obtained the defendants' product in a foreign market (be it the defendants' national market or any other market) and brought the defendants' product into the United States, the fact that the product eventually found its way into the United States does not transform the defendant into an "importer" and, hence, an antitrust claim against the defendants must pass muster under the FTAIA['s "substantial, direct and reasonably foreseeable" exception] before the Sherman Act claim can be entertained.  See id. at 304 (The fact "[t]hat 'some of the goods purchased in [a foreign market] may ultimately have been imported by individuals into the United States' [is] immaterial to determining if defendants [are] involved in 'import trade or import commerce' [since the defendants' own] actions did not directly increase or reduce imports into the United States") (quoting Kruman v. Christie's Int'l PLC, 284 F.3d 384, 395 (2d Cir. 2002).

Docket Entry No. 73, at 26-27 (emphases removed).

### 1.    Plaintiffs' Allegations

The allegations stated in the Amended Complaint are less than clear as to whether

Plaintiffs are suing Defendants as exporters or as importers.

Specifically, some Plaintiffs' claims use the term "import" and the phrase "sale of

magnesite products to customers *in* the United States" (rather than "sale *to* United States

customers," which could have been taking place *outside* the United States).  See Am. Compl. ¶¶

1-2 (asserting that "[t]his action seeks no damages or relief with respect to non-import foreign

commerce," "Defendants have directly sold and delivered magnesite and magnesite products to

customers in the United States").  However, while some Defendants are named as entities that

"directly sold . . . and *shipped magnesite products to the United States* during the period described

in the [Amended] Complaint," id. ¶ 12-13, 15, 19-20, 22-25 and 27 (emphasis supplied), hence

suggesting that Defendants were *im*porters, other Defendants are described as "producer[s] and

exporter[s] of magnesite," suggesting that Defendants were not importers at all. Id. ¶¶ 17, 26 (emphases supplied).  To add to the uncertainty, Plaintiffs' Paragraph Fifty-One outright merges the "substantial, direct and reasonably foreseeable effect on United States commerce" language of the FTAIA exception from 15 U.S.C. § 6a(1)(A) (applicable to exporters of goods that are brought into the United States by others) with an assertion that Defendants, on their own, brought these goods into the United States.  See id. ¶ 55 ("The conduct of Defendants . . . has directly, substantially and foreseeably restrained trade and commerce in the United States.  [They] directly sold [their goods] in United States commerce").  Finally, to make Plaintiffs' allegations even more confusing, the Amended Complaint opens with the sentence asserting that Defendants ha[d] "the purpose and effect of fixing prices of magnesite . . . products exported to . . . the United States," id. ¶ 1 (emphasis supplied), but then immediately proceeds to state that "Defendants have directly sold and delivered magnesite . . . to customers in the United States."  Id. ¶ 2 (emphasis supplied). These inconsistent allegations necessarily allows for two readings of the Amended Complaint: (1) one, where Plaintiffs seem to assert inapplicability of the FTAIA jurisdictional bar on the grounds of the § 6a(1)(A) exporter exception ( addressed in the prior section of this Opinion); and (2) another, where Plaintiffs seem to assert an "altogether" inapplicability of the FTAIA on the grounds that Defendants were importers (i.e., relying on the FTAIA's introductory clause). Plaintiffs' statements to the latter effect could be roughly subdivided into three categories: (1) Plaintiffs' conclusory references to certain Defendants as entities that "directly . . . shipped magnesite products to the United States during the period described in the [Amended] Complaint," id. ¶ 12-13, 15, 19-20, 22-25 and 27; (2) Plaintiffs' legal position that Defendants were importers because American entities either purchased Defendants' goods or consumed/resold

these goods in the United States; and (3) Plaintiffs' assertion that Defendants were importers in light of the evidence contained in certain Plaintiffs and Defendants' exhibits.

The first category, consisting of numerously repeated factless self-serving assertions, cannot support Plaintiffs' position even for the purposes of facial review under the standard articulated in Iqbal and Twombly and, a fortiori, is insufficient for the purposes of factual review, as defined in Turicentro.  Hence, this category of conclusory statements will be disregarded without further discussion.  However, Plaintiffs' position based on alleged Defendants' sales to "American" entities, as well as Plaintiffs' reliance on certain exhibits, warrants a detailed review.

### 2.   Claim That Defendants Effectively Acted as Importers

The Amended Complaint is void of any factual statements or references to exhibits related to Defendants' alleged importation of goods into the United States.  See, generally, Am. Compl.  However, Plaintiffs' included in their amended pleadings a statement seemingly aiming to assert purchases of Defendants' goods by an entity which, upon bringing these goods to the United States, resold them to Plaintiffs (and, hence, introduced these goods in United States stream of domestic commerce).  See id. ¶ 11.

Specifically, Plaintiffs' Paragraph Eleven reads:

> Possehl, Inc. [("Possehl")] has assigned to [Plaintiffs all Possehl's] rights, title and interest in and to all causes of action it may have relating to magnesite or magnesite products brokered by Possehl, Inc. and subsequently delivered to [Plaintiffs] during the relevant period.  Possehl, Inc. purchased magnesite and magnesite products directly from [D]efendants during the [relevant] period and shipped those products to [Plaintiffs].

Id.  All other relevant statements made in the Amended Complaint are entirely factless, i.e., they present mere conclusory assertions lacking even verbal specificity, let alone actual factual proof.  See Am. Compl. ¶¶ 12-13, 15, 19-20, 22-25 and 27.  Yet, Plaintiffs' factual assertions currently

Page 63 of  222

before the Court are not limited to the above-quoted two sentences in Paragraph Eleven. Rather,

these statements and evidentiary material are contained in Plaintiffs' Opposition and exhibits

attached thereto. See Docket Entry No. 105. Plaintiffs' inclusion of these statements (and

exhibits) in their Opposition rather than in their Amended Complaint is a procedural oversight,

since a litigant cannot plead claims, state and/or support facts by any non-pleading document, be it

moving papers, an opposition to adversaries' motion, the litigant's traverse, etc. See, e.g., Bell v.

City of Phila., 275 Fed. App'x 157, 160 (3d Cir. 2008); Gilmour v. Gates, McDonald & Co., 382

F.3d 1312, 1315 (11th Cir. 2004); Veggian v. Camden Bd. of Educ., 600 F. Supp. 2d 615, 628

(D.N.J. 2009). However, for the purposes of this Opinion only, the Court will consider Plaintiffs'

Opposition statements and exhibits attached thereto as if they were included in the Amended

Complaint by reference, via the above-quoted statement made in Paragraph Eleven.

### a.   *Plaintiffs' Legal Position*

Plaintiffs' legal position is not entirely clear, granted that Plaintiffs assert:

> Defendants . . . directly sold magnesite to U.S. customers for delivery in the United States
> during the relevant time period. . . . Contracts previously submitted to the Court establish
> that [Defendants] sold magnesite to U.S. companies pursuant to contracts requiring
> delivery to the United States. Publicly available import records confirm that . . .
> Defendants . . . sold magnesite directly to customers in the United States for delivery in the
> United States.
> . . .
> Courts have uniformly concluded that the FTAIA exception for conduct involving import
> trade applies to claims by domestic importers arising from direct purchases of price-fixed
> goods. See, e.g., The 'In'Porters, S.A. v. HonesPrintables, Inc., 663 F. Supp. 494, 499
> (M.D.N.C. 1987) (applying FTAIA to claims of antitrust plaintiffs "other than [] domestic
> importers]"); Coors Brewing Co. v. Miller Brewing Co., 889 F. Supp. 1394, 1398 (D.
> Colo. 1995) (stating that the FTAIA applies to antitrust plaintiffs' claims "with the
> exception of claims brought by domestic importers"); see also Caribbean Broad Sys. Ltd.
> v. Cable and Wireless PLC, 1995 U.S. Dist. LEXIS 19225, C.A. No. 93-2050, 1995 WL
> 767164, at *2 (D.D.C. Dec. 21, 1995), rev'd on other grounds, 148 F.3d 1080 (B.C. Cir.
> 1998) (noting that the FTAIA "makes clear that the concern of the antitrust laws is

Page 64 of 222

protection of American consumers and American exporters, not foreign consumers or producers").

. . .

In Kruman v. Christie's Int 'l PLC, 284 F.3d 384, 398 (2d Cir. 2002)[,] the defendant auction houses were accused by plaintiffs that had purchased goods at auctions outside of the United States of conspiring to fix commissions on foreign auctions. In concluding that the import trade exception did not apply, the Second Circuit noted that, although "some of the goods purchased in those auctions may ultimately have been imported by individuals in the United States," "the commerce that is the focus of this case is the charging of fixed commissions on the purchase and sale of goods at foreign auctions, not the trade in and subsequent movement of the goods that were purchased and sold." Id. at 395-96.

Opp. at 14-15, 27-28.

Plaintiffs' invocation of The 'In'Porters does not seem to raise any legal point worthy of

discussion, since it merely reiterates the Court's reading of the FTAIA as wholly inapplicable to

claims against importers that bring goods in the United States. Similarly, Plaintiffs' reliance on

Kruman does not seem to add any wrinkle, since the Court of Appeals for the Third Circuit

already adopted the Kruman point highlighted by Plaintiffs in the Court of Appeal's Turicentro

decision. See 303 F.3d at 302. That adoption of Kruman by the Court of Appeals was already

duly noted by this Court in its December Opinion, when the Court states:

"[while the FTAIA] does not define the term 'import,' . . . the term generally denotes a product (or perhaps a service) has been brought into the United States from abroad." [Turicentro, 303 F.3d at 302.] However, if "[d]efendants did not directly bring items or services into the United States . . . , they cannot be labeled 'importers,' [nor it could be said that defendants] have they engaged in 'import trade or commerce.'" Id. In other words, even if a certain importer purchased or otherwise obtained the defendants' product in a foreign market (be it the defendants' national market or any other market) and brought the defendants' product into the United States, the fact that the product eventually found its way into the United States does not transform the defendant into an "importer" and, hence, an antitrust claim against the defendants must pass muster under the FTAIA['s "substantial, direct and reasonably foreseeable" exception] before the Sherman Act claim can be entertained. See id. at 304 (The fact "[t]hat 'some of the goods purchased in [a foreign market] may ultimately have been imported by individuals into the United States' [is] immaterial to determining if defendants [are] involved in 'import trade or import commerce' [since the defendants' own] actions did not directly increase or reduce imports

Page 65 of 222

into the United States") (quoting <u>Kruman</u>, 284 F.3d [at] 395).

Docket Entry No. 73, at 26-27.

Hence, the excerpt from Plaintiffs' Opposition quoted at the outset of this subsection

leaves the Court with only two Plaintiffs' quotations, one from <u>Carribean</u> and another from <u>Coors</u>.

However, <u>Carribean</u> is wholly inapposite to the case at hand since it deals with the issue of

whether a purchaser in a foreign country can bring a Sherman Act claim based on foreign harm;

this question was answered in the negative by the Supreme Court in <u>Empagran S.A.</u>, 542 U.S.

155. One court explained and illustrated the issues associated with the <u>Carribean</u> language quoted

by Plaintiffs as follows:

> In asserting [that they have standing to sue], Plaintiffs rely on the FTAIA's introductory
> language, which states that the FTAIA's requirement of a "direct, substantial, and
> reasonably foreseeable effect" on domestic commerce applies to claims "involving trade or
> commerce (other than import trade or import commerce) with foreign nations." . . . Based
> on this language, Plaintiffs assert that the parenthetical exclusion of "import trade or
> import commerce" means that a foreign antitrust claim need never satisfy the FTAIA as
> long as it involves products that might be shipped to the United States. . . . The court
> determines that Plaintiffs' position is not a correct statement of the law. The "main
> significance" of the FTAIA is to "make[] clear that the concern of the antitrust laws is
> protection of American consumers and American exporters, not foreign consumers or
> producers" . . . . Phillip Areeda & Herbert Hovenkamp, Antitrust Law P 272h2, at 362-63
> (1997) . . . . The antitrust laws' goal of protecting American consumers and producers
> cannot realistically be served by Plaintiffs' version of the FTAIA, which would permit
> foreign plaintiffs to bring treble damages suits based on conduct that has only indirect,
> insubstantial, and unforeseeable effects on commerce in this country.

<u>United Phosphorus, Ltd. v. Angus Chem. Co.</u>, 131 F. Supp. 2d 1003, 1022 (N.D. Ill. 2001).

Since Plaintiffs' reference to <u>Carribean</u> is inapposite to the matter at hand, the Court is left

to distill Plaintiffs' position from: (a) Plaintiffs' mentioning of Possehl in Paragraph Eleven of the

Amended Complaint, <u>see</u> Am. Compl. ¶ 11; (b) Plaintiffs' thrice paraphrased assertion that

Defendants "sold magnesite to U.S. customers for delivery in the United States," "sold magnesite

to U.S. companies pursuant to contracts requiring delivery to the United States," and "sold magnesite directly to customers in the United States for delivery in the United States," Opp. at 14-15; and (c) Plaintiffs' quotation from Coors that suggests Plaintiffs' reading of Coors as a case standing for the proposition the FTAIA jurisdictional bar is inapplicable to the claims brought *by* plaintiffs who are *United States importers*.  See id. at 27.  Read jointly, these statements seems to express Plaintiffs' position that a foreign *ex*porter automatically becomes a de facto *im*porter of goods in the United States (and, hence, automatically loses his/her ability to invoke the FTAIA jurisdictional bar) if: (a) that *ex*porter sells his/her goods to an *im*porter that is/labels/deems itself an American entity; and (b) that importer brings the goods purchased from that exporter into the United States, either for the importer's consumption or for the importer's further re-sale of these goods to other American end-users.  Accord Opp. at 27 (titling this section of the Opposition as "The Sale of . . . Products *to U.S. Companies for Delivery in the United States* is 'Conduct Involving' '. . . Import Trade or Import Commerce'") (emphasis supplied).[48]  Presuming that the Court correctly distilled Plaintiffs' legal position, such position -- as explained below -- is without merit and, hence, Plaintiffs cannot reclassify Defendants-*ex*porters into *im*porting entities prevented from invoking the FTAIA jurisdictional bar.[49]

---

[48]  In other words, Plaintiffs seem to invite the Court to find that the process of "importation" begins right at the loading docks of an exporter if the exporter sells to an American end-user or to a broker who informs the exporter of the broker's intent to resell the goods directly to American end-user once the goods enter the United States.  Such reading divorces United States actual geographic borders from Plaintiffs-created "virtual borders" which become drawn at any point where an American end-user or catering-to-Americans broker gets the good.

[49]  The Court notes, in passing, that it is not entirely clear as to any rights, title or interests in any cause of action that Possehl might have in this matter, since: (a) Possehl is a German entity, situated in Lübeck (Schleswig-Holstein land of Germany), see <<http://www.possehl.de/en/index.html>>; (b) Possehl is an importer of all kinds of goods and is operating world-wide,

**b.**     ***Coors* Does Not Lend Support to Plaintiffs' Legal Position**

Writing one of the very few pilot FTAIA decisions, the court in <u>Coors</u> grappled with a

question completely different, both factually and legally, from the issue of what circumstances

could reclassify an *ex*porter defendant into an *im*porter.  <u>See Coors Brewing Co. v. Miller Brewing

Co.</u>, 889 F. Supp. 139.  With finesse of sub-agreements addressed in <u>Coors</u> being factored out, the

circumstances in <u>Coors</u> were as follows: Coors Brewing Company (a Colorado corporation

engaged in the business of brewing, marketing, and distributing beer) entered into a licensing

agreement with Molson Breweries of Canada (a Canadian corporation, also in the beer industry),

pursuant to which Molson would brew and distribute Coors products in Canada.  <u>See Coors

Brewing Co. v. Molson Breweries,</u> 51 F.3d 1511, 1512-13 (10th Cir. 1995).  Thereafter, Miller

Brewing Company (a Wisconsin corporation also in the business of brewing and marketing beer)

entered into a partnership with Molson; under that agreement, Miller became the exclusive

distributor of Molson's products in the United States, and Molson became the exclusive

distributor of Miller's products in Canada.  <u>See id.</u>  At no point in the <u>Coors</u> litigation did Molson

and/or Miller deny the existence of the Miller-Molson alliance, pursuant to which Molson and

Miller  jointly targeted United States and Canadian markets through coordination of their

marketing and pricing.  <u>See id.; see also Coors,</u> 889 F. Supp. 139.  In light of this Miller-Molson

agreement, Coors initiated a legal action asserting that the Miller-Molson alliance limited Coors'

ability to *ex*port its beer to Canada and, in addition, "somewhat restrained" trade in the United

---

see <u>id.</u>; (c) here, Possehl seemingly has been purchasing Chinese goods for further world-wide
importation, which bars Possehl's claims under the holding of <u>Empagran S.A.</u>, 542 U.S. 155; and
(d) the only injury Possehl might have suffered as a result of the alleged collusive activity is a
wholly speculative Possehl's inability to make "more" profit on resale of Chinese goods.

States. See Coors, 889 F. Supp. at 1397. In response, Miller and Molson asserted that Coors'

claim was jurisdictionally barred by the FTAIA, and that the FTAIA's "direct, substantial, and

reasonably foreseeable effect" exception (restoring jurisdiction) did not apply. See id. at 1397.

Presented with such contentions, the District of Colorado ruled that the Molson-Miller alliance

"satisfie[d] both subsections . . . of the FTAIA [exception] because it ha[d] a direct, substantial,

and reasonably foreseeable effect not only on Coors' export trade with Canada, but also, albeit less

directly, on the United States beer market."  In other words, the Coors court made its finding

primarily under subsection (1)(B) of the FTAIA, which: (a) removes the jurisdictional bar with

regard to claims asserting "direct, substantial, and reasonably foreseeable [effect] on *export* trade

[of American entities selling *to*] foreign nations," see id. (emphasis supplied); and (b) is entirely

inapplicable to the matter at hand, since -- here -- Plaintiffs are not suing in Plaintiffs' capacity as

exporters of goods to China or to any other nation.[50]

    At no point did the Coors court deal with the question of whether Molson, an *exporter*,

could be re-characterized into an *im*porter of Canadian beer to the United States on the grounds

that Miller was "directly" bringing Molson's goods into the United States for sale to American

consumers: the *im*porter/*ex*porter roles in Coors were firmly allocated and never contested by the

parties.[51]  With that observation, the Court now turns to the Coors sentence quoted by Plaintiffs;

---

[50] This Court does not endorse the Coors court's choice of words suggesting that an
antitrust plaintiff might establish a direct effect necessary for subsection (1)(A) by pleadings
asserting that the defendants' actions affected United States "less directly."

[51] Hence, even if the Coors court were to make a finding that Molson was a quasi-
*im*porter of its Canadian beer to the United States as a result of engaging Miller, such finding
would be necessarily a dictum having no precedential value even in the Coors court jurisdiction,
and certainly in no other jurisdiction, such as this District.  However, it does not seem that the
Coors court made such a finding even in dicta.

the paragraph from which Plaintiffs extracted that sentence reads, in its entirety, as follows:

> Although cases applying the FTAIA are few, its "inelegant" language has been interpreted to mean that *with the exception of claims brought by domestic importers*, the Sherman Act will not apply to conduct affecting foreign markets, consumers or producers unless there is also a direct, substantial, and reasonably foreseeable effect on the domestic market (subsection (1)(A)) or on opportunities to export from the United States ((1)(B)). [See] P. Areeda & H. Hovenkamp, Antitrust Law ¶ 236'a at pp. 306-07 (1993 Supp.); see McGlinchy v. Shell Chemical Co., 845 F.2d 802, 813 (9th Cir. 1988) (allegations of a refusal to deal in foreign markets injuring only foreign customers and plaintiff insufficient to confer antitrust jurisdiction under FTAIA); The 'In'Porters, S.A. v. Hanes Printables, Inc., 663 F. Supp. 494, 498-99 (M.D.N.C. 1987) (French garment distributor had no cause of action under federal antitrust laws absent evidence of injury within the United States); Liamuiga Tours v. Travel Impressions Ltd., 617 F. Supp. 920, 922-23 (E.D.N.Y. 1985) (court lacked jurisdictional nexus under the FTAIA where restraint of trade and conspiracy claims involved exclusively lost business and anti[-]competitive effects in St. Kitts).

Id. at 1397-98 (language quoted in Plaintiffs' Opposition italicized).

In light of the Coors court's references to Areeda & Hovenkamp, McGlinchy, The 'In'Porters and Liamuiga Tours, none of which suggests, even remotely, that an *exporter* could be "re-characterized" into an *importer* if a catering-to-Americans importer or an American end-user purchases the exporter's goods in a foreign market, this Court cannot exclude the possibility that the Coors court's phrase "with the exception of claims brought *by* domestic importers" (which, it seems, merely made a generic reference to the introductory clause of the FTAIA) was meant to read "with the exception of claims brought *against* domestic importers," i.e., that the Coors court merely summarized the introductory language of the FTAIA stating the statute's inapplicability to claims against importers of goods into the United States. So read, the Coors decision certainly cannot support Plaintiffs' position, while – read otherwise – it would be mere dicta.

### c.   *Plaintiffs' Position Contradicts the Gist of the Third Circuit Law*

As noted supra, the Court of Appeals for the Third Circuit provided some guidance as to

what entity qualifies as an "importer" for the purposes of the FTAIA analysis, stating that, while

the FTAIA "does not define the term 'import,' . . . the term generally denotes a product [that] has

been brought into the United States from abroad. [If d]efendants did not directly bring items or

services into the United States . . . , they cannot be labeled 'importers.'"[52] Turicentro, 303 F.3d at

---

[52]   The Court takes note of Plaintiffs' position that, in order to avoid the FTAIA
jurisdictional bar under the introductory language "[the Sherman Act] shall not apply to conduct
involving trade or commerce (other than import trade or import commerce) with foreign nations
unless . . ." 15 U.S.C. §6a, Plaintiffs need not show that Defendants were actually "importers" of
goods to the United States but could make a "diluted" showing that Defendants were just
"involved" in import to the United States. See Opp. at 29-30 ("the FTAIA exception is not
limited to claims against *importers* but extends to claims alleging illegal conduct that *involves*
import trade or import commerce,"emphasis in original, quoting Carpet Group, 227 F.3d at 71,
statement that "[t]he proper inquiry [is] whether the alleged conduct by the defendants 'involved'
import trade or commerce," and In re Air Cargo Shipping Servs. Antitrust Litig., 2008 U.S. Dist.
LEXIS 107882, at *99 (E.D.N.Y. Sept. 26, 2008), rejected in part, 2009 U.S. Dist. LEXIS 97365
(E.D.N.Y. Aug. 21, 2009), for the proposition that "language makes clear that not only import
commerce, but conduct *involving* import commerce, is never removed from the reach of the
Sherman Act," retaining the emphasis of Magistrate Judge Victor V. Pohorelsky). Plaintiffs
misconstrue the meaning the word "involved," as utilized by the Court of Appeals in Carpet
Group and even by Judge Pohorelsky in Air Cargo. The paragraph of the Carpet Group opinion,
from which Plaintiffs extracted their quotation, reads, in its entirety, as follows:

> The Magistrate Judge held that this case did not fall into the FTAIA's parenthetical
> exclusion, *i.e.*, did not "involve" import trade or commerce, because the plaintiffs in this
> case were not importers . . . . [T]his is plainly an inaccurate reading of the FTAIA. It is
> an incorrect focus on the plaintiffs' function rather than the defendants' conduct. [The]
> FTAIA's exemption from the Sherman Act focuses on the latter's application to "conduct
> involving trade or commerce (other than import trade or import commerce) with foreign
> nations." . . . The implication that the Sherman Act provisions "apply to import trade and
> import commerce is unmistakable." Eskofot A/S v. E.I. DuPont de Nemours & Co., 872
> F. Supp. 81, 85 (S.D.N.Y. 1995). The proper inquiry was therefore whether the alleged
> conduct by the defendants "involved" import trade or commerce, not on whether the
> plaintiff 's conduct, which is not being challenged as violative of the Sherman Act,
> "involved" import trade or commerce.

Carpet Group, 227 F.3d at 71. Hence, the word "involved" was utilized by the Court of Appeals
in order to denote which party (i.e., the plaintiff or the defendants) has to be importer(s) in order
to render the FTAIA's jurisdictional bar wholly inapplicable to the plaintiffs' claims; the word
was not used in order to set forth a "diluted" or "relaxed" meaning of the term "import."  This is

302.  This definition, while undoubtedly helpful, does not, however, provide a bright-line test as to what process qualifies as "bringing" a product into the United States.  True, such inquiry is easy in a scenario where the buyer "X" goes to country "Y" and -- upon purchasing goods from the selling entity "Z" -- brings these goods into the United States and consumes the goods or resells them within the United States: in such case, "X" is undoubtedly the "importer" of Z's goods. (Alternatively, if Z brings Z's goods into the United States and then sells them to X, then Z is both an exporter from Z's country and, also, an importer for the purposes of the United States. However, modern trade is a process infinitely more complicated than the above-described simple scenarios.  For instance: (a) seller Z typically receives a pro-forma offer from an intermediary "A" who, in turn, is interested in Z's goods because he either already has a pro-forma offer to buy from a purchaser X or anticipates such offer from X and/or from other X-like buyers; (b) in response to or in anticipation of X's offer, A obtains price quotes from Z and then quotes to X and X-like buyers A's price list (which, typically, factors in A's surcharge); (c) if X contacts A (or

---

especially obvious in light of the Court of Appeals' unaltered quotation from Eskofot: had the Court of Appeals wished to relax the Eskofot language, it would change it to "the Sherman Act provisions 'apply to [acts somehow involving] import trade and import commerce.'" Magistrate Judge Pohorelsky's focus on the word "involving" is, too, different from Plaintiffs' position. While his end-conclusion does not persuade this Court (and was indeed rejected, in part, by the Eastern District of New York), his "Analysis" section following the quotation extracted by Plaintiffs indicates that Judge Pohorelsky utilized the word in response to defendants' assertion that the act of price fixing outside the United States must be divorced, for the purposes of the FTAIA analysis, from any importation activities, and only the foreign situs of the price fixing could be assessed.  See Air Cargo Shipping Servs., 2008 U.S. Dist. LEXIS 107882, at *99-100. In light of the foregoing, the Court finds Plaintiffs' reliance on Carpet Group and Air Cargo without merit.  Simply put, the FTAIA is wholly inapplicable to Plaintiffs' claims if -- and only if -- Defendants were, in fact, importers: so read, the introductory language of the FTAIA yields the result comparable, policy-wise, to the "meant/intended to affect" test of Alcoa/Hartford Fire adopted in the subsection (1)(A)'s requirement for "direct, substantial and reasonably foreseeable effect," since an entity which is the "main force" behind the transaction bringing the goods on United States soil is expected to "mean/intend to affect" United States commerce.