## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ANIMAL SCIENCE PRODUCTS, INC.,** and **RESCO PRODUCTS, INC.,** <br><br> **Plaintiffs,** <br><br> v. <br><br> **CHINA MINMETALS CORP., et al.,** <br><br> **Defendants.** | Civ. No. 2:05-cv-04376 (KM) <br><br><br> **OPINION** |

**McNulty, District Judge**

## TABLE OF CONTENTS

TABLES OF PARTIES, CLAIMS AND MOTIONS . . . . . . . . . . . . . . . . . . . . .   3

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

I. Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

II. Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

      A. Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8
      B. Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9
      C. Summary of the Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

III. Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

      A. Sherman Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12
      B. Clayton Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13
      C. Motion to Dismiss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16
            1. Rule 12(b)(6) standards in general . . . . . . . . . . . . . . . . . . .   16
            2. Dismissal based on lack of antitrust standing . . . . . . . . . .   18
            3. Dismissal based on Foreign Trade Antitrust
               Improvements Act ("FTAIA"). . . . . . . . . . . . . . . . . . . . . . . .   19
      D. Motion to Compel Arbitration . . . . . . . . . . . . . . . . . . . . . . . . .   21

IV.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     23

    A.  Failure to State a Claim – Injury, Antitrust
       Standing and the Direct Purchaser Rule . . . . . . . . . . . . . . . .     23
         1.  Antitrust standing in general . . . . . . . . . . . . . . . . . . . .     25
         2.  Antitrust injury and causation . . . . . . . . . . . . . . . . . . .     30
         3.  Antitrust purchaser standing . . . . . . . . . . . . . . . . . . . .     32
            a. Statutory standing and the appropriate plaintiff . . .     32
            b. The direct purchaser requirement as a bright-line
               standing rule . . . . . . . . . . . . . . . . . . . . . . . . . . .     37
         4.  Analysis of Resco's direct purchaser standing . . . . . . . .     40
            a. Class members' standing not attributable to Resco .     40
            b. Direct purchases from Defendants . . . . . . . . . . . . .     41
            c. Direct purchases from Chinese "co-conspirators" . . .     44
            d. Resco's acquisition of Worldwide Refractories . . . . . .     47
            e. Assignment of claims from Possehl to Resco . . . . . . .     48
               i. The face of the complaint and the assignment .     48
               ii. Allegations in other pleadings . . . . . . . . . . . . .     55
         5. Dismissal with or without prejudice . . . . . . . . . . . . . . . . .     58

    B.  Motion to Compel Arbitration . . . . . . . . . . . . . . . . . . . . . . . . .     59
    C. Motions to Dismiss under the FTAIA . . . . . . . . . . . . . . . . . . . .     65

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     69

**TABLES OF PARTIES, CLAIMS AND MOTIONS**

| Claim/Statute | Brought by | Against |
|---|---|---|
| Clayton Antitrust Act, 15 U.S.C. § 4 (for treble damages) seeking, *inter alia*, a decree that Defendants have entered into an "unlawful combination and conspiracy [that is] an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1" AC ¶¶ 1, 6, Prayer for Relief | **Resco** on behalf of itself and the direct purchasers class ("all persons or entities who have directly purchased magnesite or magnesite products manufactured by any Defendant or their co-conspirators from September 2001 to the date of the cartel is ended by injunction or otherwise"). AC ¶ 32. | **Defendants moving to dismiss (ECF 98, 99) and to compel arbitration (ECF 37):**<br><br>1. China Minmetals Corporation<br>2. China National Minerals Co., Ltd.<br>  (the "Minmetals Defendants")<br><br>3. Sinosteel Corporation,<br>4. Sinosteel Trading Company,<br>5. Liaoning Jiayi Metals & Minerals Co, Ltd.<br>(the "Sinosteel Defendants")<br><br>**Defendants moving to compel arbitration (ECF 37):**<br>6. Haicheng Houying Corp, Ltd.<br>7. Haicheng Huayu Group Import & Export Co. Ltd.<br>(the "Haicheng Defendants")<br><br>**Inactive Defendants:**<br>Xiyang Group, Xiyang (Pacific) Import & Export Ltd. Company, Xiyang Refractory Materials Ltd. Company, Xiyang Fireproof Material Co. Ltd., Liaoning Foreign Trade General Corporation, Liaoning Jinding Magnesite Group, Dalian Golden Sun Import & Export Corp., Haicheng Pailou Magnesite Ore Co. Ltd., Yingkou Huachen (Group) Co. Ltd. |
| Clayton Antitrust Act, 15 U.S.C. § 16 (for injunctive relief) | **Animal Science** on behalf of itself and indirect purchasers ("all persons or entities who have purchased magnesite or magnesite products manufactured by any Defendant for delivery in the United States") AC ¶ 31. | **All Defendants** (same as above) |

3

| "Co-conspirators" (identified in Complaint but not named as Defendants) |
|---|
| Shangawa Rongyuan Refractories Co., Ltd.<br>Yingkou Sanhua Refractory Materials Co., Ltd.<br>Shenyang Metals and Minerals<br>CITIC Trading. |

| Motions | Brought on behalf of |
|---|---|
| Motion to Dismiss (Docket No. 98) | The Sinosteel Defendants:<br>Sinosteel Corporation, Sinosteel Trading Company, and Liaoning Jiayi Metals & Minerals Co, Ltd. |
| Motion to Dismiss (Docket No. 99) | The Minmetals Defendants:<br>China Minmetals Corp. and China National Minerals Import and Export Corp. |
| Motion to Compel Arbitration (Docket No. 37) | The Minmetals, Sinosteel, and Haicheng Defendants (collectively, the "Seven Defendants"):<br>China Minmetals Corp., China National Minerals Import and Export Corp., Sinosteel Corporation, Sinosteel Trading Company, Liaoning Jiayi Metals & Minerals Co, Ltd., Haicheng Houying Corp, Ltd., and Haicheng Huayu Group Import & Export Co. Ltd. |

## INTRODUCTION

Plaintiffs seek to represent a putative class of U.S. purchasers of magnesite. They allege that sixteen Chinese corporations have conspired to fix prices and control the supply of magnesite and magnesite products exported to the United States. As a result, they say, magnesite prices have remained above market levels since at least April 2000. Defendants' cartel is alleged to constitute a *per se* violation of § 1 of the Sherman Act. Plaintiff Resco Products, Inc., contends that it and similarly situated direct purchasers suffered damages amounting to $58.9 million, trebled pursuant to § 4 of the Clayton Act. Plaintiff Animal Science Products, Inc., on behalf of indirect purchasers, seeks injunctive relief pursuant to § 16 of the Clayton Act.

This matter had a protracted history in this Court, interrupted by a reversal and remand by the Court of Appeals, before it was reassigned to me in August 2012. Currently before me are (1) two motions to dismiss the amended complaint for failure to state a claim, and (2) a motion to compel arbitration. I here find that Plaintiff Resco has not plausibly pleaded facts sufficient to establish its antitrust standing as a direct purchaser. Consequently, I will grant the motions to dismiss the Amended Complaint, without prejudice.

In light of that dismissal, I will not now determine whether the US antitrust laws apply to Defendants' alleged foreign anti-competitive activity under the Foreign Trade Antitrust Improvements Act. I do briefly discuss that issue to provide guidance in the event that Plaintiffs file a Second Amended Complaint. Likewise, on the current state of the record, I cannot find that Plaintiffs must arbitrate their claims against Defendants, but again I discuss the issue briefly, in anticipation of a possible amended pleading.

Many of the defects in the Amended Complaint trace back to the antitrust standing requirement that the plaintiff (or the entity from which plaintiff obtained its claims by assignment) be a direct purchaser. The Complaint alleges direct purchases by an assignor, Possehl (US), but it does so in self-contradictory terms, and without supporting facts (such as, for example, the identification of even a single concrete purchase). It should be possible in a subsequent amended pleading to identify such purchase/sale transactions, and the agreements under which they were made. If that is done, the Court may determine whether Possehl (US) was a direct purchaser. The Court may also then ascertain whether such agreements contained arbitration clauses. (Defendants have made a suggestive demonstration that certain related agreements did contain such clauses.) Any subsequent pleading should also furnish a specific factual basis to assess the applicability of the "import exception" or the "effects exception" of the FTAIA. The relevant facts are, or should be, available to Plaintiffs, and they must be pleaded before I will permit this complex and expensive litigation to proceed.

## I.   Procedural History

The original complaint, filed on September 7, 2005, *see* ECF No. 1, named as Defendants sixteen Chinese entities. It also named one U.S. subsidiary, Minmetals, Inc. ("Minmetals USA"), alleged to be a New Jersey corporation with its principal place of business in Bergen County. *Id.* ¶ 10. After Defendants failed to answer the complaint or move to dismiss, in May 2007 the Clerk of Court began making entries of default for failure to appear against the Chinese Defendants. On December 14, 2007, Plaintiffs moved for Default Judgment. *See* Motion for Default Judgment as to Defaulting Defendants, Dec. 14, 2007, ECF No. 28 (MDJ, 28). Also on December 14, 2007, Defendant Minmetals USA moved to dismiss the Complaint. *See* ECF No. 27. Several of the defaulting Chinese Defendants responded to Plaintiffs' Motion for Default Judgment. Relying on facts presented in Plaintiffs' moving papers, seven of the Chinese Defendants (collectively, the "Seven Defendants") filed a Motion to Compel Arbitration. *See* Motion of Seven Defendants to Compel Arbitration, Feb. 5, 2008, ECF No. 37 ("MTCA, 37"). Those Seven Defendants comprise the following: China Minmetals Corp., China Nat'l Minerals Co., (together the  "Minmetals Defendants"),[1] Sinosteel Corp., China Metallurgical Import & Export Corp. (subsequently renamed Sinosteel Trading Company), Liaoning Jiayi Metals & Minerals Co., Ltd, (together, the "Sinosteel Defendants"), Haicheng Houying Corp., Ltd., and Haicheng Huayu Group Import & Export Co. Ltd. (Huaziyu), (together, the "Haicheng Defendants").

In September 2008, the case was reassigned to Chief Judge Garrett E. Brown, Jr. In October 2008, Judge Brown heard oral argument on the three pending motions (Minmetals' Motion to Dismiss, Plaintiffs' Motion for Default Judgment and the Seven Defendants' Motion to Compel Arbitration). *See* ECF No. 72; docket entry dated October 6, 2008. In December 2008, Judge Brown terminated without prejudice the three pending motions and dismissed the original complaint. ECF No. 74. The grounds for dismissal, raised *sua sponte* by the Court, were that the Court lacked subject matter jurisdiction to adjudicate the dispute pursuant to the Foreign Trade Antitrust Improvements Act. *See Animal Science Prods., Inc. v. China Nat'l Metals & Minerals Imp. & Exp. Corp.,* 596 F. Supp. 2d 842 (D.N.J. 2008).

On March 30, 2009, Plaintiffs filed an Amended Complaint, ECF No. 77 (cited as "AC." Herein, "Amended Complaint" and "Complaint," unless specified otherwise, are used interchangeably to refer to the amended complaint.) That Amended Complaint included more specific allegations and proofs to support the antitrust allegations, as instructed by the District Court. *See Animal Science Prods., Inc.,* 596 F. Supp. 2d at 881. A motion to dismiss the Amended

---

[1]   These two Defendants were erroneously named in the Complaint as China National Metals & Minerals Import & Export Corp., and China National Minerals Import & Export Corporation, respectively.

Complaint was then filed by two groups of Defendants, the Minmetals Defendants and the Sinosteel Defendants. *See* Motion to Dismiss by Sinosteel Defendants, June 26, 2009, ECF No. 98 ("Sinosteel MTD, 98"); Motion to Dismiss by Minmetals Defendants, June 26, 2009, ECF No. 99 ("Minmetals MTD, 99").

In a 220-page opinion issued in April 2010, the district court engaged in comprehensive fact-finding, determined that the FTAIA deprived it of subject matter jurisdiction, and dismissed the Amended Complaint. *See Animal Science Prods. Inc., v. China Nat'l Metals & Minerals Imp. & Exp. Corp.,* 702 F. Supp. 2d 320 (D.N.J. 2010); ECF Nos. 112, 113. Plaintiffs appealed.

Noting that it was overturning existing precedent, the United States Court of Appeals for the Third Circuit held that the FTAIA imposed substantive limits on antitrust claims, but did not raise a jurisdictional bar. It vacated Judge Brown's decision and remanded the case. *See Animal Science Prods, Inc. v. China Minmetals Corp.,* 654 F.3d 462, 467-68 (3d Cir. 2011); ECF Nos. 118-119. In December 2011 the case was reinstated and assigned to Judge Salas. In January 2012, Judge Salas administratively terminated the case pending the outcome of Defendants' petitions to the Supreme Court for a writ of certiorari. ECF No. 127. The cert petitions of the Minmetals Defendants and the Sinosteel Defendants were denied in 2012. *See China Minmetals Corp. v. Animal Sci. Products, Inc.,* 132 S. Ct. 1744 and *Sinosteel Corp. v. Animal Sci. Products, Inc.,* 132 S. Ct. 174.

In April 2012, Judge Salas reopened the case. She stated that she would consider first the Seven Defendants' Motion to Compel Arbitration. ECF No. 131. On that Motion Judge Salas permitted supplemental briefing, which proceeded through the summer. *See* ECF Nos. 133 – 142.

Meanwhile, on August 1, 2012, the case was reassigned to me. ECF No. 144. Currently before me are the Motions of the Sinosteel Defendants and the Minmetals Defendants to Dismiss the Amended Complaint, on remand from the Court of Appeals, as well as the 2008 Motion of Seven Defendants to Compel Arbitration, as supplemented on remand.[2]  Because it is inextricably

---

[2]    As to Plaintiffs' Motion for Default Judgment and Defendant Minmetals USA's Motion to Dismiss, Judge Brown's Order of December 30, 2008, ECF No. 74, granted the Motion of Minmetals USA to Dismiss Plaintiffs' Complaint and denied Plaintiffs' Motion for Default Judgment. *See id.* Minmetals USA was not named as a Defendant in the Amended Complaint and was terminated as a party on April 1, 2009. Plaintiffs have not sought default judgment against the Defendants who have failed to move or respond to the Amended Complaint. As to any future motions for default judgment, "it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law." *DirecTV, Inc. v. Decroce,* 332 F. Supp. 2d 715 (D.N.J. 2004) (reversed and remanded on other grounds). *Accord Basara v. CBRL Group, Inc.,* 2012 U.S. Dist.

intertwined with the merits of those motions, I am raising and considering *sua sponte* the issue of Plaintiffs' statutory standing to bring this antitrust action. Plaintiffs' antitrust standing was raised and addressed in the Parties' briefs in connection with the Motion to Compel Arbitration.

In fairness to the parties, who may have limited the scope of their briefing in response to Judge Salas's limitation of the issues, I *sua sponte* invited supplemental briefing on that antitrust standing issue. On September 9, 2013, both sides filed supplemental briefs on antitrust standing. ECF Nos. 155, 156.

## II.   Factual Background

### A.  Plaintiffs

Plaintiffs' pleadings provide little information about the putative class representatives. Plaintiff Animal Science Products ("ASP"), said to represent "indirect purchasers," is a "Texas corporation with its principal place of business in Nacogdoches, Texas." AC ¶ 10. The Declaration of Animal Science Products submitted in Support of its Motion for Default Judgment, December 14, 2007, ECF No. 28-3 ("ASP Decl. MDJ, 28-3") states that "Animal Science Products manufactures and distributes feed additives and packaged goods. We serve all facets of the feed industry with feed additives, micro ingredients, and premixes, as well as the poultry and swine packaged goods markets. Since 2000, we have purchased magnesite in the form of magnesium oxide produced and sold by defendants, which we use in several of our products." *Id.* ¶¶ 5-6.

Plaintiff Resco Products, Inc. ("Resco"), the putative class representative for "direct purchasers," is a "Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania." AC ¶ 11. In a certification, Resco provides the only description of its business: "In March 2006, Resco purchased Worldwide Refractories, Inc. . . . [which] manufactures refractory materials. It offers basic products for the steel and cement industries. The company manufactures both dolomite and magnesite-enriched dolomitic bricks, rams, and mixes." Certification of Resco Products, Inc. in Support of its Motion for Default Judgment, Class Damages, and Injunctive Relief, December 14, 2007, ECF No. 28-4 ("Resco Cert. MDJ, 28-4").

Resco's Certification also explains that it "purchases magnesite from China principally through brokers," and names one such broker as Possehl, Inc. ("Possehl (US)") *Id.* ¶¶ 7-8. The Complaint, too, refers to Possehl, Inc., which allegedly "has assigned to Resco its rights, title, and interest in and to all causes of action it may have relating to magnesite products brokered by

---

LEXIS 92376 (D.N.J. July 2, 2012). Accordingly, any potential issues of default will be set aside until the viability of Plaintiffs' claim for relief is established.

Possehl, Inc. and subsequently delivered to Resco during the relevant period. Possehl, Inc. purchased magnesite and magnesite products directly from defendants during the class period and shipped those products to Resco." AC ¶ 11. Thus, Resco's rights apparently are alleged to arise by virtue of an assignment from Possehl (US). Possehl (US), however, is not a party to the action and Plaintiffs' pleadings provide no further information about Possehl (US).

### B. Defendants

As noted above, the Amended Complaint names sixteen Chinese entities as Defendants, but only the "Seven Defendants" (comprising the Minmetals Defendants, the Sinosteel Defendants, and the Haicheng Defendants), have responded to the Complaint. I therefore focus on them.

Plaintiffs allege that the Minmetals Defendants are Chinese state-owned trading companies based in Bejing. AC ¶ 12. China Minmetals is alleged to be "a conglomerate that includes the trading of metals and minerals" and "conducts business with and through its wholly owned subsidiary and North American Headquarters, China Minmetals U.S.A., Inc., which maintains its principal place of business in Leonia, Bergen County, New Jersey."[3] China National Minerals Import and Export Co. is alleged to be "a subsidiary and affiliate of China Minmetals." *Id.* ¶ 13. The Minmetals Defendants are movants in the Motion to Compel Arbitration, *see* MTCA, 37, and have moved to dismiss the Amended Complaint, *see* Minmetals MTD, 99.

Plaintiffs allege that Sinosteel Corp. "is a direct or indirectly state-owned multinational conglomerate that includes metals and minerals production and trading." AC ¶ 18. Sinosteel Trading Company ("Sinosteel Trading") (f/k/a China Metallurgical Import & Export Corp.), is alleged to be a "wholly-owned subsidiary of Sinosteel Corp," *id.* ¶ 19, while Liaoning Jiayi Metals & Minerals Co., Ltd, ("Liaoning Jiayi") is alleged to be "not state-owned." *Id.* ¶ 20. The Sinosteel Defendants are movants in the Motion to Compel Arbitration, *see* MTCA, 37, and have moved to dismiss Plaintiffs' Complaint, *see* Sinosteel MTD, 98.

The Complaint alleges that both of the Haicheng Defendants, Haicheng Houying Corp., Ltd., ("Haicheng Houying") and Haicheng Huayu Group Import & Export Co. Ltd. (Huaziyu) ("Haicheng Huayu") are "not state-owned" and are producers and exporters of magnesite. *See* AC ¶¶ 24-25. The Haicheng Defendants are movants in the Motion to Compel Arbitration. *See* MTCA, 37.

The Defendants who have not answered or moved are (1) Xiyang Group,

---

[3]     However, allegations against Minmetals USA were dismissed in 2008 and it has not been named as a defendant in the Amended Complaint. *See* n.2 *supra*.

9

(2) Xiyang (Pacific) Import & Export Ltd. Company ("Xiyang Pacific"), (3) Xiyang Refractory Materials Ltd. Company ("Xiyang Refractory"), (4) Xiyang Fireproof Material Co. Ltd. ("Xiyang Fireproof"), (5) Liaoning Foreign Trade General Corporation ("Liaoning Trade"), (6) Liaoning Jinding Magnesite Group ("Liaoning Jinding"), (7) Dalian Golden Sun Import & Export Corp. ("Dalian Golden Sun"), (8) Haicheng Pailou Magnesite Ore Co. Ltd. ("Haicheng Pailou"), and (9) Yingkou Huachen (Group) Co. Ltd. ("Yingkou Huachen"). (Collectively, they are referred to as the "Inactive Defendants").

The Complaint alleges that Defendants' "co-conspirators include [1] Rongyuan Magnesite Corporation of China, subsequently renamed Shangawa Rongyuan Refractories Co., Ltd., [2] Yingkou Sanhua Refractory Materials Co., Ltd., subsequently renamed Yingkou Wonjin Refractory Material Co., Ltd., [3] Shenyang Metals and Minerals, and [4] CITIC Trading." *Id.* ¶ 28. The "co-conspirators," however, are not named as defendants, and there are no specific allegations as to their acts.

### C. Summary of the Claims

Plaintiffs allege that "[e]ach of these Defendants and its co-conspirators has colluded with each other to restrain competition by, among other things, setting artificial prices pursuant to illegal agreements among these competitors. These horizontal practices were designed to, and in fact did, have a substantial and adverse impact in the United States." AC ¶ 29. Specifically, according to Plaintiffs, Defendants conspired to form two Chinese Magnesite[4] price-fixing groups in 2000. The first, "Jiayun Magnesite Export Group" ("Jiayun EG") allegedly included inactive defendants Xiyang Refractory Material, Yingkou Hachen, Dalian Golden Sun and Liaoning Foreign Trade. *Id.* ¶ 52. The second group, "Huaxia Magnesia Products Export Group ("Huaxia EG") included active Defendants Liaoning Jiayi ("Jiayi") and Haicheng Huayu ("Huayu") and "co-conspirators" Shenyang Metals & Minerals ("Shenyang") and CITIC Trading ("CITIC"). According to Plaintiffs, Jiayun EG and Huaxia EG "collectively represented more than 70% of the export volume of magnesite in China." *Id.* ¶ 54. In 2001, these two Export Groups formed "a single, unified group under the name 'Chinese Magnesite Export Association'" ("CMEA"). *Id.* ¶ 57. Plaintiffs' allege that CMEA "aimed to provide strict management control of all sales, production schedules of individual producers and export prices for Chinese magnesite, including exports to the United States." *Id.*

The Amended Complaint then alleges that in 2003 the original CMEA Cartel conducted several meetings with the Defendants and other exporters

---

[4]   According to the Complaint, magnesite is the naturally occurring carbonate form of magnesium. One variety (dead-burned magnesite, or "DBM") is used to line metallurgical or refractory furnaces. Other varieties have a variety of other applications. AC ¶¶ 41-45.

during which the Cartel agreed that it should be established "under the name 'China Magnesite Forum' and established goals of restraining competition and establishing limits on export supply in order to maintain and increase prices." *Id.* ¶ 59. Thereafter, between 2003 and 2007, various members of the Cartel held meetings to discuss and determine price increases "including [on] exports to the United States." *See* AC ¶¶ 58-64. Specifically, Plaintiffs allege that

> During the period of the charged combination and conspiracy, Defendants and their co-conspirators have participated in meetings and conversations . . . in which the export prices, production, and foreign markets for magnesite and magnesite products were discussed and agreed upon. At their meetings, Defendants and others agreed to and did eliminate, suppress, and limit competition by, among other things:
>
> > (a) discussing the production schedules and export prices of magnesite and magnesite products including for the U.S.;
> >
> > (b) agreeing to control the supply of magnesite and magnesite products for export to the U.S. and elsewhere;
> >
> > (c) agreeing to increase and maintain export prices of magnesite and magnesite products to the U.S. and elsewhere[.]

AC ¶ 67. As a result of Defendants' conspiratorial activities, Plaintiffs allege, "(a) [t]he price of magnesite and magnesite products purchased by Plaintiffs (and the plaintiff classes) has been fixed, raised, maintained and stabilized at artificial and non-competitive levels;" and "(b) Competition in the sale of magnesite and magnesite products has been restrained." *Id.* ¶ 75.

Plaintiffs maintain that the Defendants have been able to achieve these price increases despite the fact that they do not control 100 percent of the magnesite market "because the Defendant producers have the competitive advantage of lower costs than their competitors" and "because China has employed a fixed currency exchange rate which undervalues the Yuan, making Chinese exports of magnesite and magnesite products to the United States relatively less expensive" than other nations' magnesite exports. *Id.* ¶ 69.

11

## III.   Legal Standards

### A. Sherman Act

The Sherman Anti-Trust Act declares "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations . . . to be illegal." 15 U.S.C. § 1.

> The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conductive to the preservation of our democratic political and social institutions. But even were that premise open to question, the policy unequivocally laid down by the Act is competition. And to this end it prohibits 'Every contract, combination or conspiracy, in restraint of trade or commerce among the several States.' Although this prohibition is literally all-encompassing, the courts have construed it as precluding only those contracts or combinations which 'unreasonably' restrain competition.

*Northern Pacific. Ry. Co. v. United States*, 356 U.S. 1, 4-5 (1958) (citations omitted).

"In order to sustain a cause of action under § 1 of the Sherman Act, the plaintiff must prove: (1) that the defendants contracted, combined, or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiff was injured as a proximate result of that conspiracy." *Martin B. Glauser Dodge Co. v. Chrysler Corp.*, 570 F.2d 72, 81-82 (3d Cir. 1977). *Accord Howard Hess Dental Laboratories Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir. 2010) ("A plaintiff asserting a Section 1 claim . . . must allege four elements: "(1) concerted action by the defendants; that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action.") (citing *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005)); *cf Franco v. Connecticut Gen. Life Ins.*

*Co.*, 818 F. Supp. 2d 792, 829 (D.N.J. 2011) ("Pleading a colorable Sherman Act section 1 claim requires a plaintiff to allege (1) an agreement (2) imposing an unreasonable restraint of trade within a relevant product market and (3) resulting in antitrust injury, that is "injury of the type the antitrust laws were intended to prevent and ... that flows from that which make defendants' acts unlawful.").

"The existence of an agreement is the hallmark of a Section 1 claim. Liability is necessarily based on some form of concerted action. . . . The agreement, of course, must pertain to some unlawful conduct within the meaning of the antitrust laws. To establish liability under section 1, a plaintiff must demonstrate that the challenged practice imposed an unreasonable restraint on trade. The illegality of the restraint may be demonstrated in one of two ways: under the *per se* standard or under a rule of reason analysis." *Franco*, 818 F. Supp. 2d at 829-30 (D.N.J. 2011) (internal citations and quotations omitted). "While the rule of reason typically mandates an elaborate inquiry into the reasonableness of a challenged business practice, there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable. Such plainly anticompetitive agreements or practices are deemed to be illegal *per se*." *United States v. Brown Univ. in Providence in State of R.I.*, 5 F.3d 658, 669 (3d Cir. 1993) (internal quotations and citations omitted). *Accord In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 316 (3d Cir. 2010) ("Judicial experience has shown that some classes of restraints have redeeming competitive benefits so rarely that their condemnation does not require application of the full-fledged rule of reason. . . . Once a practice has been found to fall into one of these classes, it is subject to a 'per se' standard.") The types of "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use . . . are price fixing, division of markets, group boycotts, and tying arrangements." *N. Pac. Ry. Co.*, 356 U.S. at 5 (1958). *Accord Arizona v. Maricopa County Med. Soc.*, 457 U.S. 332, 345 (1982); *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 830 (3d Cir. 2010) ("Some categories of restraints, such as horizontal price-fixing and market allocation agreements among competitors, 'because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable.'") (quoting *Brown Univ. in Providence in State of R.I.*, 5 F.3d at 669)); *In re Ins. Brokerage*, 618 F.3d at 316 ("Paradigmatic examples [of *per se* illegal restraints] are 'horizontal agreements among competitors to fix prices or to divide markets.'") (quoting *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007)).

## B. Clayton Act

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides "any person who

shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." Thus, § 4 broadly defines "the class of persons who may maintain a private damage action under the antitrust laws," and "a literal reading of the statute is broad enough to encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation." *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 529 (1983) ("*AGC*"). *Accord Warren Gen. Hosp. v. Amgen Inc.*, 643 F. 3d 77, 80 (3d Cir. 2011) ("Section 4 of the Clayton Act . . . provides a private right of action for 'any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws.") (quoting 15 U.S.C § 15(a)).

Federal courts have long recognized that, despite its expansive language, the Clayton Act's damages remedy is not limitless. As the Supreme Court observed:

> the lower federal courts have been virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation. . . . An antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but despite the broad wording of § 4 there is a point beyond which the wrongdoer should not be held liable. It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property.

*AGC*, 459 U.S. at 534-535 (internal quotations and citations omitted). *Cf Blue Shield of Virginia v. McCready*, 457 U.S. 465, 477 (1982) ("the unrestrictive language of the section, and the avowed breadth of the congressional purpose, cautions us not to cabin § 4 in ways that will defeat its broad remedial objective. But the potency of the remedy implies the need for some care in its application.").

As discussed in detail below, *see infra* § IV.A, there is no precise formula for triggering the Clayton Act's treble damages remedy. In general, however, an antitrust plaintiff must establish that its injuries are not "too remote from the violation and the purposes of the antitrust laws to form the predicate for a suit under § 4." *McCready*, 457 U.S. at 477. *See also Alberta Gas Chemicals Ltd. v. E.I. Du Pont De nemours & Co.*, 826 F.2d 1235, 1240 (3d Cir. 1987) ("Clayton

Act deterrence through compensatory provisions is aimed toward the directly harmful effects of an antitrust transgression. The statutory sanctions do not constitute a broad restitutionary scheme for injuries not closely related to the violation but caused by other effects, desirable or not, of the illegal conduct.").

The Clayton Act also grants private plaintiffs a cause of action for injunctive relief against anti-competitive activity. "Under § 16 of the Clayton Act, 38 Stat. 737, as amended, 15 U.S.C. § 26,[5] private parties 'threatened [with] loss or damage by a violation of the antitrust laws' may seek injunctive relief." *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 105 (1986). Plaintiffs seeking injunctive relief face a lower burden than those seeking treble damages pursuant to § 4.

> [Section] 4 requires a plaintiff to show actual injury, but § 16 requires a showing only of "threatened" loss or damage; similarly, § 4 requires a showing of injury to "business or property," . . . while § 16 contains no such limitation. Although these differences do affect the nature of the injury cognizable under each section, the lower courts, including the courts below, have found that under both § 16 and § 4 the plaintiff must still allege an injury of the type the antitrust laws were designed to prevent.

*Id.* at 111 (internal citation omitted).

---

[5]     Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue: *Provided,* That nothing herein contained shall be construed to entitle any person, firm, corporation, or association, except the United States, to bring suit for injunctive relief against any common carrier subject to the jurisdiction of the Surface Transportation Board under subtitle IV of Title 49. In any action under this section in which the plaintiff substantially prevails, the court shall award the cost of suit, including a reasonable attorney's fee, to such plaintiff.

Clayton Act § 16, 15 U.S.C. § 26.

### C. Motion to Dismiss

#### 1. Rule 12(b)(6) standards in general

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the nonmoving party. *See Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 (3d Cir. 1994). The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (internal citations and quotations omitted). *Accord In re K-Dur Antitrust Litig.,* 338 F. Supp. 2d 517, 528-29 (D.N.J. 2004) ("While a court will accept well-pleaded allegations as true for the purposes of the motion, it will not accept unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations.") (citing *Miree v. DeKalb County. Ga.,* 433 U.S. 25, 27 n. 2, (1977)). In order to raise a right to relief above a speculative level, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009); *Accord Phillips v. County of Allegheny,* 515 F.3d 224, 234 (3d Cir. 2008) (internal citations and quotations omitted) ("stating ... a claim requires a complaint with enough factual matter (taken as true) to suggest the required element. This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.").

This now familiar standard, enunciated in *Twombly* (itself an antitrust case) and developed by *Iqbal*, has long been required of antitrust pleadings. While "there is no heightened pleading standard in antitrust cases, and the general principles governing Rule 12(b)(6) motions apply," an antitrust plaintiff must "plead his complaint with particularity; a complaint, or counterclaim containing only conclusory recitations of law is insufficient to survive a motion

16

to dismiss." *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 529 (D.N.J. 2004) (emphasis, internal quotations, and citations omitted). *Accord AGC*, 459 U.S. at 526 ("As the case comes to us, we must assume that the [plaintiff] can prove the facts alleged in its amended complaint. It is not, however, proper to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged.").

The Third Circuit has given full scope to the *Twombly* standard:

> We must accept all factual allegations in the complaint as true, construe the complaint in the light favorable to the plaintiff, and ultimately determine whether plaintiff may be entitled to relief under any reasonable reading of the complaint. In order to withstand a motion to dismiss, a complaint's factual allegations must be enough to raise a right to relief above the speculative level. This requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. On the contrary, a court is not required to accept legal conclusions alleged in the complaint. The pleading must contain sufficient factual allegations so as to state a facially plausible claim for relief. A claim possesses such plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents.

*Mayer v. Belichick*, 605 F.3d 223, 229-30 (3d Cir. 2010) (internal citations, quotations, and punctuation omitted).

The Third Circuit has usefully distilled the Rule 12(b)(6) analysis to three steps:

> To determine whether a complaint meets the pleading standard, our analysis unfolds in three steps. First, we outline the elements a plaintiff must plead to a state a claim for relief. *See* [*Iqbal*, 556 U.S.] at 675; *Argueta* [*v U.S. Immigration and Customs Enforcement*], 643 F.3d [60,] 73 [3d Cir. 2011]. Next, we peel away those allegations that are no more than conclusions and thus

not entitled to the assumption of truth. *See Iqbal*, 556 U.S. at 679; *Argueta*, 643 F.3d at 73. Finally, we look for well-pled factual allegations, assume their veracity, and then "determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679; *Argueta*, 643 F.3d at 73. This last step is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

*Bistrian v. Levi,* 696 F.3d 352, 365 (3d Cir. 2012).

## 2. Dismissal based on lack of antitrust standing

"Statutory [antitrust] standing is distinct from jurisdictional standing in that Article III standing is required to establish a justiciable case or controversy within the jurisdiction of the federal courts, whereas lack of antitrust standing affects a plaintiff's ability to recover, but does not implicate the subject matter jurisdiction of the court. Accordingly, statutory standing is simply another element of proof for an antitrust claim, rather than a predicate for asserting a claim in the first place." *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 307 (3d Cir. 2011) (internal citations and quotations omitted). *Accord Ethypharm S.A. France v. Abbott Laboratories,* 707 F.3d 223, 232 n.15 (3d Cir. 2013) ("failure to establish antitrust standing is a merits issue"). Still, statutory standing is a threshold issue:

> [B]ecause the remoteness doctrine is not jurisdictional in the sense that Article III standing is-if there is no Article III standing, the court is obliged to dismiss the suit even if the standing issue has not been raised-it may seem that it can be waived or forfeited just like any other nonjurisdictional defense to a suit. But nonconstitutional lack of standing belongs to an intermediate class of cases in which a court can notice an error and reverse on the basis of it even though no party has noticed it and the error is not jurisdictional, at least in the conventional sense.

*MainStreet Org. of Realtors v. Calumet City, Ill.*, 505 F.3d 742, 747 (7th Cir. 2007)

"Because the court (and not a jury) decides standing, the district court must decide issues of fact necessary to make the standing determination." *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 747 (9th Cir. 2012) (citing *Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 72 (1978)). We are, however, at the pleading stage. At this stage, questions of statutory standing, like other factual issues, are considered under the same pleading requirements as a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). *See Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 73 (3d Cir. 2011) ("A dismissal for lack of statutory standing is effectively the same as a dismissal for failure to state a

claim."); *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 449 (6th Cir. 2007) ("antitrust standing and Article III standing are not one and the same, and we not only may—but we must—reject claims under Rule 12(b)(6) when antitrust standing is missing.").

### 3.   Dismissal based on Foreign Trade Antitrust Improvements Act ("FTAIA")

The Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6(a), addresses "conduct involving trade or commerce with foreign nations" by limiting the applicability of the Sherman Act (sections 1-7) only to alleged foreign antitrust conduct involving (1) import trade or import commerce, or (2) conduct having a "direct, substantial, and reasonably foreseeable effect" on domestic commerce. *Animal Sci. Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 467-68 (3d Cir. 2011) (as amended Oct. 7, 2011), *cert. denied*, 132 S. Ct. 1744 (2012) ("*ASP v. CMC*").

The pertinent portion of the FTAIA provides:

Sections 1 to 7 of this title shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless--

(1) such conduct has a direct, substantial, and reasonably foreseeable effect—

(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

(2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

If sections 1 to 7 of this title apply to such conduct only because of the operation of paragraph (1)(B), then sections 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States.

19

15 U.S.C. § 6a.

The Third Circuit has described the statute as "inelegantly phrased," and referred to its "convoluted language." *ASP v. CMC*, 654 F.3d at 465 (quoting *Turicentro, S.A. v. Am. Airlines Inc.*, 303 F.3d 293, 300 (3d Cir. 2002)). Be that as it may, *ASP v. CMC* has now provided clear guidance as to the FTAIA's character, scope, and applicable standard of review.

Parsing the statutory language, the Court of Appeals first explained the mechanics and scope of FTAIA:

> The FTAIA first limits the reach of the U.S. antitrust laws by articulating a general rule that the Sherman Act "shall not apply to conduct involving trade or commerce ... with foreign nations." The FTAIA then creates two distinct exceptions that restore the authority of the Sherman Act. First, the FTAIA provides that it does not apply (and thus that the Sherman Act *does* apply) if the defendants were involved in "import trade or import commerce" (the "import trade or commerce" exception). Second, the FTAIA's bar is inapplicable if the defendants' "conduct has a direct, substantial, and reasonably foreseeable effect" on domestic commerce, import commerce, or certain export commerce and that conduct "gives rise" to a Sherman Act claim (the "effects" exception).

*Id.* at 466 (citing *Turicentro*, 303 F.3d at 298–306 (discussing the FTAIA, the import trade or commerce exception, and the effects exception); *Carpet Group Int'l v. Oriental Rug Importers Ass'n.*, 227 F.3d 62, 71–73 (3d Cir.2000) (discussing the FTAIA and the import trade or commerce exception)).

Second, the Court held that the FTAIA is a substantive component of antitrust claims; it is not a jurisdictional bar. *See id.* at 466-469. *Accord Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 853 (7th Cir. 2012) ("the FTAIA relates to the merits of a claim, rather than the subject-matter jurisdiction of the court"); *cf. In re Vitamin C Antitrust Litig.*, 2012 WL 5839303, *2-3 (E.D.N.Y. Nov. 16, 2012) (noting that "[a] line of recent Supreme Court cases has emphasized that questions about a statute's reach are merits issues, not issues of subject matter jurisdiction," citing *Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869, 2877 (2010) and *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514, 126 S. Ct. 1235, 1244 (2006), and observing that "[s]ince *Morrison*, . . . the Second Circuit has not opined on whether the FTAIA is jurisdictional.").

Third, the FTAIA's substantive nature implies that motions to dismiss

pursuant to the FTAIA "must be decided pursuant to the procedural framework that governs a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, rather than a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1)." *ASP v. CMC*, 654 F.3d at 469. The Court pointed out "just two of the significant differences" between these two standards and suggested how they might play out on remand:

> First, the burden in a Rule 12(b)(1) motion rests with the plaintiff, who must establish that there is subject matter jurisdiction; by contrast, the defendant carries the burden in a Rule 12(b)(6) motion. Accordingly, the burden on remand would no longer rest with the plaintiffs, but with the defendants. Second, while a court generally looks only to the face of the plaintiff's complaint, must accept all alleged facts to be true, and is not permitted to make independent findings of fact when deciding a Rule 12(b)(6) motion, a court may examine evidence and resolve factual disputes on a Rule 12(b)(1) motion. . . . It would therefore be inappropriate for the District Court, on remand, to assess independently the credibility of allegations asserted by plaintiff's expert witness.

*Id.* at n.9 (internal citation omitted).

Accordingly, the framework for my consideration of the motions to dismiss will be a Rule 12(b)(6) standard.

### D. Motion to Compel Arbitration

This Circuit's case law has meandered somewhat in defining the proper standard of review of a motion to compel arbitration. The upshot, however, is fairly clear. Where the issue can be decided without evidence, it will be, based on an application of the familiar Rule 12(b)(6) standard to the face of the pleadings. Failing that, however, the Court will permit discovery and decide the issue on a summary judgment standard, pursuant to Rule 56. If there is a genuine issue of fact, summary judgment will be denied and the issues will be tried.

Because arbitration is a "matter of contract" between two parties, "a judicial mandate to arbitrate must be predicated upon the parties' consent." *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 771 (3d Cir. 2013) (quoting *Par–Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*, 636 F.2d 51, 54 (3d Cir. 1980)). Pursuant to the Federal Arbitration Act ("FAA"), a court may enforce a contract to arbitrate, but only if the court is satisfied that the

"making of the agreement" to arbitrate is not "in issue." *Id.*

In *Guidotti v. Legal Helpers Debt Resolution*, the Third Circuit stated the approach a court must take on a motion to compel arbitration. The judiciary must balance the competing goals of the FAA: the speedy and efficient resolution of disputes, and the enforcement of private agreements. *Id.* at 773. Reconciling sometimes murky precedent in light of those competing interests, the *Guidotti* court reasoned that where "the affirmative defense of arbitrability of claims is apparent on the face of a complaint (or ... documents relied upon in the complaint), . . . the FAA would favor resolving a motion to compel arbitration under a motion to dismiss standard without the inherent delay of discovery." *Id.* at 773-74. Such an approach "appropriately fosters the FAA's interest in speedy dispute resolution. In those circumstances, '[t]he question to be answered . . . becomes whether the assertions of the complaint, given the required broad sweep, would permit adduction of proofs that would provide a recognized legal basis' for rejecting the affirmative defense." *Id.* at 774 (quoting *Leone v. Aetna Cas. & Sur. Co.*, 599 F.2d 566, 567 (3d Cir. 1979)).

"In many cases, however, a more deliberate pace is required, in light of both the FAA's insistence that private agreements be honored and the judicial responsibility to interpret the parties' agreement, if any, to arbitrate." *Id.*

[The Rule 12(b)(6) standard will not be appropriate] when either the motion to compel arbitration does not have as its predicate a complaint with the requisite clarity to establish on its face that the parties agreed to arbitrate or the opposing party has come forth with reliable evidence that is more than a naked assertion . . . that it did not intend to be bound by the arbitration agreement, even though on the face of the pleadings it appears that it did. Under the first scenario, arbitrability not being apparent on the face of the complaint, the motion to compel arbitration must be denied pending further development of the factual record. The second scenario will come into play when the complaint and incorporated documents facially establish arbitrability but the non-movant has come forward with enough evidence in response to the motion to compel arbitration to place the question in issue. At that point, the Rule 12(b)(6) standard is no longer appropriate, and the issue should be judged under the Rule 56 standard.

Under either of those scenarios, a restricted inquiry into factual issues will be necessary to properly evaluate whether there was a meeting of the minds on the agreement to arbitrate and the non-movant must be given the opportunity to conduct limited discovery on the narrow issue concerning the validity of the arbitration agreement. In such circumstances, Rule 56 furnishes the correct

standard for ensuring that arbitration is awarded only if there is an express, unequivocal agreement to that effect.

*Id.* (internal citations and quotations and external citation omitted).

Thus, where the complaint and supporting documents are unclear as to an agreement to arbitrate or where a plaintiff responds to a motion to compel with additional facts sufficient to place the issue of arbitrability "in issue," then the parties should be entitled to discovery. After limited discovery, a court may then "entertain a renewed motion to compel arbitration" and should review such a motion under the summary judgment standard.

If summary judgment is unwarranted in light of material factual disputes regarding an agreement's enforceability, a court should then proceed to trial "regarding 'the making of the arbitration agreement or the failure, neglect, or refusal to perform the same,' as Section 4 of the FAA envisions." *Id.* (quoting *Somerset Consulting, LLC v. United Capital Lenders, LLC*, 832 F. Supp. 2d 474, 482 (E.D. Pa. 2011)). In every instance, "[b]efore a party to a lawsuit can be ordered to arbitrate and thus be deprived of a day in court, there should be an express, unequivocal agreement to that effect." *Id.* (quoting *Par–Knit Mills*, 636 F.2d at 54).

## IV.   Discussion

There is a logical nexus between the question whether Plaintiff has standing to bring a Sherman Act claim and the question whether Defendants are amenable to Sherman Act lawsuits under the Foreign Trade Antitrust Improvements Act. Added to the mix is Defendants' Motion to Compel Arbitration, which turns on the question whether Plaintiff stepped into the shoes of its brokers, and whether the brokers contracted to arbitrate disputes with Defendants. In one way or another, all three of these questions are affected by the degree of attenuation between Defendants' alleged antitrust activity and Plaintiff's alleged injury. And all depend to some degree on plaintiffs' describing the purchases they made, and the terms of the contracts under which they made them, which they have not done in this Complaint.

I first discuss the standing questions. They provide valuable context and also make it easier to see what is required to poise the Motion to Compel Arbitration for decision.

### A. Failure to State a Claim – Injury, Antitrust Standing and the Direct Purchaser Rule

I analyze standing in the context of Defendants' Motion to Dismiss

pursuant to Rule 12(b)(6). As to the motions to dismiss, I technically raise the issue of "antitrust standing" *sua sponte*. It was in connection with the motion to compel arbitration that Defendants first challenged the adequacy of Plaintiffs' allegations of direct-purchaser status.[6] *See, e.g.*, Seven Defendants' Brief in Support of Motion to Compel Arbitration, Feb. 5, 2008, ECF No. 37-1 ("Def. Brief MTCA, 37-1"), and Defendants' Supplemental Brief in Further Support of its Motion to Compel Arbitration, July 6, 2012, ECF No. 137 ("Def. Supp. Brief MTCA, 137"). But when my analysis persuaded me that standing was central to many of the issues raised in the motions, I gave the parties fair warning that I was considering it, and invited supplemental briefing on the standing issue. ECF No. 153. Both sides submitted supplemental briefs on antitrust standing.  ECF Nos. 155, 156. The Defendants also filed a letter in reply to Plaintiffs' supplemental brief. ECF No. 157.

Of course, the issue of standing does not even arise unless Plaintiff has pleaded the minimum prerequisites of a potential Sherman Act violation. That threshold has been met here. The Complaint alleges that a cartel fixed prices, the quintessential antitrust violation. *See Arizona v. Maricopa County Med. Soc.*, 457 U.S. 332, 345 (1982) (recognizing that the Court, "has consistently and without deviation adhered to the principle that price-fixing agreements are unlawful per se under the Sherman Act" and that "any combination which tampers with price structures is engaged in an unlawful activity") (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940)); *accord Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 830 (3d Cir. 2010) ("Some categories of restraints, such as horizontal price-fixing and market allocation agreements among competitors, 'because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable.'") (quoting *N. Pac. Ry. Co.*, 356 U.S. at 5)); *Cordes & Co. Fin. Services, Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 105 (2d Cir. 2007) ("Horizontal price-fixing agreements are *per se* violations of the Sherman Act.")

---

[6]     While antitrust standing (as opposed to Article III Constitutional standing) is not jurisdictional and therefore may be waived, I find that Defendants have preserved the issue by raising it, among other places, in their Motion to Compel Arbitration ("MTCA"). Plaintiffs challenged the timeliness of the MTCA, *see* Pl. Brief Opp. MTCA, 53 § I, but Defendants maintain that they filed "as early as practicable" upon learning that Resco was relying on an assignment of antitrust claims from a third party, which in turn called into question Resco's direct purchaser status and led Defendants to uncover arbitration agreements with the third-party assignor or a related entity. *See* Defendants' Reply Brief on Motion to Compel Arbitration, May 22, 2008, ECF No. 59 ("Def. Reply MTCA, 59") § I.A. ("it was not until Resco revealed the identity of its assignor (*i.e.* Possehl) in its default papers that Defendants were in a position to demonstrate . . . that Plaintiffs were bound to arbitrate based on the agreement of the their assignor. . . . Defendants moved to compel Plaintiffs to arbitrate *as soon as* they became aware of the source of Plaintiffs' professed standing to assert [an antitrust] claim. . . .").

(citing *Socony-Vacuum Oil Co.*, 310 U.S. at 210-28)).

Plaintiffs' theory is that this is a *per se* violation of § 1 of the Sherman Act:

> Defendants have directly sold and delivered magnesite and magnesite products to customers in the United States at prices inflated, fixed, and maintained by the conspirators pursuant to horizontal agreements to restrain trade. The allegations of this Complaint of a conspiracy are not inferred from evidence of parallel pricing; instead, Defendants have expressly agreed and conspired to fix prices and limit competition. Defendants also engaged in communications and meetings. This is confirmed by documentary evidence from a nongovernmental association of which Defendants are members. These acts constitute *per se* violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

AC ¶ 2.

The Complaint sufficiently alleges meetings among the Defendants in which the export price of magnesite was discussed and agreed upon. *See* § II.C, *supra*. Such facts plausibly set forth the existence of "horizontal price-fixing" agreements which "because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable." *Deutscher Tennis Bund*, 610 F.3d at 830 (quoting *N. Pac. Ry. Co.*, 356 U.S. at 5). At least for purposes of a motion to dismiss, then, Plaintiffs have adequately alleged conduct that would constitute a *per se* violation of § 1 of the Sherman Act.

Whether the Plaintiffs have alleged antitrust injury arising from such a violation, and whether Plaintiffs possess standing to bring such claims, however, are questions that require closer analysis.

### 1. Antitrust standing in general

The Clayton Act creates a private antitrust right of action, but this "additional avenue of enforcement . . . is not open to all who might be interested in punishing the wrongdoer or who might have suffered some peripheral loss. In an effort to keep private enforcement within reasonable bounds, the courts have imposed limitations designed to discourage plaintiffs other than those most apt to carry out the purposes of the statutes." *Alberta Gas Chemicals Ltd.*, 826 F.2d at 1239. *Accord Warren Gen. Hosp.*, 643 F. 3d at

80; *see also Blue Shield of Virginia v. McCready*, 457 U.S. 465, 476-77 (1982) ("An antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but 'despite the broad wording of § 4 there is a point beyond which the wrongdoer should not be held liable.'") (quoting *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 760 (1977)).

It is well settled that a private party seeking treble damages pursuant to § 4 of the Clayton Act must establish that it is the proper private enforcer. First, an antitrust plaintiff must show that it has suffered injury of the type the antitrust laws intended to prohibit. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977). Second, an antitrust plaintiff must establish that it has "antitrust standing," meaning that it is the proper plaintiff to enforce § 4's private right of action. *See AGC*, 459 U.S. at 535 n.31 ("Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action").

In cases like this one involving alleged overcharges by a cartel, the concept of "standing" is often loosely used to encompass the distinct but related doctrines of antitrust injury, antitrust standing, and the "direct purchaser rule." Those doctrines all attempt to limit the scope of antitrust liability at an early pleading stage to reduce the burden of antitrust litigation. One commentator explains it thus:

> These doctrines have at least two common features. First, they all bear on the larger question of the scope of antitrust liability. They are the tools by which courts identify which victims of an antitrust violation may recover damages, given the nature of the relationship between the victim's harm and the violation. Second, the three doctrines are all commonly applied at an early stage of litigation, in either a motion to dismiss or for summary judgment. These common elements turn out to be related. To be most effective as a means of rationally limiting the costs of antitrust litigation, a doctrine should be suited to summary disposition, since unjustified suits can then be weeded out before their costs become unnecessarily burdensome. Limitations on the scope of liability are particularly well-suited to this task, since they often involve few issues of fact. While relatively permissive pleading and summary judgment standards may allow a plaintiff to survive on general allegations of a substantive violation, it is particularly difficult to conceal the plaintiff's relationship to the alleged violation. The

26

characteristics of that relationship are the focus of inquiry in defining the scope of liability.

William H. Page, *The Scope of Liability for Antitrust Violations*, 37 Stan. L. Rev. 1445, 1447-48 (1985).

Antitrust standing—"a malleable concept not easily defined"—is a requirement challenging to identify and enforce. *See Alberta Gas*, 826 F.2d at 1239 ("A malleable concept not easily defined, antitrust standing has been construed in a variety of ways and settings. The struggle to articulate a precise formulation is a continuing one because success has proved elusive."). In this case, where Plaintiff Resco alleges antitrust injury arising from its purchases of magnesite at prices inflated by a horizontal price-fixing conspiracy, the standing analysis is delimited by the "direct purchaser rule," first announced in *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 88 (1968), and further developed in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 760 (1977). *See Warren Gen. Hosp.*, 643 F.3d at 85-87 (discussing the origins and development of the direct purchaser rule). The *Illinois Brick* rule "limits antitrust actions to suits brought by parties that are the direct purchasers of the product." *Id.* at 84 (citing *Illinois Brick*). Although *Illinois Brick* did not explicitly frame its analysis in terms of standing, it has been understood as such in subsequent cases. *See McCarthy v. Recordex Service, Inc.*, 80 F. 3d 842, 847-48 (1996) ("the Supreme Court articulated the so-called 'direct purchaser' rule, *an antitrust standing doctrine* that barred downstream indirect purchasers from bringing an antitrust claim.") (emphasis added); Page, *Scope of Liability* at 1447 ("A second, closely related doctrine that has been used to limit the scope of antitrust liability is the *Illinois Brick* rule, under which indirect purchasers of price-fixed goods are denied the right to recover for overcharges under Section 4, except in rare circumstances."). The *Illinois Brick* direct purchaser rule limits the scope of liability by choosing the most suitable plaintiff from among the purchasers potentially harmed by cartel pricing.

The courts sometimes combine the related requirements of antitrust injury and antitrust standing. Thus the Third Circuit has articulated a multi-pronged test for "antitrust standing" that includes antitrust injury as one prong. Most recently, in *Ethypharm S.A. France*, 707 F.3d at 232-33, the Court of Appeals explained its development of a "multifactor test" extracted from the Supreme Court's decision in *AGC*:

> The Supreme Court, in *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), articulated several factors to be considered when deciding whether a complainant has antitrust

standing. We have organized those factors (the "*AGC* factors*") into the following multifactor test:

(1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*Id.* (citing *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165–66 (3d Cir. 1993)). *Accord McCarthy*, 80 F. 3d at 850 (noting that the "*AGC* five-factor framework was an attempt by the Court to synthesize and clarify the confusing collection of the then-extant antitrust standing rules"). That is not to say that injury and standing are equivalent; the Third Circuit itself recognizes that they are not. But they are interdependent: "Antitrust injury is a necessary but insufficient condition of antitrust standing." *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 182 (3d Cir. 1997) (citation omitted). *Accord Ethypharm*, 707 F.3d at 233 (explaining that if antitrust injury is lacking, "we need not address the remaining *AGC* factors"); *Franco v. Connecticut Gen. Life Ins. Co.*, 818 F. Supp. 2d 792, 831 (D.N.J. 2011) ("injury within the meaning of an antitrust claim represents more than an element of the merits of a claim; it is a condition of standing to pursue the claim").

In some cases, then, the lack of antitrust injury will imply that antitrust standing, too, is lacking. That reality, however, should not obscure the necessity of establishing both injury and standing if a case is to go forward. Conflating the two can confuse the analysis and skew the outcome.[7] The Third Circuit has explained:

---

[7]   *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977), the seminal case on antitrust injury, articulated a two-part test for establishing antitrust injury: [1] "injury of the type the antitrust laws were intended to prevent" and [2] "that flows from that which makes defendants' acts unlawful." Some courts in this Circuit have conflated this test, in whole or in part, with the doctrine of antitrust standing. *See, e.g., Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 429 (3d Cir. 1993) ("In *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), the Supreme Court set forth a two-part test for antitrust standing that has recently been applied by our court. *See International Raw Materials, Ltd. v. Stauffer Chem. Co.*, 978 F.2d 1318, 1327-28 (3d Cir.1992). To establish antitrust standing a plaintiff must show both: 1) harm of the type the antitrust laws were intended to prevent; and 2) an injury to the plaintiff which flows from that which

A showing of antitrust injury is necessary but not always sufficient to establish antitrust standing. A party may have suffered antitrust injury yet not be considered a proper plaintiff for other reasons. It has been suggested that although standing is closely related to antitrust injury, the two concepts are distinct. Once antitrust injury has been demonstrated by a causal relationship between the harm and the challenged aspect of the alleged violation, standing analysis is employed to search for the most effective plaintiff from among those who have suffered loss. However, in the sense that plaintiffs who sustain no antitrust injury may not recover, they may be loosely said to lack standing.

*Alberta Gas*, 826 at 1240 (internal citations omitted) (discussing *Brunswick Corp.*, 429 U.S. 477 and suggesting that while some courts and commentators have treated *Brunswick* as a standing case, it is actually concerned with

---

makes defendant's acts unlawful. *Id.*"); *In Re Hypodermic Products Antitrust Litig.,* MDL NO. 1730, 2007 WL 1959224, *7-8 (D.N.J. June 29, 2007) (discussing cases in which plaintiffs were found to lack "standing" where their loss could not be causally connected to defendants antitrust activities). Although formulations of the *Brunswick* rule may differ, the Third Circuit, other Circuits, and commentators have recognized that *Brunswick*'s concern is "centered on antitrust injury," *see Alberta Gas*, 826 F.2d at 1240, and is "analytically distinct" from the doctrine of antitrust standing. *See Illinois Brick*, 431 U.S. at 728 n.7 ("the question of which persons have been injured by an illegal overcharge for purposes of s 4 is analytically distinct from the question of which persons have sustained injuries too remote to give them standing to sue for damages under § 4"); *see also Cordes & Co. Fin. Services, Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 95 (2d Cir. 2007) ("The antitrust injury element raises both factual questions related to whether the plaintiff has suffered harm and legal questions related to whether that harm is 'of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'") (citing *Brunswick,* 429 U.S. at 489)); *Glen Holly Entm't, Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1008, *opinion amended on denial of reh'g sub nom., Glen Holly Entm't, Inc. v. Tektronix, Inc.,* 352 F.3d 367 (9th Cir. 2003) ("Antitrust injury is made up of four elements: '(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent.'"); Page, *Scope of Liability* at 1459-60 ("most courts have recognized that *Brunswick* announced a general principle that requires every treble damages plaintiff to show that his harm is related to the anticompetitive aspect of the defendant's conduct. Among these decisions, there are dubious and incorrect applications of the principle, but the principle remains."). In practical terms, this means that even if a plaintiff can show both that it has suffered antitrust injury and that its damages flow from that injury, as *Brunswick* requires, it still must prove it is the most proper party to enforce § 4's private right of action.

antitrust injury). *See generally* Page, *Scope of Liability* at 1484 (1985) ("In its broadest sense, standing subsumes the entire question of the scope of antitrust liability. Courts sometimes use the term this way, treating antitrust injury issues . . . as issues of 'standing'. . . . For reasons of clarity, standing should be defined to consist of requirements that are distinct from antitrust injury. Allowing a vague standing inquiry to subsume the question of antitrust injury confuses the larger question of the scope of antitrust liability.").

I will therefore attempt to clarify this analytical framework before determining where the facts fall within that framework.

2.      Antitrust injury and causation

To recover treble damages pursuant to § 4, plaintiffs "must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "'the type of loss that the claimed violations . . . would be likely to cause.'" *Brunswick Corp.*, 429 U.S. at 489 (quoting *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 125 (1969)). *Accord Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) ("A private plaintiff may not recover damages under § 4 of the Clayton Act merely by showing injury causally linked to an illegal presence in the market. Instead, a plaintiff must prove the existence of "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. . . . [I]injury, although causally related to an antitrust violation, nevertheless will not qualify as "antitrust injury" unless it is attributable to an anti-competitive aspect of the practice under scrutiny." (internal citations and quotations omitted); *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 101 (3d Cir. 2010) ("The antitrust-injury requirement helps ensure "that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place, and it prevents losses that stem from competition from supporting suits by private plaintiffs for ... damages."); *Cordes & Co. Fin. Services, Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 105 (2d Cir. 2007) ("Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor...." 15 U.S.C. § 15(a). This has been read to require that to prevail in an antitrust suit, a plaintiff "must prove [that it has suffered] *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.") (citing *Brunswick Corp.*, 429 U.S. at 489.

Animal Science, the putative class representative of indirect purchasers,

30

seeks only injunctive relief pursuant to § 16 of the Clayton Act. As such, it faces lower hurdles than does Resco, its direct-purchaser counterpart, which seeks damages pursuant to § 4. An antitrust plaintiff proceeding under section 16 must, however, still demonstrate that the injury in question is "injury of the type the antitrust laws were intended to prevent...." *Brunswick Corp.*, 429 U.S. at 489. The Third Circuit has held that an indirect purchaser class must "make a showing of entitlement to injunctive relief requiring the demonstration of: (1) threatened loss or injury cognizable in equity; (2) proximately resulting from the alleged antitrust injury." *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 400 (3d Cir. 2000) (citing *McCarthy*, 80 F.3d at 856.

I focus on Resco (although I note that the Complaint says almost nothing about the antitrust injury allegedly suffered by Animal Science). The Amended Complaint provides few specific allegations of the harm suffered by Resco. Rather, Plaintiffs' theory of injury causation goes something like this:  The Chinese Defendants dominate the magnesite export market; the U.S. imports 25% of China's magnesite production; the Defendants' anticompetitive activity is responsible for overcharges paid by U.S. purchasers ranging from 4% to 21%; *ergo* the overcharges paid by U.S. purchasers (i.e. "injury of the type the antitrust laws were intended to prevent") were caused by Defendants' conspiracy. More specifically, the Complaint alleges: (1) "China is a leading producer of magnesite." AC ¶ 46. (2) "During the period described in the Complaint, the international market for magnesite and magnesite products was dominated by Defendants and their co-conspirators." *Id.* ¶ 47. (3) "Hundreds of thousands of metric tons of magnesite are imported into the United States each year from China." *Id.* ¶ 48. (4) "The value of U.S. imports of magnesite and magnesite products from China exceeded $50 million in 2000 and exceeded $160 million in 2008." *Id.* ¶ 49. (5) "The United States consumes about 25 percent of China's magnesite exports." *Id.* ¶ 50. As a result of Defendants' significant presence in the global magnesite market, their conspiracy to increase export prices resulted in "significant price increases in the U.S., stabilized U.S. prices, and avoided major price cutting despite low levels of demand." *Id.* ¶ 65. The most specific allegation is that, according to Plaintiffs' expert, "between 2000 and 2003, the Cartel overcharged U.S. buyers of magnesite by an average of 4 percent, while between 2004 and 2008, as a direct result of the Cartel's activities, U.S. magnesite purchasers were overcharged more than 21 percent." *Id.* ¶ 65.

A plaintiff's injury must "flow from that which makes defendants' acts unlawful" under the antitrust laws. *See Brunswick Corp., Inc.*, 429 U.S. at 489. Standing alone, Plaintiffs' allegations establish no "more than injury causally linked to an illegal presence in the market." *Id.* Plaintiffs here attempt to supply the necessary antitrust connection by contending that they are "consumers" within the market affected by Defendants' illegal conduct. *See W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 102 (3d Cir. 2010) ("As a

general matter, the class of plaintiffs capable of satisfying the antitrust-injury requirement is limited to consumers and competitors in the restrained market"); *AC* ¶ 75 ("The price of magnesite and magnesite products purchased by Plaintiffs (and the plaintiff classes) has been fixed, raised, maintained and stabilized at artificial and non-competitive levels.").

Plaintiffs claim that they are consumers of *Defendants'* magnesite and magnesite products, albeit in a slippery, "and/or" manner:

> Plaintiffs have purchased magnesite and magnesite products from Defendants and their coconspirators and/or are purchasers of magnesite and magnesite products requiring injunctive relief. By reason of the alleged violations of the antitrust laws, Plaintiffs paid more for magnesite and magnesite products and substitute products than they would have paid in the absence of the illegal combination and conspiracy, and as a result, they have been irreparably injured . . . .

AC ¶ 76. Therefore, the reasoning goes, Plaintiffs' injuries logically *must* flow from Defendants' anti-competitive activity.

While those allegations border on "conclusory," they have some plausibility. I will accept for Rule 12(b)(6) purposes the Plaintiffs' contention that, as consumers of magnesite products that ultimately originated with Defendants, they have paid the overcharges allegedly caused by Defendants' horizontal price-fixing conspiracy. *See Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 (3d Cir. 1994) (explaining that on "a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)," the court is required to "accept all allegations of fact as true and draw all reasonable inferences" in favor of the nonmoving party); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) ("a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."). On that assumption, the Complaint sufficiently alleges injury causation.

### 3.   Antitrust purchaser standing

#### a. Statutory standing and the appropriate plaintiff

Injury causation-in-fact, however, is only the beginning. Resco, which seeks treble damages under Section 4 of the Clayton Act, has a particular burden to plead antitrust standing.[8]

---

[8]    I focus on Resco's damages claims. ASP's claims for injunctive relief under

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise. In both dimensions it is founded in concern about the proper-and properly limited-role of the courts in a democratic society." *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (internal citations omitted). *Accord D.R. Ward Const. Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485, 492 (E.D. Pa. 2006) ("the question of whether a plaintiff has standing to bring a cause of action in federal court is a jurisdictional issue, a 'threshold question in every federal case.'") (quoting *Warth*). It is important to draw a clear distinction between Constitutional standing requirements arising under Article III[9] and statutory standing requirements arising under legislative enactments.[10] "Article III standing is required to establish a justiciable case or

---

Section 16 of the Clayton Act raise lesser standing concerns:

> Section 16 has been applied more expansively, both because its language is less restrictive than that of § 4 ... and because the injunctive remedy is a more flexible and adaptable tool for enforcing the antitrust laws than the damage remedy...." *Schoenkopf v. Brown & Williamson Tobacco Corp.*, 637 F.2d 205, 210 (3d Cir.1980). Most importantly, "because standing under § 16 raises no threat of multiple lawsuits or duplicative recoveries [i.e. the concerns voiced in Illinois Brick ], some of the factors other than antitrust injury that are appropriate to a determination of standing under § 4 are not relevant under § 16. *Cargill*, 479 U.S. at 111 n. 6, 107 S.Ct. at 490 n. 6.

*McCarthy*, 80 F.3d at 856.

[9] "The irreducible constitutional minimum of standing contains three requirements. First and foremost, there must be alleged (and ultimately proved) an 'injury in fact'—a harm suffered by the plaintiff that is concrete and actual or imminent, not 'conjectural' or 'hypothetical.' Second, there must be causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant. And third, there must be redressability—a likelihood that the requested relief will redress the alleged injury. This triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-04 (1998) (internal citations and quotations omitted).

[10] "In addition to the immutable requirements of Article III, the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing. Like their constitutional counterparts, these judicially self-imposed limits on the exercise of federal jurisdiction are founded in concern about the proper-and properly limited-role of the courts in a democratic society, but unlike their constitutional counterparts, they can be modified or abrogated by Congress." *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (internal citations and quotations omitted).

controversy within the jurisdiction of the federal courts, whereas lack of antitrust standing affects a plaintiff's ability to recover, but does not implicate the subject matter jurisdiction of the court. Accordingly, statutory standing is simply another element of proof for an antitrust claim, rather than a predicate for asserting a claim in the first place." *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 307 (3d Cir. 2011) *cert. denied*, 132 S. Ct. 1876 (U.S. 2012), *reh'g denied*, 132 S. Ct. 2451 (2012) (internal citations and quotations omitted). *Accord Ethypharm S.A. France*, 707 F.3d at 232 (internal citations and quotations omitted) ("Constitutional standing is augmented by consideration of prudential limitations. For plaintiffs suing under federal antitrust laws, one of the prudential limitations is the requirement of antitrust standing.' It does not affect the subject matter jurisdiction of the court, as Article III standing does, but prevents a plaintiff from recovering under the antitrust laws.").

As the Supreme Court explained in *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, "the focus of the doctrine of 'antitrust standing' is somewhat different from that of standing as a constitutional doctrine. Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." 459 U.S. at 535 n.31. In the antitrust context, standing takes on an even more critical "gatekeeper" role. "Far from being a mere technicality, antitrust standing is the glue that cements each suit with the purposes of the antitrust laws, and prevents abuses of those laws . . . ." *NicSand, Inc.*, 507 F.3d at 449-50 ("[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement we must dismiss it as a matter of law—lest the antitrust laws become a treble-damages sword rather than the shield against competition-destroying conduct that Congress meant them to be.")

As discussed above, *see* § IV.A.1, the Third Circuit has developed a "multi-factor test" for antitrust standing that encompasses considerations of injury, remoteness and efficiency. *See Ethypharm*, 707 F.3d at 232-33 (articulating the multi-factored test as "(1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.").[11]

---

[11]    Other Circuits have developed substantially similar tests. *Cf. NicSand, Inc.*, 507 F.3d at 449-50 ("An antitrust claimant must do more than make 'allegations of consequential harm resulting from a violation of the antitrust laws,' and that is true

The determination of standing can be a nebulous and complex task. In certain circumstances, however, the Supreme Court has laid down bright line rules that determine which plaintiffs qualify as the most efficient and effective enforcer of § 4's private right of action. The *Illinois Brick* direct purchaser rule, applicable here, is one such bright line rule. *See McCarthy*, 80 F.3d at 847-48 ("Recognizing that allowing an indirect purchaser to assert an antitrust claim for the portion of an overcharge "passed on" to the indirect purchaser would create an intractable problem of tracing and apportioning damages between different purchasers in the chain of distribution, the [*Illinois Brick*] Court chose to avoid this morass by enunciating a bright-line rule that only the purchaser immediately downstream from the alleged monopolist may bring an antitrust action"); *In re ATM Fee*, 686 F.3d at 748 ("a bright line rule emerged from *Illinois Brick:* only direct purchasers have standing under § 4 of the Clayton Act to seek damages for antitrust violations").

I pause for a moment to discuss the development of the direct purchaser antitrust standing rule. A "direct purchaser rule" was first considered by the Supreme Court in *Hanover Shoe, Inc. v. United Shoe Mach. Corp.,* 392 U.S. 481 (1968), where it took the form of an affirmative defense. The defendant made the argument—now, but not then, counterintuitive—that the plaintiff lacked standing because it had effectively "passed on" any overcharge to its customers. *Id.* at 488 n.6. The Supreme Court rejected that defense, finding that *only* the direct purchaser of an illegally overcharged good, and not others in the chain of manufacturing or distribution, will be regarded as the "injured" party for purposes of Section 4. *Id.* at 489–91. The Court reasoned that (1) if indirect purchasers were permitted to bring antitrust suits, the proof of the fact and extent of injury would become extremely complicated, *id.* at 491–93, and

---

even when the complaint is 'buttressed by an allegation of intent to harm the [claimant].' Even when a complaint makes these allegations, it may not proceed when '[o]ther relevant factors—the nature of the [claimant's] injury, the tenuous and speculative character of the relationship between the alleged antitrust violation and the [claimant's] alleged injury, the potential for duplicative recovery or complex apportionment of damages, and the existence of more direct victims of the alleged conspiracy—weigh heavily against judicial enforcement.'" (quoting *ACG*, 459 U.S. at 545, internal citation omitted); *Laumann v. Nat'l Hockey League*, 12 CIV. 1817 SAS, 2012 WL 6043225 (S.D.N.Y. Dec. 5, 2012) ("The Second Circuit analyzes antitrust standing under a two part test. *First*, a " 'plaintiff must show ... injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.' " *Second*, a plaintiff must show that he is a proper plaintiff in light of four 'efficient enforcer' factors: (1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.") (citing *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009)).

35

(2) because indirect purchasers would have "only a tiny stake in a lawsuit" and therefore would possess less incentive to sue, a doctrine that allowed *only* indirect purchasers to bring suit on their diluted injuries would tend to enable antitrust violators to "retain the fruits of their illegality." *Id.* at 493–94. *See also Warren Gen. Hosp.*, 643 F.3d at 85.

A decade later, in *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977), the Court seemingly conceded that a chain of consumers could all theoretically claim to have suffered the "antitrust injury" of paying inflated prices arising from a price-fixing conspiracy. Nevertheless, it held that only the "direct purchasers" would be recognized as the injured party. As a group, the direct purchasers were best situated to pursue a § 4 treble-damages claim. *See id.* at 735 ("antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it"). The Court reasoned: "Permitting the use of pass-on theories under § 4 essentially would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge—from direct purchasers to middlemen to ultimate consumers. However appealing this attempt to allocate the overcharge might seem in theory, it would add whole new dimensions of complexity to treble-damages suits and seriously undermine their effectiveness." *Id.* at 737.. The Court based its decision on three policy considerations:

> The first policy rationale that the Court drew on was the "serious risk of multiple liability for defendants" . . . . Next, the Court drew attention to the "evidentiary complexities and uncertainties" involved in ascertaining how much of the overcharge was "passed on" to the indirect purchasers. . . . The calculations necessary to determine how much of the overcharge had been "passed on" would be "long and complicated" and would have to be "repeated at each point at which the price-fixed goods changed hands before they reached the plaintiff.". . . Finally, the Court also examined the third policy rationale: the need for effective enforcement of antitrust law. . . . the Court explained that "the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it."

36

*Warren Gen. Hosp.,* 643 F.3d at 85-86 (quoting *Illinois Brick*). *See also In re ATM Fee,* 686 F.3d at 748 ("The underlying purposes for the rule are (1) 'to eliminate the complications of apportioning overcharges between direct and indirect purchasers,' (2) 'to eliminate multiple recoveries,' and (3) to 'promote the vigorous enforcement of the antitrust laws'") (quoting *Kansas v. UtiliCorp United, Inc.,* 497 U.S. 199, 208-14) (1990);, internal citations omitted).

*Illinois Brick* therefore held that "the overcharged direct purchaser, and not others in the chain of manufacture or distribution, is the party 'injured in his business or property' within the meaning of" § 4 of the Clayton Act. 431 U.S. at 729.

The antitrust standing inquiry seeks to determine "whether the plaintiff is a proper party to bring a private antitrust action." *AGC,* 459 U.S. at 535 n.31. Numerous cases following *Illinois Brick,* whether they draw an analytical line between the direct purchaser rule and the concept of standing or meld the two, have all cited the same practical need for some restriction on private enforcement.[12] Thus the Third Circuit has repeatedly considered the direct purchaser rule within the conceptual framework of "antitrust standing," recognizing the overarching goal of selecting the most appropriate plaintiff from a pool of injured parties. *See, e.g. McCarthy* 80 F.3d at 847-48 (describing the "direct purchaser" rule as "an antitrust standing doctrine that barred downstream indirect purchasers from bringing an antitrust claim"); *Warren Gen. Hosp.,* 643 F.3d at 79 ("In *Illinois Brick,* the Supreme Court held that only direct purchasers have standing under Section 4 of the Clayton Act."); *Franco,* 818 F. Supp. 2d at 835 ("It is well-established that only direct purchasers have standing to pursue federal antitrust claims for damages.").

Accordingly, because Resco asserts that it is a purchaser, I will consider its standing within the confines of the bright-line direct purchaser rule.

### b. The direct purchaser requirement as a bright-line standing rule

The Supreme Court's early efforts to rein in § 4 of the Clayton Act focused on restricting the pool of proper plaintiffs. The Court's goal was to guard against double recovery on the one hand, and against overly complex apportionment problems on the other. The "direct purchaser" rule, however,

---

[12]    That practical need is served by both the direct purchaser rule and the doctrine of standing generally. For example, *AGC,* decided shortly after *Illinois Brick,* articulated a concern about "the indirectness of alleged injury" which "implicates the strong interest . . . in keeping the scope of complex antitrust trials within judicially manageable limits [and] the importance of avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other." *AGC,* 459 U.S. at 543-44.

will be applied irrespective of the extent to which it advances those underlying policies in an individual case; it is a "bright line" rule.

Thus, after *Illinois Brick,* plaintiffs have argued for various exceptions to the direct purchaser rule, but without much success. For example, in *Kansas v. UtiliCorp United, Inc.,* 497 U.S. 199 (1990), the Supreme Court rejected the argument that the *Illinois Brick* rule was coterminous with the underlying policies. It reaffirmed that this was a bright-line rule, and that "even assuming that any economic assumptions underlying the *Illinois Brick* rule might be disproved in a specific case, we think it an unwarranted and counterproductive exercise to litigate a series of exceptions." *Id.* at 217. Fifteen years later, in *Howard Hess Dental Laboratories Inc. v. Dentsply Int'l, Inc.,* 424 F.3d 363 (3d Cir. 2005), the Third Circuit surveyed the intervening case law and found that the courts had consistently declined to consider case-by-case exceptions to the "bright line rule" of *Illinois Brick. Id.* at 371. The scope of *Illinois Brick* is not unlimited, *see* discussion at § IV.A.3.a, *infra,* but the essential elements and "bright line" quality of the rule remain unchanged.

When determining whether a plaintiff and defendant are involved in a direct purchaser/seller relationship, courts look to the "economic substance of the transaction," rather than the physical attributes of the transaction or the geographical movement of goods and services. *See Howard Hess Dental Laboratories Inc. v. Dentsply Int'l, Inc. (Hess I"),* 424 F.3d at 373. *Hess I,* for example, considered an alleged direct purchasing relationship among a manufacturer (Dentsply), a dealer, and a purchaser (Hess). That Court found that, although the defendant manufacturer shipped goods directly to the plaintiff, the purchase was nevertheless "indirect"; the direct purchaser was the intermediate dealer, not plaintiff, who received the goods. The direct shipment of goods did "not affect the economic substance of the transaction. That is, the dealers still make the sale to Plaintiffs and Dentsply makes the sale to the dealers. Plaintiffs pay the dealers their usual price, the dealers take their profit, and then the dealers pay Dentsply. While it is true that the dealers do not take physical possession of the [goods], this is nothing but a formal difference from the typical transactions." *Id.* (internal citation omitted).

Elaborating, the *Hess I* Court explained why it rejected any argument that the manufacturer and dealer together constituted (in effect) a unitary seller:

> [E]ven assuming that Dentsply does exert some degree of control over its dealers, *Illinois Brick's* policy reasons for denying standing remain. Nothing about Dentsply's "control" over its dealers would prevent the dealers from suing Dentsply, thus creating a risk of duplicative liability for Dentsply and potentially

inconsistent judgments. Also, if Plaintiffs wanted to recover overcharge damages, they would still have to demonstrate the portion of the overcharge dealers had passed on to them, leaving intact the evidentiary complexities and uncertainties of concern in *Illinois Brick*. Moreover, permitting Plaintiffs to sue for damages could potentially lead to inefficient enforcement of the antitrust laws, because the ultimate recovery for the dealers would be diluted (assuming that, rather than the dealers being permitted to recover the entire overcharge, it was apportioned among the dealers and the labs), thereby decreasing the dealers' incentive to sue.

*Id.* at 372.

Recently, in *Warren Gen. Hospital v. Amgen*, the Third Circuit reaffirmed that the "economic substance" of the sales transaction controls the direct purchaser analysis. 643 F.3d at 89. In that case, Warren General Hospital sought to represent a class of entities that purchased pharmaceutical drugs manufactured and sold by Amgen. Warran alleged that Amgen "violated antitrust law by 'tying' the purchase" of its White Blood Cell Growth Factor ("WBCGF") drugs to the purchase of its Red Blood Cell Growth Factor ("RBCGF") drugs. *Id.* at 80. While "[t]he Complaint did not set forth the mechanics of the hospital's WBCGF and RBCGF purchases . . . at the motion to dismiss stage, it became clear that Warren General Hospital in practice purchases Amgen's drugs through an independent middleman wholesaler known as AmerisourceBergen." *Id.* at 82. The Court found that even though the plaintiff purchaser (Warren General) had direct interactions and negotiations with the defendant manufacturer (Amgen), the transactions necessary to execute the drug purchases were conducted through the intermediary dealer (AmerisourceBergen). The plaintiff, Warren, was therefore an indirect purchaser in relationship to the defendant manufacturer, Amgen. *Id.* at 88-91.

To characterize the purchasing relationship, *Amgen* looked to the following factors:

First, when Warren General wants to purchase Amgen's WBCGF and RBCGF drugs it places its order through AmerisourceBergen. Accordingly, AmerisourceBergen charges Warren General for its order. Second, AmerisourceBergen maintains the right to set the price of the drugs it sells, and thus AmerisourceBergen's price is not necessarily the price it paid Amgen. Third, Warren General physically takes

delivery of the shipment from AmerisourceBergen. Fourth, Warren General pays AmerisourceBergen directly; it transmits no funds to Amgen.

We agree that the hospital is "the immediate buyer" from AmerisourceBergen, and does not purchase directly from the "alleged antitrust violators." *UtiliCorp,* 497 U.S. at 207, 110 S.Ct. 2807. The purchases go through at least one other stage in the chain of distribution before reaching Warren General, and therefore the situation before us is akin to the facts in *UtiliCorp* and *Illinois Brick.* There are no allegations that AmerisourceBergen is controlled or owned by Amgen and thus part of the conspiracy; AmerisourceBergen is a publicly traded company. (Appellee Br. 12). In light of this record, there is no way of getting around the conclusion that Warren General is the *second* purchaser in the chain of distribution.

*Id.* at 88.

In short, then, the requirement that a plaintiff be a "direct purchaser" is a bright-line rule of antitrust standing. And to determine whether plaintiff is a direct purchaser, the court must look to the "economic substance" of the transaction.

### 4.   Analysis of Resco's direct purchaser standing

#### a.   *Class members' standing not attributable to Resco*

I deal briefly with a threshold issue. Resco, as a putative class representative, cannot rely on the direct purchases of other class members to establish its own standing. "To have standing to sue as a class representative it is essential that a plaintiff must be a part of that class, that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents."[13] *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 216 (1974) (citation omitted). *Accord Cordes & Co. Fin. Services,* 502 F.3d at 101. As the Second Circuit Court of Appeals noted in *Cordes & Co. Financial Services, Inc.,* "The rule that "a class representative must be part of

---

[13]   "An individual litigant seeking to maintain a class action . . . must meet the prerequisites of numerosity, commonality, typicality, and adequacy of representation specified in Rule 23(a). These requirements effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 156 (1982) (internal quotation and citation omitted).

the class," is one of prudential standing, related to the broader principle that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* at 100 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. at 156; *Warth v. Seldin*, 422 U.S. at 499).

*Cordes & Co.* is particularly instructive because it involved claims of antitrust injury arising from a horizontal price-fixing scheme—claims which, like Resco's claims here, were subsequently assigned to two class representatives who had no prior interest or involvement in them. The Second Circuit—while noting some potential ethical pitfalls—held that the assignees had standing to pursue the antitrust claims:

> The assignment of a claim from a person who suffered an injury to someone who did not does not make the claim any less a "case or controversy" which the courts have the constitutional capacity to resolve. It is indeed commonplace for an assignee to institute or continue an action of his or her assignor on an assigned claim even though he or she, apart from the assignment, is without standing, and the court, apart from the assignment, would be without power to decide the case. *See, e.g.*, Fed. R. Civ. P. 25(c) (providing that in the case of "any transfer of interest, the action may be continued by or against the original party" or, upon motion, by or against the transferee).

502 F.3d at 102

There is, however, one critical fact that distinguishes *Cordes & Co.* from the case now before me. There, the class action was initiated by two putative class representatives who were "indisputably members of the class they sought to represent." *Id.* at 99. That is, the class representatives had themselves suffered the same injury that gave rise to the assigned antitrust claims they asserted. Here, the facts are not so clear, or at least, have yet to be established, as discussed below.

Suffice it to say that, at this stage, Resco must establish its own standing, either through its own direct purchases or through the direct purchases of some entity that validly assigned its claims to Resco.

### b.     *Direct purchases from Defendants*

Plaintiff Resco has pleaded very few facts regarding its own "direct purchases" of magnesite from Defendants. The original complaint, ECF No. 1, filed September 7, 2005, contains no statements regarding Resco's direct purchases of magnesite, or Animal Science's indirect purchases of magnesite.

However, in the 2008 Motion for Default Judgment as to Defaulting Defendants (ECF No. 28-1), Plaintiffs submitted the following facts regarding their magnesite acquisitions.

> In March 2006, Resco purchased Worldwide Refractories, Inc. ("Worldwide"). . . . In 2004, Worldwide purchased magnesite directly from a co-conspirator in this case, Yingkou Sanhua Refractory of China. Resco purchases magnesite from China principally through brokers. Resco, however, made one direct purchase from a co-conspirator in this case, Rongyuan Magnesite Corp. of China, in 2004. With respect to other purchases, Possehl Inc., one of Resco's brokers, has assigned to Resco its "rights, title, and interest in and to all causes of action it may have . . . relating to magnesite or magnesite products brokered by Possehl and subsequently delivered it Resco during the period from 2000 to the present." Possehl purchased magnesite and magnesite products directly from defendants during the class period and shipped those products to Resco.

ECF No. 28-1 at 8 (internal citations omitted). *See also* Certification of Resco Products, Inc. in Support of its Motion for Default Judgment, Class Damages and Injunctive Relief, December 14, 2007, ECF No. 28-4 ("Resco Cert.") at ¶¶ 5-8.

Later in the same brief, Plaintiffs asserted standing to bring their claims based on these facts alone:

> Resco and Animal Science each have standing to assert their claims under the Sherman Act. As an indirect purchaser threatened with continuing losses caused by Defendants' conspiracy, Animal Science has standing to seek injunctive relief under § 16 of the Clayton Act.
>
> Resco has standing as a direct purchaser and through its acquisition of Worldwide Refractories, which is also a direct purchaser. In addition, Resco has standing as an assignee of another direct purchaser.

ECF No. 28-1 at 17 (internal citations omitted).

After Judge Brown dismissed Plaintiffs' original complaint and denied their Motion for Default Judgment in December 2008 (ECF No. 73), Plaintiffs filed the Amended Complaint, which included the following allegations:

42

> Resco purchased magnesite directly from co-conspirators Rongyuan Magnesite Corporation [("Rongyuan")] and Yingkou Sanhua Refractory Material Co., Ltd [("Yingkou")]. Possehl, Inc. has assigned to Resco its rights, title, and interest in and to all causes of action it may have relating to magnesite or magnesite products brokered by Possehl, Inc. and subsequently delivered to Resco during the relevant period. Possehl, Inc. purchased magnesite and magnesite products directly from defendants during the class period and shipped those products to Resco.

AC ¶ 11.

Throughout the Amended Complaint, Plaintiffs allege that Defendants have sold magnesite products directly "to U.S. companies" and "shipped magnesite products to the United States." The Complaint does *not* specifically allege that Resco was one such "U.S. company," or that Resco was a direct recipient of magnesite that Defendants "shipped … to the United States." *See, e.g.*, AC ¶¶ 2, 12, 51. And in any event the physical shipment route of magnesite, while informative, would not establish a "direct purchase"; rather, as discussed above, it is the economic substance of the transaction that controls. *See* discussion at § IV.A.3.b, *supra*.

The Amended Complaint does not allege in so many words that Resco conducted any direct sales transactions with any of the named Defendants. To the contrary, Resco acknowledges that it purchases magnesite through intermediaries. Again, in an excess of caution, I have reviewed other motion papers filed by Resco, but I find nothing helpful. For example, in its 2007 Motion for Default Judgment, quoted above, and more recently in its Opposition to Defendants' Motion to Compel Arbitration, Resco explains that it "primarily purchases magnesite *through brokers*." Supp. Resco Decl., 133-2 ¶ 5 (emphasis added).

In short, Plaintiffs allege *no direct purchases by Resco from any named Defendants*. Nothing in the Amended Complaint constitutes a plausible factual allegation in support of the most direct and obvious form of standing: plaintiff's direct purchases from one or more of the defendants.

Resco's standing as a direct purchaser, then, must depend on two thinly pleaded alternative allegations: (1) direct purchases from "co-conspirators" by itself or its subsidiary, Worldwide; and (2) Resco's acquisition by assignment of claims belonging to Possehl, Inc. I will address each.

### c. Direct purchases from Chinese "co-conspirators"

Resco does allege direct purchases from "co-conspirators." These number just two: one made by Resco itself and one made by Worldwide prior to its acquisition by Resco. Rongyuan and Yingkou, the "co-conspirators" from whom Resco allegedly made purchases, are not named as defendants. Nor are they included in the list of alleged participants in the Cartel.[14]  *See* AC at ¶¶ 52-53, 57. And even if they were, it is unlikely that purchases from such a co-conspirator would secure Resco's standing as a direct purchaser.

First some legal background. Resco here attempts to take advantage of the so-called "co-conspirator exception" to the direct purchaser rule. In *Illinois Brick,* the Court alluded to an "exception," or rather a factual scenario that would fall outside the purview of its bright-line rule: An indirect purchaser may sue if it can establish that the actual direct purchaser, the middleman, has entered into a price-fixing conspiracy with the manufacturer, thus rendering the direct purchaser a "co-conspirator." *See* 2A Phillip E. Areeda et al., *Antitrust Law* ¶ 346h (3d ed. 2007). The possibility of a "co-conspirator exception" was recognized, but not applied, by the Third Circuit in *McCarthy,* 80 F.3d at 854. There, the plaintiffs argued, in the alternative, that "indirect buyers have standing to bring an antitrust claim against defendants who are co-conspirators in a vertical antitrust conspiracy." The *McCarthy* plaintiffs relied on *Link v. Mercedes-Benz of N. Am., Inc.,* 788 F.2d 918 (3d Cir. 1986). In *Link,* however, the Court declined to "carve out a narrow exception to *Illinois Brick* in vertical conspiracies where the intervening parties in the distribution process are named as co-conspirators (a so-called "co-conspirator exception")" where "the alleged co-conspirators are not also joined as co-defendants." *Id.* at 931. The *McCarthy* plaintiffs also cited *In re Brand Name Prescription Drugs Antitrust Litigation,* 867 F. Supp. 1338 (N.D. Ill. 1994), wherein "the district court did allow the plaintiff retailers of pharmaceutical drugs to sue both the manufacturers and the wholesalers, [but] did so on the basis that the plaintiffs had alleged that the parties *immediately upstream* (i.e. the wholesalers) had colluded with the manufacturers to fix prices. The plaintiffs had not alleged that overcharges were *passed on* but rather that the wholesalers, as part of a price-fixing conspiracy, had *directly* imposed an overcharge on the plaintiff retailers." *McCarthy,* 80 F.3d at 854 (discussing *Brand Name,* 867 F.Supp. at 1344).

In *McCarthy,* however, the Third Circuit ultimately declined to apply the

---

[14]    Plaintiffs allege that the Huaxia EG included "co-conspirators" Shenyang Metals & Minerals and CITIC Trading. They do not allege that Rongyuan Magnesite Corporation and Yingkou Sanhua Refractory Material Co., Ltd. were members of either Huaxia EG or Jiyuan EG. *See* AC ¶¶ 52-53.

co-conspirator exception: "[I]n order to fall within the exception, plaintiffs here would have to allege that the intermediaries *immediately upstream* . . . colluded with the defendants to overcharge plaintiffs [and] plaintiffs would be obliged to join the [co-conspirators] as defendants, which they have not done." *Id.* at 855. *McCarthy's* formulation of the "co-conspirator exception"—requiring (1) collusion between defendants and intermediaries immediately upstream and (2) joining the intermediaries as defendants—was recognized and expanded slightly in two related cases: *Howard Hess Dental Laboratories Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363 (3d Cir. 2005) ("*Hess I*") and *Howard Hess Dental Laboratories Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237 (3d Cir. 2010) ("*Hess II*").

In *Hess I*, the Third Circuit considered the consolidated appeals of Howard Hess Dental Laboratories ("Hess") and Jersey Dental Laboratories ("Jersey") alleging antitrust class actions against Dentsply International, a manufacturer of artificial teeth, and its designated dealers. Plaintiffs alleged "an exclusive-dealing conspiracy and a retail price-fixing conspiracy among Dentsply and its dealer-middlemen." *Hess I* at 366. Plaintiffs, asserting direct purchaser standing, purchased artificial teeth indirectly though Defendant's dealers or directly through "drop-shipping," meaning that the dealer arranged the order, sale, payments and delivery, but never took physical possession of the teeth. *See id.* at 367. The district court denied both plaintiffs standing to recover under the *Illinois Brick* rule. *See id.* at 366. On appeal, Hess and Jersey asserted that they should be able to recover damages under the "co-conspirator" exception to *Illinois Brick*. *Id.*

*Hess I's* adoption of the co-conspirator exception was somewhat equivocal:

> Our Court has not explicitly adopted a co-conspirator exception to *Illinois Brick*. In *McCarthy*, we neither adopted nor rejected the exception because it was inapplicable to the case, but we did explain its "nature": "In order to fall within the exception, plaintiffs here would have to allege that the intermediaries immediately upstream ... colluded with the defendants to overcharge plaintiffs.... Moreover, plaintiffs would be obliged to join the [intermediaries] as defendants...." 80 F.3d at 855 (emphasis omitted).).

*Hess I*, 424 F.3d at 376. *Hess I* ultimately found the co-conspirator exception to be inapplicable to the facts of the case.

Although Hess alleged that the exclusive dealing arrangement between Dentsply and its dealers qualified as a conspiracy, "Plaintiffs did not name any of the dealers as co-defendants," *id.* at 370, as *McCarthy* required. The Court explained, "[w]e have rejected attempts to invoke the co-conspirator exception to *Illinois Brick's* bar on indirect purchaser standing when plaintiffs have not

named the co-conspirators immediately upstream as defendants." *Id.* However, the Court found that the co-conspirator exception could apply in Jersey's case because Jersey did allege "that they made purchases from Dentsply's dealers (the intermediaries immediately upstream from Plaintiffs) and that Dentsply and its dealers are co-conspirators. In addition, the *Jersey Dental* Plaintiffs sued not only Dentsply, but also joined as defendants twenty-six of Dentsply's then twenty eight authorized dealers. Thus, under *McCarthy*, Plaintiff's potentially qualify for the co-conspirator exception." *Id.* 376-77. The Court noted that Jersey would not be able to recover from the two dealers it had not joined as defendants because the "Court has expressly refused to adopt a co-conspirator exception when the alleged co-conspirators immediately upstream have not been joined." *Id.* at n.8.

On remand, the District Court dismissed Jersey's co-conspirator claims against the Dealers, finding that the Dealers were not coequal participants in the conspiracy. Jersey again appealed. The Third Circuit, considering the co-conspirator exception for a second time in *Hess II*, agreed with the district court that Jersey had failed to allege a conspiracy among the Dealers. *See Hess II* at 255 ("we conclude that the amended complaint lacks any allegation of an agreement among the Dealers themselves. The amended complaint states only in a conclusory manner that all of the defendants—Dentsply and all the Dealers included—conspired and knew about the alleged plan to maintain Dentsply's market position."). The Court characterized the alleged conspiracy as a "hybrid of both vertical and horizontal conspiracies." It accepted that a valid conspiracy allegation was not confined to a simple vertical or chain conspiracy, noting that a so-called "'hub-and-spoke' conspiracy, has a long history in antitrust jurisprudence." *See id.* at 254-55; *see also In re ATM Fee*, 686 F.3d at 750 (noting that the Ninth Circuit applies the exception "when the direct purchaser conspires horizontally or vertically to fix the price paid by the plaintiffs"). Nonetheless, the Court concluded that Jersey's allegation that the Dealers had knowledge of the same exclusive dealing arrangement among one another was not enough to survive a motion to dismiss. Citing *Twombly*, the Court held, "to survive dismissal it does not suffice to simply say that the defendants had knowledge; there must be factual allegations to plausibly suggest as much." *Id.* Considering this conclusion in the context of *Illinois Brick* and the co-conspirator exception, the Court explained:

> [T]he Plaintiffs could come within *Illinois Brick*'s coconspirator exception only if the Dealers were precluded from asserting claims against Dentsply because their participation in the conspiracy was "truly complete." *Hess I,* 424 F.3d at 383. As we have already concluded, however, the amended complaint does not give rise to a plausible inference that the Dealers' involvement in the conspiracy was truly complete. Therefore, to state a viable claim against the

> Dealers, the Plaintiffs must come within the
> coconspirator exception—or some other exception—to
> *Illinois Brick*. Because they have failed to do so, the
> Plaintiffs in essence are asserting their claims against
> the Dealers as mere middlemen. This they cannot do

*Id.* at 259.

The "co-conspirator exception," then, is a limited one, and is not quite secure as a matter of Third Circuit law. But let that pass. Like the *Hess* courts, I will assume the exception exists. For the reasons expressed by those courts, I hold that the Complaint contains no allegations sufficient to invoke the exception.

Resco included general allegations of purchases from Rongyuan and Yingkou, but it failed to name these "co-conspirators" as defendants. It seems that Resco believed it would be sufficient simply to attach the epithet "co-conspirator" to Rongyuan and Yingkou. Clearly, under Rule 12(b)(6) standards, that is not enough. The Complaint contains no *facts* sufficient to plausibly suggest that these two entities were co-conspirators.

Resco has not characterized the alleged "co-conspirators" as intermediaries at all, let alone intermediaries immediately upstream in a vertical conspiracy. Resco has not alleged a "hub-and-spoke" conspiracy wherein the co-conspirators conspire with the named defendants (the hub) and amongst each other (the spokes). Rather, Resco alleges only that each Defendant and each of "its co-conspirators [have] colluded with each other to restrain competition by, among other things, setting artificial prices pursuant to illegal horizontal agreements among these competitors." AC ¶ 29. This conclusory legal language lacks any supporting factual allegations. Resco makes no attempt to distinguish the roles of the named Defendants from the roles of the named co-conspirators, other than to label them as such. Nor does it explain what the "co-conspirators" allegedly did to merit that label. Tellingly, the allegations of cartel meetings and agreements, detailed enough in other respects, do not include any reference to the co-conspirators. *See* AC ¶¶ 57-64.

In short, I have rearranged the facts before me, but I see no configuration that would come close to placing Resco's allegations within the co-conspirator exception. It follows that Resco has failed to plead direct purchaser standing based on purchases by, or from, Rongyuan and Yingkou.

### d. *Resco's Acquisition of Worldwide Refractories*

Closely related to Resco's "co-conspirator" theory is its reliance on its acquisition of Worldwide Refractories in March 2006. The notion seems to be that, in purchasing Worldwide, Resco succeeded to some direct-purchaser

47

status that Worldwide possessed. For this theory to work, Worldwide Refractories must be alleged, plausibly and factually, to have been a direct purchaser in its own right. There is no such allegation.

Inspecting the Amended Complaint, I see no specific allegation of any direct purchase by Worldwide Refractories, let alone a specific allegation of dates, times and places. There is no allegation of Resco's accession to standing possessed by Worldwide that could withstand a Rule 12(b)(6) motion.

Giving Resco the benefit of the doubt, I have also inspected its Motion for Default Judgment and a supporting declaration. There, Resco states that Worldwide Refractories purchased magnesite directly from "co-conspirator" Yingkou in 2004. *See* ECF No. 28 at 8; Resco Cert. ¶¶ 5-6. But for the reasons given in § IV.A.4.c, *supra*, the Complaint does not adequately allege that purchases from this "co-conspirator" would establish standing, even as to Resco directly. Still less does it allege purchases by Worldwide Refractories that could be attributed to Resco.

### e. Assignment of Claims by Possehl (US) to Resco

As noted above, Plaintiffs argue in the alternative that they have standing by virtue of an assignment of claims from Possehl (US). The theory is that Possehl (US) possessed valid claims as a direct purchaser, which it assigned to Resco. Unfortunately, the necessary facts are not forthrightly alleged in the Complaint. Rather, they have tumbled out in a variety of pleadings. I recognize the proper scope of a motion to dismiss, and I will therefore make a determination based on the Complaint and other material properly considered under Rule 12(b)(6). Thereafter, I will refer to certain facts extrinsic to the Complaint to guide the case going forward and to suggest what the Complaint is missing.

#### i. The face of the complaint and the assignment

*Bell Atlantic v. Twombly,* the seminal modern case on pleading requirements, was an antitrust case. Its reasoning is therefore particularly instructive. In *Twombly,* the Court instructed that "stating [an antitrust claim] requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Bell Atl. Corp. v. Twombly*, 550 U.S. at 556.

Unlike the plaintiff in *Twombly,* Plaintiffs here have plausibly pleaded the existence of an illegal agreement or combination. That is not in itself sufficient to make out a cause of action. As held by the numerous cases cited above,

Plaintiffs must also plead facts sufficient to demonstrate standing: as relevant here, that requires a plausible factual allegation that Possehl (US) possessed claims based on direct purchases, and that it assigned those claims to Resco.

In deciding whether Plaintiffs have pleaded a claim upon which relief may be granted, I "must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer,* 605 F.3d at 230. Extrinsic evidence is not relevant to a motion to dismiss. "However, an exception to the general rule is that a document *integral to or explicitly relied* upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir. 1997) (internal citations and quotations omitted). I will therefore consider, not only the Amended Complaint, but the Assignment Contract. Resco's direct-purchaser claim rests on the Assignment, which is integral to the Amended Complaint and which is explicitly and implicitly relied upon by Resco. AC ¶ 11.

I therefore consider the language of the Assignment and its legal effect on a motion to dismiss an antitrust claim for lack of standing.

The assignment contract, included by Defendants as Exhibit A to the Declaration of Leda Dunn Wettre (ECF No. 37-16) and by Plaintiffs as Exhibit 1 to the Supp. Resco Decl., 133-2 (the "Assignment Contract"), is just one-and-a-half pages long. Its relevant language is as follows:

ASSIGNMENT

THIS ASSIGNMENT OF CLAIMS is entered into this 21st day of June, 2005, by and between Possehl, Inc. ("Possehl") and Resco Products, Inc. ("Resco") in the Commonwealth of Pennsylvania.

1.   Possehl is a broker of raw materials, minerals, and alloys, including but not limited to, magnesite and magnesite products.

2.   Resco has purchased magnesite and magnesite products from various producers or suppliers from China, utilizing Possehl as a broker.

3.   Possehl has not brought suit and does not anticipate bringing suit to recover possible overcharges on brokered purchases of magnesite or magnesite products which may have resulted with respect to the sale of those products.

4.   Possehl does not represent that it is aware of any possible overcharges on brokered purchases of

magnesite or magnesite products, which may have resulted with respect to Resco's purchases of those products.

AGREEMENT

NOW, THEREFORE, in recognition of good and valuable consideration of $100 (One Hundred Dollars), the receipt and sufficiency of which are hereby acknowledged, intending to be legally bound hereby, Possehl hereby conveys, assigns, and transfers to Resco all rights, title, and interest in and to all causes of action it may have under the laws of the United States of America or any State thereof relating to magnesite or magnesite products brokered by Possehl, and subsequently delivered to Resco during the period from 2000 through the present. Possehl, as Assignor, will make available for copying at the sole expense of Resco, as Assignee, records documenting the producing seller to Resco of products covered by this Assignment.

*Id.*

There is nothing wrong with the abstract legal basis of Resco's theory of standing. It is well settled in the Third Circuit that "express assignments of antitrust claims from a direct purchaser to an indirect purchaser are permissible and do not run afoul of *Illinois Brick*'s standing requirements." *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d at 539 (citing *Gulfstream III Associates, Inc.*, 995 F.2d at 438–440 (holding that "any assignment of antitrust claims, as a matter of federal common law, must be an express assignment . . . [because] an express assignment . . . entirely eliminates any problems of split recoveries or duplicative liability.")); *see also In re Wellbutrin Sr Direct Purchaser Antitrust Litig.*, 70 Fed. R. Serv. 3d 664 (E.D. Pa. 2008) ("this circuit has long recognized that antitrust claims can be assigned. . . . Indeed, numerous courts have certified litigation classes in which the named plaintiffs were operating under an assignment.").

Equally well-settled, however, is the principle that a party can assign no more than it has. "[A]ssignment requires an assignable right," Restatement (Second) of Contracts § 324 (1981), and "an assignee of a claim takes it with whatever limitations it had in the hands of the assignor," *Caribbean S.S. Co., S. A. v. Sonmez Denizcilik Ve Ticaret A. S.*, 598 F.2d 1264, 1266 (2d Cir. 1979). *See also Septembertide Pub., B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 682 (2d Cir. 1989) (an assignor cannot assign that which it no longer owns or controls) (citing *Int'l Ribbon Mills, Ltd. v. Arjan Ribbons, Inc.*, 36 N.Y.2d 121, 126, 325

N.E.2d 137, 139 (1975) ("It is elementary ancient law that an assignee never stands in any better position than his assignor. He is subject to all the equities and burdens which attach to the property assigned because he receives no more and can do no more than his assignor")). That adage—"that an assignee never stands in any better position than his assignor"—has two direct consequences here. First, it means that Possehl (US) must have possessed an antitrust claim in its own right, as a direct purchaser, before it could assign such a claim to Resco.[15] Second, it means that, if Possehl (US) contractually agreed to forgo litigation and arbitrate such claims, that agreement to arbitrate was assigned to Resco along with Possehl's claims.

The requirement that Possehl (US) have been a direct purchaser distinguishes this case from the issue presented in *In re K-Dur Antitrust Litigation*. In *K-Dur*, an antitrust class action involving pharmaceuticals, the plaintiffs asserted "claims as assignees against Defendants on behalf of assignors who have assigned their claims." 338 F. Supp. 2d at 539. Defendants objected on the grounds that the Plaintiffs, absent a valid assignment, lacked the *capacity* to sue. *Id.* at 540.

Judge Greenaway declined to consider the validity of the assignment on a Rule 12(b)6) motion: "Under Fed. R. Civ. P. 9(a), '[i]t is not necessary to aver the capacity of a party to sue or be sued or the authority of a party to sue or be sued in a representative capacity ... except to the extent required to show the jurisdiction of the court.'" *Id.* (quoting Wright & Miller § 1292 ("Under [Rule 9(a)], the fact that a plaintiff, defendant, third-party litigant, or intervenor is participating in the action as a corporation, partnership, administrator, guardian, trustee, or other representative need not be pleaded.")). The Court concluded that "[a] complaint will not be dismissed for lack of pleading a party's capacity to sue *except* where lack of capacity affirmatively appears on the face of the complaint, or where an opposing party has made a specific negative averment in a responsive pleading." *Id.*

Here, however, the issue is not the validity of an assignment, and the assignee plaintiff's resulting capacity to sue. The issue, as in *Cordes & Co*, discussed at § IV.A.i.d., *supra*, is whether the *assignors* possessed a valid cause of action prior to assignment.[16]

A similar distinction was recently drawn by the U.S. District Court for

---

[15]   Defendants argue that "Possehl (US) cannot assign, and could not have assigned, an antitrust claim to Resco because as a broker Possehl (US) has no direct purchaser antitrust standing of its own." Def. Supp. Brief MTCA, 137 at 8.

[16]   I also note that *K-Dur* is a pre-*Twombly* decision. A more stringent pleading standard might well have produced a different result.

the Northern District of California in *In re TFT-LCD (Flat Panel) Antitrust Litig.,* 787 F. Supp. 2d 1036 (N.D. Cal. 2011). There, contractors purchased the goods and resold them to the States of Michigan and Wisconsin. The contractors later assigned their antitrust claims to the States, who sued as assignees. *See id.* at 1040. Defendants moved to dismiss on the grounds that the States neither identified the assignors nor "alleged sufficient facts to demonstrate that the assignors would be entitled to relief." *Id.* Necessary information, said the defendants, would include "the identities of the assignors, information regarding the purchase contracts that gave rise to the assignment, and information regarding whether the relevant purchases were made in Michigan and Wisconsin."

The *TFT-LCD* Court agreed with the defendants.[17] It explicitly distinguished *K-Dur* because "defendants' challenge to the complaint is not solely related to capacity to sue":

> This allegation speaks only to the States' purchases, not the original purchases that give rise to the assigned claims. This Court has previously held that in order to invoke the various state antitrust laws at issue, plaintiffs must be able to allege that the occurrence or transaction giving rise to the litigation—plaintiffs' purchases of allegedly price-fixed goods—occurred in the various states. Consistent with this Court's prior decisions, the Court holds that in order to bring the assigned claims under the state antitrust laws, Michigan and Wisconsin must allege that the purchases were made in Michigan and Wisconsin.

*Id.* at 1041 n.3. In other words, the complaint had to sufficiently allege a valid cause of action arising prior to assignment—an issue separate and distinct from the plaintiffs' capacity to sue as assignee.

This case, too, falls outside the scope of *K-Dur* and within the scope of *TFT-LCD,* for several reasons. I begin with what is not contested, but we very quickly get into deep water. There is no objection to the facial validity of the assignment itself—there is no dispute, for example, as to whether the assignment of antitrust claims was express,[18] or whether consideration was

---

[17]    While the Court granted Defendants' motion to the extent that it sought information regarding the identity of the assignors and facts alleging that the purchases at issue occurred in the relevant States, the Court found that the "balance of information sought by defendants, such as information about the contracts, is not required as a pleading matter and can be explored in discovery." *Id.* at 1041 and n.3.

[18]    In *Gulfstream,* the Third Circuit made clear that a general assignment, that is,

paid. The Assignment Contract recites that Resco paid $100 in consideration for the assignment and that that assignment encompasses "all rights, title, and interest in and to all causes of action [assignor Possehl] may have under the laws of the United States of America or any State thereof . . . ."

The allegations of the Amended Complaint are nevertheless inadequate to establish standing-by-assignment. Buried in the description of "parties" is an allegation that "Possehl, Inc. has assigned to Resco its right, title, and interest in and to all causes of action it may have relating to magnesite or magnesite products brokered by Possehl, Inc. and subsequently delivered to Resco during the relevant period. Possehl, Inc. purchased magnesite and magnesite products directly from defendants during the class period and shipped those products to Resco." AC ¶ 11. Right at the outset, then, there is an ambiguity about whether Possehl (US) "purchased" magnesite, "brokered" such purchases, or both. Not a single relevant "direct purchase" by Possehl (US) is identified or alleged factually. And such a direct purchase is a prerequisite to Possehl (US)'s possession of an antitrust cause of action that it could assign.

This Complaint fails to allege a single specific purchase by Possehl (US). If Possehl (US) is a direct purchaser, then it should be possible to allege the factual particulars of its purchases. Those facts are either within Resco's control, or could be made so. That circumstance influences my consideration

---

one that does not specifically refer to rights arising under the antitrust laws, will not be read to imply the assignment of antitrust claims. *See Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 431, 438–439 (3d Cir. 1993). The assignment agreement in *Gulfstream* "sold, assigned, transferred and set over . . . all of the rights, title, and interest in and to" an aircraft and the related Purchase Agreement. *Id.* The assignment did not mention the transfer of any rights in and to legal claims, let alone claims specifically arising under the antitrust laws. *See id.* Shortly after *Gulfstream* was decided, the Third Circuit clarified that for an assignment to be express, it need not name the type of claims included in the assignment (e.g. antitrust or RICO) but rather must be "unambiguous and all-inclusive." *See Lerman v. Joyce Intern., Inc.*, 10 F.3d 106, 112 (3d Cir. 1993) (holding that an assignment of "all causes of action . . . claims, and demands of whatsoever nature" constituted an express assignment of RICO claims); *accord In re Linerboard Antitrust Litigation*, 443 F. Supp. 2d 703, 712 (E.D.P.A. 2006) ("the *Lerman* Court held that an unambiguous and all-inclusive assignment of claims, even without specifying the types of causes of action assigned, satisfies the express assignment requirement.").

Here, while the Assignment Contract does not specifically refer to "antitrust claims" it does refer to "all rights, title, and interest in and to all causes of action it may have under the laws of the United States of America or any State thereof"— language which is "unambiguous and all-inclusive" and presumably encompasses potential antitrust claims. Moreover, Defendants have not asserted that this is a general assignment as opposed to an express one. Thus, I will proceed on the assumption that this is an express assignment.

under *Twombly* of whether the necessary facts would likely emerge through discovery. *Twombly*'s pleading standard was influenced by its practical consideration of whether to allow an unfounded antitrust complaint to proceed at considerable cost to the courts and the parties. "[I]t is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive." *Twombly*, 550 U.S. at 558 (citing *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528, n.17 (1983) ("a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed."). The opinion also cautions that a deficient complaint should "be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558.

More clarity is needed before I will set this case on an expensive course of discovery. The facts brought before the Court by both parties suggest that the confusion, if not purposeful, is inexcusable, and should be remedied by Resco. The Complaint simply fails to clarify whether Possehl (US) was in fact a direct purchaser in its own right. The Assignment Contract does not really help. It does not specify whether, where, or by whom any direct purchases were made. Nor does it confirm that Possehl (US) was a direct purchaser; rather it assigns *whatever* claims Possehl (US) *may* have had, begging the question of whether Possehl (US) had any. It refers to Possehl's "brokered purchases," and "Resco's purchases," further confusing the issue.[19]

---

[19]   "Possehl hereby conveys, assigns, and transfers to Resco all rights, title, and interest in and to all causes of action it may have under the laws of the United States of America or any State thereof . . . ." Indeed, Possehl expressly disavows any knowledge of potential antitrust claims arising from its own dealings: "Possehl does not represent that it is aware of any possible overcharges on brokered purchases of magnesite or magnesite products, which may have resulted with respect to Resco's purchases of those products." Assignment Contract. *See also* Def. Brief MTCA, 37-1 at 4-5.

Defendants' position on this issue is most clearly articulated in its supplemental briefing on the Motion to Compel Arbitration. *See* ECF Nos. 133-142. There, Defendants submit:

> Resco simply asserts it "primarily purchases magnesite through brokers" and relies on an assignment from Possehl (US) to bring this action. This simple assertion fails, however, as there is no evidence that Possehl (US) ever purchased magnesite directly from any Defendant or alleged co-conspirator on which to base an assignment of a direct purchaser antitrust claim for damages. While another entity, Possehl (HK), actually purchased magnesite from Defendants (evidenced by contracts produced to Plaintiffs by Defendants), including presumably on behalf of Resco as brokered by Possehl (US), there is no allegation or evidence

Construing the Complaint and the Assignment Contract in the light most favorable to Plaintiffs, I do not find that they are sufficient "to raise a right to relief above the speculative level." *Mayer,* 605 F.3d at 230; *Twombly,* 550 U.S. at 555. Resco must do more than merely label Possehl (US), the alleged assignor, a "direct purchaser," while at the same time calling it a "broker." That is tantamount to stating a legal conclusion, which I am not required to accept as true. *See id.*  The underlying Assignment Contract, which asserts that Possehl (US) is a broker, contains no factual allegations that Possehl (US) ever made a purchase. If I were to assume that Possehl (US) brokered *and* purchased magnesite directly from the Defendants and assigned rights arising from those direct purchases to Resco, I would be speculating. Such a state of facts perhaps is not definitively ruled out by the current allegations,[20] but neither is it actually alleged.

For these reasons, based on the face of the Complaint and the underlying Assignment incorporated therein, I will grant the motion to dismiss for lack of standing.

### ii.  Allegations in other pleadings

Defendants suggest that the smoking deficiencies in this Complaint betoken fire. Defendants state that it was not Possehl (US), but a different Possehl entity, Possehl Hong Kong, Ltd ("Possehl (HK)"), that made relevant purchases. Citing sales contracts, Defendants assert that Possehl (HK) made the magnesite purchases from at least two of the Defendants and that Possehl (HK) took physical possession of the magnesite outside of the United States.[21]

---

that Possehl (HK) assigned any U.S. antitrust claims (assuming it has any) to Resco.

Def. Supp. Brief MTCA, 137 at 4 (internal citations omitted).

[20]    In their Supplemental Sur-Reply Memorandum in Support of the Motion to Compel Arbitration and Stay Proceedings, July 30, 2012, ECF No. 142 ("Supp. Sur-Reply MTCA, 142") Defendants argue that a broker, such as Possehl (US) cannot maintain antitrust standing. *See id.* at 4 ("Direct purchasers have antitrust standing; mere brokers do not."). While I agree that a broker is not equivalent to a purchaser for purposes of determining antitrust standing, Possehl (US)'s role as a broker does not necessarily preclude it from also acting as a purchaser. Defendants are correct, however, that Plaintiffs have failed to plausibly plead this critical factual link.

[21]    "Nonetheless, some Defendants were able to find in their own files magnesite sales contracts with Possehl (HK) Ltd. that demonstrate that Possehl, and hence, its assignee Resco, agreed to arbitrate and/or are estopped from refusing to arbitrate claims." Def. Brief MTCA, 37-1, at 5, n.4.

Further complicating matters, those contracts with Possehl (HK) contain the arbitration clauses that are at issue in the motion to compel arbitration.

I do not suggest that Defendants' contentions or evidence extrinsic to the Complaint would directly bear on the motion to dismiss; I have granted that motion because the allegations of the Complaint are insufficient. True, such evidence might figure into *Iqbal*'s "plausibility" analysis, "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." 556 U.S. at 679; *see also Bistrian*, 696 F.3d at 365. But it is not necessary to stretch a point here.

Rather, I cite these extrinsic matters primarily because they point the way to the allegations that any amended Complaint must contain. Moreover, if it turns out to be the case that Possehl (HK) is the relevant entity—or, alternatively, that any contracts with Possehl (US), like the Possehl (HK) contracts, contain an arbitration clause—that will place the motion to compel arbitration on a much different footing. In short, an amended pleading, any subsequent motion to dismiss it, and the motion to compel arbitration may *all* depend on allegations that identify the relevant purchases, contracts, and assignments with reasonable specificity. Such facts, then, may bear on the following issues: (a) whether this dismissal should be with prejudice; (b) the principles of law that should govern any subsequent amended complaint; (c) factual issues that must be addressed in any subsequent amended pleading; and (d) the motion to compel arbitration, discussed below.

Other submissions by Resco tend to confirm one of the Complaint's two competing characterizations of Possehl (US): that it is a "broker." Resco acknowledges that it "primarily purchases magnesite through brokers"—first, in its Motion for Default Judgment, *see* ECF No. 28-1 at 8 and Resco Cert. MDJ, 28-4 ¶ 7, and later, in a Declaration submitted in support of its Supplemental Opposition to Defendants' Motion to Compel Arbitration, May 25, 2012, Supp. Resco Decl. 133-2 at ¶ 5. That second Declaration includes the following details of the alleged assignment of claims by Possehl (US): "On June 21, 2005, one of Resco's *brokers*, Possehl, Inc., assigned to Resco its 'rights, title, and interest in and to all causes of action it may have under the laws of the United States of America or any State thereof related to magnesite or magnesite products *brokered* by Possehl and subsequently delivered to Resco during the period from 2000 to present.'" *Id.* (emphasis added). Resco provides no further details about the assignment or Possehl (US)'s alleged purchases from Defendants.

According to Defendants, "Possehl (through at least Possehl (HK) Ltd.) agreed to arbitrate any and all disputes arising out of its magnesite purchases in signed contracts with two Defendants." Def. Brief MTCA, 37-1 at 2. I note, however, that the relationship between Possehl (US) and Possehl (HK) is

unexplained, and I cannot simply assume that they are fungible entities, or that one acted "through" the other.

Further obfuscating matters, Plaintiffs and Defendants, respectively, refer to Possehl (HK) as "an affiliate of Resco's assignor" and "a related Possehl entity." Neither party provides any information regarding the corporate relationship between Possehl (US) and Possehl (HK). It is not disclosed, for example, whether one is a subsidiary of the other or whether both are subsidiaries of a third entity.[22] That information may be critical to determining whether purchases or assignments made by one entity affect the status of the other.

Resco remains notably unspecific about the transactions on which its claims depend. In supplemental briefing on the Motion to Compel Arbitration, Resco merely denies that the purchases made by Possehl (HK) have any effect on any assignment made by Possehl (US). *See* Plaintiffs' Supplemental Memorandum in Opposition to Defendants' Motion to Compel Arbitration, May 25, 2012, ECF No. 133 ("Pl. Supp. Opp. MTCA, 133") at § 1. But Resco does not directly deny *factually* that its direct purchaser claims rely, in whole or in part, on purchases made by Possehl (HK). Nor does Resco, even in response to a direct challenge, offer evidence or even a specific allegation regarding Possehl (US)'s alleged direct purchases from Defendants. Nor does Resco clear up its own competing characterizations of the role of Possehl (US) as purchaser or broker.

Defendants point out that Resco has cited specific dollar amounts it paid "for Chinese magnesite brokered by its assignor Possehl and delivered to Resco in the United States," bolstering the natural inference that Resco possesses information about the transactions. Def. Supp. Brief MTCA, 137 at 3. But Resco has not responded to requests for "underlying contracts between its broker/assignor Possehl (US) and Defendants (or an alleged co-conspirator)."[23]

---

[22]    The following information, not submitted or confirmed by the Parties, is offered solely to illustrate that Plaintiffs have failed to provide the most basic information about the entities involved, and to highlight the necessity of bringing some clarity now. An internet search using the name "Possehl" and "magnesite" returns results indicating that Possehl (US) and Possehl (HK) may be affiliates or subsidiaries of the German company, Possehl Erzkontor GmbH ("PE GmbH"), a member of the L. Possehl & Co. mbH Group.

[23]    Resco's President, Bill Brown, declares: "Between the beginning of the damages period, September 1, 2001, and December 31, 2003, Resco paid approximately $2,468,800 for Chinese magnesite brokered by its assignor Possehl and delivered to Resco in the United States. Between January 1, 2004 and the date of the assignment, June 21, 2005, Resco paid approximately $1,108,1000 for Chinese magnesite brokered by its assignor Possehl and delivered to Resco in the United States." Resco Supp. Decl., 133-2 at ¶¶ 6-7. Defendants also maintain that they have sought from

*Id.* More to the point on this Rule 12(b)(6) motion, Resco has not alleged the existence or contents of such contracts, on which its claims ultimately depend.

### 5.   Dismissal with or without prejudice

As stated above, the Amended Complaint must be dismissed for lack of standing. An issue that remains is whether that dismissal will be with prejudice, or whether Plaintiffs should be permitted to file a Second Amended Complaint in which they attempt to remedy the deficiencies of the first.

The Third Circuit has adopted a particularly liberal approach in favor of permitting pleading amendments to ensure that "a particular claim will be decided on the merits rather than on technicalities." *Dole v. Arco Chem. Co.*, 921 F.2d 484, 487 (3d Cir. 1990). Indeed, where a complaint is dismissed on Rule 12(b)(6) grounds "a District Court *must* permit a curative amendment, unless an amendment would be inequitable or futile." *Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004) (emphasis added).

The current complaint is technically an amended complaint. The standing issue, however, came to light in stages, apparently in connection with Resco's disclosure of Possehl (US)'s assignment in its Motion for Default Judgment and Defendants' Motion to Compel Arbitration.[24] At any rate, the first amendment of the original complaint did not occur in response to any court ruling with respect to standing, and standing has not been squarely addressed by any prior motion to dismiss. In that limited sense, for purposes of the standing issue and *Alston,* this Amended Complaint is comparable to an initial pleading.

I also find that, unless and until the direct purchases upon which Plaintiffs base their claims are clarified, I cannot meaningfully assess the motion to compel arbitration. For this reason, too, I am inclined to give Plaintiffs the opportunity to reframe their allegations.

On the other side of the ledger is the reality that the minimum facts needed to plead a cause of action, relating to Plaintiffs' direct purchases or the assignment of claims arising therefrom, are within the control of Plaintiffs, or could have been obtained long ago.[25] Resco, as the putative direct purchaser,

---

Plaintiffs' counsel but have been unable to obtain the "records documenting the producing seller to Resco of products covered by this Assignment" referenced in the Assignment Contract. *See* Def. Brief MTCA, 37-1 at 5, n.4.

[24]   *See* Def. Reply MTCA, 59 § 1.A. and n.5 *supra.*

[25]   For example, the Assignment Contract provides that "Possehl, as Assignor, will

has the burden to plead the circumstances of its purchases of magnesite, including the underlying agreements. I cannot accept the conclusory allegation that Resco is a direct purchaser or simply assume that Resco will pull a purchasing rabbit out of its hat after months or years of costly discovery. I will, however, grant Plaintiffs leave to file a Second Amended Complaint. It may be that Plaintiffs can plead facts sufficient to establish standing. Those facts may or may not be supported by evidence produced in discovery (and I would probably order that early discovery be targeted to the standing issue). I will, however, insist that the standing issue being properly framed before I will permit it to proceed to discovery, summary judgment, or trial.

The Amended Complaint is dismissed without prejudice. Plaintiffs may, if they wish, file a proposed Second Amended Complaint. If they do not do so within 70 days, this dismissal will become final.

## B. Motion to Compel Arbitration

Plaintiffs' Motion for Default Judgment first put in issue the Possehl (US) Assignment Contract, later cited in the Amended Complaint. Defendants then moved to compel arbitration, after (they say) discovering sales contracts with Possehl (HK) ("an affiliated entity") which contained arbitration clauses. *See* Def. Brief MTCA, 37-1 at 5. The arbitration issue is thus in a kind of resonance with the direct-purchaser issue. Defendants submit that if Resco seeks to rely on purchases made by Possehl (HK) in order to secure its antitrust standing, then it must also be bound to Possehl (HK)'s agreements to arbitrate claims arising from its purchases of magnesite. *See* Def. Supp. Brief MTCA, 137 at 11 ("Plaintiffs, thus, face a critical dilemma and cannot have it both ways: they either are bound to arbitrate based on the underlying magnesite contracts on which they base their claims, or have no judicial standing to bring an antitrust claim as an indirect purchaser (or an assignee) in which case arbitration is their only forum."). But there is a link missing from Defendants' reasoning. Resco has not really alleged that it does (or does not) rely on purchases made by Possehl (HK); nor has Resco submitted that Possehl (HK) and Possehl (US) are so interrelated that the purchases of one entity may be imputed to the other. I have alluded to this uncertainty in connection with the motion to dismiss. *See* § IV.A.4, *supra*. But I would be guilty of the very inconsistency identified by Defendants if I were to turn around and assume that, when Plaintiffs said Possehl (US), they meant Possehl (HK), or that the two are functionally interchangeable for purposes of the Motion to Compel Arbitration.

If Resco decides to amend its Complaint to include plausible, specific factual allegations of direct purchases by Possehl (US), that is one thing. If so,

make available for copying at the sole expense of Resco, as Assignee, records documenting the producing seller to Resco of products covered by this Assignment."

however, I will require that such allegations identify the relevant contracts and state whether such contracts contain arbitration clauses. If, on the other hand, Resco, in an amended pleading, relies on purchases made by Possehl (HK), then it will have to confront the arbitration agreements already identified by Defendants. I do not imply that I have found that there is a valid agreement to arbitrate; I cannot decide that question unless and until the allegations are clarified.[26] I do say that, if Plaintiffs intend to rely upon purchases made pursuant to sales contracts, they must identify those contracts and be prepared to address the impact of any arbitration clauses contained therein.

Why, then, address the arbitration issue now? I do so because the Plaintiff has raised, and the parties have extensively briefed, the issue of whether, *even if* there is a valid agreement to arbitrate, the court should nevertheless decline to enforce it. If I were to rule at the outset that an agreement to arbitrate these claims is unenforceable, that would moot a set of potential issues. I will therefore briefly address Plaintiffs' arguments.

Plaintiffs submit that the China International Economic and Trade Arbitration Commission ("CEITAC"), the arbitral body named in the Possehl (HK) arbitration agreements,[27] could not properly and fairly adjudicate their

---

[26]    "A motion to compel arbitration calls for a two-step inquiry into (1) whether a valid agreement to arbitrate exists and (2) whether the particular dispute falls within the scope of that agreement. When a dispute consists of several claims, the court must determine on an issue-by-issue basis whether a party bears a duty to arbitrate. When determining both the existence and the scope of an arbitration agreement, there is a presumption in favor of arbitrability." *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005) (internal citations and quotations omitted). *Accord Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983)) ("the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute. The court is to make this determination by applying the 'federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the [Federal Arbitration] Act.'"). An inherent prerequisite in the first step of this inquiry—"whether the parties agreed to arbitrate the dispute"—is identifying the parties who allegedly agreed to arbitrate.

[27]    Defendants submit that a magnesite sales contract between Defendant Liaoning Jiayi and Possehl (HK) contains the following arbitration clause which is representative of the arbitration clauses the other Defendants include in their own magnesium sales contracts:

> Arbitration: Any dispute arising from or in connection with this Sales Contract shall be submitted to China International Economic and Trade Arbitration Commission for arbitration which should be conducted in accordance with the Commission's arbitration rules in effect at the time of applying for arbitration. The Decision of the Commission

60

claims. *See* Plaintiffs' Memorandum in Opposition to Defendants' Motion to Compel Arbitration, April 16, 2008, ECF No. 53 ("Pl. Opp. MTCA, 53") § II, and Pl. Supp. Opp. MTCA, 133 § II ("The Arbitration Clauses are Unenforceable Because Their Enforcement Would Cause Resco to Forgo its Rights Under the Sherman Act"). Defendants, relying on several Supreme Court decisions, respond that "mere speculation about how CIETAC will adjudicate this dispute cannot serve as a basis to avoid arbitration." Def. Brief MTCA, 37-1 at 17 (citing *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 30 (1991); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614 (1985); *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,* 515 U.S. 528, 537 (1995). I will reserve final decision until the arbitration issues are fully crystallized. Nevertheless, in the interest of narrowing the issues, I will state that I am inclined to reject Plaintiffs' position.

The Federal Arbitration Act, 9 U.S.C. § 1, *et seq.,* was enacted "to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer,* 500 U.S. at 24. Its enactment has engendered a strong and well established federal policy in favor of arbitration that "applies with special force in the field of international commerce." *See Mitsubishi Motors Corp.,* 473 U.S. at 631. This policy applies with equal force "where a party bound by an arbitration agreement raises claims founded on statutory rights," including antitrust claims. *Id.* at 629 (rejecting the argument that antitrust claims are inappropriate for arbitration, concluding that "concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes require that we enforce the parties' agreement, even assuming that a contrary result would be forthcoming in a domestic context."); *see also Gilmer,* 500 U.S. at 26 ("It is by now clear that statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA. Indeed, in recent years we have held enforceable arbitration agreements relating to claims arising under the Sherman Act, 15 U.S.C. §§ 1-7; § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); the civil provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.;* and § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77/(2)."). In *Mitsubishi Motors,* the Supreme Court expressly rejected the "proposition that an arbitration panel will pose too great a danger of innate hostility to the constraints on business conduct that antitrust law imposes" and declined to "indulge the presumption that the parties and arbitral body conducting a

---

shall be accepted as final and binding upon both parties.

Exhibit B to Declaration of Sijie Zhao for Defendant Liaoning Jiayi Metals & Minerals Co., Ltd., In Opposition to Plaintiffs' Motion for Default Judgment, February 5, 2008, ECF No. 35-4 ("Zhao Decl. Ex. B"). *See also* Def. Brief MTCA, 37-1 at 5-7.

proceeding will be unable or unwilling to retain competent, conscientious, and impartial arbitrators." *Id.* at 634.

Plaintiffs have submitted an expert report opining on the inadequacies of CIETAC and the Plaintiffs' ability to fully and fairly vindicate their antitrust class action claims there. They have not, however, cited a single case in which a court preemptively, in advance of arbitration, set aside the strong presumption in favor of enforcing arbitration agreements based on generalized concerns about the impartiality of arbitration in a particular nation or forum, or based on the predicted unfairness of a hypothetical outcome.

In support of their position, Plaintiffs cite the following statement made, but not discussed, by the Supreme Court in *Mitsubishi Motors*. There, the Court quoted its 1972 decision in *M/S Bremen v. Zapata Off –Shore Co.*, 407 U.S. 1 (1972), regarding the validity of a forum selection clause: "a party may attempt to make a showing that would warrant setting aside the forum-selection clause-that the agreement was '[a]ffected by fraud, undue influence, or overweening bargaining power'; that 'enforcement would be unreasonable and unjust'; or that proceedings 'in the contractual forum will be so gravely difficult and inconvenient that [the resisting party] will for all practical purposes be deprived of its day in court.'" *See Mitsubishi Motors Corp.*, 473 U.S. at 632 (quoting *M/S Bremen*, 407 U.S. at 12, 15, 18). The *M/S Bremen* Court's statement refers to a scenario in which "a forum clause, even though it is freely bargained for and contravenes no important public policy, may nevertheless be 'unreasonable' and unenforceable if the chosen forum is seriously inconvenient for the trial of the action." *M/S* Bremen, 407 U.S. at 16. In other words, a party would effectively "be deprived of its day in court," not because of the inadequacy or bias of the forum but because one or both of the parties could not physically appear, or because the "remoteness of the forum suggests that the agreement was an adhesive one." *Id.* at 17.

The claim of Plaintiffs here is very different; they fear that the procedures will be unfair, or the outcome inequitable. Such concerns may be raised in, *e.g.,* a motion to confirm or vacate any award. At any rate, *M/S Bremen* left little doubt that even the specific grounds it raised would rarely constitute justifiable grounds for rendering a forum selection clause "unenforceable," reasoning, "where it can be said with reasonable assurance that at the time they entered the contract, the parties to a freely negotiated private international agreement contemplated the claimed inconvenience, it is difficult to see why any such claim of inconvenience should be heard to render the forum clause unenforceable." *Id.* at 16. Ultimately, the *M/S Bremen* Court concluded that "[a] contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision." *Id.* at 15. *Mitsubishi* and subsequent decisions leave no doubt that

the "strong public policy" in this instance is to enforce arbitration agreements. *See Mitsubishi Motors Corp.,* 473 U.S. at 626 ("questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.... The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.") (quoting *Moses H. Cone Memorial Hospital,* 460 U.S. 1, 24-25 (1983)).

Here, the only agreement to arbitrate currently in the record was executed between Chinese Defendants and Possehl (HK), *i.e.* Possehl Hong Kong, Ltd., another Chinese entity. It is unlikely that Possehl (HK) shares Resco's concerns regarding the adequacy or partiality of CIETAC. And Possehl (US), considering the nature of its business, should have reasonably anticipated and prepared for the alternative resolution of disputes in China (or else should have negotiated for the settlement of disputes elsewhere). Resco, too, perhaps would not have selected CIETAC as its arbitral forum of choice. But if it was not the contracting party, and obtained its claims by assignment, then it must take the bitter with the sweet. Recall that Resco took this assignment of claims voluntarily from a party which explicitly warranted that it knew of no antitrust claims—and which, by hypothesis, freely entered into the contracts of sale that may or may not require arbitration of claims in a Chinese forum.

I will forgo any lengthy discussion of the many "compelling reasons why a freely negotiated private international agreement, unaffected by fraud, undue influence, or overweening bargaining power . . . should be given full effect." *M/S Bremen,* 407 U.S. at 12. Suffice it to say that, for at least forty years, the Supreme Court has proceeded on the premise that full enforcement of such agreements, be they arbitration agreements, forum selection agreements, or assignment agreements, "accords with ancient concepts of freedom of contract and reflects an appreciation of the expanding horizons of American contractors who seek business in all parts of the world." *Id.* at 11-12.

Again, the existence and scope of arbitration agreements that may apply to this case remain murky, a state of affairs for which Plaintiffs are primarily responsible. But I cannot rule at the outset that the arbitration agreements currently before me would be unenforceable as a matter of law.

Plaintiffs submit in the alternative that, even if CIETAC is generally a legitimate forum, it is not a legitimate forum for arbitrating Plaintiffs' specific claims. Again, the cases Plaintiffs cites do not apply. In *Blair v. Scott Specialty Gases,* 283 F.3d 595 (3d Cir. 2002), the United States Court of Appeals for the Third Circuit overturned a district court's rejection of an individual plaintiff's

claim that she could not afford the costs associated with arbitration as provided for in her employment contract. *See id.* at 605. The Third Circuit, reasoning that "[a]rbitration costs are directly related to a litigant's ability to pursue the claim," and that "the Supreme Court [has] acknowledged that the existence of large arbitration costs could preclude a litigant … from effectively vindicating her federal statutory rights in the arbitral forum," *id.,* remanded for limited discovery and a determination as to whether "resort to arbitration would deny [plaintiff] a forum to vindicate her statutory rights." *Id.* at 610. Similarly, in *Bradford v. Rockwell Semiconductor Sys., Inc.,* the Fourth Circuit found that "it is undisputed that fee splitting can render an arbitration agreement unenforceable where the arbitration fees and costs are so prohibitive as to effectively deny the employee access to the arbitral forum." 238 F.3d 549, 554 (4th Cir. 2001). Plaintiffs have not suggested that arbitration would be prohibitively expensive, but rather cite these cases for the proposition that the inquiry must be whether "this particular plaintiff can effectively vindicate its U.S. statutory rights in a CIETAC arbitration," Pl. Supp. Opp. MTCA, 133 at 9. I find the analogy unconvincing.

In short, Plaintiffs have not directed the Court to any decision in which a court preemptively refused to order arbitration at CIETAC (or a comparable forum). Indeed, they have not cited a case in which a U.S. court has retrospectively vacated a CIETAC award based on concerns like those raised by Plaintiffs here.

International arbitration, like any dispute resolution mechanism, has many strengths, but also has inherent disadvantages—the perceived bias of certain countries' forums and arbitrators, weak injunctive relief, and difficulties in enforcing judgments, to name a few. Parties nevertheless enter into contracts every day in which, after weighing the advantages and disadvantages, they decide to arbitrate their disputes abroad rather than litigate in U.S. courts. Our legislators, through enactment of the FAA, including the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. Ch. 2, have given the Government's stamp of approval to such agreements. They have also provided for the review and vacation of arbitral awards by U.S. district courts where a party presents, *ex post,* concerns similar to those raised by Plaintiffs here. *See* 9 U.S.C. §§ 9-11 (providing for the confirmation, vacation, rehearing, modification or correction of arbitral awards by U.S. district courts); *Mitsubishi Motors,* 473 U.S. at 638 ("Having permitted the arbitration to go forward, the national courts of the United States will have the opportunity at the award-enforcement stage to ensure that the legitimate interest in the enforcement of the antitrust laws has been addressed. The Convention reserves to each signatory country the right to refuse enforcement of an award where the "recognition or enforcement of the award would be contrary to the public policy of that country."). Such review, not the refusal to honor arbitration agreements, is the primary check on unfairness.

## C. Motions to Dismiss Under the FTAIA

Also dependent on the direct-purchaser issue is Defendants' motion to dismiss the Complaint under the Foreign Trade Antitrust Improvements Act (FTAIA). Unlike my predecessor, I have the benefit of the Third Circuit's ruling, which instructs the district court to review any subsequent complaint for compliance with the FTAIA under the standards of Fed. R. Civ. P. 12(b)(6). *See ASP v. CMC*, 654 F.3d at 469 (instructing that "[o]n remand, the District Court may entertain renewed motions to dismiss pursuant to the FTAIA's statutory limitations . . . however, those motions must be decided pursuant to the procedural framework that governs a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, rather than a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1)"); *see also* discussion *supra* § III.C.2. Because I am already dismissing the Complaint for failure to allege standing, I touch on the FTAIA motion briefly here.

The FTAIA first limits the reach of the U.S. antitrust laws by articulating a general rule that the Sherman Act "shall not apply to conduct involving trade or commerce ... with foreign nations." The FTAIA then creates two distinct exceptions that restore the authority of the Sherman Act. First, the FTAIA provides that it does not apply (and thus that the Sherman Act *does* apply) if the defendants were involved in "import trade or import commerce" (the "import trade or commerce" exception). Second, the FTAIA's bar is inapplicable if the defendants' "conduct has a direct, substantial, and reasonably foreseeable effect" on domestic commerce, import commerce, or certain export commerce and that conduct "gives rise" to a Sherman Act claim (the "effects" exception).

*ASP v. CMC*, 654 F.3d at 466. *Accord F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 158 (2004) ("The Foreign Trade Antitrust Improvements Act of 1982 (FTAIA) excludes from the Sherman Act's reach much anticompetitive conduct that causes only foreign injury. It does so by setting forth a general rule stating that the Sherman Act "shall not apply to conduct involving trade or commerce ... with foreign nations." 96 Stat. 1246, 15 U.S.C. § 6a. It then creates exceptions to the general rule, applicable where (roughly speaking) that conduct significantly harms imports, domestic commerce, or American exporters.")

There is no dispute that Plaintiffs' claims involve "trade or commerce with foreign nations" and therefore trigger the FTAIA. Accordingly, the question

before me will be whether Plaintiffs have pleaded facts that are sufficient to trigger one of the two exceptions to the FTAIA, either the "import exception"[28] or the "effects exception."[29] *See ASP v. CMC*, 654 F.3d at 466.

---

[28]     In *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012), the Seventh Circuit Court of Appeals takes issue with the label "import exception" reasoning that the import trade or import commerce that is excluded from the purview of the FTAIA by the parenthetical in the statute's *chapeau* (prefatory language)—" Sections 1 to 7 of this title . . . shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless . . ."—is "pure import commerce—that is the kind of commerce that is not subject to the special rules created by the FTAIA," whereas foreign conduct that has a "direct, substantial and reasonably foreseeable effect . . . on import trade or import commerce with foreign nations" does constitute an *exception* to the FTAIA. *See id.* at 853-55. According to the *Min-Chem* court,

> Although some, including the Third Circuit in *Animal Science,* have referred to [the parenthetical "other than import trade or import commerce" in the *chapeau*] as the "import exception," that is not an accurate description. Import trade and commerce are excluded at the outset from the coverage of the FTAIA in the same way that domestic interstate commerce is excluded. This means only that conduct in both domestic and import trade is subject to the Sherman Act's general requirements for effects on commerce, not to the special requirements spelled out in the FTAIA. Where the FTAIA does apply, it "remov[es] from the Sherman Act's reach ... commercial activities taking place abroad, unless those activities adversely affect ... imports to the United States

*Id.* at 854 (internal quotations and citation omitted). *See also In re Vitamin C Antitrust Litig.*, 06-MD-1738 BMC JO, 2012 WL 5839303 (E.D.N.Y. Nov. 16, 2012) ("there are two types of Sherman Act claims that implicate import trade or import commerce which fall outside the scope of the FTAIA. The first is the 'import trade or commerce' parenthetical, which provides that the antitrust law *shall* apply to conduct 'involving' import trade or commerce with foreign nations. I shall refer to this exception as "the import exception." The second is that the FTAIA brings back within the reach of the Sherman Act conduct involving nonimport trade or nonimport commerce when that conduct (1) has a direct, substantial, and foreseeable effect *on* import trade or import commerce, and (2) the Sherman Act claim arises out of that effect. I shall refer to this exception as the "domestic effects exception.") (internal citations, quotations and punctuation omitted). Semantics aside, it is clear that the Sherman Act *does apply* to both "conduct involving import trade or import commerce" (which I will continue to refer to as the "import exception") *and* foreign conduct that has a direct, substantial and foreseeable effect *on* import trade or commerce (which falls into the "effects" exception).

[29]     The "effects" exception encapsulates the following statutory language:

The Third Circuit's opinion in *ASP v. CMC* discusses those two exceptions as they may relate to this case. I will not repeat that analysis, but commend it to the Plaintiffs in connection with the drafting of any amended complaint. To defeat a motion to dismiss based on FTAIA, the Court will require specific, plausible allegations that are factual in nature, in accordance with *Twombly, supra.*

For the parties' guidance, I comment on one other aspect not fully explored in *ASP v. CMC*. A plaintiff need not allege or prove that the "defendants' conduct was subjectively intended/consciously meant to produce a consequence in the United States." *Id.* at 471. It is not enough, however, that such domestic consequences coexist with a viable Sherman Act claim. The FTAIA requires that such domestic consequences of foreign conduct *give rise to the antitrust claim at issue.* "That is to say, it is not sufficient that a theoretical plaintiff injured in the United States by the conduct at issue might have a Sherman Act claim. Rather, the foreign anticompetitive conduct must have domestic effects that give rise to Plaintiffs' Sherman Act claim in [the present case]." *Emerson Elec. Co. v. Le Carbone Lorraine, S.A.*, 500 F. Supp. 2d 437, 444 (D.N.J. 2007). So, while a plaintiff need not show that the defendants' anti-competitive conduct was specifically intended to harm plaintiff, it must show that the conduct was, in fact, the "proximate cause" of plaintiff's antitrust injury. *See Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*, 417 F.3d 1267, 1270-71 (D.C. Cir. 2005) ("*Empagran II*") ("'but-for' causation between the domestic effects and the foreign injury claim is simply not sufficient to bring anti-competitive conduct within the FTAIA exception. The statutory language—'gives rise to'—indicates a direct causal relationship, that is, proximate causation, and is not satisfied by the mere but-for 'nexus' the appellants advanced in their

---

[The Sherman Act] shall not apply to conduct involving trade or commerce . . . with foreign nations unless--
(1) such conduct has a direct, substantial, and reasonably foreseeable effect--
    (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
    (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
(2) such effects give rise to a claim under the provisions of sections 1 to 7 of [The Sherman Act] . . . .

15 U.S.C. § 6a. It thus provides for application of the Sherman Act if the defendants' conduct has a "direct, substantial and reasonably foreseeable effect" on one of three areas of U.S. commerce – (1) domestic commerce ("on trade or commerce which is not trade or commerce with foreign nations"); (2) import commerce ("on import trade or import commerce with foreign nations"); or (3) American export commerce ("on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States;"). *See id.* Neither party has suggested that the third category, American export commerce, would be applicable here.

brief."); *accord In re Hydrogen Peroxide Antitrust Litig.,* 702 F. Supp. 2d 548, 552 (E.D. Pa. 2010) (noting that the *Empagran II* decision in which "the D.C. Circuit concluded on remand that such but-for causation is not sufficient to meet the Causation Prong [of the FTAIA]," "has been widely adopted by other courts"); *Emerson Elec. Co,* 500 F. Supp. 2d. at 446 (rejecting as "but-for causation" plaintiffs' submission that price-fixing in one segment of the international market was required to maintain a cartel's stability and profitability and therefore gave rise to antitrust injury in other markets); *Latino Quimica-Amtex S.A. v. Akzo Nobel Chemicals B.V.,* 2005-2 Trade Cas. (CCH) P 74974, 2005 WL 2207017 (S.D. N.Y. 2005) ("While these allegations plead, in general terms, a causal relationship between Defendants' conspiracy and Plaintiffs' injuries abroad, they support only a theory that Plaintiffs were injured by Defendants' global anticompetitive conduct. Nothing in these allegations even suggests that Plaintiffs' injuries were directly, or proximately, caused by the domestic effect of Defendants' alleged conspiracy."). I add that, of course, a foreign injury does not become a US injury merely because a foreign injured party assigns its cause of action to a US plaintiff.

Thus, for example, conclusory allegations, like the ones in the Amended Complaint, that Defendants made direct sales "to U.S. customers," or general allegations that the conspiracy must have been a "but-for" cause of price effects in the US, will not do. Without a specific factual allegation of a connection between Defendants' foreign anticompetitive conduct and, *e.g.,* a purchase by a plaintiff, the complaint may well fall short of the Rule 12(b)(6) pleading standard.

As I have said, I have dismissed the complaint for failure to allege standing. If plaintiffs submit an amended pleading, however, they should do so with the FTAIA standards, described above, in mind.

## V.    CONCLUSION

Plaintiff Resco's status as a direct purchaser, whether obtained through its own direct purchases or by means of an assignment, is a critical and yet unresolved question in this case. That uncertainty permeates not only the Amended Complaint but the Motion to Compel Arbitration.

For the reasons discussed above, the Minmetals and Sinosteel Defendants' Motions to Dismiss Plaintiffs' Amended Complaint are **GRANTED** on standing grounds only. The Amended Complaint is **DISMISSED WITHOUT PREJUDICE** to the filing of a Second Amended Complaint. The Seven Defendants' Motion to Compel Arbitration is **DISMISSED AS MOOT,** subject to reinstatement if and as appropriate in light of the allegations of any subsequent amended complaint.

Dated: July 24, 2014

**Kevin McNulty**
**United States District Judge**

69