## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANIMAL SCIENCE PRODUCTS, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> CHINA MINMETALS CORPORATION, et al., <br><br> Defendants. | Case 2:05-cv-04376-KM-MAH |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND <u>AMENDED CLASS ACTION COMPLAINT</u>**

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................1

ARGUMENT .......................................................................................1

I.    PLAINTIFFS HAVE SUFFICIENTLY ALLEGED ANTITRUST
STANDING. ...............................................................................1

    A.    Plaintiff Resco is a Direct Purchaser...............................2

        1.    Purchases from Nonparty Co-Conspirators in a Price
Fixing Conspiracy Are Direct Purchases...................3

        2.    The Complaint Adequately Alleges Participation of Co-
Conspirators. .............................................................8

        3.    Resco is Entitled to Discovery of Possehl US Purchases. .........9

    B.    Plaintiff Intersource is a Direct Purchaser. .......................11

    C.    Plaintiffs Have Standing to Seek Injunctive Relief. ..........13

II.    PLAINTIFFS ARE NOT REQUIRED TO ARBITRATE THEIR
CLAIMS IN CHINA. .................................................................15

    A.    Defendants Have Not Met Their Burden of Establishing an
Agreement to Arbitrate.......................................................15

    B.    Defendants Waived Any Right to Demand Arbitration.....................18

III.    THE ADDITION OF INTERSOURCE AS A NAMED PLAINTIFF
IS PERMISSIBLE. .....................................................................20

    A.    There Was No Undue Delay in Adding Intersource as a Named
Plaintiff. ............................................................................21

    B.    Adding Intersource as a Named Plaintifff Is Not Futile. ..................22

    C.    Intersource's Claim is Not Barred by the Statute of Limitations.......23

IV.    THE SECOND AMENDED COMPLAINT SATISFIES THE
ELEMENTS OF THE FTAIA........................................................27

    A.    The SAC Satisfies the "Import Exception"........................27

    B.    The SAC Satisfies the "Effects Exception". ......................29

        1.    Plaintiffs Allege Direct, Substantial and Reasonably
Foreseeable Effect on U.S. Commerce...................29

i

2.    Plaintiffs Have Alleged That an Effect on U.S.
          Commerce Gave Rise to Their Claims. ...................................32

V.    JUDGE BROWN'S 2010 DECISION REGARDING
      GOVERNMENT COMPULSION IS NOT THE LAW OF THE
      CASE. ........................................................................................................34

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*American Hotel Int'l Group, Inc. v. OneBeacon Ins. Co.*,
   611 F. Supp. 2d 373 (S.D.N.Y. 2009) ..................................................................38

*American Pipe & Constr. Co. v. Utah*,
   414 U.S. 538 (1974)..............................................................................23, 24, 25, 26

*Animal Sci. Products, Inc. v. China Nat'l Metals & Minerals Imp. &
   Exp. Corp.*,
   702 F. Supp. 2d 320 (D.N.J. 2010)..............................................................34, 36

*Animal Sci. Products, Inc. v. China Minmetals Corp.*,
   654 F.3d 462 (3d Cir. 2011) ..........................................................................27, 28

*Animal Sci. Products, Inc. v. China Minmetals Corp. ("ASP II")*,
   34 F. Supp. 3d 465 (D.N.J. 2014)................................................3, 17, 18, 20, 21

*AT&T Corp. v. Innocom Telecom LLC*,
   No. C-06-05400 EDL, 2007 WL 163193 (N.D. Cal. Jan. 17, 2007) ................19

*AT&T Techs., Inc. v. Commc'ns. Workers of Am.*,
   475 U.S. 643 (1986)..........................................................................................16

*In re Auto Parts Antitrust Litig.*,
   29 F. Supp. 3d 982 (E.D. Mich. 2014) ..............................................................4

*In re Auto. Parts Antitrust Litig.*,
   No. 12-MD-02311, 2014 WL 4209588 (E.D. Mich. Aug. 26, 2014) ...............29

*Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*,
   118 F.3d 178 (3d Cir. 1997) ..........................................................................10

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
   603 F.2d 263 (2d Cir. 1979) ............................................................................5

*Blue Shield of Virginia v. McCready*,
   457 U.S. 465 (1982)..........................................................................................5

*California Pub. Employees' Ret. Sys. v. Chubb Corp.*,
  No. CIV. NO. 00-4285-GEB, 2002 WL 33934282 (D.N.J. June 26,
  2002) ................................................................................................25

*In re Carbon Black Antitrust Litig.*,
  No. 03-10191-DPW, 2005 U.S. Dist. LEXIS 660 (D. Mass. Jan.
  18, 2005) ...........................................................................................7

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
  479 U.S. 104 (1986).........................................................................13

*In re Cathode Ray Tube Antitrust Litig.*,
  No. 192013, U.S. Dist. LEXIS 137945 (N.D. Cal. June 20, 2013).....................6

*Chatham Brass Co., Inc. v. Honeywell, Inc.*,
  512 F. Supp. 108 (S.D.N.Y. 1981) ......................................................5

*In re City of Philadelphia Litig.*,
  158 F.3d 711 (3d Cir. 1998) ......................................................34, 35

*In re Cmty. Bank of N. Virginia*,
  622 F.3d 275 (3d Cir. 2010) ...............................................................23

*Commercial St. Express LLC v. Sara Lee Corp.*,
  No. 08 C 1179, 2008 WL 5377815 (N.D. Ill. Dec. 18, 2008)...........................31

*In re Coordinated Petroleum Products Antitrust Litig.*,
  691 F.2d 1335 (9th Cir. 1982) .............................................................4

*In re Coordinated Pretrial Proceedings in Petroleum Antitrust Litig.*,
  497 F. Supp. 218 (C.D. Cal. 1980) ......................................................5

*Cordes & Co. Fin. Svcs., Inc. v. A.G. Edwards & Sons, Inc.*,
  502 F.3d 91 (2d Cir. 2007) ...................................................................2

*In re Cotton Yard Antitrust Litig.*,
  505 F.3d 274 (4th Cir. 2007) ...............................................................7

*County of Orange v. Sullivan Highway Products, Inc.*,
  Nos. 88 Civ. 8583 (JFK), 89 Civ. 4218 (JFK), 1989 U.S. Dist.
  LEXIS 12128 (S.D.N.Y. Oct. 12, 1989)...............................................5

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
No. 09 CR 3690, 2013 WL 4506000 (N.D. Ill. August 23, 2013) ......................9

*Dart Drug Co. v. Corning Glass Works*,
480 F. Supp. 1091 (D. Md. 1979).........................................................................6

*Delaware Valley Surgical Supply, Inc. v. Johnson & Johnson*,
523 F.3d 1116 (9th Cir. 2008) ............................................................................3

*Den Norske Stats Olijeselskap As v. HeereMac Vof*,
241 F.3d 420 (5th Cir. 2001) ............................................................................29

*Dickson v. Microsoft Corp.*,
309 F.3d 193 (4th Cir. 2002) ............................................................................14

*Doctor's Assocs., Inc. v. Distajo*,
107 F.3d 126 (2d Cir. 1997) ............................................................................18

*In re Ductile Iron Pipe Fittings (DIPF) Direct Purchaser Antitrust
Litig.*,
No. 12–711, 2013 WL 812143 (D.N.J. Mar. 5, 2013) ....................................2, 9

*In re Ductile Iron Pipe Fittings Indirect Purchaser Antitrust Litig.*,
No. 12-169, 2013 WL 5503308 (D.N.J. Oct. 2, 2013).......................................15

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
516 F. Supp. 2d 1072 (N.D. Cal. 2007)..............................................................15

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
No. C 02-1486, C 05-3026, 2006 WL 515629 (N.D. Cal. Mar. 1,
2006) ................................................................................................................30

*Empagran S.A. v. Hoffman-LaRoche, Ltd.*,
417 F.3d 1267 (D.C. Cir. 2005).........................................................................29

*Eurim-Pharm GmbH v. Pfizer Inc.*,
593 F. Supp. 1102 (S.D.N.Y. 1984) ..................................................................31

*Fenerjian v. Nongshim Co., Ltd.*,
No. 13-CV-04115-WHO, 2014 WL 5685562 (N.D. Cal. Nov. 4,
2014) ................................................................................................................28

*In re Flash Memory Antitrust Litig.*,
   No. C 07-0086, 2010 WL 2465329 (N.D. Cal. June 10, 2010)...................21, 22

*Florida Power Corp. v. Granlund*,
   78 F.R.D. 441 (M.D. Fla. 1978) ..........................................................6

*Freedom Holdings. Inc. v. Cuomo*,
   624 F.3d 38 (2d Cir. 2010) ...............................................................13

*Gas-A-Tron of Arizona v. American Oil Co.*,
   1977-2 Trade Cas. (CCH) P 61,789 (D. Ariz. 1977)..........................................6

*General Star Nat'l Ins. Co. v. Administratia Asigurarilor De Stat*,
   289 F. 3d 434 (6th Cir. 2002) ...........................................................19

*Go-Tane Service Stations, Inc. v. Ashland Oil Co.*,
   508 F. Supp. 200 (N.D. Ill. 1981).......................................................5

*Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.*,
   995 F.2d 425 (3d Cir.1993) ............................................................2, 10

*Haas v. Pittsburgh Nat'l Bank*,
   526 F.2d 1083 (3d Cir. 1975) .......................................................24, 25

*Hecht Co. v. Southern Union Co.*,
   474 F. Supp. 1022 (D.N.M. 1979).........................................................6

*Hospital Bldg. Co. v. Trustees of Rex Hosp.*,
   425 U.S. 738 (1976)...................................................................18

*Howard Hess Dental Labs. v. Dentsply Int'l, Inc.*,
   424 F.3d 363 (3rd Cir. 2005) ........................................................3, 4

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1997).............................................................2, 4, 5, 6

*In re IndyMac Mortgage-Backed Securities Litig.*,
   793 F. Supp. 2d 637 (S.D.N.Y. 2011) ....................................................25

*International Association of Machinists v. OPEC*,
   477 F. Supp. 553 (C.D. Cal. 1979) ......................................................15

*In re K-Dur Antitrust Litig.*,
  338 F. Supp. 2d 517 (D.N.J. 2004) ....................................................................2

*Kirleis v. Kickie, McCamey & Chilcote, P.C.*,
  560 F.3d 156 (3d Cir. 2009) ...........................................................................16

*Koken v. Morelli*,
  No. 06-1024, 2007 WL 2990681 (D.N.J. Oct. 10, 2007) ...................................18

*Latino Quimica-Amtex S.A. v. Akzo Nobel Chemicals B.V.*,
  No. 03 Civ. 10312, 2005 WL 2207017 (S.D.N.Y. Sept. 8, 2005).......................30

*In re Linerboard Antitrust Litig.*,
  305 F.3d 145 (3d Cir. 2002) ...................................................................6, 12, 13

*Lotes Co., Ltd. v. Hon Hai Precision Indus. Co.*,
  753 F.3d 395 (2d Cir. 2014) ............................................................................33

*In re Magnesium Oxide Antitrust Litig.*,
  No. CIV. 10-5943 DRD, 2011 WL 5008090 (D.N.J. Oct. 20, 2011) ...............15

*Mannington Mills, Inc. v. Congoleum Corp.*,
  595 F.2d 1287 (3d Cir. 1979) ..........................................................................34

*Mary Anne Pensiero, Inc. v. Lingle*,
  847 F.2d 90 (3d Cir. 1988) ..............................................................................18

*Minn-Chem, Inc. v. Agrium, Inc.*,
  683 F.3d 845 (7th Cir. 2012) ......................................................................28, 33

*MM Global Services, Inc. v. Dow Chemical Co.*,
  No. Civ. 3:02 CV 1107 (AVC), 2005 WL 556577 (D. Conn. Mar.
  18, 2004) .........................................................................................................30

*Newark Branch, N.A.A.C.P. v. Town of Harrison, N.J.*,
  907 F.2d 1408 (3d Cir. 1990) ..........................................................................20

*O.J. Distrib., Inc. v. Hornell Brewing Co.*,
  340 F.3d 345 (6th Cir. 2003) ......................................................................19, 20

*Parker v. Hahnemann Univ. Hosp.*,
No. Civ. 00-4173, 2001 WL 797247 (D.N.J. June 15, 2001)..............................16

*In re Polyester Staple Antitrust Litig.*,
2007-2 Trade Cas. (CCH) P75,809 (W.D.N.C. 2007)..........................................7

*In re Polyurethane Foam Antitrust Litig.*,
No. 1:10 MD 2196, 2014 U.S. Dist. LEXIS 161020 (N.D. Ohio
Nov. 17, 2014) ....................................................................................................6

*Possehl, Inc. v. Shanghai Hia Xing Shipping*,
No. 00 Civ. 5157 (RWS), 2001 U.S. Dist. LEXIS 2169 (S.D.N.Y.
Mar. 7, 2001)......................................................................................................10

*Precision Assocs., Inc. v. Panalpina World Transp., (Holding) Ltd.*,
No. CV-08-42 JG VVP, 2013 WL 6481195 (E.D.N.Y. Sept. 20,
2013) ..................................................................................................................29

*ProFoot, Inc. v. MSD Consumer Care, Inc.*,
No. 11-7079, 2014 WL 5446710 (D.N.J. Oct. 24, 2014) .....................................9

*In re Puerto Rican Cabotage Antitrust Litig.*,
No. 3:08-md-1960, 2010 U.S. Dist. LEXIS 90338 (D.P.R. July 12,
2010) ....................................................................................................................7

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979).............................................................................................5

*Reiter v. Sonotone Corp.*,
486 F. Supp. 115 (D. Minn. 1980).......................................................................6

*San Microsystems Inc. v. Hynix Semiconductor Inc.*,
534 F. Supp. 2d 1101 (N.D. Cal. 2007)..............................................................30

*In re Scrap Metal Antitrust Litig.*,
527 F.3d 517 (6th Cir. 2006) ...............................................................................6

*In re Southeastern Milk Antitrust Litig.*,
No. 2:08-MD-1000, 2011 U.S. Dist. LEXIS 5590 (E.D. Tenn. Jan
19, 2011) ..............................................................................................................6

*Staggers v. Otto Gerdau Co.*,
   359 F.2d 292 (2d Cir. 1966) ................................................................26

*Stoppelman v. Owens*,
   580 F. Supp. 944 (D.D.C. 1983)...........................................................26

*In re Sugar Industry Antitrust Litig.*,
   579 F.2d 13 (3d Cir. 1978) ...............................................5, 11, 12, 13

*Sullivan v. DB Investments, Inc.*,
   667 F.3d 273 (3rd Cir. 2011) .............................................................13

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   No. 3:07-md-10827-SI, Memo Op. (N.D. Cal. Nov. 6, 2012) ............................4

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   No. C 12-0335, 2012 WL 5949585 (N.D. Cal. Nov. 28, 2012) .........................9

*In re Titanium Dioxide Antitrust Litig.*,
   2013-2 Trade Cas. (CCH) P78,527 (D. Md. 2013) .............................................7

*United States v. LSL Biotechnologies*,
   379 F.3d 672 (9th Cir. 2004) ..............................................................33

*In re Uranium Antitrust Litig.*,
   552 F. Supp. 518 (N.D. Ill. 1982) .........................................................5

*Verizon Communications Inc. v. Trinko*,
   540 U.S. 398 (2004).........................................................................15

*Vermont Int'l Petroleum Co. v. Amerada Hess Corp.*,
   492 F. Supp. 429 (N.D.N.Y. 1980)........................................................6

*In re Vitamin C Antitrust Litig.*,
   No. 06-MD-1738 (BMC) (JO), 2012 U.S. Dist. LEXIS 152275
   (E.D.N.Y. Oct. 23, 2012)....................................................................5

*In re Vitamin C Antitrust Litig.*,
   No. 06-MD-1738 (BMC) (JO), 2013 U.S. Dist. LEXIS 169083
   (E.D.N.Y. Nov. 26, 2013).................................................................5, 14

*In re Vitamin C Antitrust Litig.*,
  No. 05-CV-0453, 2013 WL 6191945 (E.D.N.Y. Nov. 26, 2013) .....................37

*In re Vitamin C Antitrust Litig.*,
  810 F. Supp. 2d 522, 525 (E.D.N.Y. 2011) ......................................................37

*In re Vitamins Antitrust Litig.*,
  2002-2 Trade. Cas. (CCH) P73,768 (D.D.C. 2002) ...........................................7

*West Penn Allegheny Healthy System, Inc. v. UPMC*,
  627 F.3d 85 (3d Cir. 2010) .................................................................................9

**Statutes**

15 U.S.C. § 6a ...........................................................................................................27

Clayton Act, Section 4, 15 U.S.C. § 15 ...................................................................13

Clayton Act, Section 16, 15 U.S.C. § 26  ................................................................13

Federal Arbitration Act, 9 U.S.C. § 2 ................................................................15, 16

Foreign Trade Antitrust Improvements Act...............................................27, 29, 30

Fed. R. Civ. P. 15 ...............................................................................................23, 26

Fed. R. Civ. P. 12(b)(6)......................................................................................22, 23

**Other Authorities**

H.R. REP. NO. 97-686, at 13 (1982) .......................................................................30

## PRELIMINARY STATEMENT

Plaintiffs Animal Science Products, Inc. ("Animal Science"), Resco Products, Inc. ("Resco"), and Intersource, Inc. ("Intersource") (collectively, "Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants' motion to dismiss the Second Amended Class Action Complaint (Mov. Br.).

## ARGUMENT

## I.   PLAINTIFFS HAVE SUFFICIENTLY ALLEGED ANTITRUST STANDING.

Plaintiffs' Second Amended Class Action Complaint ("SAC" or "Complaint") alleges three plaintiffs with antitrust standing.  First, Plaintiff Animal Science is alleged an indirect purchaser that accordingly (along with direct purchaser Plaintiffs) has standing under federal law to seek injunctive relief.  (SAC ¶ 10)

Second, Plaintiff Resco purchased magnesite in 2004 directly from a co-conspirator Rongyuan Magnesite Corporation.  (SAC ¶ 11)  Resco also owns Worldwide Refractories, Inc., which in 2004 purchased magnesite directly from another co-conspirator, Yingkou Sanhua Refractory Material Co., Ltd.  (SAC ¶ 12)

Resco also is an assignee of the purchases of Possehl Inc. and Possehl's records of purchases are in the possession of Defendants.  (SAC ¶¶ 13-17)  It is well established that "express assignments of antitrust claims from a direct

1

purchaser to an indirect purchaser are permissible and do not run afoul of *Illinois Brick*'s standing requirements." *In re K-Dur Antitrust Litig*., 338 F. Supp. 2d 517, 539 (D.N.J. 2004) (citing *Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.,* 995 F.2d 425 (3d Cir. 1993)); *accord Cordes & Co. Fin. Svcs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91 (2d Cir. 2007); *see also Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1997).

Third, new Plaintiff Intersource purchased magnesite directly from co-conspirators Haicheng City Xiyang Import and Export Co. and Haicheng Xiyang Refractories Materials Corp. during the class period.  (SAC ¶ 18; Ex. 21)

A.   <u>**Plaintiff Resco is a Direct Purchaser.**</u>

A direct purchaser of a product alleged to be the subject of a conspiracy in violation of Section 1 of the Sherman Act has standing to seek monetary damages for the increase in prices.  *Illinois Brick Co.*, 431 U.S. 720.  Plaintiffs must show they "paid a higher price for goods purchased from the defendant than they would have paid absent the alleged conspiracy." *In re Ductile Iron Pipe Fittings (DIPF) Direct Purchaser Antitrust Litig.*, No. 12–711, 2013 WL 812143, at *7 (D.N.J. Mar. 5, 2013).

One exception to the direct purchaser rule in *Illinois Brick* is where an antitrust violator controls or owns the direct purchaser.  431 U.S. at 749.  There is also an exception to the direct purchaser rule that may permit indirect purchaser

plaintiffs to sue middlemen who are co-conspirators.  *Howard Hess Dental Labs. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 370 (3rd Cir. 2005).  The co-conspirator exception allows an indirect purchaser to sue when the direct purchaser conspires vertically to fix the price paid by the plaintiffs.  *Id.*

1.      **Purchases from Nonparty Co-Conspirators in a Price Fixing Conspiracy Are Direct Purchases.**

In its July 24, 2014 Opinion and Order dismissing the First Amended Complaint ("Order"), this Court has previously stated that co-conspirators must be named as defendants in order to invoke an exception to the direct purchaser rule for co-conspirators.  *Animal Sci. Products, Inc. v. China Minmetals Corp. ("ASP II")*, 34 F. Supp. 3d 465, 462 (D.N.J. 2014).  The Complaint here, however, alleges direct purchases from co-conspirators.  There are two potentially relevant types of co-conspirators that may be alleged here: (1) members of a horizontal conspiracy and (2) members of a vertical conspiracy including sellers in the vertical chain below the upstream conspirators.   Vertical co-conspirators (called "middlemen" by the Supreme Court)—the second category—may be sued by *indirect purchasers* under an exception to the direct purchaser rule.  *Howard Hess Dental Labs*, 424 F.3d at 370.  Under the co-conspirator exception, "an indirect purchaser may bring suit where he establishes a price-fixing conspiracy between the manufacturer and the middleman."  *Delaware Valley Surgical Supply, Inc. v. Johnson & Johnson*,

523 F.3d 1116, 1123 n.1 (9th Cir. 2008).  Here, Plaintiffs allege a horizontal conspiracy.

For the co-conspirator *exception* for *indirect* purchasers, the Third Circuit has required that vertical co-conspirators be named as defendants:  "We have rejected attempts to invoke a co-conspirator exception to *Illinois Brick*'s bar on indirect purchaser standing when plaintiffs have not named the co-conspirators *immediately upstream* as defendants."  *Howard Hess Dental Labs.*, 424 F.3d at 370.  The reason for this is that where there are allegations of a vertical conspiracy, there is a risk of double recovery against the party at the top of the vertical chain, because both the plaintiffs and the downstream members of the vertical chain may claim the rights of direct purchasers.  *Id.*

In the other situation, a horizontal conspiracy such as alleged here, plaintiffs who purchase from conspirators, whether named as defendants or co-conspirators, are *direct* purchasers from the conspiracy; no exception to the direct purchaser rule is at issue.  *In re Coordinated Petroleum Products Antitrust Litig.*, 691 F.2d 1335 (9th Cir. 1982) ("plaintiffs may seek damages from the defendants only as to direct purchases from the defendants, their co-conspirators") (internal quotation marks omitted); *In re Auto Parts Antitrust Litig.*, 29 F. Supp. 3d 982 (E.D. Mich. 2014) (denying motion to dismiss of class of direct purchasers from defendants or co-conspirators); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 3:07-md-10827-SI,

Memo Op. (N.D. Cal. Nov. 6, 2012) (denying in part motion for summary

judgment as to direct purchases from unnamed co-conspirators based on whether

there was sufficient evidence to establish that company was a co-conspirator)[1]; *In*

*re Vitamin C Antitrust Litig.*, No. 06-MD-1738 (BMC) (JO), 2013 U.S. Dist.

LEXIS 169083, at *17-18 (E.D.N.Y. Nov. 26, 2013) (jury verdict for direct

purchasers includes damages for purchasers from horizontal co-conspirators);

*County of Orange v. Sullivan Highway Products, Inc.*, Nos. 88 Civ. 8583 (JFK), 89

Civ. 4218 (JFK), 1989 U.S. Dist. LEXIS 12128, at *6 (S.D.N.Y. Oct. 12, 1989)

("Plaintiffs in this action are direct purchasers from defendants and their co-

conspirators.  Plaintiffs are thus deemed to have suffered the antitrust injury").

     The standing of *direct purchasers* from unnamed defendants to a price fixing

conspiracy was explained in *In re Uranium Antitrust Litig.*, 552 F. Supp. 518, 521-

22 (N.D. Ill. 1982):

> We turn to Gulf's claim that *Illinois Brick* precludes recovery for
> overcharges paid to cartel members not named as defendants. This claim is
> puzzling since Gulf seems to concede that it is liable for overcharges paid to
> its co-conspirators who are named as defendants. Indeed this is the case;
> nothing in *Illinois Brick* precludes liability for overcharges directly paid to
> members of a price-fixing conspiracy.  *See e.g., Blue Shield of Virginia v.*
> *McCready*, 457 U.S. 465, 102 S. Ct. 2540, 2546, 2550-51, 73 L. Ed. 2d 149
> (1982); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 60 L. Ed. 2d 931, 99 S. Ct.
> 2326 (1979); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 52 L. Ed. 2d 707,
> 97 S. Ct. 2061 (1977); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d
> 263, 53 A.L.R. Fed. 768 (2d Cir. 1979), *cert. denied*, 444 U.S. 1093, 62 L.

---

[1] Declaration of Robert A. Magnanini ("Magnanini Decl."), dated February 27,
2015, Ex. A.

Ed. 2d 783, 100 S. Ct. 1061 (1980); *In re Sugar Industry Antitrust Litig.*, 579 F.2d 13 (3d Cir. 1978); *Chatham Brass Co. v. Honeywell, Inc.*, 512 F. Supp. 108, 116 (S.D.N.Y. 1981); *Go-Tane Service Stations, Inc. v. Ashland Oil Co.*, 508 F. Supp. 200 (N.D. Ill. 1981); *In re Coordinated Pretrial Proceedings in Petroleum Antitrust Litig.*, 497 F. Supp. 218, 225-26 (C.D. Cal. 1980); *Vermont International Petroleum Co. v. Amerada Hess Corp.*, 492 F. Supp. 429, 438-39 (N.D.N.Y. 1980); *Reiter v. Sonotone Corp.*, 486 F. Supp. 115, 119-20 (D. Minn. 1980); *Dart Drug Co. v. Corning Glass Works*, 480 F. Supp. 1091, 1101 (D. Md. 1979); *Hecht Co. v. Southern Union Co.*, 474 F. Supp. 1022, 1027-28 (D.N.M. 1979); *Florida Power Corp. v. Granlund*, 78 F.R.D. 441, 443-44 (M.D. Fla. 1978); *Gas-A-Tron of Arizona v. American Oil Co.*, 1977-2 Trade Cas. (CCH) P 61,789 (D. Ariz. 1977). Apparently, Gulf attaches some significance to whether the overcharge was paid to a cartel member who is not named as a defendant, arguing that *Illinois Brick* permits recovery for overcharges paid to conspiring defendants but not to conspiring non-defendants. However, Gulf never explains why anything should turn on this distinction, and cites no authority for the distinction. None of the policies underlying *Illinois Brick* are affected by whether or not the overcharge is paid to a named defendant or a non-defendant co-conspirator. To the contrary, it has long been the law that an antitrust defendant is jointly and severally liable for the acts of its co-conspirators.

No exception to the direct purchaser rule is thus at issue in this case where direct purchases are alleged from co-conspirators in a horizontal cartel. The universal rule is that direct purchasers from co-conspirators in a cartel may recover damages for those purchases (and there is no record of any defendant since *Illinois Brick* contesting that rule).[2]  *See, e.g.*, *In re Linerboard Antitrust Litig.* 305 F.3d

---

[2] *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir. 2006) (affirming antitrust class action for direct purchasers from "defendants and/or their co-conspirators"); *In re Polyurethane Foam Antitrust Litig.* No. 1:10 MD 2196, 2014 U.S. Dist. LEXIS 161020 (N.D. Ohio Nov. 17, 2014) (certifying class of direct purchasers from "defendants and/or their co-conspirators"); *In re Cathode Ray Tube Antitrust Litig.*, No. 192013, U.S. Dist. LEXIS 137945 (N.D. Cal. June 20,

145, 148-49 (3d Cir. 2002) (affirming grant of class certification for two classes, one class of direct purchasers of corrugated containers from defendants and another class for direct purchasers of corrugated sheets in the United States from anyone, but excluding defendants and co-conspirators).

Where plaintiffs are direct purchasers from a horizontal cartel, there is no risk of double recovery—and there is no apportionment of damages  because all conspirators are jointly and severally liable for all damages to the direct victims of the conspiracy.  In addition, in a price fixing case, "co-conspirators are not necessary parties in an action against a single conspirator."  *In re Cotton Yard Antitrust Litig.*, 505 F.3d  274, 285 (4th Cir. 2007).  A new rule requiring co-conspirators to be named as defendants in a horizontal cartel case would damage cartel enforcement for direct purchases from co-conspirators who are outside the reach of the Court, who settle their claims, who are bankrupt,[3] who are parties to

---

2013); *In re Vitamin C Antitrust Litig.*, No. 06-MD-1738 (BMC) (JO), 2012 U.S. Dist. LEXIS 152275 (E.D.N.Y. Oct. 23, 2012) (certifying class of direct purchasers from defendants or co-conspirators); *In re Southeastern Milk Antitrust Litig.,* No. 2:08-MD-1000, 2011 U.S. Dist. LEXIS 5590 (E.D. Tenn. Jan 19, 2011) (same); *In re Puerto Rican Cabotage Antitrust Litig.*, No. 3:08-md-1960, 2010 U.S. Dist. LEXIS 90338 (D.P.R. July 12, 2010) (same); *In re Polyester Staple Antitrust Litig.*, 2007-2 Trade Cas. (CCH) P75,809 (W.D.N.C. 2007) (same); *In re Carbon Black Antitrust Litig.*, No. 03-10191-DPW, 2005 U.S. Dist. LEXIS 660 (D. Mass. Jan. 18, 2005) (same); *In re Vitamins Antitrust Litig.*, 2002-2 Trade. Cas. (CCH) P73,768 (D.D.C. 2002) (same).
[3] *E.g.*, *In re Titanium Dioxide Antitrust Litig.*, 2013-2 Trade Cas. (CCH) P78,527, at *6 n.3 (D. Md. 2013) (approving class notice for direct purchaser class and noting bankrupt co-conspirator).

arbitration clauses, or for whom the additional cost of litigation (such as Hague

Convention service in China) does not make sense.

>     **2.     The Complaint Adequately Alleges Participation of Co-
>             Conspirators.**

Defendants' argument that the Complaint makes a bare allegation that the

Chinese magnesite exporters named as co-conspirators are part of the conspiracy

wholly ignores the conspiracy alleged and the substantial exhibits attached to the

Complaint.  No price fixing complaint against a cartel has previously been required

to provide the amount of documentation of the existence of a conspiracy as has

been required in this case, but the Complaint and that documentation that has been

provided strongly supports the allegations of the scope of the conspiracy in this

case.

The Complaint alleges that Defendants and the co-conspirators are members

of a price fixing cartel that is ongoing.  (SAC  ¶¶ 24-25)  The Complaint alleges

many details about the cartel, including dates of meetings and agreements reached.

Defendants cite no case that requires more than this.  Co-conspirators Haicheng

City Xiyang Import and Export Co. and Haicheng Xiyang Refractories Materials

Corp. are specifically alleged to be wholly-owned subsidiaries of Defendant the

Xiyang Group (SAC ¶ 19), which was a founding member of the conspiracy.

(SAC ¶¶ 65-71; Ex. 13)  (Even if they were not co-conspirators, purchases from

these companies would be subject to the ownership and control exception to the

direct purchaser rule.)  Numerous Yingkou entities are also named in the cartel.

(SAC Ex. 16)

### 3.    Resco is Entitled to Discovery of Possehl US Purchases.

Plaintiff Resco has properly alleged that Possehl Inc. was a direct purchaser

who has assigned its clams to Resco.  Possehl U.S. is no longer in existence and

Plaintiff has not been permitted to take discovery from Defendants or third parties

to show its purchases.  The requirement of antitrust standing "does not impose a

probability requirement at the pleading stage, but instead simply calls for enough

facts to raise a reasonable expectation that discovery will reveal evidence of the

necessary element."  *West Penn Allegheny Healthy System, Inc. v. UPMC*, 627

F.3d 85, 98 (3d Cir. 2010) (internal quotation marks omitted); *see also ProFoot,*

*Inc. v. MSD Consumer Care, Inc.*, No. 11-7079, 2014 WL 5446710, at *1 (D.N.J.

Oct. 24, 2014).[4]

Defendants argue that the allegations are nonetheless insufficient to justify

the limited discovery requested.  Plaintiffs have alleged, however, a basis for

discovery of information not otherwise available to it due to Possehl Inc.'s records

not being available to Resco.  Further, U.S. Customs information documents sales

---

[4] *See also In re Ductile Iron Pipe Fittings Direct Purchaser Antitrust Litig.*, 2013
WL 812143, at *6-8 (complaint sufficient where it alleged plaintiffs made direct
purchases and paid higher prices); *In re Dairy Farmers of Am., Inc. Cheese
Antitrust Litig.*, NO. 09 CR 3690, 2013 WL 4506000, at *7 (N.D. Ill. Aug. 23,
2013) (same); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 12-0335, 2012
WL 5949585, at *3 (N.D. Cal. Nov. 28, 2012) (same).

of magnesite directly to Possehl Inc. in the United States in 2004 and 2005 by Defendants.  Dkt. No. 155-2.  Possehl Inc. is also historically recognized as an importer of magnesite from China.  *Possehl, Inc. v. Shanghai Hia Xing Shipping*, No. 00 Civ. 5157 (RWS), 2001 U.S. Dist. LEXIS 2169 (S.D.N.Y. Mar. 7, 2001) (dispute with cargo company for magnesite).

Defendants argue, relying on *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 184 (3d Cir. 1997), that Resco's assignor does not have antitrust standing because it merely brokered the magnesite purchased by Resco from Defendants.  But Resco alleges that Possehl, Inc. purchased magnesite directly from Defendants and shipped those products to Resco.  If Resco's assignor is not the direct purchaser for those sales, but a middleman without antitrust standing, as Defendants argue, then Resco is the direct purchaser.  In either event, Resco has antitrust standing as either a direct purchaser or as an assignee of a direct purchaser.

In addition, the assignment agreement between Possehl, Inc. and Resco specifically states that it assigns "all causes of action" relating to magnesite overcharges and does not need to specifically reference antitrust claims.  Dkt. No. 37-17.  Defendants' reliance on *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 440 (3d Cir. 1993), is misplaced because the court

specifically determined that the assignment did not include all related causes of action.  *Id.*

**B.    Plaintiff Intersource is a Direct Purchaser.**

Defendants argue that Intersource purchased magnesia bricks that are different products from those alleged in the Complaint.  Magnesia bricks, however, are made of magnesite.  (SAC Ex. 21)  The Complaint does not define the products at issue based on the form, such as a brick, and instead alleges price fixing of magnesite and "magnesite products."  (SAC ¶¶ 1, 39)  The Exhibits to the Complaint show that magnesite bricks are a major form of magnesite products sold by Defendants.  (SAC Ex. 20 at 14)  Defendants by their argument thus seek to rewrite the Complaint.

Even if magnesite bricks were not the price-fixed product itself, if a Plaintiff purchases a finished product containing a price-fixed component directly from a Defendant or one of the Defendants' related or affiliated entities, that Plaintiff has standing as a direct purchaser to bring a claim under the federal antitrust laws.  It is the law of this Circuit that fixing the price of an item that was incorporated into the item purchased by the plaintiff makes that plaintiff the direct purchaser of the product.  *See In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13 (3d Cir. 1978).

The defendants in *Sugar* had allegedly conspired to fix the price of refined sugar.  *Id.*  One of the plaintiffs had not purchased any refined sugar, but rather had

directly purchased from a subsidiary of one of the defendants and a division of another of the defendants hard candy made from refined sugar. *Id.* at 15. In *Sugar*, there was no allegation that the defendants had fixed the price of the finished product (hard candy). Rather, the plaintiff alleged that it had purchased the finished product containing the price-fixed component directly from one of the defendants. In vacating the district court's grant of summary judgment to defendants, the Third Circuit stated:

> As the defendants here point out, the product which plaintiff purchased competes not with sugar, but with other candy, and more than one ingredient determines the price. To this extent, there will be some additional complications underlying the damage claims. However, this **must not be allowed to obscure the fact that the plaintiff did purchase directly from the alleged violator.** True, the price-fixed commodity had been combined with other ingredients to form a different product. But just as the sugar sweetened the candy, the price-fixing enhanced the profits of the candy manufacturers.

*Id.* at 17-18 (emphasis added).

Likewise, in *In re Linerboard Antitrust Litig.*, 305 F.3d at 159-60, the plaintiff classes included finished product purchasers of corrugated sheets or boxes that incorporated linerboard, the product subject to alleged output restrictions. *Id.* at 159. As in *Sugar*, there was no allegation that the defendants had fixed the price of the finished product (corrugated sheets and boxes), but merely that the plaintiff had purchased the finished product containing the price-fixed component

(linerboard) directly from one of the defendants.  Similar to the decision in *Sugar*,

the Third Circuit held:

> the putative class plaintiffs purchased corrugated sheets or boxes directly from Appellants, and, like the candy in *In re Sugar*, which contained allegedly price-fixed sugar, the corrugated sheets and boxes contain linerboard that was subject to an agreement on output, which is equivalent to a price-fixing agreement. Accordingly, the putative class members are direct purchasers and are entitled to recover the full amount of any overcharge.

*Id.* at 159-60.

## C.    Plaintiffs Have Standing to Seek Injunctive Relief.

"[I]n order to seek injunctive relief under §16, a private plaintiff must allege

threatened loss or damage of the type the antitrust laws were designed to prevent

and that flows from that which makes Defendants' acts unlawful."  *Cargill, Inc. v.*

*Monfort of Colorado, Inc.*, 479 U.S. 104, 113 (1986) (internal quotation marks

omitted).  "Section 16 has been applied more expansively [than Section 4 of the

Clayton Act], both because its language is less restrictive than that of §4 and

because the injunctive remedy is a more flexible and adaptable tool for enforcing

the antitrust laws than the damage remedy."  *Sullivan v. DB Investments, Inc.*, 667

F.3d 273, 316 (3rd Cir. 2011).

Indirect purchasers under these standards have antitrust standing to seek

injunctive relief.  *Cargill Inc.,* 479 U.S. at 111-12 (indirect purchasers have

standing under Section 16 of the Clayton Act); *Freedom Holdings. Inc. v. Cuomo*,

13

624 F.3d 38, 52 n.14 (2d Cir. 2010) (same); *Dickson v. Microsoft Corp.,* 309 F.3d

193, 214 n.24 (4th Cir.  2002).  The Eastern District of New York recently granted

precisely such relief following a jury trial in *In re Vitamin C Antitrust Litig.*, 2013

U.S. Dist. LEXIS 169083, at *20 (E.D.N.Y. Nov. 26, 2013).

    Defendants argue that Plaintiff Animal Science Products is not an indirect

purchaser.  But Defendants also argue that Plaintiffs Resco and Intersource are

indirect purchasers.  Whether Resco or Intersource are direct or indirect

purchasers, they have standing to seek injunctive relief and this action must

proceed.

    Without any factual record, Defendants argue that Animal Science Products

is not an indirect purchaser.  The Complaint alleges that producers from China

dominate sale of magnesite in the United States.  (SAC ¶ 55)  In addition to

alleging that Animal Science Products is an indirect purchaser, the exhibits to the

Complaint establish that purchasers of animal feed such as Animal Science are a

major sector of end users of magnesite.  (SAC Ex. 3 at 48.2; Ex. 19 at 46.1)   No

court has required more specificity than this at the pleading stage.

    This case has been pending since 2005.  Not surprisingly, in the absence of

discovery, since the filing of this case, public information about the conduct of this

cartel has disappeared.  Thus it is ironic that Defendants contend that injunctive

relief may not be ordered because there are no specific allegations of what the

cartel is up to in 2014.  In the absence of injunctive relief, there is no reasonable

prospect of enforcement of the antitrust laws against this cartel, what the Supreme

Court has called "supreme evil of antitrust."  *Verizon Communications Inc. v.*

*Trinko*, 540 U.S. 398, 408 (2004).[5]

## II.   PLAINTIFFS ARE NOT REQUIRED TO ARBITRATE THEIR CLAIMS IN CHINA.

### A.   Defendants Have Not Met Their Burden of Establishing an Agreement to Arbitrate.

The Federal Arbitration Act ("FAA") requires "[a] written provision . . . in a

contract evidencing a transaction . . . to settle by arbitration a controversy

---

[5]      Defendants rely on *In re Ductile Iron Pipe Fittings Indirect Purchaser Antitrust Litig.*, No. 12-169, 2013 WL 5503308 (D.N.J. Oct. 2, 2013).  There the court also found relevant to dismissal that the parties had entered into consent decrees, because courts generally find no risk of irreparable injury when there is a similar existing consent decree.  The court also later dismissed the indirect purchaser claims for failure to allege individual injury, because plaintiffs did not clearly show they purchased affected products during the conspiracy. The latter analysis, however, was in the context of antitrust standing under Indiana state law. *Id.* at *7.

Defendants also rely on *In re Magnesium Oxide Antitrust Litig.*, No. CIV. 10-5943 DRD, 2011 WL 5008090 (D.N.J. Oct. 20, 2011).  This case is not applicable if Animal Science purchased products containing more than trace amounts of magnesite, specifically, more than at least 4%.  The court does note that a small percentage is not fatal, however, if there is a showing that a price increase in that ingredient has a "significant foreseeable effect" on the price of the purchased product.  Id. at *7.  *In re Dynamic Random Access Memory Antitrust Litig.*, 516 F. Supp. 2d 1072 (N.D. Cal. 2007), is case under California state law using the factors applying the standards for antitrust standing for damages and not injunctive relief.  In *International Association of Machinists v. OPEC,* 477 F. Supp. 553 (C.D. Cal. 1979)**,** the Court relied on multiple causes of gasoline price increases (regulations, increase in demand, etc.) other than a conspiracy to show that plaintiff failed to establish proximate cause.

thereafter arising out of such contract or transaction . . . ." 9 U.S.C. § 2.  It is fundamental that "a party cannot be required to submit to arbitration any disputes which he has not agreed to submit." *AT&T Techs., Inc. v. Commc'ns. Workers of Am.*, 475 U.S. 643, 648-49 (1986).  To satisfy the FAA, it is the defendant's burden to prove the existence of a valid, enforceable arbitration agreement. *See Parker v. Hahnemann Univ. Hosp.*, No. Civ. 00-4173, 2001 WL 797247, at *5 (D.N.J. June 15, 2001).  In determining whether the defendant has met this burden, the plaintiff "is entitled to 'the benefit of all reasonable doubts and inferences that may arise.'" *Kirleis v. Kickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 159 (3d Cir. 2009).  The FAA's "presumption in favor of arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties." *Id*. at 159.

Defendants have not met their burden of establishing that Plaintiffs or their assignors have agreed in writing to arbitrate disputes arising out of the specific sales that were affected by Defendants' cartel.  Nowhere in their Motion to Dismiss do Defendants even allege that such arbitration agreements exist.  Instead, Defendants make two unavailing arguments.

First, Defendants argue that it is "industry custom and practice" to include mandatory arbitration clauses in Chinese sales contracts.  (Mov. Br. at 14) Defendants cite no authority to support the argument that evidence of industry

16

custom and practice satisfies the requirement of demonstrating a written agreement to arbitrate the claims at issue.  Moreover, Defendants fail to show that such an industry custom and practice exists.  Although Defendants cite to a few sales contracts that they produced in prior motion practice (Mov. Br. at 14 (citing Dkt. Nos. 37, 53, 59, 133, 137, 140, 142)), they offer no allegations or evidence that these contracts are representative of sales contracts in the industry.  Additionally, although Defendants allegedly possess evidence that Possehl (HK) has agreed to arbitrate its claims in China (Mov. Br. at 15 (citing Dkt. Nos. 137 at 4; 35-6; 35-9)), this evidence is immaterial.  As this Court recognized, it is improper for Defendants to assume that Possehl (US) and Possehl (HK) "are fungible entities, or that one acted 'through' the other." *ASP II Order*, 34 F. Supp. 3d at 514.

Second, Defendants improperly try to shift the burden on Plaintiffs to prove the non-existence of an arbitration agreement.  Defendants note that the Court instructed Plaintiffs, in its June 24, 2014 decision, to "identify the relevant contracts and state whether such contracts contain arbitration clauses" in amending their Complaint. *Id.* at 517.  Plaintiffs addressed this instruction by stating in their SAC that they have made "diligent efforts" to locate such contracts, and that any such evidence "is in the hands of the Defendants."  (SAC ¶ 16)

Defendants are the most likely source of information about their export activities and sales to the United States.  "In antitrust cases, where 'the proof is

largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 74 (1976) (internal citations omitted); *see also Mary Anne Pensiero, Inc. v. Lingle*, 847 F.2d 90, 105 (3d Cir. 1988) ("Proving a conspiracy is usually difficult and often impossible without resort to discovery procedures").  Indeed, Defendants have demonstrated their possession of this type of information by producing sales contracts with Possehl (HK).  Dkt Nos. 137 at 4; 35-6; 25-9.  Although the Court views these contracts as "a suggestive demonstration that certain related agreements did contain such clauses" (*ASP II Order*, 34 F. Supp. 3d at 475), a suggestive demonstration is insufficient to defeat Plaintiffs' claims at this stage.

**B.   Defendants Waived Any Right to Demand Arbitration.**

Even assuming that the parties' contracts contained valid arbitration clauses, Defendants have waived their right to seek arbitration.  "It is well settled that a party can waive its contractual right to arbitration like any other contractual provision."  *Koken v. Morelli*, No. 06-1024, 2007 WL 2990681, at *2 (D.N.J. Oct. 10, 2007) (citing *Ehleiter v. Grapetree Stores, Inc.*, 482 F.3d 207 (3d Cir. 2007)).  A party may waive that right by delaying its assertion to such an extent that the opposing party incurs actual prejudice.  *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 131 (2d Cir. 1997) (recognizing that a party waives the right to arbitrate

where it delays the invocation of that right to the extent that the opposing party incurs "unnecessary delay or expense"); *see also O.J. Distrib., Inc. v. Hornell Brewing Co.*, 340 F.3d 345, 356-57 (6th Cir. 2003) ("[B]oth this Court and our sister circuits have been willing to find under appropriate circumstances that a party has waived its right to arbitrate by virtue of its actions in delaying the right to the point of prejudicing the other party").

Here, Plaintiffs filed their original complaint on September 7, 2005.  It is undisputed that Defendants had notice of this action by February 2006 at the latest, when they reportedly met with U.S. attorneys.  Dkt. No. 53-1.  Defendants waited until February 5, 2008—more than 24 months after receiving notice—to file a Motion to Compel Arbitration, and made that motion only after a default judgment had been entered against them.  During that time, Defendants' unlawful conspiracy continued unabated; U.S. businesses continued to pay supra-competitive prices for magnesite and magnesite products; and Plaintiffs continued to incur the significant costs of litigation.  In this regard, Plaintiffs have been prejudiced by Defendants' delay in seeking arbitration.  Under these circumstances, Defendants have waived their right to arbitration.  *See General Star Nat'l Ins. Co. v. Administratia Asigurarilor De Stat*, 289 F. 3d 434, 438 (6th Cir. 2002) (defendant waived its right to arbitrate where it waited 17 months to respond to the complaint and responded only after the court entered a default judgment against it); *see also O.J.*

*Distrib., Inc.*, 340 F.3d at 358; *AT&T Corp. v. Innocom Telecom LLC*, No. C-06-05400 EDL, 2007 WL 163193, at *4 (N.D. Cal. Jan. 17, 2007).

## III.   THE ADDITION OF INTERSOURCE AS A NAMED PLAINTIFF IS PERMISSIBLE.

In its July 24, 2014 Order, this Court granted Plaintiffs leave to file a Second Amended Class Action Complaint to "plead facts sufficient to establish standing," including facts "not … supported by evidence produced in discovery."  *ASP II Order*, 34 F. Supp. 3d at 516.  Despite this directive, Defendants contest the addition of a plaintiff as outside the scope of the Court's Order.

Defendants' argument are without merit.  As this Court stated, "[t]he Third Circuit has adopted a particularly liberal approach in favor of permitting pleading amendments to ensure that 'a particular claim will be decided on the merits rather than on technicalities.'"  *Id.* at 515 (citing *Dole v. Arco Chem. Co.*, 921 F.2d 484, 487 (3d Cir. 1990)).  Moreover, Third Circuit case law clearly refutes Defendants' argument that Intersource's claim is barred by the statute of limitations.[6]

---

[6] Defendants also argue that, were Resco to have filed a motion to amend its FAC to add a new plaintiff,  Resco's lack of standing would have deprived the Court of subject matter jurisdiction to entertain such a motion.  (Mov. Br. at 17-18)  This is a hypothetical argument.  Resco did not file a motion to amend because the Court granted Resco the opportunity to file an amended complaint to cure its alleged standing deficiencies.  In any event, the Third Circuit has held that a district court, after dismissing a complaint for lack of standing, retains power to exercise its discretion as to whether the plaintiff should be granted leave to amend its complaint.  *Newark Branch, N.A.A.C.P. v. Town of Harrison, N.J.*, 907 F.2d 1408,

**A.**    **There Was No Undue Delay in Adding Intersource as a Named Plaintiff.**

Defendants claim that Intersource should have been named as a Plaintiff earlier because "Resco has been on notice of its deficient standing at least since its standing was challenged initially by Defendants on February 5, 2008," and "there is no justification for the undue delay of nearly seven years in trying to address this deficiency." (Mov. Br. at 16)  This is a mischaracterization of the procedural history of this case.  As the Court stated in its Order:

> The current complaint is technically an amended complaint. The standing issue, however, came to light in stages, apparently in connection with Resco's disclosure of Possehl (US)'s assignment in its Motion for Default Judgment and Defendants' Motion to Compel Arbitration. At any rate, the first amendment of the original complaint did not occur in response to any court ruling with respect to standing, and standing has not been squarely addressed by any prior motion to dismiss. In that limited sense, for purposes of the standing issue and *Alston*, this Amended Complaint is comparable to an initial pleading.

*ASP II Order*, 34 F. Supp. 3d at 516.  Thus, although this case has been ongoing for several years, the standing issue was not "squarely addressed" until July 24, 2014, when the Court issued its opinion dismissing the FAC.  The SAC, therefore, was Plaintiffs' first opportunity to correct any deficiencies in standing.

In this regard, Defendants' reliance on *In re Flash Memory Antitrust Litig.*, No. C 07-0086, 2010 WL 2465329, at *5 (N.D. Cal. June 10, 2010), is improper. In *Flash Memory*, there was "no dispute between the parties that [Plaintiff]—the

---

1417 (3d Cir. 1990) (holding that the district court abused its discretion in refusing to permit the plaintiff to amend its complaint after dismissal for lack of standing).

only plaintiff named as a class representative in the Consolidated Complaint—was never a direct purchaser of any [of the defendant's products]." *Id.* at *3 (citing plaintiff's deposition testimony, in which plaintiff stated, "Have I personally purchased anything from these companies? Personally, no.")  The court concluded that plaintiff's counsel should have ascertained the standing deficiencies prior to even filing the action. *Id.* at *5.  Nevertheless, the plaintiff waited two and a half years after commencing suit before seeking leave to join new class representatives. *Id.*

Here, there was no determination of Plaintiffs' standing deficiencies until the Court issued its July 24 Order.  In any event, the Court specifically granted Plaintiffs the right to amend the complaint to address standing deficiencies and, therefore, already determined that addressing these issues now would not constitute "undue delay."

**B.**   **Adding Intersource as a Named Plaintiff Is Not Futile.**

"[W]here a complaint is dismissed on Rule 12(b)(6) grounds 'a District Court *must* permit a curative amendment unless an amendment would be inequitable or futile.'"  *Id.* (citing *Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004)).  Defendants have failed to offer any evidence that the amendments to the FAC are "inequitable or futile."  As set forth in Section I(B) above and as alleged in the SAC, Intersource was a direct purchaser of magnesite during the relevant

time period of the conspiracy.  As a result of the conspiracy, Intersource has

suffered damages.  For those reasons, Intersource has standing to bring its claims

and adding it as a named plaintiff is therefore not futile.

**C.**     **Intersource's Claim is Not Barred by the Statute of Limitations.**

Defendants argue that even if Intersource were permitted to be added as a

plaintiff, its claim would be barred by the Sherman Act's four year statute of

limitations.  (Mov. Br. at 18)  Under both Rule 15 of the Federal Rules of Civil

Procedure and *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974),

however, Intersource's claims are timely.  Moreover, the Third Circuit has held

that the question of "whether a particular party is eligible for equitable tolling

generally requires consideration of evidence beyond the pleadings," and is,

therefore, "not generally amenable to resolution on a Rule 12(b)(6) motion."  *In re*

*Cmty. Bank of N. Virginia*, 622 F.3d 275, 301-02 (3d Cir. 2010) (citing *Huynh v.*

*Chase Manhattan Bank*, 465 F.3d 992, 1003-04 (9th Cir. 2006); *Reiser v.*

*Residential Funding Corp.*, 380 F.3d 1027, 1030 (7th Cir. 2004)).

First, the *American Pipe* tolling doctrine provides that "the commencement

of the original class suit tolls the running of the statute for all purported members

of the class."  *See* 414 U.S. at 553.  Under *American Pipe*, therefore, the filing of

Resco's original complaint tolled the statute of limitations with respect to

Intersource's claims.  Both this Court and the Third Circuit have explicitly held

23

that the *American Pipe* tolling doctrine applies even where the original plaintiff

lacked standing.  *See Haas v. Pittsburgh Nat. Bank*, 526 F.2d 1083 (3d Cir. 1975).

In *Haas*, the plaintiff sought to bring a class action against several banks on

behalf of a class of credit card holders.   The district court held that the plaintiff

lacked standing because she did not hold a card issued by Equibank, one of the

defendants.  *Id.* at 1086.  To cure her standing deficiencies, the plaintiff amended

her complaint to add a nominal plaintiff who held an Equibank credit card.  *Id.*

The Third Circuit held that the commencement of the original action "tolled the

statute of limitations as to all asserted members of the class who would have been

parties had the suit been permitted to continue as a class action," and that "[t]he

addition of [the new plaintiff], therefore, relates back to the initial filing of the

complaint[.]"  *Id.* at 1098.  The court reasoned:

> Although the Court in *American Pipe* dealt with a situation where the
> basis for the district court's rejection of the class action was the failure
> to satisfy the numerosity requirement of Rule 23, we believe the broad
> tolling principle it enunciated should also apply to the instant case
> where the district court determined after its original certification of the
> class action that [plaintiff] could not represent cardholders at
> Equibank since she did not hold a card issued by it.  [Plaintiff]'s
> timely action . . . provided Equibank with notice within the statutory
> period of the substantial nature of the claims against which they
> would be required to defend and also 'the number and generic
> identifies of the potential plaintiffs.'

*Id.* at 1097.

Pursuant to the Third Circuit's decision in *Haas*, this Court explicitly rejected the notion that "if the original plaintiffs lacked standing to bring their claims in the first place, the filing of a class action does not toll the statute of limitations for other members of the purported class." *California Pub. Employees' Ret. Sys. v. Chubb Corp.,* No. CIV. NO. 00-4285-GEB, 2002 WL 33934282, at *29 (D.N.J. June 26, 2002).  The Court stated that, "[i]n light of *Hass*, it is clear that such a generalized rejection of *American Pipe* in the standing context is not the law in this circuit."  *Id.*  Indeed, "[s]everal courts have held that *American Pipe* is appropriately applied to motions to intervene or amended complaints filed to substitute a proper class representative with standing prior to a decision."  *Id.* (citing *Bromley v. Michigan Educ. Ass'n*, 178 F.R.D. 148 (E.D. Mich. 1998); *Lawrence v. Philip Morris Cos., Inc.*, 1999 WL 51845, at *3 (E.D.N.Y. Jan. 9, 1997); *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193 (S.D.N.Y. 1992)); *see also In re IndyMac Mortgage-Backed Securities Litig.*, 793 F. Supp. 2d 637 (S.D.N.Y. 2011).

Accordingly, the fact that Resco's claims were dismissed for lack of standing does not affect the application of *American Pipe* tolling to Intersource's claims.  Moreover, tolling the statute of limitations would not surprise Defendants or force them to defend against stale claims because Resco's original complaint notified them of the same claims that Intersource now seeks to assert.  Defendants

were, therefore, apprised "[w]ithin the period set by the statute of limitations . . . [of] the essential information necessary to determine both the subject matter and the size of the prospective litigation." *American Pipe*, 414 U.S. at 555.

Second, Federal Rule of Civil Procedure 15(c)(1) provides that "[a]n amendment to a pleading relates back to the date of the original pleading" when either of the following is true:  (1) "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading" (Fed. R. Civ. P. 15(c)(1)(B)); or (2) "the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied" (Fed R. Civ. P. 15(c)(1)(C)).  Although Rule 15(c)(1)(C), "on its face, only addresses 'changing the party against whom a claim is asserted,' it is clear that the rule is applicable to amendments substituting or changing plaintiffs as well." *Stoppelman v. Owens*, 580 F. Supp. 944, 946 (D.D.C. 1983); *see also Staggers v. Otto Gerdau Co.*, 359 F.2d 292, 297 (2d Cir. 1966) ("No matter who the plaintiffs are, the 'transactions' with which we are concerned are those . . . set forth in the 'original pleading.' There is no meaningful statute of limitations problem here; the claims of all potential plaintiffs relate back to the date of the original pleading.").  Accordingly, pursuant to Rule 15(c)(1), a plaintiff may amend its complaint to substitute or add a plaintiff so long as the amendment asserts a claim that arose out of the same conduct, transaction, or occurrence set

out in the original complaint.  Here, Intersource's claims arise out of the same price-fixing conspiracy that formed the basis of Resco's FAC and, therefore, relate back to the date of Resco's original complaint.

## IV. THE SECOND AMENDED COMPLAINT SATISFIES THE ELEMENTS OF THE FTAIA.

The Foreign Trade Antitrust Improvements Act ("FTAIA") provides that the Sherman Act "shall not apply to conduct involving trade or commerce . . . with foreign nations," unless one of two exceptions apply.  15 U.S.C. § 6a.  First, the Sherman Act applies where the defendant's conduct involves "import trade or import commerce."  *Id.*  Second, the Sherman Act applies where (1) the defendant's conduct has a "direct, substantial, and reasonably foreseeable effect" on United States commerce, and (2) "such effect gives rise to a claim" under the Sherman Act.  *Id.*  The allegations in the SAC are sufficient to satisfy both the "import" and "export" exceptions to the FTAIA.

### A. The SAC Satisfies the "Import Exception".

A plaintiff satisfies the import exception if it demonstrates that "defendants' alleged anticompetitive behavior 'was directed at an import market.'"  *Animal Science Products, Inc. v. China Minmetals Corp*., 654 F.3d 462, 470 (3d Cir. 2011).  The Third Circuit has instructed in this very case that when considering the import exception, the court should "give weight to any well-pled allegations that

the defendants . . . made direct sales of magnesite for delivery in the United States during the time period of the alleged conspiracy." *Id.* at 471.

The Complaint contains ample facts that Defendants made direct sales of magnesite for delivery in the United States during the relevant time period.  First, the Complaint alleges that Defendants  contracted for products to be shipped directly to the United States.  (SAC ¶¶ 20-21, 23, 27, 28, 30-33, 35)  Second, the Complaint alleges a course of conduct wherein Defendants fixed the price of products sold in the United States.  (SAC ¶¶ 60-79)  Third, the Complaint alleges that Defendants are the dominant players in a market where import statistics show over $100 million in imports each year.  (SAC ¶¶ 55, 57)  Finally, publicly available import records establish that Defendants made substantial sales of magnesite to United States companies for delivery to the United States.  (SAC ¶ 56)  Under similar circumstances, courts have held that foreign defendants' conduct satisfies the import exception.  *See, e.g.*, *Minn-Chem, Inc. v. Agrium, Inc*., 683 F.3d 845, 858-59 (7th Cir. 2012) (plaintiffs satisfied the import exception by alleging that (i) defendants controlled a large share of the world market in potash, (ii) U.S. is one of the two largest consumers of potash in the world, (iii) approximately 85% of U.S. potash comes from overseas, and (iv) during the relevant time period the price of potash in the U.S. increased six-fold); *Fenerjian v. Nongshim Co., Ltd.*, No. 13-CV-04115-WHO, 2014 WL 5685562, at *15 (N.D.

Cal. Nov. 4, 2014) (plaintiffs satisfied the import exception by alleging that

"Korean Defendants manufactured Korean Noodles in Korea, imported the noodles

into the United States, and sold them to plaintiffs in the United States.").

**B.**     **The SAC Satisfies the "Effects Exception".**

    **1.**     **Plaintiffs Allege Direct, Substantial and Reasonably Foreseeable
Effect on U.S. Commerce.**

Courts unanimously hold that an allegation that a price-fixing conspiracy

caused U.S. companies to pay supra-competitive prices in the U.S. satisfies the

"direct, substantial and reasonably foreseeable effect" test under the FTAIA. *See,*

*e.g.*, *Empagran S.A. v. Hoffman-LaRoche, Ltd.*, 417 F.3d 1267, 1271 (D.C. Cir.

2005) (allegations of conspiracy increasing prices satisfies effect test of FTAIA);

*Den Norske Stats Olijeselskap As v. HeereMac Vof*, 241 F.3d 420, 426-27 (5th Cir.

2001) (allegations that international conspiracy "compelled Americans to pay

supra-competitive prices" were "sufficient to satisfy the first requirement of the

FTAIA"); *In re Auto. Parts Antitrust Litig.*, No. 12-MD-02311, 2014 WL 4209588,

at *3, 6 (E.D. Mich. Aug. 26, 2014) (allegations of "a worldwide conspiracy to fix

the price of automotive bearings, which caused the price of bearings in the United

States to increase" "[c]ertainly . . . affects domestic trade and commerce and is not

merely foreign conduct that indirectly impacts the United States"); *Precision*

*Assocs., Inc. v. Panalpina World Transp., (Holding) Ltd.*, No. CV-08-42 JG VVP,

2013 WL 6481195, at *27 (E.D.N.Y. Sept. 20, 2013) ("[W]here the defendant's

conduct is directed at the United States market for the price-fixed products and purchasers in the United States paid those supracompetitive prices the first prong of the exception is satisfied"); *accord San Microsystems Inc. v. Hynix Semiconductor Inc.*, 534 F. Supp. 2d 1101, 1112-13 (N.D. Cal. 2007); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. C 02-1486, C 05-3026, 2006 WL 515629, at *3 (N.D. Cal. Mar. 1, 2006), *aff'd*, 546 F.3d 981 (9th Cir. 2008); *Latino Quimica-Amtex S.A. v. Akzo Nobel Chemicals B.V.*, No. 03 Civ. 10312 (HBDF), 2005 WL 2207017, at *6 (S.D.N.Y. Sept. 8, 2005); *MM Global Services, Inc. v. Dow Chemical Co.*, No. Civ. 3:02 CV 1107 (AVC), 2005 WL 556577, at *6 (D. Conn. Mar. 18, 2004).  Plaintiffs satisfy this exception because they allege that Defendants' anti-competitive conduct has required U.S. purchasers to pay inflated, supra-competitive prices for magnesite and magnesite products, and that this has affected millions of dollars of commerce relating to a product of importance to several industries and to the U.S. economy in general.

Defendants argue that Plaintiffs' allegations "do not link the foreign conduct to an actual effect on U.S. commerce."  (Mov. Br. at 24)  However, Congress has made clear that "[a]ny major activities of an international cartel would likely have the requisite impact on United States commerce to trigger United States subject matter jurisdiction" under the FTAIA.  H.R. REP. NO. 97-686, at 13 (1982), *reprinted* in 1982 U.S.C.C.A.N. 2487, 2498.  Moreover, the cases on which

Defendants rely to support their argument are inapposite.  (*See* Mov. Br. at 24

(citing *Eurim-Pharm GmbH v. Pfizer Inc*., 593 F. Supp. 1102 (S.D.N.Y. 1984);

*Commercial St. Express LLC v. Sara Lee Corp*., No. 08 C 1179, 2008 WL

5377815 (N.D. Ill. Dec. 18, 2008).)[7]   In contrast to the complaints at issue in those

cases, the Complaint specifically alleges the following chain of events that had a

"direct, substantial and reasonably foreseeable effect" on U.S. commerce.

First, the Complaint alleges that Defendants expressly agreed to conspire to

fix the prices of magnesite and limit competition in a manner that deliberately

targeted U.S. consumers.  (SAC ¶ 60-79)  The Complaint alleges not only that it

was Defendants' "goal" to maintain prices, as Defendants contend, but also that

Defendants actually "met and agreed to increase the prices by $10 per ton for

exports of DBM, including exports to the United States."  (SAC ¶ 71)  The

Complaint further states that "[t]his agreement followed an earlier agreement by

---

[7] In *Eurim-Pharm GmbH*, the German plaintiff "made no allegations whatsoever regarding the manufacture, sale or marketing" of the price-inflated product, and did not even specify where prices had been inflated.  593 F. Supp. at 1106.  In fact, the plaintiff "conced[ed]. . . that defendants' conduct lack[ed] a direct, substantial, and reasonably foreseeable effect" on U.S. commerce, relying instead on allegations that the defendant's activities had a "spillover effect" on U.S. commerce.  *Id*. (emphasis added).  Similarly, in *Commercial St. Express*, there were "no factual allegations in Plaintiff's Complaint that any Defendant agreed in Germany, or anywhere else, to restrict competition in the United States."  2008 WL 5377815, at *4.  The court held that "[m]erely stating that the Defendants' are global companies that sell products in the United States is insufficient."  *Id*. at *3.

31

members of the Cartel, reached in November 2006, to increase the price of exported DBM, including exports to the United States, by $30 per ton." (*Id.*)

Second, the Complaint alleges that Defendants' price-fixing conspiracy caused an artificial increase in the price of magnesite for U.S. consumers. (SAC ¶ 73) Contrary to Defendants' contention, the Complaint specifically alleges "whether and how" Defendants' conduct translated into higher U.S. prices, by citing to an overcharge analysis from a regression model that was prepared by Plaintiffs' expert economist Dr. Russell Lamb. This analysis shows that, "between 2000 and 2003, the Cartel overcharged U.S. buyers of magnesite by an average of 4 percent, while between 2004 and 2008, as a direct result of the Cartel's activities, U.S. magnesite purchasers were overcharged more than 21 percent." (SAC ¶ 73)

Finally, the Complaint alleges that Defendants directly sold and delivered magnesite and magnetite products to U.S. consumers at those inflated prices. (SAC ¶ 2) Those inflated prices substantially affected U.S. commerce because, in each year from 2000 to 2006, the U.S. imported more than 500,000 metric tons of magnesite. (SAC ¶ 56)

### 2. Plaintiffs Have Alleged That an Effect on U.S. Commerce Gave Rise to Their Claims.

A defendant's "direct, substantial, and reasonably foreseeable effect" on U.S. commerce "gives rise" to a plaintiff's claim under the Sherman Act if it either *proximately causes* the plaintiff's injury or "follows as an immediate consequence

32

of defendant's activity." *Lotes Co., Ltd. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 410-13 (2d Cir. 2014); *Minn-Chem, Inc.*, 683 F.3d at 856-57; *United States v. LSL Biotechnologies*, 379 F.3d 672, 680 (9th Cir. 2004).  Under either construction, Plaintiffs have sufficiently alleged that the effects of Defendants' price-fixing activities on U.S. commerce *gave rise* to their claims because Plaintiffs purchased magnesite *directly from* Defendants at their artificially inflated prices.

Defendants' argument that Plaintiffs fail to provide specific factual allegations of a connection between Defendants' conduct and Plaintiffs' purchases is without merit.  (Mov. Br. at 26)  In fact, in addition to the Complaint's allegations of direct purchases from Defendants, the Complaint emphasizes Defendants' significant market share.  During the period described in the Complaint, "the international market for magnesite and magnesite products was dominated by Defendants and their co-conspirators, including producers of magnesite and magnesite products and trading companies in China exporting magnesite products."  (SAC ¶ 55)  Moreover, "China is the most significant foreign supplier of magnesite to the United States with an 83 percent share of fused and dead-burned magnesite imports and an 87 percent share of caustic calcined magnesia imports in 2007."  (*Id.*)  Additionally, "[t]he United States consumes about 25 percent of China's magnesite export."  (SAC ¶ 58)   Given that

Defendants are the dominant players in this market, the evidence presented reasonably supports the inference that Plaintiffs' injuries were proximately caused by, and an immediate consequence of, Defendants' export of price-fixed magnesite.

## V.   JUDGE BROWN'S 2010 DECISION REGARDING GOVERNMENT COMPULSION IS NOT THE LAW OF THE CASE.

The government compulsion doctrine "shields from antitrust liability the acts of parties carried out in obedience to the mandate of a foreign government." *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1293 (3d Cir. 1979). In support of their contention that the Chinese government compelled their conduct, Defendants argue that Judge Brown's 2010 decision, *Animal Sci. Products, Inc. v. China Nat'l Metals & Minerals Imp. & Exp. Corp.*, 702 F. Supp. 2d 320 (D.N.J. 2010), is the "law of the case," notwithstanding that the decision was vacated and remanded on other grounds by the Court of Appeals.  (Mov. Br. at 28)  The law of the case doctrine, however, "does not restrict a court's power but rather governs its exercise of discretion."  *In re City of Philadelphia Litig.*, 158 F.3d 711, 718 (3d Cir. 1998) (citing *Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997)). Accordingly, the doctrine does not preclude reconsideration of previously decided issues in "extraordinary circumstances such as where: (1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier

34

decision was clearly erroneous and would create manifest injustice." *In re City of Philadelphia Litig*., 158 F.2d at 718.

The law of the case doctrine does not preclude reconsideration of Judge Brown's 2010 decision on the issue of government compulsion because this decision was clearly erroneous, as set forth fully in Plaintiffs Third Circuit briefing.[8]  The Complaint, as well as the FAC that was before this Court in 2010, specifically allege that "Defendants' decision to enter into the per se unlawful agreements with each other as competitors . . . was and is wholly voluntary, not the result of government action."  (SAC ¶ 4)  The Complaint further alleges that "[n]either the [China Chamber of Commerce of Metals, Minerals & Chemicals Importers & Exporters ("CCCMC")] nor the government of China interferes with the pricing decisions of the associations' members, including those members that are state-owned enterprises," and that "the CCCMC has unequivocally made such representations to the United States Department of Commerce and to the United States International Trade Commission."  (SAC ¶ 76)  Finally the Complaint alleges that the "CCCMC is not a governmental organization," (SAC ¶ 68) and that the CCCMC has represented to the U.S. Department of Commerce that  "[i]t has no right to fix the prices for these enterprises, whether they are state-owned or privately owned, nor does it have the ability to influence prices by interfering in

---

[8] Dkt. Nos. 003110253767, 003110318131.

the purchase of raw materials, the channels of distribution, or company business practices."  (SAC ¶ 4)

Based largely on its own, *sua sponte*, factual investigation, however, and without discovery or a hearing on the issue, the Court determined that the Chinese government compelled Defendants' price-fixing activities.  In reaching this decision, the Court declined to accept Plaintiffs' allegations as true, drew inferences against Plaintiffs, and ignored the existence of disputed issues of material fact.

In its 2010 decision, the Court also erroneously interpreted the government compulsion defense.  Instead of considering whether Defendants were  *actually* compelled by the Chinese government to export magnesite at supra-competitive prices—as case law requires—the Court considered whether "a reasonable entity standing in the defendants' shoes . . . would *feel* compelled to consent" to a course of conduct.  702 F. Supp. 2d at 422.  The Court also placed substantial weight on the "theoretical severity" of sanctions that might be imposed, without regard to whether sanctions were *actually* imposed or threatened.

Finally, in a case recently litigated against a similar Chinese cartel, the defendants sought, unsuccessfully, to dismiss the plaintiffs' claims based upon foreign sovereign compulsion.  *See In re Vitamin C Antitrust Litig.*, No. 06-MD-1738 (BMC) (JO), 05-CV-0453 (E.D.N.Y. March 14, 2013).  Although the alleged

conspiracy occurred between 2001 and 2006, the defendants sought—as Defendants have in this case—to characterize China's legal regime during that period as though it operated as it did in the 1980s and 1990s.  In fact, the legal regime fundamentally shifted in 2002 when China deregulated its market in advance of World Trade Organization admission.  Accordingly, the court declined, on several occasions, to dispose of the case.  *See, e.g.*, *In re Vitamin C Antitrust Litig.*, No. 05-CV-0453, 2013 WL 6191945, at *1 (E.D.N.Y. Nov. 26, 2013) ("The Court stands by and reaffirms its prior rulings that Chinese law did not compel defendants to engage in antitrust violations"); *In re Vitamin C Antitrust Litig.*, 810 F. Supp. 2d 522, 525 (E.D.N.Y. 2011) (denying defendants' summary judgment motion upon determining that "[t]he Chinese law relied upon by defendants did not compel their illegal conduct.").  Proceeding to trial, the jury found that the defendants knowingly agreed to fix the prices of vitamin C, and that the Chinese government did not compel their price-fixing conduct.

Because this Court's 2010 decision was clearly erroneous, it does not constitute the law of the case.  Moreover, although that decision remains the most-recent judicial determination in this case on Defendants' government compulsion defense, Plaintiffs appealed this issue to the Third Circuit.  Therefore, in contrast to the cases on which Defendants rely, the Third Circuit was not silent on the government compulsion issue because it "had no occasion to consider the point."

*American Hotel Int'l Group, Inc. v. OneBeacon Ins. Co.*, 611 F. Supp. 2d 373, 376-77 (S.D.N.Y. 2009) aff'd, 374 F. App'x 71 (2d Cir. 2010). Rather, the Third Circuit did not address this issue because it found other sufficient grounds to reverse the Court's decision. *See id.* (emphasizing that the plaintiff did not raise the issue on appeal and, indeed, "passed up every conceivable opportunity to raise [the] issue.").

## **CONCLUSION**

For the foregoing reasons, this Court should deny Defendants' motion to dismiss Plaintiffs' Second Amended Class Action Complaint.

Dated:  February 27, 2015

Respectfully submitted,

s/ Robert A. Magnanini
Robert A. Magnanini
David S. Stone
Amy Walker Wagner
STONE & MAGNANINI LLP
150 John F. Kennedy Parkway, 4th Floor
Short Hills, New Jersey 07078
(973) 218-1111
(973) 218-1106 (fax)

William Isaacson
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue NW, 8th Floor
Washington, DC 20015
(202) 237-2727
(202) 237-6131 (fax)

August Horvath
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, New York 10178
(212) 808-7800